# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

          v.                                              Case No. 1:23-cv-5749

RICHARD SCHUELER, et al.,

                              Defendants.


**AMICUS CURIAE BRIEF OF PULSECHAIN FOUNDATION DAO IN SUPPORT OF
DEFENDANT RICHARD SCHUELER'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................................. ii

INTERESTS OF AMICUS CURIAE ............................................................................................1

SUMMARY OF ARGUMENT .......................................................................................................1

ARGUMENT ....................................................................................................................................3

I.    THE "SOFTWARE PROGRAM DEFENDANTS" ARE INANIMATE
      TECHONOLOGICAL TOOLS, NOT ASSOCIATIONS OF PERSONS. .........................3

II.   THE REMEDIES SOUGHT BY THE SEC ARE AGAINST PUBLIC POLICY .............4

      A.    The SEC Seeks to Enjoin Lawful Activities by Nonparties. ...................................5

      B.    The SEC's Claims Threaten Users' First Amendment Rights................................7

CONCLUSION ................................................................................................................................9

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Comm. for Idaho's High Desert, Inc. v. Yost*,
    92 F.3d 814 (9th Cir. 1996) ....................................................................................4

*Packingham v. North Carolina*,
    582 U.S. 98 (2017).............................................................................................7, 9

*Royal Knitwear Co. v. N.L.R.B.*,
    324 U.S. 9 (1945) ..............................................................................................5-6

*SEC v. Coinbase, Inc.*,
    No. 23 CIV. 4738, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ...........................5

*SEC v. LBRY*,
    No. 21-CV-260, 2023 WL 4459290 (D.N.H. July 11, 2023) .................................5

*SEC v. Ripple Labs, Inc.*,
    2023 WL 4507900 (S.D.N.Y. July 13, 2023) ......................................................4-5

*So. Cal. Darts Ass'n v. Zaffina*,
    762 F.3d 921 (9th Cir. 2014) .............................................................................3-4

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001).................................................................................7

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007).................................................................................9

**Statutes**

15 U.S.C. § 77b.......................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 17(b) ...............................................................................................3

Fed. R. Civ. P. 65(d) ...............................................................................................5

## INTERESTS OF AMICUS CURIAE

Amicus PulseChain Foundation DAO (the "PulseChain Foundation") is a nonprofit association organized by and for members of the PulseChain community to further the growth of that community and its activities.  The PulseChain Foundation submits that the United States Securities and Exchange Commission (the "SEC") has a tendency through litigation such as this case to expand its authority beyond its statutory and constitutional limits to the detriment of people like those in the PulseChain community.  As users of the technology named by the SEC as defendants in this case, the PulseChain Foundation offers a perspective different than that provided by the parties.  Specifically, the PulseChain Foundation seeks to ensure that the SEC's expansive view of the federal securities laws and its own jurisdiction does not improperly interfere with the rights and legal activities of the PulseChain Foundation's members, including, among other things, interfering with those members' rights to freedom of expression and association.  No party or party's counsel, and no person other than the PulseChain Foundation and its counsel, authored this brief in whole or in part or contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

You can't sue the sidewalk, or a piece of software. This case marks an unprecedented departure from the SEC's already-expansive approach to crypto enforcement actions, by naming as defendants Hex, PulseChain, and PulseX (the "Software Program Defendants").  According to the Complaint, ECF No. 1 ("Complaint"), Hex is a blockchain *token*, PulseChain is a blockchain *network*, and PulseX is a *protocol* deployed on a blockchain network.  All three are software.

Suing the Software Program Defendants is not just bizarre, but potentially harmful to the PulseChain community.  The SEC mislabels all members of this community as "investors" and then (purportedly in furtherance of its mission to protect investors), seeks to stamp the community out of existence by targeting its digital infrastructure.

The remedies sought by the SEC against the Software Program Defendants are wildly overbroad and may (if interpreted as the SEC appears to intend) improperly chill legitimate activities by people not named in the SEC's Complaint and not alleged to have committed any wrongdoing. Among the activities that the SEC's Complaint will chill are political, artistic, and cultural expressions by PulseChain community members and others. Such restraints would, if permitted to go forward, violate the First Amendment Rights of nonparties to this litigation.

Defendant Richard Schueler's ("Defendant") Motion to Dismiss (the "Motion") seeks to dismiss only those claims alleged against him. However, the Motion sets forth arguments that also apply to the claims asserted against the Software Program Defendants, including that the Complaint does not adequately allege that any parties entered into an "investment contract" (Section IV), that the SEC has failed to plausibly plead the existence of a domestic purchase, sale, or offer of securities (Section II), and that the Complaint unconstitutionally infringes on the First Amendment rights of Mr. Heart and thousands of Hex, Pulsechain, and PulseX participants (Section V). While the PulseChain Foundation agrees with those portions of Defendant's Motion, the arguments will not be repeated here. Instead, Amicus writes to address the far-reaching negative impact the SEC's case will have beyond the interests of the parties.

If the Court permits the SEC's novel and unsupported legal theories and pleadings to survive the Motion, the resulting cloud of uncertainty about what conduct may or may not ultimately be deemed to violate the federal securities laws (and what *inanimate technology* might somehow be deemed liable for any violation), will cast doubt on the PulseChain community's ability to communicate, operate, and exist. The SEC's Complaint is against public policy, and Amicus respectfully requests that the Court grant Defendant's Motion and dismiss claims against the Software Program Defendants.

2

## ARGUMENT

### I. THE "SOFTWARE PROGRAM DEFENDANTS" ARE INANIMATE TECHONOLOGICAL TOOLS, NOT ASSOCIATIONS OF PERSONS.

The SEC has described the Software Program Defendants as "unincorporated alter-ego entities" of Defendant, without providing specific allegations to establish them as entities or to address the nature of the "alter ego" aspect. Complaint at ¶¶ 1, 12-14. It does so notwithstanding the factual allegations that these Software Program Defendants are a digital *token*, a blockchain *network*, and a software *protocol*, respectively. Hex is a software program comprising a digital token (Hex) that runs on a cryptographically secured, decentralized network of computers known as the Ethereum blockchain. *Id.* ¶¶ 2, 20. PulseChain is a global, decentralized "Ethereum fork and layer-1 blockchain" network (i.e., a separate blockchain network comprised of computers running software derived from the Ethereum network software) that Defendant allegedly "released" on May 12, 2023. *Id.* ¶¶ 13, 53. Similarly, PulseX is a software protocol that was "deployed" on the PulseChain blockchain network on May 12, 2023, the same day that the network launched. *Id.* ¶¶ 14, 69. The Software Program Defendants are certainly unorthodox defendants.

In addition to being unorthodox, the Software Program Defendants are also *improper* defendants. Federal Rule of Civil Procedure 17(b) limits those who may be sued to individuals, corporations, partnerships and "other unincorporated associations," none of which include the Software Program Defendants even as expansively described by the SEC. Similarly, the statutes on which the SEC bases its claims against the Software Program Defendants—the Securities Act of 1933 and the Securities Exchange Act of 1934—impose liability for the actions of certain "persons," which the statutes define as, "an individual, a corporation, a partnership, an association, a joint-stock company, a trust, any unincorporated organization, or a government or political subdivision thereof." 15 U.S.C. § 77b; *see So. Cal. Darts Ass'n v. Zaffina,* 762 F.3d 921, 927 (9th

Cir. 2014) (defining unincorporated association as "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective" (citations omitted)); *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996) (same). The SEC's description of the Software Program Defendants fails to include anything that would suggest those Defendants were *formed* by a group of persons by mutual consent for the purpose of promoting a common objective, much less that the Software Program Defendants themselves *are* a group of persons formed by mutual consent.

In fact, the Software Program Defendants are simply tools that are used by a large number of people, much like Microsoft Excel, Google Docs, or a public wifi network are tools comprised of software deployed across a computer network and used by large numbers of people. However, a significant difference exists between the Software Program Defendants and Excel or Docs: once the Software Program Defendants were "released" into the world (Complaint ¶ 13), neither Defendant nor the users of the Software Program Defendants controlled how the Software Program Defendants would be used. Rather than a group promoting a common objective, users of the Software Program Defendants, including members of amicus PulseChain Foundation, are individual parts of a disparate group pursuing a multitude of objectives.

The Court should not permit the SEC to proceed with its case against the Software Program Defendants because doing so is not permitted under the federal securities laws or federal rules of civil procedure, and, as explained further below, to allow the SEC to proceed is against public policy.

## II.     THE REMEDIES SOUGHT BY THE SEC ARE AGAINST PUBLIC POLICY.

Courts in this Circuit have rightly resisted the current SEC's pattern of disregarding or downplaying secondary impacts on nonparties of its litigation efforts. *See, e.g.*, *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *11 (S.D.N.Y. July 13, 2023) (rejecting SEC's attempt to prevent

unregistered secondary market transactions where buyers "could not have known if their payments of money went to [an issuer], or any other seller of" the subject token); *SEC v. LBRY, Inc.*, No. 21-CV-260, 2023 WL 4459290, at *3 (D.N.H. July 11, 2023) (clarifying that injunctive relief would not extend to "secondary market offerings" because the issue had "not been litigated in this case" only after court in a separate hearing expressed "concern" about the issue, eliciting assurance from the SEC that it was "not seeking in this action to regulate secondary sales," *see* Mots. Hr'g Tr. at 24:23-36:13, *SEC v. LBRY, Inc.*, No. 21-CV-260 (Jan. 30, 2023), ECF No. 105); *SEC v. Coinbase, Inc.*, No. 23 CIV. 4738, 2024 WL 1304037, at *33-36 (S.D.N.Y. Mar. 27, 2024) (denying SEC's attempt to prevent consumers from accessing "wallet" program in the absence of registration as a securities broker).  The claims and remedies the SEC is seeking against the Software Program Defendants in this case demonstrate just such a disregard for negative impacts on non-parties, and, as such, the claims are against public policy.

### A.     The SEC Seeks to Enjoin Lawful Activities by Nonparties.

In addition to its usual "obey the law" injunctive relief, in this case the SEC seeks to enjoin lawful activity.  Specifically, the SEC's prayer for relief requests a judgment:

> Permanently barring Defendants from participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset security, or engaging in activities for purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset security by others.

Complaint, Prayer for Relief ¶ 3.  Note that this form of injunctive relief goes much further than an "obey the law" injunction—it would prohibit conduct that does not violate any law.  Further, as with all federal court injunctions, Federal Rule of Civil Procedure 65(d) would prevent the foregoing lawful activity by "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation."  The SEC contends the Software Program Defendants are "unincorporated alter-ego entities," which may mean the injunctive relief

extends even further than the persons enumerated in Fed. R. Civ. P. 65(d).  *See Royal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945) (applying injunctive relief to "successors and assigns" under some circumstances).

The potential for harmful chilling of legitimate conduct by nonparties is clear.  Take as an example, the Software Program Defendant PulseChain, described by the SEC as "an Ethereum fork and layer-1 blockchain" released on May 12, 2023, at which time "investors" received PLS tokens.  Complaint ¶¶ 13, 53.  On the PulseChain network, "gas" fees are paid with PLS tokens, enabling people to use PLS tokens to execute software commands and communicate over the network. *Id*. ¶¶ 54, 56; *see also* Defendant's Opposition Brief at 8.  The SEC alleges that "more than 59,000 deposits to the PulseChain SA have been identified."  Complaint ¶ 55.  The SEC contends that PulseChain delivery of PLS constituted an unregistered offer of securities (*Id*. at ¶ 4-6).

If the SEC succeeds in obtaining its requested injunctive relief against PulseChain, the SEC undoubtedly will take the position that the software program *itself* will be barred from participating directly or indirectly in the purchase, offer or sale of PLS, and *agents* of the software program will be similarly barred.  While the implications are unclear of an injunction barring agents of a software program from participating in the offer or sale of a digital asset, members of the PulseChain community would proceed at great peril to use that software for any purpose in the face of such an ambiguous injunction, exposed to potential contempt proceedings for engaging in activity that is not otherwise illegal.  The SEC's penchant for seeking the broadest possible interpretation of its authority will further add to the perceived peril of anyone transacting in PLS tokens.

Because PLS tokens are used to execute software commands and to communicate over the PulseChain network, the SEC's Complaint will shut down the network including any and all perfectly legitimate, expressive conduct by nonparties to this litigation. The same is true for the SEC's claims against the other Software Program Defendants.

**B.    The SEC's Claims Threaten Users' First Amendment Rights.**

In his Motion, Defendant more than ably sets forth the First Amendment legal framework protecting the expressive activity embodied as computer code in the Software Program Defendants, as well as the expressive activities of users of the platforms. Motion 51-53 (citing, among other authorities, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 434 (2d Cir. 2001) ("Communication does not lose constitutional protection as speech simply because it is expressed in the language of computer code") and *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (striking down statute interfering with expression and recognizing the internet and "social media in particular" as a "vast democratic forum")).

As demonstrated below, there are many ways the Software Program Defendants act as platforms for expression—expression that will be improperly chilled by the SEC's claims. One of the primary incentives for users of the Software Program Defendants to "sacrifice" or lose their coins was to further a belief that "free speech is a protected human right and blockchains are speech, and you're sacrificing to prove that you believe that." Complaint ¶ 66. While (for obvious reasons) the SEC repeatedly substitutes the word "investment" in place of "sacrifice," the fact remains that a primary motivation for users to sacrifice or lose their assets was to express themselves. Users' expression was not limited to the initial sacrifice of assets; such expression continues in the form of expending PLS tokens to communicate on the blockchain. *See* Complaint ¶ 54 (PLS tokens as "gas" necessary to execute transactions on blockchain).

A starting point for assessing the size and sentiments of the Software Program Defendants' user community would be the online petition started and signed by many such users.  *See* Petition in Support of An Amicus Brief Requesting Fair Adjudication in the Case of *SEC v. Schueler, et al.* (the "Petition").[1]  Under the banner of "Defending Blockchain Technology as Freedom of Speech," the website soliciting petition signatures reports a current total of over 44,000 signatures.[2]  The Petition signatories avow that they "are not now, nor have we ever been, victims of fraud by Richard Heart, nor did we hold any expectation of profit solely derived from his work. Those of us who chose to sacrifice for 1st Amendment issues did not harbor any expectations as to how the monies raised through our contribution to the public sacrifices were to be spent."  Petition, II.  That is, according to the Petition signatories, the act of "sacrificing" assets was an act of expression and assembly protected by the Constitution's First Amendment.

But the expressive acts by users of the Software Program Defendants go far beyond the expressions embodied in the initial "sacrifice."  User expression appears in various ways, including inscriptions on the PulseChain blockchain itself.  For example, hundreds of creators have inscribed images into the PulseChain blockchain.  *See, e.g.*, NFTonPulse – Pulsechain NFT Marketplace (https://nftonpulse.io/), Plsc Market (https://plsc.market/), Beatbox Market (https://beatbox.market/), and Mintra (https://www.mintra.ai/).  As one would expect in an open "town square," the images range from profane to political, artistic to crass, and everything in between.  It is not the SEC's place to decide whether that public forum may exist.

When assessing the SEC's claims against the Software Program Defendants, the Court should keep in mind the Supreme Court's observation about the Internet in *Packingham*:

---

[1] Attached hereto as Attachment A, and available at https://pulsepetition.org/wp-content/uploads/2024/01/Scrivners-Errors-Removed-Petition-Final-Draft.pdf.

[2] Available at https://pulsepetition.org/.

The nature of a revolution in thought can be that, in its early stages, even its participants may be unaware of it. And when awareness comes, they still may be unable to know or foresee where its changes lead. So too here. While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

*Packingham*, 582 U.S. at 105 (internal citations omitted).

Amicus urges the Court to be conscious of (i) the nature of the Software Program Defendants as inanimate technological tools, (ii) the many ways that people can *and do* use these tools for constitutionally protected expression, and (iii) the vast potential for chilling users' freedom of expression using these tools and others like them, now and in the future, if the SEC's case proceeds as set forth in the Complaint. *See Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) ("It is well-established that First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech").

## <u>CONCLUSION</u>

For the reasons discussed above, this Court should dismiss the SEC's Complaint.

Dated:  April 15, 2024

Respectfully submitted,

JENNER & BLOCK LLP

By:*/s/ Kayvan B. Sadeghi*
Kayvan B. Sadeghi
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
ksadeghi@jenner.com


INVESTOR CHOICE ADVOCATES NETWORK

By: */s/ Nicolas Morgan*
Nicolas Morgan (pro hac vice forthcoming)
453 S. Spring Street, Suite 400
Los Angeles, CA 90013
Tel: (310) 849-0384
nicolas.morgan@icanlaw.org

*Attorneys for Amicus Curiae PulseChain Foundation DAO*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing document was filed on April 15, 2024 with the Clerk of the Court by using the CM/ECF system, which will effect electronic service on all parties and attorneys registered to receive notifications via the CM/ECF system.

Dated:  April 15, 2024                                  By:     */s/ Kayvan B. Sadeghi*
                                                                        Kayvan B. Sadeghi

# Attachment A

**TABLE OF CONTENTS FOR PETITION IN SUPPORT OF AN AMICUS BRIEF REQUESTING FAIR ADJUDICATION IN THE CASE OF:**

**Securities and Exchange Commission v. Richard J. Schueler a/k/a Richard Heart, Hex, PulseChain, and PulseX, No. 23-cv-05749 (E.D.N.Y. filed July 31, 2023)**

I. Introduction (p. 1)

II. Statement of Our Position (p. 1)

III. Pulse, PulseX and HEX are not investment contracts and are therefore not securities (p. 2)

IV. Recent Case Law is Strongly Against the SEC (p. 2)

V. Unincorporated Alter Egos (p. 3)

A. Legal Entities (p. 3)
B. Decentralization (p. 3)
C. Smart Contracts (p. 4)
D. Branding and Association (p. 4)
E. Lack of Traditional Business Structure (p. 4)
F. Legal Distinction (p. 4)
G. "Unincorporated Alter Egos" (p. 4)

VI. Potential Impacts on Cryptocurrency Holders and Sacrifice Bonus Recipients from Unincorporated Alter Egos Allegations (p. 4)

A. Loss of Ownership Rights (p. 4)
B. Reduction in Value (p. 4)
C. Asset Seizure or Freezing (p. 4)
D. Loss of Trust (p. 5)
E. Regulatory Complications (p. 5)
F. Market Liquidity Concerns (p. 5)
G. Reputation Damage (p. 5)

VII. The Sacrifice was not a disguised fundraiser for an unregistered Security (p. 5)

VIII. The point of our sacrifice was to create a record of supporting speech as money on the blockchain in support of the 1st Amendment (p.6)

IX. Value and Market Determination (p. 7)

X. Two things can be true at the same time (p. 7)

XI. The SEC is masquerading as helping while conducting harmful actions.  (p.9)

XII. Proof of harm to holders of HEX, Pulse and PulseX (p. 9)

XIII. Conclusion (p.9)

XIV Appendix (p. 10-12)

**PETITION IN SUPPORT OF AN AMICUS BRIEF REQUESTING FAIR ADJUDICATION IN THE CASE OF:**

**Securities and Exchange Commission v. Richard J. Schueler a/k/a Richard Heart, Hex, PulseChain, and PulseX, No. 23-cv-05749 (E.D.N.Y. filed July 31, 2023)**

**To the Honorable Judge Carol Ann Bagley of the Eastern District of New York:**

**I.  Introduction:**

We, the undersigned holders of HEX, PulseChain, PulseX, and other similar personal properties, firmly assert our support for an amicus brief requesting fair adjudication in the matter of Securities and Exchange Commission v. Richard J. Schueler a/k/a Richard Heart, Hex, PulseChain, and PulseX.

A majority of us hold the cryptocurrencies specified in the complaint, and sacrificed our own money for the right to be recorded supporting the First Amendment to the Constitution. Those of us in the cryptocurrency industry who are indirectly affected by this case (through knock-on effects) also share this ideology with those who made financial sacrifices in this decentralized frontier. We come forward not only as holders of HEX, PulseChain, and/or PulseX, but as a broader coalition, reflecting a diverse range of experience within the crypto community yet united in our view against the SEC's jurisdiction.

We believe that our perspective as active participants in the decentralized PulseChain ecosystem, driven by a shared belief in the political and social viewpoints for which we made financial sacrifices or spent money, contribute invaluable insights to the ongoing legal proceedings. In this document, the name Richard Heart shall be used interchangeably for the name Richard Schueler.

**II.  Statement of Our Position:**

We emphasize that we are not now, nor have we ever been, victims of fraud by Richard Heart, nor did we hold any expectations of profit solely derived from his work.  Those of us who chose to sacrifice for 1st Amendment issues did not harbor any expectations as to how the monies raised through our contribution to the public sacrifices were to be spent. We considered the money which we sacrificed for 1st Amendment issues to be **gone** once it was sacrificed. The SEC is claiming that holders of the current PulseChain tokens had a "tongue in cheek" understanding with Richard Heart, and if that was not understood by the sacrificers then the logical implication is that the sacrificers were simply too dumb to realize they were being "victimized" by Richard Heart, or worse, that the sacrificers really did not care about the 1st Amendment.  Instead, the allegation falsely assumes that the sacrificers were in on some secret scheme to communicate with Richard Heart through "tongue-in-cheek disavowals".

1

III. **Pulse, PulseX and HEX are not investment contracts and are therefore not securities**:
The term "investment contract" is very important and has been the centerpiece of arguments against the SEC's claims in similar cases like Ripple (SEC v Ripple Labs, 2023), in which Ripple's XRP sales to retail customers were decidedly **not** an investment contract.  The claim on page 3 of the complaint refers to "veiled references" and "tongue-in-cheek disavowals". At no point in this case should the questioning of HEX, PulseChain, or PulseX as "investment contracts" be necessary to call into question. HEX, PulseChain, and PulseX are all finished products which launched **complete** and without the need for further essential managerial effort from Heart, both at these product's release and for the indefinite future. There is no merit to invoke the concept of an "Investment contract" based on the SEC's completely subjective concept of "tongue-in-cheek disavowals".  Any reasonable person would conclude that these supposed "tongue in cheek disavowals" are actually fair and objective disclaimers. In fact, even if the case warrants that the Howey test be invoked, Heart's products still fail its 4 legs. The very definition of the word "products" indicates Heart's ideas are finished and completed, without any past, current, or future essential managerial effort solely from Heart, and thus not "investment contracts" requiring ongoing promises of future work.

IV. **Recent Case Law is Strongly Against the SEC:**
The SEC is actively suing Pulse, PulseX and HEX as three "unincorporated alter egos" of Richard Schueler.  In reality, they are personal properties that can be held or swapped on the PulseChain blockchain, which are controlled by thousands of individuals worldwide, and this will be made clear in this lawsuit.  The "unincorporated alter egos'' do not exist. Richard Schueler does not mask his identity in these tokens, and these tokens are not Richard Schueler's personal property, unless they are money in wallets under his control. On that false premise, in addition to other inaccuracies in this case, we ask that the case be dismissed.
In the case of SEC v Ripple Labs (1:20-cv-10832, S.D.N.Y.) United States district judge Analisa Torres ruled that the sale of Ripple's XRP digital token on public exchanges complied with federal securities laws because purchasers had no reasonable expectation of profit based on Ripple's efforts. Essentially, buyers were not investing in the success of Ripple as a company or its projects; instead, they were purchasing a digital token with utility on the Ripple network. This distinction was pivotal in Judge Torres' determination that XRP, when acquired on exchanges, was not a security.  Based on this ruling, Pulse, HEX and PulseX are also ipso facto compliant with federal securities laws, since they too have utility on the PulseChain network.
Similarly, we, who control Pulse, PulseX or HEX tokens have never had any expectations of the work of others. This argument is further bolstered by the fact that Richard Heart had expressly made public that there was to be no expectation of work from himself, or any team involved with these tokens prior to launch.  Subsequently, these tokens launched as completely finished, full system state products, without requiring further work to operate.

The ruling against the SEC was reaffirmed by the court on October 3, 2023 when the SEC lost in an attempt to appeal Judge Torres' ruling. (*See Appendix Item 6)

The SEC also voluntarily dropped its claim for personal liability against Ripple Chief Executive Brad Garlinghouse and co-founder Chris Larsen claiming they "aided and abetted sales of the cryptocurrency XRP."

Similarly, in a case which was not a direct loss for the SEC but which creates precedent against the SEC's position that PulseChain/HEX/PulseX are securities, in the case of Nessa Risley, et al. v. Universal Navigation Inc. et al.: (No. 22-cv-2780, S.D.N.Y), US district judge Katherine Polk Failla of the Southern District of New York, threw out a class action lawsuit against Uniswap Labs.  In her commentary she stated that Ethereum is not a security. As PulseChain is a full system state fork of Ethereum with the same consensus algorithm, PulseChain should also not be a security, since Ethereum is not a security. The PulseChain codebase was primarily copied from that of Ethereum, and they are structurally the same exact technologies. Furthermore, as of the day of this writing, PulseChain boasts more than 45,000 active nodes, scattered throughout the world, making it one of the most sufficiently decentralized networks in the entire world and thus it should not be recharacterized as a security.

In addition, the Blockchain Association suggested a framework, called the "Hinman Token Standard," which is based on a speech delivered by the director of the SEC's former Division of Corporation Finance, William Hinman, on June 14, 2018 at the Yahoo Finance Markets Summit. In his remarks, Director Hinman said that digital tokens or coins may not be securities if the network on which they exist is "sufficiently decentralized." Applying this standard to Bitcoin and Ethereum, he concluded that neither digital coin qualified as a security because it existed on a network where no single actor or group maintained sufficient control over its success or failure. This statement by Dr. Hinman was used as evidence in the SEC v Ripple case as supporting evidence against the SEC's claim that Ripple was a security. The Hinman Standard applies moreso to the thousands of unique nodes worldwide running the decentralized HEX/PulseChain/PulseX software.

**V.    Unincorporated Alter Egos**: The SEC is pursuing a dangerous legal strategy, alleging that PulseChain, PulseX and HEX tokens are not in fact tokens, but "unincorporated alter egos" of Richard Schueler.

Richard Heart's name is notably tied to HEX and is associated with the creation or promotion of Pulse and PulseX. However, deeming these as "unincorporated alter egos of Richard Schueler" is inaccurate due to several reasons.:

1.  **Legal Entities**: Cryptocurrencies like HEX, Pulse, and PulseX are not legal entities in a traditional sense but cryptographic assets on a blockchain.

2.  **Decentralization**: A primary tenet of most cryptocurrencies is decentralization, ensuring no single entity has complete control after the token's launch.

3. **Smart Contracts:** HEX, for instance, is a smart contract on the Ethereum blockchain. These contracts, once deployed, are autonomous and are not modifiable by Richard Heart or anyone else unless predefined within the contract.

4. **Branding and Association:** While Richard Heart is a principal figure associated with these projects, it doesn't translate to him "owning" them as unincorporated entities.

5. **Lack of Traditional Business Structure:** These cryptocurrencies don't operate like typical businesses with a centralized system.

6. **Legal Distinction:** The legal relationship between a cryptocurrency's founder and the cryptocurrency is intricate. Founders often ensure they aren't personally liable for the cryptocurrency's actions or performance after they are released.

7. **"Unincorporated Alter Egos":** This term of art implies ownership, and if Richard Heart owns HEX, PulseX and PulseChain, then every one of the millions of transactions involving these tokens belong to Richard Heart.  That is simply not true.   The SEC's recharacterization of the tokens that are bought and sold daily through the PulseX software, which has publicly recorded over 30 million cryptographic transactions to this date, cannot be controlled by Richard Heart. Many thousands of real people globally have controlled and transferred these digital tokens.

**VI.    Potential Impacts on Cryptocurrency Holders and Sacrifice Bonus Recipients from False Allegations:**

1. **Loss of Ownership Rights**: If these cryptocurrencies were recognized as unincorporated entities of Richard Heart, it would insinuate that he has a form of ownership or control over them. This could jeopardize the ownership rights of current holders of HEX/Pulse/PulseX. Although it is impossible for Heart to control or own everybody's coins, the thousands of current holders would face challenges in asserting their rights to these tokens.

2. **Reduction in Value**: The perception that these tokens are tied directly to Richard Heart, rather than a decentralized system, will certainly lead to a reduced demand on the open market. This will result in a significant drop in token value, causing financial loss to holders. This has already been evidenced when the SEC v Heart press release was launched, spreading fear that hurt investors to the tune of -58% losses in a single day. Although recoveries are being made, it is a slow and arduous process which further undue attacks could overturn, resulting in more harm to investors rather than protection, which goes against the core function of the SEC.

3. **Asset Seizure or Freezing**: If legal action were taken against Richard Schueler and these tokens were deemed his entities, there's a risk that they could be seized or frozen as part of legal proceedings. This would mean that people who bought them on the open

market or received them as bonuses could potentially lose access to their assets. It would be entirely unjust (and impractical) to seize assets of thousands of global, decentralized network participants.

4. **Loss of Trust**: A major attraction of real sufficiently decentralized systems such as PulseChain is trust in the code and the system, not in individuals. This legal recognition would shatter the trust of current and potential holders in the system, leading many to exit the market or avoid such tokens in the future. This could have cascading effects of people losing trust in any alternative cryptocurrencies, including popular and established ones like Bitcoin and Ethereum.

5. **Regulatory Complications**: Deeming these tokens as unincorporated entities of an individual could introduce a myriad of regulatory challenges. For example, if any small portion of these tokens were ever associated with illicit activities, the blame might shift from individual users to Richard Heart, further complicating the legal landscape and putting holders at risk, or Heart at undeserved risk.

6. **Market Liquidity Concerns**: With the looming threat of potential legal actions or regulatory crackdowns, fewer people might seek to hold these tokens. This would reduce the liquidity of these tokens, making it hard for holders to sell or trade them.

7. **Reputation Damage**: Investors and participants in the crypto space rely heavily on the reputation of projects and tokens. Associating these tokens as belonging directly to an individual, would damage their reputation, deterring new participants and causing current holders to reconsider their positions. Innocent users of PulseChain/HEX/PulseX that have publicly spoken of these products are also vulnerable to undue reputation risk.

**VII.    The Sacrifice was not a disguised fundraiser for an unregistered Security.**

Among the signers of this petition, which consists of both sacrificers and also people who purchased and hold Pulse, PulseX and HEX tokens on the secondary market, and others who have been economically harmed by the SEC, those of us who sacrificed for Pulse and PulseX assert that the SEC's misrepresentation that Richard Heart gave us "tongue in cheek" disavowals while making "veiled references as to why investors could expect profits" is both insulting to our intelligence and untrue, unless Mr. Heart's statements were to be taken out of context by the SEC, which seems to be the case. Mr. Heart did not make promises of future value or work, but rather he referenced actual statements of fact when pointing to what other similar crypto projects had accomplished in the past, and he explicitly never gave any guarantees about the future. So much so, that during the sacrifice phases of PulseChain and PulseX, Richard Heart went out of his way to state that he would not guarantee anything, and that any monies sacrificed were gone at the moment of their sacrifice, and that the sacrificers had no

right to demand anything in the way of results or allocation of funds and that no one could have any expectations of work. (See Appendix items *1 & *2)

We further understood that the PulseChain project might have not ever launched because launching a safe and effective blockchain of the size and scope of the Ethereum blockchain, but far more affordable and faster, is one of the toughest things that one could aspire to accomplish. But regardless, we the sacrificers for First Amendment issues knew, from the moment that our first dollar was sent to the sacrifice address, that the world would forever be changed by our support.

VIII. **The point of our sacrifice was to create a record of supporting speech as money on the blockchain in support of the 1st Amendment.**

The world may soon forget the specific overreaching allegations in the case of the SEC vs Richard Heart, but it can never forget the actions of the sacrificers. In standing up for the First Amendment, which many view as currently under attack, they have created a worldwide record of their actions which can never be censored or changed by any individual or government. As many as 900,000 nodes across the globe have access to an everlasting record of PulseChain's two sacrifice events on the Ethereum blockchain and in addition, up to 45,000 nodes also have access to a permanent record of the same events on Pulsechain.  (*See Appendix Item 7)

In fact, future generations may even look back and appreciate this fight as a stepping stone in affirming the Supreme Court's prior rulings that money can be used as a form of free speech and is therefore protected. (Buckley v. Valeo 424 U.S. 1, and Citizens United v. Federal Election Commission, 558 U.S. 310)

Although the SEC wants to take Richard Heart's statements out of context about not promising results as "tongue in cheek" promises from Mr. Heart to get around selling an unregistered security, the sacrifice was simply not a security offering. Sacrificers to a decentralized blockchain have no ownership or ownership interest of any entity or any company at all.  There was no  common pool of money, since the sacrificed money was by definition, gone, and we all understood that we would have no claim to it, but we would have a permanent record of what we did, etched in digital stone on a blockchain network.

We passionately embraced the PulseChain and PulseX public sacrifices to uphold fundamental principles of freedom of speech and assembly which we believe to be precious, as articulated by Richard Heart. Mr. Heart has a long history of pontificating his opinions, and these well thought-out opinions have garnered him a huge following of intelligent, independent thinkers (See Appendix Item *3 ). In the case of the PulseChain and PulseX public sacrifices, we firmly believe that controlling one's own financial decision-making process in blockchain is akin to freedom of speech (and freedom of assembly since most assemblies involve speech). Since money has been affirmed to be a form of free speech protected by the 1st amendment to the constitution (and recognized by the US Supreme Court in cases such as Buckley v. Valeo 424 U.S. 1, and Citizens United v. Federal Election Commission, 558 U.S. 310), our ability to make a financial statement is protected and should not be attacked by the SEC. In this case, the SEC has overstepped and harmed us by devaluing our cryptocurrency and mislabelling our

sacrifices as unregistered security offerings. Decentralized blockchains such as PulseChain are literally operated by money, and in the case of these sacrifices, these blockchains published an unalterable trail of how such monies were sacrificed. Richard Heart went to great lengths to have disclaimers, and to often publicly state that software is hard, crypto is harder, blockchain development is harder yet, and that there could be no guarantee or even expectation of results. The only thing we ever knew for sure was that we would receive an inalienable record of our sacrifices for First Amendment issues, carved into the  decentralized Ethereum blockchain, which should stand without the possibility of censorship by any government or other entities, for the balance of time in memoriam.

Our sacrifice engagement with these personal properties were grounded in the understanding that we might receive nothing in return for our sacrifice and that the value of any future holdings we might receive from this sacrifice would initially be worth a value of zero US dollars at launch, IF the PulseChain project ever launched at all. We further understood that if the PulseChain blockchain was successful in launching, these tokens could be distributed by an entity who might be Richard Heart, or even another unknown party. When the project did launch successfully and complete, and digital tokens were assigned to addresses, they had no US dollar value assigned to them for four days. We expected and recognized the inherent risks associated with such ventures and willingly chose to participate anyway. Since we took a long-term view, we were happy with the results. Since its inception, the blockchain itself has operated flawlessly without issues, and offers a great value as a cheaper, faster version of the Ethereum blockchain.

IX. **Value and Market Determination**: In point and in fact, upon being assigned Pulse and PulseX tokens at PulseChain's inception, these tokens initially held no US dollar value due to the absence of any connection of *fiat money* to the system. The value eventually assigned to these tokens came after the bridge from the Ethereum blockchain was opened, allowing open decentralized market dynamics, not dynamics which were controlled by Richard Heart. Initial market prices were considerably lower than many of the sacrificers had initially speculated might be the case at launch, illustrating that the free market set the prices of these personal properties, not Richard Heart, who would probably have wished for a higher value to have been assigned to the Pulse coin and its associated tokens at launch on May 13, 2023. We hereby attest that, because we support free market dynamics, we accept the results of free market dynamics which were outside of any possible manipulation by Heart, and thus are not victims of him or his creations.

X. **Two things can be true at the same time (and donations to SENS Foundation):** While it might be the case that many of us thought at the sacrifice stage, and continue to believe today, that the PulseChain blockchain has a bright financial future and we were hopeful to be assigned crypto from the efforts of our sacrifice, it can also be true that we sacrificed for both the principles of freedom of speech and freedom of assembly, while simultaneously believing that if digital tokens were assigned to us, that they may be

7

valued highly one day by the free secondary markets. One principle does not negate the other, since two things can be true at the same time. Further proving this point, more than 10,000 sacrificers willingly accepted the opportunity cost of using their digital assets elsewhere for joining the sacrifice for principles they believed in. Among these principles was supporting medical research. A large subset of sacrificers donated their money directly to the SENS foundation, a licensed 501c3 charity, to the determent to their own financial gain with the understanding that IF the PulseChain ever launched they would be assigned 25% less sacrifice credit than everyone else who sacrificed. Richard Heart, or anybody associated with him, received absolutely nothing when money was sacrificed to the SENS foundation, and yet points were assigned to those SENS foundation sacrificers at the same time that it was assigned to other sacrificers. Mr. Heart raised $27,000,000.00 for the SENS foundation, which is the largest amount of money ever privately raised for the extension of human life (*See Appendix Item 4). This is a point that appears to have been conveniently ignored by the SEC, but it speaks directly to the idea that the sacrifice was in large measure about selfless ideals more than personal properties alone, and not a "tongue in cheek" approach to raising money for an ICO event.

In a world where being heard is crucial, it's key to remove barriers that silence many. Our Supreme Court has acknowledged that money is a form of free speech and is therefore protected by the first amendment. (Buckley v. Valeo 424 U.S. 1, and Citizens United v. Federal Election Commission, 558 U.S. 310)

That's why when we sacrificed our hard-earned money for the PulseChain and PulseX sacrifices, we KNEW that our sacrifice actions would be forever accessed on as many as 700,000 Ethereum nodes globally.  We also knew that IF the PulseChain ever launched, our sacrifices would survive on the PulseChain's nodes as well, creating a giant digital version of an electronic Mt. Rushmore; a place where our actions would be recorded for eternity on the history of two now-iconic blockchain addresses (see Appendix Item 7).  A place forever avoiding the possibility of censorship from either governments or individuals.

We knew that, if this blockchain launched, then it would be more than just a symbol of free speech. It would be the world's most inclusive multilane highway of free speech. This is because with transaction fees up to 1000 times lower than the Bitcoin's, more people would be free to exercise their own rights and transact freely.

This makes PulseChain a step towards a broader, more diverse conversation, not only spreading free speech to other US citizens, but even exporting the USA's First Amendment rights to less free peoples around the world.

We also knew that the founder of PulseChain, Richard Heart, had developed HEX years ago, which has been working autonomously and flawlessly, with no managing parties for 3 years and 10 months at the time of writing.  Because of that fact, many of us, as holders of the HEX token, knew HEX was not a security since it failed all 4 legs of the Howey test. We understood that IF Pulsechain launched, it wouldn't be a security either, because it too would be sufficiently decentralized.

8

XI.     **The SEC is masquerading as helping while conducting harmful actions**

In Item 10 of the SEC complaint, the SEC claims "To protect the public from further harm and fraudulent activity, the SEC brings this action against Defendants and seeks: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains, plus prejudgment interest; and (iii) civil penalties".

We assert that we, the personal property holders within the PulseChain and HEX ecosystems, are the ones most likely to be hurt financially by any judgment awarded to the SEC in this case. The SEC's demand for permanent injunctive relief as well as disgorgement of ill-gotten gains, plus prejudgment interest and even civil penalties in advance of a fair trial is in effect a lawsuit against **us**, the holders of these personal properties, by the SEC. If a judgment were to somehow shut down some popular websites like HEX.com and create awful publicity against the tokens we hold, it could cost us potentially billions of dollars in losses. We believe this should give us standing to be represented in these hearings and that ideally the case should be dismissed.

XII.    **Proof of harm to holders of HEX, Pulse, and PulseX**

On the day of the SEC's unfounded action, July 31, 2023, the price of Pulse, PulseX and HEX dropped 58% in a single day. Furthermore, due to fear and uncertainty spread by the SEC's unjustified actions, on August 1st, 2023 HEX was de-listed from popular decentralized exchange Uniswap, the largest Decentralized Exchange on the Ethereum blockchain. In addition, this strategy by the SEC of "regulation by enforcement" caused HEX and Pulse to be delisted from OKX (a large centralized exchange) and has led to a "chilling effect" in the USA driving innovation to more friendly jurisdictions with regulatory certainty. It is backwards that the SEC would claim that it is protecting the public when in fact it is harming the public (in this case). In the cryptocurrency industry, the SEC does not have a history of helping personal property holders, but rather they have enforced actions without providing clear guidance needed for an entirely new asset class. Furthermore, any rewards that the SEC secures in settlements from cases in this industry seem to go back into their own coffers rather than to the mass benefit of investors/consumers who were supposedly harmed.

For example, in their case against BlockFi, the SEC pocketed a fifty-million-dollar penalty and none of those monies were given back to consumers. On February 14, 2022, the SEC's own commissioner, Hester Pierce, noted that "it is difficult to understand how the civil penalty will protect investors. BlockFi will pay the SEC $50 million, and will pay another $50 million in connection with state settlements for the same conduct. While penalties this size are intended to deter bad conduct, here there is no allegation that BlockFi failed to pay its customers the money due them or failed to return the crypto lent to it". (*See Appendix, item 5)

XIII.   **Conclusion**:

In presenting this petition, we express our firm support for the amicus brief requesting fair adjudication. Our participation in decentralized ecosystems reflects a genuine dedication to principles beyond immediate profit, particularly regarding the political

viewpoints on speech articulated by Richard Heart.  We believe we are better equipped to testify to the court our own motives when we sacrificed, not the SEC speaking on behalf of us miscategorized as "victims". We believe that our sacrifice was not nor will it ever be an investment contract/security, and we would like a chance to testify about the financial harm that the SEC has caused us with their legal action and the shockwaves it has caused in our community.    In short, we believe that our unique perspective and experiences as active participants in these projects can contribute to a more holistic understanding of the case.

We respectfully urge the court to consider our amicus brief as an affirmation of our sincere interest in a just and equitable resolution. We believe a complete dismissal aligns with justice, given the SEC's flawed allegations (including falsely defined "unincorporated alter egos") we've highlighted. By granting our request for consideration, the court would demonstrate its commitment to an inclusive and well-informed adjudication process that acknowledges the interests of all parties involved. Thank you for your attention to this matter. We trust that our collective voices will serve as a valuable contribution to the proceedings.  We have digitally signed our names and identifying information for the court's review.


### Appendix

1. Actual Statement and disclaimer from Richard Heart's 14,000x statement:

   In item 58, the complaint alleges that "on August 1, 2021, via a YouTube video that Richard Heart posted during the PulseChain sacrifice phase, and that he claimed that 14,000x is a reasonable estimate for what could be possible for Pulse because that's what Ethereum did and this is a very similar thing but better."

   However, that sentence was taken wildly out of context to narrowly fit the SEC's complaint.  Anyone watching the August 1, 2021 video would know, from watching the video of a question that was asked of Mr. Heart, and the entire follow up statement from Richard Heart, that there was no guarantee of any future price made by Mr. Heart about this type of personal property, and a reasonable person would not take anything said as a guarantee of anything in the future.  By alleging such things, the SEC is also implicating all buyers and sellers of these personal properties as part of what the SEC has referred to as a "tongue in cheek" scheme, and by alleging that we are dealing in unlicensed securities, they have done great harm to the value of our assets.

   Here is what Heart said in this August 1, 2021 video at 2:08:17, cited as evidence by the SEC, but quoted by the SEC out of context, in response to the question "Do you have a price expectation for Pulse?"

Heart: "Okay I don't make forward-looking price statements, but I will tell you what's possible. When I said that hex was designed to do a 10,000 x when it was invented, it was because I just looked at what Ethereum did. Ethereum did a 10,000 x and we have superior game theory so it was just a reasonable estimate of what was possible.  Well, if Ethereum did a 14,000 x, which it has so far, why can't something that's better [do a 14,000 X]?

And so I think a 14,000 x is a reasonable estimate for what could be possible for Pulse, because that's what Ethereum did and this is a very similar thing, but better.   So is that a probabilistic statement of what is the likelihood of that happening? No.

Is this a timing statement about when it might occur?

Not really, I mean I can tell you that Ethereum did it's 10,000 x in about two and a half years and it's 14,000 x… I guess took maybe six years, so they're not forward-looking price statements but they are statements as to what is possible and similar statements seem to have worked out rather presciently for hex.  Maybe prescient isn't the right word because it involves prediction, but I think you should be allowed to speak to what is possible, without having to endure locking yourself into a probability."

https://hexsearch.io/r/76Yo_l8nyx/14000x-is-a-reasonable-estimate-for-what-could-be-possible-for-pulse-because-thats-what-ethereum-did-and-this-is-a-very-similar-thing-but-better

2. Richard Heart's disclaimer video during PulseX Sacrifice:

Statement of Richard Heart on July 24, 2021, from a YouTube broadcast at 1:51:15.  Note that the sacrifice for PulseX was active, and that many sacrificers continued to sacrifice after the time of this statement, which could not be clearer:

"Let me give you guys a little reminder here; I don't work for you.
Hi, I don't work for you, I don't do anything for you, I don't owe you anything…nothing!  Neither does anyone that I know in anything that I'm involved with.  You must have no expectation of profit from the work of others.
This is not a security…you're not buying my time; you're not!  None of it…Nothing.  None of that…If you want HEX to be better, go make it better!  If you want pulse to be better, go make it better!  If you want the code to be better, go make it better.  It's on github, git lab, gitlab.com, forward slash, PulseChain dot com.  You ain't gonna get no expectations of profit from the work of others from me, never, never ever, ever, ever, ever!  Now by the way, how's that worked out?  Seems to have worked out just fine so…"

https://www.youtube.com/watch?v=pG4a9Isys1E&t=6675s

11

3.  In January of 2018, long before the launch of either HEX or PulseChain, Richard Heart wrote "SciVive" a 460-page book filled with opinions, both political and otherwise. -Statement of Richard Heart regarding freedom of speech on a YouTube stream on May 17, 2022 at 24:07.

    https://hexsearch.io/r/bmjK_KYnp/freedom-of-speech

    Statement of Richard Heart on Freedom of Speech and Freedom of Assembly on a YouTube stream on February 23, 2022 at 41:49.

    https://hexsearch.io/r/NRZN_4vlP/freedom-of-speech

4.  Proof of SENS Foundation Sacrifices: 2,000+ donors to the SENS foundation to raise $27,500,000.00 for research into extending human life (https://sens.org). This is the largest amount of money ever privately raised for longevity research, at the detriment of both the donors and the address that would have otherwise received the donations for the Pulse Sacrifice:

    https://twitter.com/senstweet/status/1422421925800857606?s=20

5.  SEC Pockets $50,000,000.00 and none of those monies were given back to consumers.

    https://www.sec.gov/news/statement/peirce-blockfi-20220214

6.  SEC loses right to appeal Ripple case.

    https://www.reuters.com/legal/us-sec-cannot-appeal-ripple-labs-decision-judge-rules-2023-10-04/

7.  The two historic sacrifice wallet addresses are:

    Pulse at: 0x9Cd83BE15a79646A3D22B81fc8dDf7B7240a62cB
    PulseX at: 0x075e72a5eDf65F0A5f44699c7654C1a76941Ddc8

    Unlike other wallets, when viewed on https://etherscan.io, these addresses are clearly identified as sacrifice addresses and show the entire history of the sacrificers. For PulseChain, this occurred from July 15, 2021 until August 3, 2021 and for PulseX, this occurred from December 30, 2021, until February 25, 2022.