UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES        AND        EXCHANGE
COMMISSION,

                    Plaintiff,

              -against-

RICHARD    SCHUELER   aka   RICHARD
HEART, HEX, PULSECHAIN, and PULSEX,

                    Defendants.

Civil Action No. 1:23-cv-05749-CBA-PK

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RICHARD HEART'S
MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.     The Parties ...................................................................................... 3

    B.     The Hex Software ........................................................................... 4

    C.     The PulseChain Software ............................................................... 7

    D.     The PulseX Software ...................................................................... 9

    E.     The Alleged Misuse of Assets from the PulseChain Sacrifice ............... 11

ARGUMENT .................................................................................................................. 11

I.      THE COURT LACKS PERSONAL JURISDICTION OVER MR. HEART .................. 12

    A.     The Complaint Fails to Establish Personal Jurisdiction Relating to the Hex Software .................................................................................... 14

    B.     The Complaint Fails to Establish Personal Jurisdiction Relating to the Alleged PulseChain and PulseX Transactions .................................... 19

    C.     Exercising Personal Jurisdiction in this Context Would Not Be Fair, Reasonable, or Consistent ............................................................. 21

    D.     The Complaint Fails to Establish Jurisdiction Over Mr. Heart Via the "Alter Ego" Entities ..................................................................... 22

II.     THE SEC HAS FAILED TO PLAUSIBLY PLEAD THE EXISTENCE OF A DOMESTIC PURCHASE, SALE, OR OFFER OF SECURITIES .................................. 24

    A.     The SEC Fails to Allege a Domestic Purchase or Sale of Securities in Connection with Its Antifraud Claims ............................................. 24

        1.     The SEC Fails to Satisfy Morrison for Its Antifraud Claims ............. 24

        2.     Dodd-Frank Did not Override Morrison for SEC Antifraud Actions ........ 27

        3.     Even if Dodd-Frank Overrode Morrison for the SEC's Antifraud Claims, the SEC Fails the Conduct-and-Effects Test ................................. 27

    B.     The SEC Fails to Allege a Domestic Sale or Offer of Securities in Connection with Its Section 5 Claims ............................................. 28

    C.     The SEC's Claims Should Be Dismissed Because the Transactions It Alleges Are Predominantly Foreign ................................................ 29

III.     THE COMPLAINT FAILS TO STATE A CLAIM FOR SECURITIES FRAUD .......... 30

    A.     The Complaint Alleges No Deceptive Act or Fraudulent Scheme ............ 31

    B.     The Complaint Fails to State a Claim for Any Fraudulent Omission ........ 34

    C.     The Complaint Fails to Allege Scienter ........................................... 36

D.     The SEC's Factual Allegations Regarding the Challenged Expenditures Are Implausible Because They Are Impossible ....................................................38

IV.   THE COMPLAINT DOES NOT ADEQUATELY ALLEGE THAT ANY PARTIES ENTERED INTO AN "INVESTMENT CONTRACT" ..................................39

A.     The SEC Is Required to Show that Hex, PulseChain, and PulseX Were Investment Contracts in Order for Federal Securities Laws to Apply ..................39

B.     The SEC Fails to Allege That Any Purported "Investment Contract" Was Created Through the Hex, PulseChain or PulseX Software ..................................43

V.    THE COMPLAINT UNCONSTITUTIONALLY INFRINGES ON THE FIRST AMENDMENT RIGHTS OF MR. HEART AND THOUSANDS OF HEX, PULSECHAIN, AND PULSEX PARTICIPANTS .............................................................47

A.     The Complaint's Reliance on Mr. Heart's Speech as a Basis for Penalizing Him Unconstitutionally Infringes on His First Amendment Rights ....................47

B.     The Inherent Features of Hex, PulseChain, and PulseX Warrant First Amendment Protection ............................................................................................51

CONCLUSION ........................................................................................................................54

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*131 Main St. Assocs. v. Manko*,
  897 F. Supp. 1507 (S.D.N.Y. 1995) ............................................................................. 5

*79th Grp., Inc. v. Moore*,
  2024 WL 36992 (S.D.N.Y. Jan. 3, 2024) ......................................... 15, 16, 19, 20, 21

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023) ...................................................................................................... 24

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ...................................................................... 24, 25, 26, 29

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
  751 F.3d 796 (7th Cir. 2014) ...................................................................................... 16

*In re Alstom SA, Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................................ 31

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) ...................................................................................................... 49

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ........................................................................................ 36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 12, 39

*Ashland Inc. v. Morgan Stanley & Co.*,
  652 F.3d 333 (2d Cir. 2011) ....................................................................................... 33

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................. 12, 31, 38

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ................................................................................ 35

*Banco Safra S.A. Cayman Islands Branch v. Samarco Mineracao S.A.*,
  849 F. App'x 289 (2d Cir. 2021) ................................................................................ 25

*Bank of Am. v. Apollo Enter. Sols., LLC*,
  2010 WL 4323273 (S.D.N.Y. Nov. 1, 2010) ............................................................ 23

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...................................................................................................... 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 11, 38

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007) ................................................................................... 13, 18

*Brass v. Am. Film Techs., Inc.*,
  987 F.2d 142 (2d Cir. 1993) ........................................................................................... 5

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ................................................................................... 13, 15, 16, 20

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
  986 F.3d 161 (2d Cir. 2021) ........................................................................................ 29

*Celestin v. Martelly*,
  2023 WL 6385339 (E.D.N.Y. Sept. 29, 2023) ............................................................ 15

*Central Hudson Gas & Elec. Corp. v. Public Servs. Comm'n*,
  447 U.S. 557 (1980) ..................................................................................................... 50

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ........................................................................................... 5

*Chiarella v. United States*,
  445 U.S. 222 (1980) ................................................................................................ 35, 36

*Chirag v. MT Marida Marguerite Schiffahrts*,
  604 F. App'x 16 (2d Cir. 2015) .................................................................................... 12

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
  356 F.3d 197 (2d Cir. 2004) ............................................................................. 48, 52, 53

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ................................................................................... 24, 25

*Conn. Bar Ass'n v. United States*,
  620 F.3d 81 (2d Cir. 2010) ........................................................................................... 50

*Davey v. PK Benelux B.V.*,
  2022 WL 1289341 (S.D.N.Y. Apr. 29, 2022) .............................................................. 15

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996) ............................................................................................. 23

*De Luz Ranchos Investment Ltd. v. Coldwell Banker & Co.*,
  608 F.2d 1297 (9th Cir. 1979) ..................................................................................... 42

*Del Med. Imaging Corp. v. CR Tech USA, Inc.*,
    2010 WL 1487994 (S.D.N.Y. Apr. 13, 2010) .......................................................... 23

*DeLorenzo v. Ricketts & Assocs., Ltd.*,
    2017 WL 4277177 (S.D.N.Y. Sept. 25, 2017) ........................................................ 12

*Dfinity Found. v. New York Times Co.*,
    2023 WL 7526458 (S.D.N.Y. Nov. 13, 2023) ......................................................... 10

*Fidrych v. Marriott Int'l, Inc.*,
    952 F.3d 124 (4th Cir. 2020) ................................................................................. 16

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ..................................................................................... 33

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) ................................................................................................ 16

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
    991 F.3d 370 (2d Cir. 2021) ................................................................................... 23

*Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*,
    2011 WL 1142916 (S.D.N.Y. Mar. 22, 2011) ........................................................ 23

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ................................................................................... 41

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................................................... 37

*Gilbert v. Indeed, Inc.*,
    513 F. Supp. 3d 374 (S.D.N.Y. 2021) .................................................................... 20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ................................................................................................ 13

*Gordian Grp., LLC v. Syringa Expl., Inc.*,
    168 F. Supp. 3d 575 (S.D.N.Y. 2016) .................................................................... 16

*Handal & Morofsky, LLC v. Viatek Consumer Prod. Grp., Inc.*,
    2018 WL 5886122 (S.D.N.Y. Nov. 8, 2018) .......................................................... 23

*Hanson v. Denckla*,
    357 U.S. 235 (1958) ................................................................................................ 16

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
    396 F. Supp. 175 (N.D. Cal. 1975) ........................................................................ 41

*Harman v. Harper,*
    1990 WL 121073 (9th Cir. Aug. 21 1990)..................................................................42

*Holsworth v. BProtocol Found.,*
    2021 WL 706549 (S.D.N.Y. Feb. 22, 2021).....................................................19, 22

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ...............................................................................................12, 21

*Interbrew v. EdperBrascan Corp.,*
    23 F. Supp. 2d 425 (S.D.N.Y. 1998)...........................................................................28

*Johnson v. TheHuffingtonPost.com, Inc.,*
    21 F.4th 314 (5th Cir. 2021) .......................................................................................21

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ......................................................................................51

*Kalnit v. Eichler,*
    264 F.3d. 131 (2d Cir. 2001) ......................................................................................12

*Key Items, Inc. v. Ultima Diamonds, Inc.,*
    2010 WL 3291582 (S.D.N.Y. Aug. 17, 2010).............................................................23

*Kuan Chen v. United States Sports Acad., Inc.,*
    956 F.3d 45 (1st Cir. 2020)..........................................................................................16

*In re Liberty Tax, Inc. Sec. Litig.,*
    828 F. App'x 747 (2d Cir. 2020) ................................................................................36

*Lihli Fashions Corp. v. N.L.R.B.,*
    80 F.3d 743 (2d Cir. 1996).........................................................................................23

*In re Livent, Inc. Noteholders Sec. Litig.,*
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...............................................................38, 46

*Loginovskaya v. Batratchenko,*
    764 F.3d 266 (2d Cir. 2014) .......................................................................................25

*Lombardi v. Staples, Inc.,*
    2016 WL 11509961 (E.D.N.Y. Dec. 15, 2016) ..........................................................21

*Lopez v. Cookies SF, LLC,*
    2022 WL 4385407 (S.D.N.Y. Sept. 22, 2022) ..........................................................16

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) .....................................................................................................36

*Mazza Consulting Grp., Inc. v. Canam Steel Corp.*,
  2008 WL 1809313 (E.D.N.Y. Apr. 21, 2008) ........................................................5

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ..............................................................................................52

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017) ..............................................................30, 31

*Mendez v. NYC Dep't of Educ.*,
  2020 WL 1042641 (E.D.N.Y. Mar. 4, 2020) ........................................................5

*In re Meta Materials Inc. Sec. Litig.*,
  2023 WL 6385563 (E.D.N.Y. Sept. 29, 2023) ....................................................33, 34

*Monroque v. Lionsgate Television Inc.*,
  2023 WL 5353406 (S.D.N.Y. Aug. 21, 2023) ......................................................23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ..................................................................................35

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ....................................................................................24, 26, 27

*Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*,
  2021 WL 6101391 (9th Cir. Dec. 21, 2021) ........................................................34

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ..................................................................................37

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................................48, 52

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ..................................................................................29

*In re Parmalat Sec. Litig.*,
  383 F.Supp.2d 616 (S.D.N.Y. 2005) ....................................................................31

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
  937 F.3d 94 (2d Cir. 2019) ....................................................................................30

*Radiation Dynamics, Inc. v. Goldmuntz*,
  464 F.2d 876 (2d Cir. 1972) ..................................................................................26

*Realuyo v. Vila Abrille*,
  2003 WL 21537754 (S.D.N.Y. July 8, 2003) ......................................................21

*Reed Int'l, Inc. v. Afghanistan Int'l Bank*,
   657 F. Supp. 3d 287 (S.D.N.Y. 2023) .................................................................. 15

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994) ....................................................................................... 42

*Risley v. Universal Navigation Inc.*,
   2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) ................................... 4, 6, 8, 9, 18, 44

*Rivera v. City of New York*,
   2022 WL 1523165 (S.D.N.Y. May 13, 2022) ........................................................ 22

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) .............................................................................................. 52

*Rodriguez v. Banco Central Corp.*,
   990 F.2d 7 (1st Cir. 1993) ..................................................................................... 42

*Roth v. United States*,
   354 U.S. 476 (1957) .............................................................................................. 51

*SEC v. Aqua-Sonic Prod. Corp.*,
   687 F.2d 577 (2d Cir. 1982) .................................................................................. 41

*SEC v. Chicago Convention Ctr., LLC*,
   961 F. Supp. 2d 905 (N.D. Ill. 2013) ..................................................................... 27

*SEC v. CKB168 Holdings, Ltd.*,
   210 F. Supp. 3d 421 (E.D.N.Y. 2016) .................................................................... 30

*SEC v. Coinbase, Inc.*,
   2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ....................................... 42, 43, 44, 46

*SEC v. Dorozhko*,
   574 F.3d 42 (2d Cir. 2009) .................................................................................... 31

*SEC v. Edwards*,
   540 U.S. 389 (2004) .......................................................................................... 40, 41

*SEC v. Goldman Sachs & Co.*,
   790 F. Supp. 2d 147 (S.D.N.Y. 2011) ....................................................... 24, 26, 28

*SEC v. Hwang*,
   2023 WL 6134041 (S.D.N.Y. Sept. 19, 2023) ....................................................... 35

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................................................... 35

*SEC v. Parnes*,
2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ........................................................37

*SEC v. PlexCorps*,
2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) ................................................17, 22

*SEC v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) ..................................................................................35

*SEC v. Rio Tinto plc*,
2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ..................................................35

*SEC v. Ripple Labs, Inc.*,
2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ..............................................28, 29

*SEC v. Sason*,
433 F. Supp. 3d 496 (S.D.N.Y. 2020) ...............................................................12

*SEC v. Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. Mar. 24, 2020) ..............................................45

*SEC v. Terraform Labs Pte. Ltd.*,
2023 WL 4858299 (S.D.N.Y. July 31, 2023) ..................................................45

*SEC v. United Ben. Life Ins. Co.*,
387 U.S. 202 (1967) ............................................................................................41

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) .....................................................................................40, 41

*Skrodzki v. Marcello*,
810 F. Supp. 2d 501 (E.D.N.Y. 2011) ...............................................16, 17, 20

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018) ..............................................................................13

*Starmedia Network, Inc. v. Star Media, Inc.*,
2001 WL 417118 (S.D.N.Y. Apr. 23, 2001) ...................................................18

*Sullivan v. Barclays PLC*,
2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ....................................................25

*Sunward Elecs., Inc. v. McDonald*,
362 F.3d 17 (2d Cir. 2004) ................................................................................13

*Sutter v. Dibello*,
2019 WL 4195305 (E.D.N.Y. Aug. 12, 2019) ...................................................5

*Tcherepnin v. Knight,*
  389 U.S. 332 (1967) ................................................................................................41

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ..........................................................................................37, 38

*In re Terrorist Attacks on Sept. 11, 2001,*
  714 F.3d 659 (2d Cir. 2013) ...................................................................................12

*Texas v. Johnson,*
  491 U.S. 397 (1989) ...................................................................................49, 52, 53

*In re Time Warner Inc. Sec. Litig.,*
  9 F.3d 259 (2d Cir. 1993) .........................................................................................35

*Troma Ent., Inc. v. Centennial Pictures Inc.,*
  729 F.3d 215 (2d Cir. 2013) ...................................................................................12

*Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co.,*
  944 F.2d 1037 (2d Cir. 1991) .................................................................................23

*Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc.,*
  328 F. App'x 744 (2d Cir. 2009) ............................................................................32

*United States v. Chestman,*
  947 F.2d 551 (2d Cir. 1991) ...................................................................................36

*United States v. Finnerty,*
  533 F.3d 143 (2d Cir. 2008) ...............................................................................31, 33

*United States v. Playboy Entm't Group, Inc.,*
  529 U.S. 803 (2000) ................................................................................................49

*United States v. Salameh,*
  992 F.2d 445 (2d Cir. 1993) ...................................................................................50

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) ...................................................................................51

*Virginia v. Black,*
  538 U.S. 343 (2003) ................................................................................................52

*Vogel v. TakeOne Network Corp.,*
  2023 WL 5276857 (S.D.N.Y. Aug. 16, 2023) .......................................................38

*Volokh v. James,*
  2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) ........................................................50

*Vugo, Inc. v. City of New York*,
    931 F.3d 42 (2d Cir. 2019)..................................................................50

*Walden v. Fiore*,
    571 U.S. 277 (2014) ..................................................................13, 15

*Williams v. Binance*,
    2024 WL 995568 (2d Cir. Mar. 8, 2024) ..................................................26

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ..................................................................13, 14

*XMission, L.C. v. Fluent LLC*,
    955 F.3d 833 (10th Cir. 2020) ..................................................15, 16

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007)..................................................................52

### Rules and Statutes

15 U.S.C. § 78c ..................................................................................40

15 U.S.C. § 77e ..................................................................................39

15 U.S.C. § 78j ..................................................................................39

15 U.S.C. § 77q ..................................................................................39

15 U.S.C. § 77v ..............................................................................27, 28

15 U.S.C. § 78aa ............................................................................27, 28

Fed. R. Civ. P. 9 ................................................................................30

### Other Authorities

*Black's Law Dictionary* (8th ed. 2004) ..................................................40

Brief for the SEC, *SEC v. Edwards*,
    540 U.S. 389 (2004), 2003 WL 21498455..................................................41

Lawrence M. Friedman, *American Law in the 20th Century* (2002) ....................40

Paola Heudebert & Claire Leveneur,
    *Blockchain, Disintermediation and the Future of the Legal Professions*,
    4 CARDOZO INT'L & COMP. L. REV. 275, (2020)..................................................17

SEC Chair Gary Gensler,
   *Statement on the Approval of Spot Bitcoin Exchange-Traded Products* (Jan.
   10, 2024), https://www.sec.gov/news/statement/gensler-statement-spot-
   bitcoin-011023 ................................................................................................................7

SEC Chair Gary Gensler, *Statement on Financial Stability Oversight Council's
   Report on Digital Asset Financial Stability Risks and Regulation Before the
   Financial Stability Oversight Council Open Meeting*
   (Oct. 3, 2022), https://tinyurl.com/2ax6c5dx) ............................................................6

Securities and Exchange Commission, *Investor Bulletin:  Initial Coin Offerings*
   (July 25, 2017), https://www.sec.gov/oiea/investor-alerts-and-
   bulletins/ib_coinofferings ............................................................................................4

Xiaofan Li et al., *Characterizing Ethereum Upgradable Smart Contracts and
   Their Security Implications,*
   *Preprint at arXiv*, available at https://arxiv.org/html/2403.01290v1 (Mar. 2,
   2024)............................................................................................................................18

## PRELIMINARY STATEMENT

In this civil enforcement action, the Securities and Exchange Commission seeks to further cement a role it has assumed for itself as the global governor of blockchain technology—a role exceeding both the agency's limited mandate and the bounds of personal jurisdiction. The SEC is suing Richard Heart, who lives in a foreign country, and (somehow) three blockchain software programs—Hex, PulseChain, and PulseX—which the SEC claims to be unincorporated "alter egos" of Mr. Heart. These open-source communications technologies are used and enjoyed by a decentralized community of thousands of people across the world, yet the SEC says that they violated U.S. securities laws by offering and selling what the SEC's novel construction dubs "crypto asset securities." The SEC also asserts a fraud claim against the global PulseChain blockchain network and Mr. Heart for purportedly using a small percentage of so-called "offering proceeds" in a way that the SEC disfavors. Because the SEC's claims suffer from a host of fatal defects—under the U.S. Constitution, the federal securities laws, the rules of pleading, and more— the case should be dismissed with prejudice.

*First*, this lawsuit cannot escape the starting gate because exercising personal jurisdiction over Mr. Heart in this case would not comport with due process. Mr. Heart lives abroad and is not alleged to have set foot in the United States during the relevant period. Nor is he alleged to have engaged in any conduct directed at the United States. The SEC alleges no U.S.-based entities, employees, contracts, payment accounts, marketing efforts, or travel associated with Mr. Heart. The general availability of Mr. Heart's speech on the Internet and the alleged presence of some unquantified number of participants in the United States cannot satisfy the requirements for asserting personal jurisdiction, because the defendant ***himself*** must purposefully reach out and establish sufficient minimum contacts with the United States. No such contacts are alleged. The

SEC's attempt to impute jurisdictional contacts to Mr. Heart through the three purported "alter ego" software programs likewise finds no support in the allegations or the law.

*Second*, the SEC has not plausibly alleged a domestic securities transaction.  The Supreme Court has held that the securities laws generally do not apply extraterritorially.  This action exemplifies the SEC's disregard for that principle.  Congress has not established the SEC as a global blockchain regulator, but the SEC in this case (and others) operates as if it has.  The SEC's total failure to come up with allegations supporting domestic securities transactions— notwithstanding the agency's sweeping investigative powers—dooms every claim.  Separately, the predominantly foreign nature of the alleged transactions precludes application of the securities laws to any domestic transaction that the SEC could theoretically identify.

*Third*, the SEC fails to satisfy basic pleading requirements for its securities fraud scheme claim regarding PulseChain.  The Complaint must spell out with particularity the circumstances of the fraudulent scheme and allege facts raising a strong inference of fraudulent intent.  But it alleges no deceptive conduct at all, nor any statement that was false or misleading.  On the contrary, statements incorporated by reference into the Complaint demonstrate Mr. Heart's consistent candor.  The SEC cannot sneak its fraud claim past dismissal by claiming that individuals supposedly had "reasonable expectations" about the use of alleged PulseChain assets, when the Complaint and the disclosures incorporated therein make clear that no such expectations were ever set.  The SEC may disfavor Mr. Heart's messages, but that does not make a fraud.

*Fourth*, the SEC has not plausibly alleged that the three software programs at issue constitute "investment contracts" subject to the federal securities laws.  The SEC fails to allege any contract at all, let alone an investment contract.  Unlike in other recent cases involving digital assets, the SEC here does not allege any advertised plans for using participants' digital assets to

develop new technologies, instead principally relying on functions built into the software, along with hypothetical expectations posited by the SEC that run counter to the alleged facts. Resorting to Mr. Heart's descriptions of how the software programs work, his design intentions for the programs, or what their associated tokens might be worth does not make up for the fatal absence of any alleged efforts beyond those of the individual users who execute the software.

*Fifth*, the SEC's case amounts to an unconstitutional infringement on the First Amendment's guarantees of freedom of speech and association for Mr. Heart and those who execute the Hex, PulseChain, and PulseX software programs. The Complaint reads as a selective review—by a disgruntled critic—of hundreds of hours of Mr. Heart's public speech about blockchain technologies. The SEC seeks to recast Mr. Heart's live commentary into securities offerings and thereby penalize him for expressing his views about the technologies and their potential. This action also threatens to stifle protected speech uttered on the blockchain, including the computer code underlying software programs that the SEC aims to shut down, along with the free expression of thousands of people across the world who have etched their beliefs into the immutable digital ledger created by the software.

## BACKGROUND

### A.   The Parties

Richard Heart is an entrepreneur, philanthropist, and free-speech pioneer who conceived of the cryptocurrency software programs Hex, PulseChain, and PulseX. Each of these technologies is an open-source software program available to the public through decentralized networks of computers across the world, where the programs exist to this day, free from Mr. Heart's control, and free to anyone who chooses to execute them.

The SEC purports to bring claims against Hex, PulseChain, and PulseX as "unincorporated alter-ego entities" of Mr. Heart. Compl. ¶¶ 1, 12-14, ECF No. 1. But they are not entities—they

are decentralized blockchain technologies.  The SEC has described blockchain technology as "an electronic distributed ledger list of entries . . . maintained by various participants in a network of computers . . . which use cryptography to process and verify transactions on the ledger."[1]  A global community of individuals have independently chosen to execute the Hex, PulseChain, and PulseX blockchain software programs and to devote their time to them.  Other than the SEC's diktat, the Complaint has no allegations explaining how these programs are Mr. Heart's alter egos.

## B.    The Hex Software

Hex is a software program that runs on a cryptographically secured, decentralized network of computers known as the Ethereum blockchain.  *Id.* ¶ 2, 20; *see also Risley v. Universal Navigation Inc.*, 2023 WL 5609200, at *3 (S.D.N.Y. Aug. 29, 2023) (describing Ethereum network and software and tokens that exist on the network).  Anyone can publish software programs and create digital asset "tokens" on the Ethereum blockchain.  *Id.*  Hex is alleged to be a type of program on the Ethereum blockchain known as a "smart contract," which the SEC defines as "self-executing computer programs . . . that perform certain functions when predetermined conditions are met" by users running those functions.  Compl. ¶ 20 & n.2.  Accordingly, the Hex software functions according to specific, immutable rules built into its software code at the time that the program was published on the Ethereum network, as Mr. Heart often explained.  *See* Ex. A,[2] Transcript of Nov. 8, 2019 YouTube Livestream at 3 (Hex is "an immutable smart contract.

---

[1]    Securities and Exchange Commission, *Investor Bulletin:  Initial Coin Offerings* (July 25, 2017), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings.

[2]    All citations to exhibits refer to the exhibits to the Declaration of Michael E. Liftik filed contemporaneously with this memorandum.

No one can change it."); *see also* Compl. ¶ 24 (incorporating November 8, 2019 livestream by reference).[3]

Thus, anyone can execute the Hex software by issuing commands to it over the decentralized Ethereum blockchain network, whereby Ethereum network participants perform any required computations and store the resulting output data in the blockchain. Users execute the Hex code pursuant to its rules, of their own accord. The SEC does not, and cannot, allege that Mr. Heart or anyone else exercises control over the operation of these software functions.[4] Hex tokens are alleged to be digital assets on the Ethereum network that can be created by users of the Hex software. Compl. ¶¶ 12 & n.1, 20.[5] Individuals who hold Hex tokens in their digital "wallets" can execute the Hex software to "stake" their tokens for a period of between 1 day and 15 years; running this function destroys the Hex tokens. *Id.* ¶¶ 45, 46.

At the end of an individual's staking period, that individual may execute another function in the Hex software that creates new Hex tokens for them in an amount equaling the number of tokens originally staked (destroyed), plus additional tokens based on the duration of the staking period and other factors. *Id.* ¶¶ 21-22, 46. The SEC characterizes this ability to create additional

---

[3] The Complaint incorporates by reference numerous of Mr. Heart's public statements, including 14 of Mr. Heart's YouTube videos, Mr. Heart's remarks at the 2023 Hex Conference, Mr. Heart's July 21, 2021 statement, and the contents of the websites Hex.win, PulseChain.com, and PulseX.com. Compl. ¶¶ 12, 22, 24-28, 32, 34, 39-40, 48-49, 56, 58-59, 66, 68, 70-71, 75. The Court "may . . . consider the full contents of these statements and documents in resolving this motion. *See Mazza Consulting Grp., Inc. v. Canam Steel Corp.*, 2008 WL 1809313, at *1 (E.D.N.Y. Apr. 21, 2008) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)) ("court may take into account documents referenced in the complaint, as well as documents that are in the plaintiff's possession or that the plaintiff knew of and relied upon in filing the suit"); *Sutter v. Dibello*, 2019 WL 4195305, at *9 (E.D.N.Y. Aug. 12, 2019) (citing *Chambers v. Time Warner*, Inc., 282 F.3d 147, 152-153 (2d Cir. 2002)) (court can properly consider documents "incorporated in the complaint by reference"); *Mendez v. NYC Dep't of Educ.*, 2020 WL 1042641, at *5 (E.D.N.Y. Mar. 4, 2020) (citing *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1532 n.23 (S.D.N.Y. 1995)).

[4] Hex's verified source code, as deployed to the Ethereum blockchain, including all of the functions referenced in the Complaint, is viewable at https://etherscan.io/token/0x2b591e99afe9f32eaa6214f7b7629768c40eeb39#code.

[5] The Complaint does not explain the terminology it uses. Tokens, cryptocurrencies, or crypto assets are known to be "digital asset[s] created and traded in the digital world" and are said to be held by individuals in cryptographically secured digital addresses known as "wallets." *See Risley*, 2023 WL 5609200, at *3, 6.

tokens as creating an expectation of profits. *Id.* ¶¶ 44, 48. But, as the Complaint's allegations and statements incorporated by reference make clear, the "returns" from Hex's staking function are simply the mathematical result of additional tokens being created by users executing the Hex software, not a profit in fiat currency terms resulting from any extrinsic work. *Id.* ¶ 46 (staking function creates "new Hex tokens"); Ex. A, Transcript of Nov. 8, 2019 YouTube Livestream at 4 ("[T]he [Hex] currency just inflates to pay everybody."); *id.* at 2 ("So if you lock up your Hex [the program] gives you more Hex in return."); *id.* at 7 ("I have no idea what the [dollar] price will be. I can't promise you [dollar] returns. . . . [Y]ou're going to get more Hex . . . [T]hat's the math. I'm describing math to you.").

The Hex software program was published on the Ethereum blockchain on December 3, 2019. *See id.* ¶ 20. After it was published, some Hex tokens were allegedly made available to certain holders of Bitcoin, the world's first significant cryptocurrency, and ETH, the "native" cryptocurrency of the Ethereum blockchain. *Id.* ¶ 33 & n.4.[6] Individuals also created new Hex tokens by running a function in the Hex software that allowed them to send their ETH tokens to an Ethereum wallet address associated with the Hex software, and thereby create new Hex tokens in the user's wallet. *Id.* ¶¶ 29, 34. This function of the Hex software was allegedly available "worldwide, via the Internet," and some unspecified number of participating wallet addresses allegedly belonged to unidentified individuals in the United States. *Id.* ¶¶ 29, 34.

---

[6]  *See* SEC Chair Gary Gensler, *Statement on Financial Stability Oversight Council's Report on Digital Asset Financial Stability Risks and Regulation Before the Financial Stability Oversight Council Open Meeting* (Oct. 3, 2022), https://tinyurl.com/2ax6c5dx (describing Bitcoin as "[t]he first big crypto token," created in 2008); *Risley*, 2023 WL 5609200, at *3 (describing ETH as Ethereum's "native token").

Hex was built as a superior alternative to Bitcoin designed to "outperform" it. *Id.* ¶ 25. Like Bitcoin—which the SEC has conceded is not a security[7]—Hex is not alleged to have any actual or intended functionalities other than the mechanics built into its software code. The Complaint does not allege that individuals were meant to do anything with their Hex tokens other than hold them in their digital "wallets" on the Ethereum network and use the aforementioned software functions. The Hex software ran on an existing network, Ethereum, and it is not alleged to have been tied to the development of a blockchain network or of any other features. Rather, it was disclosed that Hex was "immutable compiled bytecode on the Ethereum network" that "can't be changed," and that "[t]here is no expectation of profit from the work of others." *See* Ex. E, Hex Website; *see also* Compl. ¶¶ 12, 34, 40 (incorporating Hex.win website by reference). From hundreds of hours of Mr. Heart's public speech, the SEC quotes various snippets about Hex's supply-demand mechanics, the staking function, and Hex's actual and potential price appreciation (none of which are alleged to be inaccurate). *Id.* ¶¶ 23-25, 39, 45, 48-49, 72. The Complaint also alleges that, in the months leading up to the publication of the Hex software, Mr. Heart spoke about the remaining steps to completion. *Id.* ¶¶ 26-28. Mr. Heart allegedly made three websites with information about Hex and interfaces for executing certain functions of the Hex software on the Ethereum network. *Id.* ¶¶ 12, 21, 24-25, 32, 39-42, 46.

## C. The PulseChain Software

PulseChain is a global, decentralized blockchain network that Mr. Heart allegedly launched on May 12, 2023. *Id.* ¶ 53. PulseChain is allegedly a fork of the Ethereum blockchain designed as a more efficient, lower-cost alternative that distributes information faster than Ethereum and

---

[7] *See* SEC Chair Gary Gensler, *Statement on the Approval of Spot Bitcoin Exchange-Traded Products* (Jan. 10, 2024), https://www.sec.gov/news/statement/gensler-statement-spot-bitcoin-011023 (referring to Bitcoin as "non-security commodity").

with lower "gas" fees for using the network. *Id.* ¶¶ 13, 51 & n.5.  Thus, like the Ethereum network, the PulseChain network gives everyone in the world the freedom to publish software or create digital asset tokens on it. *See Risley*, 2023 WL 5609200, at *3 (describing ability to create "ERC-20" tokens on Ethereum); Compl. ¶ 67 & n.8 (referring to analogous "PRC-20" tokens on PulseChain).  On the PulseChain network, "gas" fees are paid with PulseChain's "native" token, PLS, which mirrors the role that the Ethereum network's native token (ETH) plays on the Ethereum blockchain. *Id.* ¶¶ 54, 56.  Thus, like ETH, PLS tokens had to be created so that people could use them to execute software commands and communicate over the network.

When PulseChain launched, PLS tokens became available to thousands of individuals' wallet addresses on the new network.  *Id.* ¶ 53.  One way they became available, referenced implicitly by the SEC, was the result of PulseChain being an alleged "fork" of the Ethereum network, *id.* ¶ 13, such that individuals' "native" ETH tokens on the Ethereum network became "native" PLS tokens on the PulseChain network.[8]  *See id.* ¶ 54 (alleging creation of PulseChain versions of Ethereum digital assets).

The Complaint, however, focuses on PLS tokens that became available through individuals expressing their belief that "free speech is a protected human right and blockchains are speech" by choosing to "sacrifice" their cryptocurrencies by sending them to a specified wallet address on the Ethereum network.  *Id.* ¶¶ 51-52, 66.  Despite cherry-picking from hundreds of hours of Mr. Heart's statements, the Complaint does not cite to any specific promises that Mr. Heart made to those who chose to sacrifice cryptocurrency.  On the contrary, Mr. Heart explained that to "sacrifice" cryptocurrency was to "***lose your coins.  You don't have them anymore.*** . . . You have

---

[8]   As is alleged but not explained in the Complaint, Compl. ¶ 13, a "fork" is a description of a blockchain network that builds from the publicly available ledger of an existing network but modifies the base rules of that blockchain such that a new blockchain forms, separate and distinct from the original.

lost your money, you have sacrificed it.  It is gone."  Ex. C, Transcript of July 21, 2021 YouTube Livestream at 13; *see also* Compl. ¶ 66 (incorporating July 21, 2021 livestream by reference). When the PulseChain network launched, PLS tokens were made available in wallets on the new network to individuals who participated in the sacrifice.  *Id.* ¶ 53.

The SEC alleges that some cryptocurrencies were sacrificed by an unspecified number of unidentified individuals in the United States, including one unidentified individual who allegedly resides in Brooklyn.  *Id.* ¶¶ 55, 60.

Mr. Heart allegedly operated a website about PulseChain that contained descriptions of the PulseChain network and its benefits, as well as information about how individuals could sacrifice their cryptocurrency.  *Id.* ¶¶ 13, 51, 56.  The Complaint does not allege that the website had any functionality or that it could be used either to sacrifice cryptocurrency or to interact with the PulseChain blockchain network.  The SEC also alleges that Mr. Heart spoke publicly about the features of the PulseChain network and the potential value of PLS tokens.  *Id.* ¶¶ 56-60.

**D.    The PulseX Software**

PulseX is a software program that was published on the PulseChain blockchain network[9] on May 12, 2023, the same day that the network launched.  *Id.* ¶¶ 14, 69.

The PulseX software program is allegedly modeled after a program on the Ethereum blockchain called Uniswap.  *Id.* ¶¶ 67-68.  PulseX, like Uniswap, is a decentralized, self-executing software program that allows individuals to exchange different types of tokens through the software, without middlemen.  *Id.* ¶¶ 14, 67; *see also Risley*, 2023 WL 5609200, at *9 & n.8 (describing Uniswap and noting that the program "stands on its own on the blockchain and does not change").

---

[9]  The allegation that PulseX operates "on the Ethereum blockchain" appears to be a scrivener's error.  Compl. ¶ 14.

PLSX is a cryptocurrency token on the PulseChain network that is alleged to be the "native token" for the PulseX software program. Compl. ¶ 67. When the PulseX program was launched on May 12, 2023, PLSX tokens were allegedly made available to thousands of wallet addresses based on individuals' sacrifices of cryptocurrencies. *Id.* ¶¶ 67, 69, 71. The sacrifices associated with PulseX were made to express support for "freedom of movement and freedom of association and freedom of assembly." Ex. D, Transcript of Jan. 16, 2022 YouTube Livestream at 1; *see also* Compl. ¶ 66 (incorporating January 16, 2022 livestream by reference). Again, despite referring to hundreds of hours of content, the SEC quotes no promises by Mr. Heart to those who chose to participate in the PulseX sacrifice, although it concedes that PLSX tokens were in fact made available to them when the software was published. *Id.* ¶ 69.

The SEC alleges that an unspecified number of individuals based in the United States carried out some of the sacrifices relating to PulseX. *Id.* ¶ 67. Otherwise, the Complaint alleges only a single connection between PulseX and the United States: One informational online chat between Mr. Heart and an individual in New York City that occurred on April 26, 2022, after the PulseX sacrifice period had ended. *Id.* ¶¶ 67, 70. The Complaint does not allege that this individual participated in the PulseX sacrifice or that Mr. Heart knew where the individual lived. *Id.* ¶ 70.

The SEC characterizes PLS and PLSX tokens as "practically worthless," *id.* ¶ 76, but misleadingly only quotes the prices of the tokens as of June 30, 2023, and ignores the *volume* of tokens that exist. *Id.* ¶ 76. When applied to the trillions of PLS and PLSX tokens in existence,[10]

---

[10] The Complaint does not allege how many PLS and PLSX tokens exist, but publicly available data indicates that there are many trillions of each token. *See* https://crypto.com/price/pulsechain (trillions in PLS token supply); https://crypto.com/price/pulsex (trillions in PLSX token supply); *Dfinity Found. v. New York Times Co.*, 2023 WL 7526458, at *1 (S.D.N.Y. Nov. 13, 2023) (using crypto.com data and noting that "[c]ourts may take judicial notice of the publicly-available price of assets . . . at the motion to dismiss stage").

the "worthless" prices quoted in the Complaint imply aggregate values in the hundreds of millions or billions of dollars as of that measurement date.

Mr. Heart allegedly operated a website relating to PulseX. *Id.* ¶ 14. That website allegedly contained information about how the PulseX software works, along with a statement that "PLSX is designed to increase in value." *Id.* ¶¶ 67-68, 70. The website also allegedly contained information about how to sacrifice cryptocurrency for the PulseX sacrifice, as described above. *Id.* ¶ 67. The website is not alleged to have had any functionality, nor is it alleged that individuals could have used the website to participate in the sacrifice.

### E.   The Alleged Misuse of Assets from the PulseChain Sacrifice

The SEC contends that Mr. Heart misappropriated $12.1 million worth of assets from the alleged $354 million PulseChain sacrifice and used them on personal expenditures, although the allegations add up to only $8.9 million. *Id.* ¶¶ 61-63. The Complaint speculates, without support, that individuals who sacrificed their crypto assets had a "reasonable expectation that their funds would be used to develop PulseChain." *Id.* ¶ 64. Despite referring to nearly one hundred hours of video statements by Mr. Heart, the Complaint identifies no statement by Mr. Heart supporting that alleged "reasonable expectation." *See id.* ¶¶ 62-66. Instead, in the same statement relied upon by the SEC, Mr. Heart explained that to sacrifice crypto assets meant: "You lose your coins. You don't have them anymore. . . . They to the best of my knowledge do not go to charity. . . . You should have no expectation of profit from the work of others. You have lost your money, you have sacrificed it. It is gone." Ex. C, Transcript of July 21, 2021 YouTube Livestream at 11, 13-14.

### ARGUMENT

To survive this motion to dismiss under Rule 12(b)(6), the SEC must plead "enough facts to state a claim to relief" against Mr. Heart "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The allegations must be sufficient to "allow[] the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted).  The SEC's claims under Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17 of the Securities Act are fraud-based claims, and the SEC must "satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *SEC v. Sason*, 433 F. Supp. 3d 496, 506 (S.D.N.Y. 2020) (citing *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)).  "Under Rule 9(b), a fraud claim must state with particularity the circumstances constituting fraud." *Id.* (cleaned up).

For a host of reasons, all of the SEC's claims must be dismissed.

## I.  THE COURT LACKS PERSONAL JURISDICTION OVER MR. HEART

The SEC fails to meet its burden to make a *prima facie* showing that this Court has personal jurisdiction over Mr. Heart.  *Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (citation omitted).  To adequately allege specific personal jurisdiction, a plaintiff must provide "non-conclusory fact-specific allegations," *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (citation omitted), establishing both "(1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "[C]onclusory non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a *prima facie* showing of jurisdiction." *DeLorenzo v. Ricketts & Assocs., Ltd.*, 2017 WL 4277177, at *5 (S.D.N.Y. Sept. 25, 2017) (citation omitted), *aff'd sub nom. DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018).

12

When it comes to a foreign defendant such as Mr. Heart, "[a] court must look to 'whether there was some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State,'" *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)), such that he "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citation omitted).  The required relationship "must arise out of the contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  And where a Complaint seeks to allege minimum contacts based on "the in-state effects of out-of-state activity," *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007), those "effects" must "connect[] the defendants' conduct to [the forum], not just to a [person] who lived there."  *Walden*, 571 U.S. at 288.  These strict requirements are a matter of constitutional due process.  Their purpose is to "protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties."  *Id.* at 284 (citation omitted).

The Complaint's causes of action against Mr. Heart are premised on conduct relating to the three software programs at issue.  Each of these three software programs is alleged to involve distinct transactions taking place at different times, with different users, software, and purported "alter ego" entities.  Accordingly, the SEC must allege personal jurisdiction as to Mr. Heart with respect to each of the three software programs individually.  *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted.") (citation omitted).  In other words, the SEC must show how Mr. Heart "purposefully availed" himself of the forum with respect to each program such that he "should

reasonably anticipate being haled into court there" in connection with that program. *World-Wide Volkswagen*, 444 U.S. at 297.

The SEC fails across the board. The Complaint does not plead facts sufficient to demonstrate the requisite minimum contacts between Mr. Heart and the forum with respect to any of the three software programs. The Complaint says nothing about the United States when it comes to Mr. Heart personally—not U.S. offices, entities, travel, transactions, marketing, contracts, bank accounts, payment systems, or even the use of U.S. dollars. The Complaint is utterly lacking in the jurisdictional facts courts expect to see and rely on in actions against a foreign defendant such as Mr. Heart. Rather, the SEC turns to a handful of allegations regarding the users of the software programs, websites associated with them, and statements that Mr. Heart made on social media that people in the United States could have heard (though even that is not alleged). These allegations fall far short of what due process requires.

## A. The Complaint Fails to Establish Personal Jurisdiction Relating to the Hex Software

The Complaint does not adequately allege that Mr. Heart purposefully availed himself of the privilege of doing business in the United States with respect to Hex. Even the Complaint's allegations about U.S. residents who used the Hex software are threadbare. There is nothing about how many supposed U.S. persons executed the Hex software, how much they transacted, or even whether they did so from within the United States. All that the Complaint alleges is that persons who live in the United States—just like everyone else in the world—were capable of using the global, online Ethereum network to execute the Hex software, and that some of them did so to create Hex tokens. *See* Compl. ¶ 20 & n.2 (Hex is a "self-executing" software program residing on the Ethereum blockchain); *id.* ¶ 30 (individuals used their ETH tokens to create Hex tokens); *id.* ¶ 34 (U.S. persons used the Hex software). It does not allege that Mr. Heart was even aware

14

that these individuals were using the software, let alone that they lived in the United States.  Those allegations do not begin to show Mr. Heart "purposefully direct[ing] his activities at residents of the [United States]."  *Burger King*, 471 U.S. at 472 (internal quotation marks omitted).

Well-established constitutional limits on courts' exercise of personal jurisdiction make clear that these allegations are not enough.  Defendants can be subjected to a forum's jurisdiction only if they "purposefully 'reach[] out beyond' their State and into [the forum]."  *Walden*, 571 U.S. at 285 (quoting *Burger King*, 471 U.S. at 479-80).  A corollary is that using the Internet to make something accessible in *any* jurisdiction, as the SEC alleges Mr. Heart did, does not amount to Mr. Heart reaching out into *every* jurisdiction.  Like "mass emailing, website hosting, and Internet posting," publishing software on a decentralized blockchain is "peculiarly non-territorial because the internet operates 'in' every state regardless of where the user is physically located, and when a person places information on the Internet, he can communicate with persons in virtually every jurisdiction."  *79th Grp., Inc. v. Moore*, 2024 WL 36992, at *13 (S.D.N.Y. Jan. 3, 2024) (quoting *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 844 (10th Cir. 2020)); *see also Reed Int'l, Inc. v. Afghanistan Int'l Bank*, 657 F. Supp. 3d 287, 305 (S.D.N.Y. 2023) ("[I]nternet activity is an insufficient basis for personal jurisdiction because websites are generally speaking, equally accessible everywhere.") (cleaned up).

Rather, "the alleged internet activity must be expressly targeted, or directed to [the forum], to establish the minimum contacts necessary to support the exercise of personal jurisdiction."  *Reed*, 657 F. Supp. 3d at 305.  *See also, e.g.*, *Celestin v. Martelly*, 2023 WL 6385339, at *15 (E.D.N.Y. Sept. 29, 2023) (no jurisdiction where the website "does not target [forum residents] in particular"); *Davey v. PK Benelux B.V.*, 2022 WL 1289341, at *4 (S.D.N.Y. Apr. 29, 2022);

*Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 516 (E.D.N.Y. 2011).  No such targeting of the United States is alleged.[11]

The lack of alleged purposeful direction toward the United States is underscored by the fact that users executed the Hex software program on their own, without any input from Mr. Heart. "[T]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."  *Burger King*, 471 U.S. at 474 ((quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  Instead, "[jurisdictional] contacts 'must be the defendant's own choice and not random, isolated, or fortuitous.'"  *79th Grp.*, 2024 WL 36992, at *12 (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)).

As the Complaint acknowledges, the Hex software is a "self-executing" computer program on the globally accessible Ethereum blockchain network.  Compl. ¶ 20 & n.2.  The Complaint does not, and cannot, allege that Mr. Heart had any choice in or knowledge of who executed the program, or from where.  Mr. Heart is not alleged to have played any part in individuals' execution of the software beyond publishing the software program to the blockchain in the first place. Individuals' subsequent choice to execute the software program on the global Ethereum network, from wherever they may have done so, is a quintessentially "unilateral activity" that cannot establish personal jurisdiction.  *Gordian Grp., LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 586-87 (S.D.N.Y. 2016); *see also Lopez v. Cookies SF, LLC*, 2022 WL 4385407, at *4 (S.D.N.Y.

---

[11]  Appellate decisions in other circuits addressing recent Internet-related personal jurisdiction questions have reached similar conclusions.  *See Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 60-61 (1st Cir. 2020) (no personal jurisdiction where interactive online platform was accessible in all states and did not specifically target forum); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 320 (5th Cir. 2021) (no jurisdiction where forum residents' use of site "reflect[ed] only [platform's] universal accessibility, not its purposeful availment of [forum]"); *XMission*, 955 F.3d at 847 (no personal jurisdiction where online activity "is indifferent to the physical location of the responder"); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141-43 (4th Cir. 2020); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014).

Sept. 22, 2022); *Skrodzki*, 810 F. Supp. 2d at 510 (plaintiff's payments "emanat[ing] from a bank in New York" were "unilateral activity").

This deficiency is not cured by the SEC's vague allegation that individuals could execute the Hex software to create tokens using an unexplained "online portal."  Compl. ¶ 30.  As the Complaint appears to acknowledge, any sort of "portal" would merely run "code in [Hex's] smart contract" on the Ethereum blockchain.  *Id.*  There is no allegation of a website or online service that could directly transact with users—the allegations all run back to the self-executing Hex software program, as they must.

The Complaint's reference to optional web interfaces to execute the Hex software's "staking" function (for Hex tokens that users already have access to) or to execute the Uniswap software (an unrelated third-party program) suffer from similar flaws—in addition to being irrelevant to the purported "offering" at issue.  *Id.* ¶¶ 21-22, 41-42, 45.  Those alleged interfaces are necessarily distinct from the self-executing blockchain programs, as they are merely an avenue through which users can access the programs.  *See* Paola Heudebert & Claire Leveneur*, Blockchain, Disintermediation and the Future of the Legal Professions*, 4 CARDOZO INT'L & COMP. L. REV. 275, 288-89 (2020) (describing distinction between protocols that exist on blockchain networks and interfaces that provide one avenue to access those protocols).  Any such user access provides no jurisdictional predicate for a case against Mr. Heart.

These deficient allegations stand in sharp contrast to cases such as *SEC v. PlexCorps*, where the defendant's website was alleged to have directly interacted with users by accepting payments and user registrations, processing credit card transactions, and selling tokens.  2018 WL 4299983, at *16 (E.D.N.Y. Aug. 9, 2018).  No website is alleged to have had those capabilities

here, where the only action alleged is the unilateral decision of users to execute a software program on a global blockchain network.[12]

Premising jurisdiction over Mr. Heart on the allegation that Uniswap's software developers are headquartered in Brooklyn makes even less sense. *See* Compl. ¶ 18. Uniswap is not alleged to be affiliated with Mr. Heart (nor could it be). It is a decentralized, autonomous software program through which anyone can make tokens on the Ethereum blockchain available for trading— without anyone else's permission. *See Risley*, 2023 WL 5609200, at *8-9, *17 (explaining Uniswap's permissionless nature and noting that all transactions "happen[] automatically through the code baked into the smart contracts"). Relying on where Uniswap's *developers* live would subject virtually every token on the Ethereum blockchain to personal jurisdiction in the United States.[13]

Mr. Heart's alleged statements about Hex on social media and on Hex-related websites also fail to establish jurisdiction. *See, e.g.*, Compl. ¶¶ 20, 24, 27, 40, 46, 48. "It is now well established that one does not subject himself to the jurisdiction of the courts in another state simply because he maintains a web site which residents of that state visit." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 250 (2d Cir. 2007) (quoting *Starmedia Network, Inc. v. Star Media, Inc.*, 2001 WL 417118, at *3 (S.D.N.Y. Apr. 23, 2001)). The SEC alleges nothing to suggest that Mr. Heart's statements about Hex were purposefully directed at individuals in the United States, as opposed to simply "mak[ing] information available to those who are interested," wherever they live. *Best Van Lines*, 490 F.3d at 251. Whether or not anyone in the United States saw these statements, they are

---

[12]   These threshold defects aside, the Complaint does not even allege that persons in the United States used any of these alleged optional website interfaces.

[13]   And indeed, there are many programs on Ethereum. A recent academic paper found that "more than 61 million smart contracts have been deployed on Ethereum" Xiaofan Li et al., Characterizing Ethereum Upgradable Smart Contracts and Their Security Implications, *Preprint* at *arXiv*, available at https://arxiv.org/html/2403.01290v1 (Mar. 2, 2024).

nothing more than globally available Internet content.  *See 79th Grp.*, 2024 WL 36992, at *13 (defendant could not "reasonably anticipate being haled into court" in forum due to social media post accessible to forum residents but not "expressly targeted at or directed to" them); *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *2 (S.D.N.Y. Feb. 22, 2021) (worldwide "promotional activities" for cryptocurrency could not confer jurisdiction over foreign defendants).

### B.   The Complaint Fails to Establish Personal Jurisdiction Relating to the Alleged PulseChain and PulseX Transactions

The Complaint's allegations regarding Mr. Heart's actions with respect to PulseChain and PulseX likewise fall short of the jurisdictional bar.

The SEC alleges that, out of 179,000 sacrifice transactions between PulseChain and PulseX, some unspecified number of transactions were undertaken by unidentified individuals in the United States, one of whom allegedly resides in Brooklyn.  Compl. ¶¶ 55, 60, 67.  These "sacrifices" allegedly consisted of individuals voluntarily sending cryptocurrencies to two wallet addresses on the Ethereum network that the SEC dubs the "PulseChain Sacrifice Address" and the "PulseX Sacrifice Address."  *Id.* ¶¶ 51, 67.  The Complaint does not allege that these transfers were performed on the PulseChain blockchain, which did not yet exist, *id.* ¶ 53, or on any website or interface.[14]  The SEC notably does not allege that Mr. Heart took any actions to effect those transfers.

In short, the Complaint alleges unilateral, one-way transfers that individuals could make on a global blockchain network—the blockchain equivalent of individuals anonymously mailing items to a foreign post office box.  The owner of such a box would have no knowledge or control

---

[14]   To be sure, the allegations concerning the PulseChain and PulseX websites are merely that they contained information about the programs and instructions on where individuals could send their cryptocurrencies in connection with the "sacrifices." Compl. ¶¶ 51, 56, 67-68. Such websites, which "[do] little more than make information available to those who are interested in it, [are] not grounds for the exercise [of] personal jurisdiction." *Best Van Lines*, 490 F.3d at 251.

of who sends mail to it, or from what jurisdiction it was sent—indeed, the Complaint is utterly lacking any allegations that Mr. Heart knew who or where any PulseChain or PulseX sacrifice participants were.  The "unilateral activity" of those individual senders "cannot satisfy the requirement of contact with the forum." *Burger King*, 471 U.S. at 474; *Skrodzki*, 810 F. Supp. 2d at 510 (payments emanating from New York were "unilateral activity" insufficient to confer jurisdiction).

Nor does personal jurisdiction arise out of the subsequent launch of the PulseChain blockchain network and the PulseX software.  Upon their launch, a new blockchain network was created, software was published on it, and PLS and PLSX tokens (not alleged to have had any value at launch) were created in addresses on that new network, so that it could function as intended.  *See* Compl. ¶¶ 53-54 (PLS tokens made available on PulseChain network upon launch and used as "gas" for transacting on network); *id.* ¶¶ 67, 69 (PLSX tokens made available when PulseX software was deployed and are "native token" for PulseX software).  Mr. Heart's creation of a new global blockchain network and tokens on that network was not conduct targeted at or directed to the United States—just like other Internet activities that do not discriminate by geography and are "peculiarly non-territorial." *79th Grp.*, 2024 WL 36992, at *13; *see Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 413 (S.D.N.Y. 2021); *supra* Section I.A.

The allegation that these newly created tokens on the new PulseChain network were made available in addresses accessible to sacrifice participants is of no help to the SEC either.  Compl. ¶¶ 51-53, 69.  As explained above, the SEC does not allege that Mr. Heart had any way to know or control who would send cryptocurrencies to the sacrifice addresses, or from what country.  With no such information, he could not have foreseen that these activities would have had an effect in the United States, and in any case, the allegations fail to show that he "expressly targeted" his

20

activities there. *79th Grp.*, 2024 WL 36992, at \*13 (quoting *Realuyo v. Vila Abrille*, 2003 WL 21537754, at \*10 (S.D.N.Y. July 8, 2003)).[15]

### C. Exercising Personal Jurisdiction in this Context Would Not Be Fair, Reasonable, or Consistent

Independent of the lack of alleged minimum contacts between Mr. Heart and this forum, the Court cannot exercise personal jurisdiction over him because doing so would not be "reasonable in the circumstances," *Lombardi v. Staples, Inc.*, 2016 WL 11509961, at \*5 (E.D.N.Y. Dec. 15, 2016), and thus would not comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). To find personal jurisdiction based on forum residents' interactions with software on decentralized blockchain networks would amount to an endorsement of worldwide jurisdiction over blockchain networks and the millions of software programs running on them, since they—like the Internet itself—are available everywhere. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 321 (5th Cir. 2021) ("The place from which a person visits [defendant's] website is entirely beyond [defendant's] control."). And, given that blockchain software is inherently self-executing, permissionless, and borderless, it would unfairly deprive software publishers around the world of a "chance to limit or avoid [their] exposure to a particular [forum's] courts." *Id.* at 322-23. The only way to avoid submitting to worldwide jurisdiction would be to refrain from publishing software on blockchains at all—an outcome that would chill speech and stifle innovation.

---

[15] With respect to PulseX, the Complaint attempts to distract from these incurable deficiencies by referencing a single private online chat that Mr. Heart allegedly had with an individual in New York. Compl. ¶ 70. But it does not allege that Mr. Heart knew where that individual was. Nor do the allegations support the SEC's characterization of this person as a "prospective investor." Compl. ¶ 70. The alleged chat took place after the so-called "offering" had ended. Compl. ¶¶ 67, 70. And it described how to bring assets to the PulseChain network when it launched and use the PulseX software to trade with them. Compl. ¶ 70. Use of the future network and the software in general do not relate to the purported PulseX "offering."

Exercising personal jurisdiction here would also be inconsistent with prior rulings defining the scope of U.S. courts' jurisdiction over foreign defendants in cases involving cryptocurrency. In *PlexCorps*, this Court scrutinized the SEC's claimed jurisdiction over a foreign defendant involved in the blockchain industry.  This Court found jurisdiction existed where the defendant's actions included a "trip [to the United States that] likely related to the PlexCoin project," the "repeated use of United States-based payment servicers" to process "thousands of sales," "buyers transferring money through United States payment servicers," and U.S. users who "created accounts [on defendant's website] to purchase PlexCoin." *PlexCorps*, 2018 WL 4299983, at *10-12, 17.  The SEC has alleged nothing close to that here.  Rather, the SEC's claim more closely mirrors *Holsworth*, where the court observed that general worldwide communications were insufficient to confer jurisdiction over foreign defendants. *Holsworth*, 2021 WL 706549, at *2. Because the SEC has alleged merely that Mr. Heart engaged in global communications not targeted at the United States, it would not be reasonable to subject him to this forum's jurisdiction.

### D.    The Complaint Fails to Establish Jurisdiction Over Mr. Heart Via the "Alter Ego" Entities

To the extent the SEC is seeking to establish personal jurisdiction over Mr. Heart based on jurisdiction over the three software programs at issue—purported "unincorporated alter ego entities" of Mr. Heart—that theory falls flat.  Compl. ¶¶ 1, 12-14.  The SEC fails to allege any facts establishing that Hex, PulseChain, and PulseX exist as entities at all, let alone that they are "alter egos" of Mr. Heart.  The same conclusory assertions could have been made about Mr. Heart's keyboard or his computer; simply dubbing them "entities" would not make it so.  With nothing to support the SEC's assertion, dismissal of the claims based on any affiliation with these purported entities is required because "'[t]he court lacks personal jurisdiction over an entity that does not exist.'" *See Rivera v. City of New York*, 2022 WL 1523165, at *3 (S.D.N.Y. May 13,

2022) (quoting *Del Med. Imaging Corp. v. CR Tech USA, Inc.*, 2010 WL 1487994, at *4 (S.D.N.Y. Apr. 13, 2010)); *Monroque v. Lionsgate Television Inc.*, 2023 WL 5353406, at *1 (S.D.N.Y. Aug. 21, 2023) (dismissing claims against television series because it "lacks legal existence, and therefore also lacks the capacity to be sued"). This makes good sense, as the capacity to litigate "does not extend to entities that lack legal existence." *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382, 384 (2d Cir. 2021).

Even if these three software programs somehow were legal entities, the Complaint fails to plead that they are Mr. Heart's alter egos because the allegations "do not remotely establish that [he] exercises complete domination over [them]." *Handal & Morofsky, LLC v. Viatek Consumer Prod. Grp., Inc.*, 2018 WL 5886122, at *6 (S.D.N.Y. Nov. 8, 2018); *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 2011 WL 1142916, at *6 (S.D.N.Y. Mar. 22, 2011) ("[D]ismissal of an alter ego claim at the pleadings stage is appropriate where 'the pleadings are devoid of *any* specific facts or circumstances supporting' the assertion of alter ego liability.") (quoting *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)).

These purported entities are self-executing software programs and a blockchain network. Compl. ¶¶ 12-14, 20. The Complaint does not allege "sufficient factual support" to plead that these decentralized technologies are subject to Mr. Heart's "domination and control," *Bank of Am. v. Apollo Enter. Sols., LLC*, 2010 WL 4323273, at *5 (S.D.N.Y. Nov. 1, 2010), nor that they share "substantially identical" management, ownership, or purposes with Mr. Heart. *See Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 748 (2d Cir. 1996) (quoting *Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991)). Accordingly, the alter ego claims should be dismissed outright. *See Key Items, Inc. v. Ultima Diamonds, Inc.*, 2010 WL 3291582, at *10 (S.D.N.Y. Aug. 17, 2010). And in any event, they cannot form the

basis for personal jurisdiction over Mr. Heart—which must be premised on allegations regarding his own jurisdictional activities.  As demonstrated above, such allegations are woefully lacking.

## II.    THE SEC HAS FAILED TO PLAUSIBLY PLEAD THE EXISTENCE OF A DOMESTIC PURCHASE, SALE, OR OFFER OF SECURITIES

The federal securities laws apply only to transactions and conduct within the United States. The SEC bears the burden of plausibly alleging that the activity it challenges is sufficiently domestic.  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267-68 (2010); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012).  Yet the SEC's only relevant mentions of domestic activity are that certain persons who interacted with the software at issue or who sacrificed their cryptocurrencies reside there.  Compl. ¶¶ 34, 55.  That is patently insufficient. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014). The failure to plead that the at-issue transactions and conduct "occurred in United States territory" requires dismissal.  *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023).

### A.    The SEC Fails to Allege a Domestic Purchase or Sale of Securities in Connection with Its Antifraud Claims

#### 1.    The SEC Fails to Satisfy *Morrison* for Its Antifraud Claims

The SEC asserts antifraud claims under Section 10(b) of the Exchange Act and under Section 17(a) of the Securities Act only with respect to alleged PulseChain-related offers and transactions.  Compl. ¶¶ 77-82.  The SEC must allege that the supposedly fraudulent transactions were either (1) "in securities listed on domestic exchanges" or (2) "domestic transactions in other securities."  *Morrison*, 561 U.S. at 267; *see also SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (applying *Morrison* to Section 17(a) claims).  The Complaint does not allege any listing on a domestic securities exchange.  To establish "domestic transactions" under *Morrison* for non-exchange activity, the SEC must provide plausible factual allegations that either the purchaser or seller of PLS tokens (the tokens associated with PulseChain) "became irrevocably

bound within the United States or that title was transferred within the United States." *Absolute Activist*, 677 F.3d at 67-68.  Allegations about "a purchaser's citizenship or residency do[] not affect where a transaction occurs" and are entirely insufficient.  *City of Pontiac*, 752 F.3d at 181 (quoting *Absolute Activist*, 677 F.3d at 69).

The Complaint falls far short of meeting the Second Circuit's pleading requirements as set forth in *Absolute Activist*.  Allegations concerning U.S. activity are virtually non-existent.  There are no factual allegations about any particular transaction and how or why it is domestic—despite the fact the SEC has broad authority to investigate and obtain evidence to verify and advance its legal theories.  The dearth of such allegations is telling.

The Complaint merely alleges that an unidentified resident of Brooklyn and other unspecified and unquantified "investors in the United States" sent crypto assets to an address on the Ethereum blockchain associated with the PulseChain sacrifice.  Compl. ¶¶ 55, 60, 64.  That is all, and that is not nearly enough to establish that irrevocable liability was triggered in the United States.  Courts have consistently held that far more U.S.-centric conduct is insufficient.  *See, e.g.*, *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 294 (2d Cir. 2021) (not enough to allege that investor used U.S. bank accounts and purchased through New York-based broker-dealers); *City of Pontiac*, 752 F.3d at 181 (not enough to allege U.S. investors and "mere placement of a buy order in the United States"); *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (not enough to allege investors resided in New York and funds were wired to New York in connection with the transaction); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *29 (S.D.N.Y. Feb. 21, 2017) (not enough to allege plaintiffs were U.S. residents who transacted "through [trading] terminals located in the United States").

25

Irrevocable liability attaches only "when the parties to the transaction are committed to one another," or when, "in the classic contractual sense, there was a meeting of the minds of the parties." *Absolute Activist*, 677 F.3d at 67-68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)). The Complaint says that sacrifice participants would receive PLS tokens at some unspecified point in the future, and that one person "believed" he would receive PLS tokens. Compl. ¶¶ 51-52, 60. One-sided "belief" does not establish a meeting of the minds—in the United States or anywhere else—so as to establish irrevocable liability. That is particularly true where this purported belief is contradicted by express disclosures that sacrifice participants "should have no expectation." Ex. C, Transcript of July 21, 2021 YouTube Livestream at 14. In sum, the Complaint does not plausibly allege that any individuals became "irrevocably bound within the United States" to take receipt of PLS tokens. *Absolute Activist*, 677 F.3d at 67-68.[16]

To the extent the SEC's Section 17(a) claims are directed at alleged "offers," *Morrison* requires allegations that a defendant "(1) attempt or offer, in the United States, to dispose of securities . . . or (2) solicit, in the United States, an offer to buy securities." *Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (quoting *Morrison*, 561 U.S. at 269-70 (cleaned up)). There is "no doubt that the focus of the 'offer,' under the Securities Act, is on the person or entity attempting or offering to dispose or of soliciting an offer to buy securities[.]" *Id.* But the SEC does not allege that Mr. Heart did anything at all "in the United States."

---

[16] The Second Circuit's recent decision in *Williams v. Binance* only reinforces that the SEC's allegations here fall short. 2024 WL 995568 (2d Cir. Mar. 8, 2024). There, the court determined that allegations that: (1) "the transactions were matched, and therefore became irrevocable on servers located in the United States"; and (2) "pursuant to Binance's Terms of Use," plaintiffs' buy orders, which were sent from the United States "became irrevocable when they were sent," were collectively sufficient to satisfy *Morrison*. *Id.* at 15-16. The Complaint lacks any comparable allegations.

### 2.  Dodd-Frank Did not Override *Morrison* for SEC Antifraud Actions

Unable to satisfy *Morrison*, the SEC has previewed the argument that Congress "overrode" *Morrison* with respect to "antifraud enforcement actions," and resurrected the "conduct-and-effects" test that *Morrison* abrogated.  *See* ECF No. 24 at 2.[17]  The SEC is incorrect.

Congress did not override *Morrison*.  *Morrison* held that Section 10(b)'s extraterritorial scope is "a merits question," and not "a question of subject matter jurisdiction."  *Morrison*, 561 U.S. at 253.  In Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Congress only amended the Exchange Act's and Securities Act's relevant *jurisdictional* provisions.  *See* Pub. L. 111-203 § 929P(b), 124 Stat. 1376 (July 21, 2010) (codified at 15 U.S.C. §§ 77v(c), 78aa(b)).[18]  These jurisdictional changes do not affect *Morrison*'s holding regarding the scope of a claim under the federal securities laws.  *See SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 911-12 (N.D. Ill. 2013) (the "plain language" of the Dodd-Frank amendments "does not clearly express th[e] potential intent" to "rebut the presumption against extraterritoriality").  *Morrison* stands, and the SEC does not meet it.

### 3.  Even if Dodd-Frank Overrode *Morrison* for the SEC's Antifraud Claims, the SEC Fails the Conduct-and-Effects Test

Even if, counterfactually, the Dodd-Frank *jurisdictional* amendments changed the test for whether the SEC has stated sufficient allegations **on the merits** to pursue its antifraud claims, the SEC still has not satisfied its burden.  According to the SEC, the Dodd-Frank amendments grant jurisdiction in connection with "conduct within the United States that constitutes significant steps

---

[17]  Notably, the Complaint does not cite the Dodd-Frank amendments as a basis for jurisdiction.  *See* Compl. ¶ 16.

[18]  Section 78aa(b) (within the Exchange Act) provides: "The district courts of the United States . . . *shall have jurisdiction* of an action or proceeding brought or instituted by the Commission . . . alleging a violation of the antifraud provisions of this chapter involving (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States" (emphasis added).  Section 77v(c) (within the Securities Act) is nearly identical.

in furtherance of the violation" or "conduct occurring outside the United States that has a foreseeable substantial effect within the United States."  15 U.S.C. § 77v(c); 15 U.S.C. § 78aa(b).

The Complaint does not plausibly allege either "conduct" or "effects" in the United States. Vague allegations that unquantified participants in the PulseChain sacrifice resided in the United States, do not plausibly establish "effects" in the United States that are either "substantial" or "foreseeable," let alone both.  15 U.S.C. § 77v(c)(2).  There is no allegation that Mr. Heart targeted U.S. persons, "foresaw" that they would participate, or had any way to know or control who would unilaterally send crypto assets to the PulseChain sacrifice address.  *See supra* Section I.B.  Thus, the claim fails even under the SEC's own (incorrect) view of the law.  *See Interbrew v. EdperBrascan Corp.*, 23 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1998) (effects test not satisfied despite "U.S. investors who participated in this transaction," where the U.S. "investors" were "neither the intended nor the actual 'victims'").

### B.    The SEC Fails to Allege a Domestic Sale or Offer of Securities in Connection with Its Section 5 Claims

The SEC cannot dispute that the *Morrison* domesticity test applies to its Section 5 claims. For Section 5 claims, "[t]o the extent the Court is determining whether sales occurred domestically, . . . the transactional domesticity test set out in *Morrison*, and clarified by *Absolute Activist*, governs this analysis."  *SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at *12 (S.D.N.Y. Mar. 11, 2022).  Likewise, to determine whether offers occurred domestically, the same test applies as for a Section 17(a) claim.  *Id*. (quoting the test for "offers" laid out above from *Goldman Sachs & Co.*, 790 F. Supp. 2d at 165).[19]

---

[19]    *SEC v. Ripple Labs* carefully considered and expressly rejected the theory that the SEC asserts in its pre-motion letter, ECF No. 25 at 2, that Regulation S somehow applies in lieu of *Morrison*.  2022 WL 762966 at *10-12.

Again, the SEC fails to meet *Morrison*'s strictures.  The SEC alleges only that "investors in the United States" used the Hex software to create Hex tokens and participated in the PulseChain and PulseX sacrifices.  Compl. ¶¶ 29, 34, 67.  As discussed above, it is black-letter law that the SEC must provide factual allegations showing that irrevocable liability was incurred or title passed within the United States.  *Absolute Activist*, 677 F.3d at 67-69.  The SEC does not do so.  As to alleged "offers," "it is the location of the offerors—here [Mr. Heart]—that is relevant."  *Ripple Labs*, 2022 WL 762966, at *13.  But the SEC makes no allegation that Mr. Heart ever set foot in the United States at any relevant time, let alone that he made any offers in the United States.  The SEC has failed to plausibly allege that there were any domestic offers or sales of any securities.

**C.    The SEC's Claims Should Be Dismissed Because the Transactions It Alleges Are Predominantly Foreign**

Qualifying a securities transaction as "domestic" does not end the analysis.  Where, as here, the alleged transactions are so "predominantly foreign," application of the federal securities laws is "impermissibl[y] extraterritorial" regardless of the transaction's domesticity.  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) ("[A] domestic transaction is necessary but not necessarily sufficient to make § 10(b) applicable"); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 166 (2d Cir. 2021) ("*Morrison*'s 'domestic transaction' rule operates as a threshold requirement, and as such may be underinclusive.").  The Court should dismiss the SEC's claims in accordance with *Morrison* and *Absolute Activist*.  *See Cavello*, 986 F.3d at 164 ("Assuming (without deciding) that the transaction was 'domestic,' we agree with the district court that the claims are predominantly foreign.").

The Complaint's allegations concerning Mr. Heart evince predominantly foreign conduct. It alleges that Mr. Heart, an individual living in a foreign country, Compl. ¶ 1, published software on a globally accessible blockchain network, posted blockchain addresses on the Internet to which

anyone around the world could send crypto assets, and made statements on the Internet about the software.  There is nothing at all "domestic" about this alleged conduct.  Allegations that some persons in the United States, with no relation to or affiliation with Mr. Heart or the alleged "alter ego" entities, may have executed the software or sent their cryptocurrencies to those addresses does not change the foreign character of these allegations.  *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019) (under Commodities Exchange Act plaintiff must allege "domestic—not extraterritorial—conduct by Defendants that is violative of a substantive provision" of the statute).

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR SECURITIES FRAUD

The SEC attempts to assert claims for securities fraud under Sections 17(a)(1) and 17(a)(3) of the Securities Act and under Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder.  *See* Compl. ¶¶ 77-82.  These are only "scheme liability" claims, not claims for misleading statements or omissions under Rule 10b-5(b) or Section 17(a)(2).  *Id.*  These claims relate to only one of the three software programs at issue, PulseChain, and the claims hinge on a mere six paragraphs of allegations.  *See id.* ¶¶ 61-66.

"To prove scheme liability . . . 'the SEC must show that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter.'"  *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (quotation marks and citation omitted).  The SEC must also allege that the scheme was "in connection with the purchase or sale of any security," Rule 10b-5, or "in the offer or sale of any securities," Section 17(a).  *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017).  Rule 9(b) requires the SEC to plead securities fraud claims with particularity.  *See* Fed. R. Civ. P. 9(b).  For scheme liability claims, the SEC must "state with particularity 'what deceptive or manipulative acts were performed, which defendants performed them, when the acts were

performed, and the effect the scheme had on investors in the securities at issue.'" *Menaldi*, 164 F. Supp. 3d at 577 (quoting *In re Parmalat Sec. Litig.*, 383 F.Supp.2d 616, 622 (S.D.N.Y. 2005)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Even if PulseChain were a security (and it is not), the SEC's securities fraud claims fall far short of that high bar for several reasons. The SEC fails to allege with particularity any deceptive act or scheme, and it may not assert a "scheme liability" claim based on alleged misstatements or omissions—and it alleges no such misstatement or omission in any case. The SEC also fails to allege facts supporting a strong inference of scienter, and it pleads a factually impossible timeline. Each of those defects mandates dismissal.

## A.   The Complaint Alleges No Deceptive Act or Fraudulent Scheme

Pleading a deceptive act in connection with a scheme to defraud requires alleging "conduct involving cheating or trading in falsehoods," such as by "caus[ing] to believe the false, or to disbelieve the true." *SEC v. Dorozhko*, 574 F.3d 42, 50 (2d Cir. 2009); *see also In re Alstom SA, Sec. Litig.*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005) (scheme liability "is premised on a course of deceptive conduct undertaken by the defendant"). Where deceptive conduct is not alleged, the securities fraud provisions do not apply. *See United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).

The SEC's fraud claims fail because the Complaint alleges no deceptive conduct. The SEC asserts that "investors invested more than $354 million of crypto assets in PulseChain" and that Mr. Heart allegedly used about $8.9 million of PulseChain assets to fund purchases of luxury

goods.[20]  Compl. ¶¶ 61-62.  But the Complaint is remarkably silent as to what Mr. Heart stated would be done with the assets, owing to the fact that he promised nothing.  While the SEC makes the conclusory assertion that the expenditures were of "investor assets," that conclusion is supported by no particularized facts.  *Id.* ¶¶ 62-63.  There is no allegation that these assets belonged to or were being held in custody for anyone or that they were to be used for any specific purpose.  As the Complaint concedes, individuals knew they were "sacrificing" their assets.  *Id.* ¶ 66.  Indeed, two sentences omitted by the SEC that immediately precede the snippets that they selectively quote firmly contradict the bare assertion that so-called "investors" had any claim to the assets in question:

> [Interviewer]:  When you say sacrifice, what does it mean?  ***What is a sacrifice***?
>
> Mr. Heart:  ***You lose your coins.  You don't have them anymore.***  For the political statement that you believe free speech is a protected human right and blockchains are speech.  And you're sacrificing to prove that you believe that. . . .

Ex. C, Transcript of July 21, 2021 YouTube Livestream at 11.  In the same statement, Mr. Heart made clear that people could not expect that the sacrifice proceeds would be used for any charitable purpose:

> [T]hose [sacrifice] addresses, ***to the best of my knowledge do not go to charity***, and written right there on the [PulseChain] website, it says, 'you must have no expectation of profit from the work of others.'  And so, ***you should have no expectation of profit from the work of others.  You have lost your money, you have sacrificed it.  It is gone.***  The world has viewed this, and you've entered the sacrifice set.

*Id.* at 13-14.

---

[20]   The SEC makes the conclusory assertion that Mr. Heart spent $12.1 million, but the particularized factual allegations required by Rule 9(b) do not add up to that number or support that allegation.  *See Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc.*, 328 F. App'x 744, 750 (2d Cir. 2009).  The expenditures identified by the SEC amount to $8.9 million.  *See* Compl. ¶¶ 62-63 (alleging specific expenditures of $337,642; $534,916; $314,125; $285,799; $550,000; $800,000; $1,380,000; $419,192; and $4,280,000).  Even if the conclusory $12.1 million alleged figure were credited, the failure of the SEC's fraud claims would be no less complete.

Thus, the SEC's own allegations and the express statements incorporated by reference into the Complaint dispel the SEC's conclusory assertions that sacrificed assets were promised to be held for the individuals who sacrificed them—or to be used in any particular way at all. All the SEC points to is the alleged use of a "decentralized aggregator" and "Mixer" to conduct blockchain transactions, which supposedly concealed the use of proceeds. Compl. ¶ 66. But having identified no commitment made by Mr. Heart as to the use of sacrificed assets—and given the express disclosures that the assets were "lost," "sacrificed," and "gone"—the SEC cannot allege a scheme premised on not revealing how those proceeds were then used. "[A] securities fraud claim does not lie when the [defendant] 'disclosed the very . . . risks about which [plaintiffs] claim to have been misled.'" *See In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563, at *15 (E.D.N.Y. Sept. 29, 2023) (quoting *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011)) (alterations in original). *See also Finnerty*, 533 F.3d at 150 (rejecting conclusory assertion that scheme was "self-evidently deceptive" in the absence of any "impression that was misleading" or "anything false").

Unable to articulate any form of deception, the SEC instead relies entirely on an allegation that "Heart gave investors a reasonable expectation that their funds would be used to develop PulseChain." Compl. ¶ 64. But other than that bare assertion, the SEC alleges nothing to suggest that anyone would have had any "reasonable expectations" about how the admittedly sacrificed assets would be used. Nor could it, as the same public commentary that the SEC relies upon in the Complaint plainly states that individuals who sacrificed have "lost [their] money" and "should have no expectation[s]." Ex. C, Transcript of July 21, 2021 YouTube Livestream at 14. The SEC's hypothetical expectation to the contrary is thus not reasonable at all, is not pleaded with particularity, and should not be accepted. *See First Nationwide Bank v. Gelt Funding Corp.*, 27

F.3d 763, 771 (2d Cir. 1994) (courts may not credit "unwarranted deductions of fact" at pleadings stage, particularly under Rule 9(b)); *In re Meta Materials Inc.*, 2023 WL 6385563, at *8 (drawing only "***reasonable*** inferences in the plaintiff's favor") (emphasis added). The SEC alleges only that Mr. Heart spoke about PulseChain's development and the release of PLS tokens. Compl. ¶¶ 64-65. But, as the SEC admits, the PulseChain network *was* developed and *did* launch, and PLS tokens *did* become available. *Id.* ¶ 53. The alleged facts and statements leave the SEC without any semblance of a deceptive scheme.

The Complaint also fails under Rule 9(b) because it alleges no particularized facts to support the conclusory allegation that participants were given a reasonable expectation that 100% of the alleged sacrifice funds would be spent on software development for the PulseChain network. The SEC cannot point to a single statement, social media post, or disclosure to support this theory. Relying on one unnamed person to "confirm" his belief that his assets would be used to develop PulseChain does not save the claim. *Id.* ¶ 64. Where the SEC seeks to rely on unidentified witnesses, it "must establish [the] confidential witnesses' reliability and personal knowledge with sufficient particularity," which it does not do. *Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *1 (9th Cir. Dec. 21, 2021). In any event, a single unsubstantiated "expectation" is not enough to prop up a fraud theory contradicted by the facts alleged—that participants "sacrificed" their assets.

**B.    The Complaint Fails to State a Claim for Any Fraudulent Omission**

The SEC also attempts to portray its "reasonable expectations" theory as a fraudulent omission claim, alleging that Mr. Heart "never disclosed" that certain alleged purchases and transfers relating to PulseChain sacrifice assets would occur. Compl. ¶ 66. That theory fails to state a claim because (1) claims for "scheme liability" under Rules 10b-5(a) and 10b-5(c) and

Sections 17(a)(1) and 17(a)(3) cannot be asserted solely based on fraudulent statements or omissions; and (2) Mr. Heart had no duty to disclose the information in question.

Scheme liability requires "the performance of an inherently deceptive act that is distinct from an alleged misstatement." *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *15 (S.D.N.Y. Mar. 18, 2019) (quoting *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)), *aff'd*, 41 F.4th 47 (2d Cir. 2022). The SEC cannot bootstrap an omission case onto a scheme claim, as it tries to do here. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) ("[A]n actionable scheme liability claim also requires something ***beyond*** misstatements and omissions, such as dissemination."); *see also SEC v. Hwang*, 2023 WL 6134041, at *7 (S.D.N.Y. Sept. 19, 2023) (applying *Rio Tinto's* holding to Sections 17(a)(1) and (3) of the Securities Act). The claim that Mr. Heart "never disclosed" something, Compl. ¶ 66, falls precisely into the realm prohibited by *Rio Tinto* because it does not allege any inherently deceptive act distinct from the alleged misstatement or omission.

Nor would the claims survive had they been premised on an omission theory under Section 17(a)(2) or Rule 10b-5(b), which the SEC has not asserted. Such a theory would fail because Mr. Heart had no obligation to disclose the information at issue. "An omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360-61 (2d Cir. 2010) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) ("Silence, absent a duty to disclose, is not misleading. . . .") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). A duty to disclose arises only when there exists "a fiduciary or other similar relation of trust and confidence between [the parties]." *Chiarella v. United States*, 445 U.S. 222, 228 (1980).

There is no "fiduciary or other similar relationship" between Mr. Heart and the alleged PulseChain participants whom the SEC contends were entitled to further information. Mr. Heart is not alleged to be a director, officer, trustee, broker, financial advisor, or any sort of professional assuming a role of a fiduciary or similar confidential relationship. *See United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991). On the contrary, he is alleged to be someone who led the creation of a decentralized blockchain software platform—a position bearing no resemblance to a fiduciary, particularly given his repeated and express disclaimers in statements incorporated into the Complaint. *See, e.g.*, Ex. B, Transcript of Dec. 2, 2019 YouTube Livestream at 84 ("I'm not a financial advisor. You shouldn't consider this investment advice."). Because there is no such relationship, Mr. Heart had no duty of disclosure. *See Chiarella*, 445 U.S. at 230.

Nor can the SEC identify any statement that was rendered materially misleading by the alleged nondisclosure regarding expenditures of PulseChain assets. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011). There was no statement regarding the intended uses of such assets at all. Statements incorporated into the Complaint go so far as to state that the funds should be considered "lost" and "sacrificed," and that individuals "should have no expectation" regarding them. *See* Ex. C, Transcript of July 21, 2021 Livestream at 13. Accordingly, there was no "obligation to speak up" about their use. *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352-53 (2d Cir. 2022); *see, e.g.*, *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 752 (2d Cir. 2020) (nondisclosure of "true reason" for executive's termination did not render statements about his departure materially misleading).

C.    **The Complaint Fails to Allege Scienter**

The securities fraud claims also fail because the Complaint fails to allege facts sufficient to establish Mr. Heart's scienter. The Second Circuit's "higher standard for securities fraud . . . requires the SEC to allege facts giving rise to a strong inference of fraudulent intent." *SEC v.*

36

*Parnes*, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) (internal quotation marks omitted). The SEC must therefore establish that Mr. Heart "had both motive and opportunity to commit fraud" or provide "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). A complaint can pass this bar "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Moreover, when an allegation of scienter is based on the nondisclosure of information, "a failure to disclose particular information, by itself, can only constitute recklessness if there was an obvious duty to disclose that information." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006).

The Complaint pleads no deception at all, let alone that Mr. Heart knew or was reckless in not knowing that he was engaged in a deception of anyone. The Complaint cannot avoid the disclosures it incorporates by reference, in which Mr. Heart told participants they were "sacrificing" their assets such that they "have lost [them]" and "don't have them anymore," and that those assets "do not go to charity." Compl. ¶ 66; July 21, 2021 Livestream at 11. Rather than deceive people about the consequences of sending assets to the sacrifice wallet, Mr. Heart was transparent—he explained that the sacrifice meant the assets were gone and that he would make no representations about how the assets would or would not be used. The Complaint also alleges that Mr. Heart intended to develop and release the PulseChain blockchain network and create PLS tokens on that network, and concedes that Mr. Heart did so. *Id.* ¶¶ 51-53, 60.

In other words, Mr. Heart allegedly promised only things that came true, and he is alleged to have done exactly what he said he would do. Thus, not only does the Complaint fail to make the required allegation that "[Mr. Heart] secretly *intended* not to perform," it does not allege that

Mr. Heart failed to perform in any respect. *ATSI*, 493 F.3d at 105 (emphasis added). The SEC may disagree with Mr. Heart's statements and actions, but they do not give rise to any inference of fraudulent intent, let alone a strong one. The far more "cogent" and "compelling" inference is that Mr. Heart meant exactly what he said. *See Tellabs, Inc.*, 551 U.S. at 324.

### D.   The SEC's Factual Allegations Regarding the Challenged Expenditures Are Implausible Because They Are Impossible

All these legal defects aside, the SEC's fraud claim also fails because it is factually impossible, and therefore, implausible. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (facts must be alleged to state a claim that is "plausible on its face").

The SEC alleges the following timeline:

- In August 2021, Mr. Heart began making disputed purchases using the proceeds of certain cryptocurrency "mixer" transactions that allegedly mixed certain assets from the PulseChain sacrifice wallet. *See* Compl. ¶ 61 (noting that Mr. Heart "benefited" from mixer transactions through alleged purchases); *id.* ¶ 62 (alleging purchases made "from the Mixer transactions").

- In January 2022, Mr. Heart conducted the aforementioned "mixer" transactions, through which he allegedly mixed assets from the PulseChain sacrifice wallet and received the proceeds that he began using in August 2021. *See id.* ¶ 61 (describing "Mixer" transactions occurring on January 26, 2022).

If this timeline appears confusing, it is because it makes no sense. The SEC claims that Mr. Heart somehow began spending the proceeds of the "Mixer" transactions ***five months*** before those proceeds existed. That cannot be: The SEC alleges that Mr. Heart purchased cars and watches, not time machines. Even at the motion to dismiss stage, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent." *Vogel v. TakeOne Network Corp.*, 2023 WL 5276857, at *5 (S.D.N.Y. Aug. 16, 2023) (rejecting claims based on internally inconsistent allegations) (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001)). A timeline that necessitates time travel is not only incoherent but "sufficiently fantastic to defy reality as we know it." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 696 (2009) (Souter, J., dissenting) (noting that even before *Twombly*, fantastical allegations involving "time travel" were subject to dismissal).

## IV.     THE COMPLAINT DOES NOT ADEQUATELY ALLEGE THAT ANY PARTIES ENTERED INTO AN "INVESTMENT CONTRACT"

The SEC's Complaint also fails because it has failed to allege that any of Hex, PulseChain, and PulseX were offered as investment contracts and are therefore subject to the federal securities laws.  The SEC's Complaint spends paragraphs detailing (often inaccurately) how users acquired Hex, PLS, or PLSX tokens, what users could choose to do with the software programs, and the statements Mr. Heart made about how the software code representing those tokens operates.  Yet missing from the Complaint is a single allegation of how these programs function as a contract, let alone an ***investment*** contract entailing an expectation of profit. Without that, the Complaint fails to state a claim on which relief can be granted.

### A.     The SEC Is Required to Show that Hex, PulseChain, and PulseX Were Investment Contracts in Order for Federal Securities Laws to Apply

Each of the SEC's claims requires that the users of Hex, PulseChain, and PulseX have engaged in securities transactions.  Section 10(b) of the Exchange Act requires that the underlying conduct relate to "the purchase or sale of any security."  15 U.S.C. § 78j(b).  Section 17 of the Securities Act requires "the offer or sale of any securities."  15 U.S.C. §§ 77q(a)(1); (3). And Section 5 of the Securities Act applies to transactions only where the instrument at issue is a security.  15 U.S.C. §§ 77e(a); (c).  Absent a security transaction as to each of the three software programs, the SEC has no jurisdiction.

Section 3(a)(10) of the Exchange Act defines "security" to include stocks, notes, treasury stocks, security-based swaps, bonds, certificates of deposit for a security, and other items,

including "investment contracts." 15 U.S.C. § 78c(a)(10).[21]  The SEC alleges that users of the Hex, PulseChain, and PulseX software programs entered into investment contracts regarding the programs and that, accordingly, by making the programs available to the public, Mr. Heart engaged in the offering of securities.  *E.g*, Compl. ¶ 6.  These allegations and the circular, conclusory logic behind them fail as a matter of law.  The Complaint fails to allege the existence of any contract, underlying agreement, or promise of future actions between *any* parties, much less between Mr. Heart and any person who chose to engage with the software programs he allegedly published.

The Exchange Act does not define the term "investment contract."  Rather, the Supreme Court interpreted the term in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and subsequent cases. In *Howey*, the Court examined whether "an offering of units of a citrus grove development coupled with a contract for cultivating, marketing and remitting the net proceeds to the investor" constituted an investment contract.  *Id.* at 294.  The Court, relying on the meaning of "investment contract" in the state blue sky laws[22] that predated the Securities Act, held that an "investment contract" is any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  *Id.* at 298-99.  The Court concluded that the offering in *Howey* was an investment contract because—through the combination of "land sales *contracts*, warranty deeds and service *contracts*"—the purchasers "provide the capital and share in the earnings and profits," while "the promoters manage, control

---

[21]  Although the provisions defining "security" in the Securities Act and the Exchange Act employ "slightly different formulations," the Court has long treated them "as essentially identical in meaning."  *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[22]  State blue sky laws refer to state laws regulating the exchange of securities.  Most blue sky laws "were enacted long before the Securities Act of 1933."  *Black's Law Dictionary* (8th ed. 2004) (citations omitted); *see also* Lawrence M. Friedman, *American Law in the 20th Century* 163 (2002) (noting that "by the early 1930s, every state except Nevada had its own blue sky law").

and operate the enterprise" pursuant to their ongoing obligations in the service contracts.  *Id.* at 300 (emphasis added).

For a contract or agreement to create an expectation of profit as required by *Howey*, one party must have a continuing obligation to another to generate profits.  The Supreme Court has repeatedly reinforced this basic requirement in a series of decisions handed down since *Howey*, each of which has confirmed that an "investment contract" involves a contract in which an offeror has continuing obligations to an investor.  *See, e.g.*, *SEC v. Edwards*, 540 U.S. at 395, 397 (2004) (payphone sale agreement that promised a fixed rate of return was an investment contract); *Tcherepnin v. Knight*, 389 U.S. 332, 338-39 (1967) ("withdrawable capital share" in a corporation that afforded voting and dividend rights was an investment contract); *SEC v. United Ben. Life Ins. Co.*, 387 U.S. 202, 211 (1967) ("accumulation provision[]" of a deferred annuity plan was an investment contract).  The SEC itself has observed as much.  *See* Brief for the SEC, *SEC v. Edwards*, 540 U.S. 389 (2004), 2003 WL 21498455, at *17 (noting that the "second word in [investment contract] means an agreement between two or more persons to do or forbear something").

Cases in the Second Circuit and elsewhere similarly recognize that investment contracts require ongoing obligations from one party to another.  *See, e.g.*, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239-40 (2d Cir. 1985) (sale of certificates of deposit are "financial instruments [that] most clearly resemble 'investment contracts,'" where investors rely on the skill and financial stability of their wealth manager); *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 578 (2d Cir. 1982) (a sales license was an investment contract as it created ongoing sales obligations); *see also Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 179-81 (N.D. Cal. 1975) ("promises of the general nature made by

41

defendants" did not form an investment contract where there were no contracts imposing "actual commitments to perform specific services").

Conversely, where no continued obligation is owed from one party to another, both the Second Circuit and other Circuits have rejected assertions that an investment contract exists. *See, e.g.*, *Revak v. SEC Realty Corp.,* 18 F.3d 81 (2d Cir. 1994) (condominium purchase contracts, without more, were not investment contracts due to a lack of common enterprise); *Rodriguez v. Banco Central Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (no investment contract without a showing that any "obligated person or entity was promising the buyers to build or provide anything"); *Harman v. Harper*, 1990 WL 121073, *5 (9th Cir. Aug. 21, 1990) (joint venture agreement in property transaction was not an investment contract where the promoter was "not obligated by the terms of the [agreement] to effectuate [property] improvements" and equity interests were not investment contracts where issuer "made no promises to develop or otherwise manage the properties"); *De Luz Ranchos Investment Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th Cir. 1979) (no investment contract where there was no "obligation on the part of [defendant] to develop any land").

Recent cryptocurrency decisions are instructive on this point.  In *SEC v. Coinbase, Inc.*, for example, Judge Failla recently held that transactions on the Coinbase cryptocurrency platform plausibly met the definition of investment contracts based on multiple promises and future commitments made to token users.  *See* 2024 WL 1304037, at *20-23 (S.D.N.Y. Mar. 27, 2024). Specifically, in denying Coinbase's motion for judgment on the pleadings, Judge Failla focused on allegations that "developers advertise the fact that capital raised through retail sales of tokens will continue to be re-invested" and "issuers publicized to investors in the primary and secondary

markets that profits from the continued sale of tokens would be fed back into further development of the token's ecosystem. . . ." *Id.* at *25, *22.

Thus, the existence of a continuing obligation is necessary for the formation of an "investment contract" subject to the securities laws.

**B.   The SEC Fails to Allege That Any Purported "Investment Contract" Was Created Through the Hex, PulseChain or PulseX Software**

Here, the Complaint fails to allege the existence of a contract or agreement involving Mr. Heart (or anyone else) or any ongoing obligations owed by Mr. Heart (or anyone else) to people who used the three software programs at issue.   Unlike the allegations in *Coinbase*, Hex, PulseChain, and PulseX are not alleged to have required, promised, or advertised that users' assets would be invested into business growth, ecosystem development, or other coordinated and continued efforts.  Neither Mr. Heart nor anyone else is alleged to have made statements suggesting that users' assets would be invested or used for anything at all.

For instance, it was clearly disclosed that Hex launched as a complete product.[23]  Like Bitcoin, which the SEC concedes is not a security, Hex is a simple digital asset with no intended— or promised—functionality beyond its software code.  The Hex software allowed individuals to use their ETH tokens to create Hex tokens during a fixed period of time, Compl. ¶¶ 20, 34, and to "stake" their Hex tokens to programmatically create additional Hex tokens.  *Id.* ¶¶ 44-46.  Those functions were built into the software from the start and required no further input from anyone but those who chose to use it.  The Complaint does not allege otherwise.

Thus, the only efforts alleged are those of the Hex *users* themselves, who execute the Hex software to lock up their Hex tokens, and later execute the Hex software to programmatically

---

[23]   *See, e.g.*, Ex. B, Transcript of Dec. 2, 2019 YouTube Livestream at 88 ("Hex is fully functional, complete audit tested, running, now.  And it makes you no promises or expectations of anything at all because it's already awesome.").

create "new Hex tokens" at the end of their staking period.  *Id.* ¶ 46.  No lending, investing, custodying, technical, or managerial efforts are alleged.  The "annual return[s]" from staking are simply the mathematical result of tokens being created by stakers executing the software (which the SEC does not and cannot allege has ever failed to function as programmed).  *Id.* ¶ 45.  The Complaint's assertion that Mr. Heart "promised that the Hex smart contract would pay . . . additional Hex tokens to be delivered in the future" is merely a characterization of how that software function works.  *Id.* ¶ 22.  Mr. Heart was no more "promising" anything than a person "promises" that a log placed in a fire will burn.  *See* Ex. A, Transcript of Nov. 8, 2019 YouTube Livestream at 7 ("You're going to get more Hex … [T]hat's the math. I'm describing math to you.").  Consequently, users of the Hex software could not have reasonably expected to derive profit from managerial efforts of Mr. Heart or anyone else.[24]

No planned development for Hex is alleged.  As the Complaint concedes, Hex was published on an existing blockchain network, Ethereum.  Compl. ¶ 20.  Many software programs and tokens exist on the Ethereum network, and "smart contract tokens can be created by anyone with a basic understanding of Ethereum . . . ."  *See Risley*, 2023 WL 5609200, at *3 & n.2.  As such, no maintenance or development of the Hex software was required or even possible.  The program's continued existence on the Ethereum network has nothing to do with Mr. Heart—he could not shut it off even if he wanted to.  Nor could anyone else.  Without the possibility of continued efforts through a common enterprise, there can be no investment contract.  That sets Hex apart from cases where digital assets allegedly were intended to grow in value based on technological development.  *See, e.g.*, *Coinbase*, 2024 WL 1304037, at *22 (developers and

---

[24]   The entirety of the Hex staking apparatus is contained within Hex's immutable source code on the Ethereum blockchain, along with all of the other software functions incorporated by reference into the Complaint.  The content of the source code is publicly available and not subject to reasonable dispute.  That source code is available at https://etherscan.io/token/0x2b591e99afe9f32eaa6214f7b7629768c40eeb39#code.

promoters "advertis[ed] the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset"); *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *14 (S.D.N.Y. July 31, 2023) ("defendants premised their case for LUNA's profitability on the defendants' particular investment and technical acumen"); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 375 (S.D.N.Y. 2020) (purchasers "were entirely reliant on Telegram's efforts to develop, launch, and provide ongoing support for the TON Blockchain").

The Complaint also fails to allege that Mr. Heart owed any person a continuing obligation of any sort, much less an obligation to generate profits.  To allege that Mr. Heart stated that the design intention of Hex, PLS, and PLSX was to be valuable, or that he believed they would appreciate, is not to allege that he promised or undertook any ongoing obligations to do anything. Citations to Mr. Heart's comments on the cryptocurrency industry or various tokens come nowhere close to alleging that he undertook to generate profit on any user's behalf.  Also absent from the Complaint are allegations that Mr. Heart or others had any obligation to provide services for or have any interaction at all with the Hex, PulseChain, or PulseX software programs.

As to PulseChain, the Complaint alleges that Mr. Heart "promised to deliver PLS tokens . . . in the future."  Compl. ¶ 52.  Notably, that allegation does not quote any language that this "promise" was made by Mr. Heart, although the Complaint is otherwise replete with direct quotes from him.  And the allegation is contradicted by the very disclosures the SEC cites in the immediately preceding paragraph.  *See id.* ¶ 51 (discussing how the PulseChain website "instructed" people on how to "sacrifice" ETH or other tokens).  The SEC neglected to quote the full statement, which reads:

> You are sacrificing to prove how strong you believe that blockchains
> are speech and speech is a protected human right.  This is an
> important political statement.  You must have no expectation of
> profit from the work of others.  The set of people who have

> sacrificed to show their commitment to this political statement
> makes a great set of people to airdrop free things to. This [sic]
> sacrifice points are not meant to have any monetary value.
> Remember, you're not buying anything, the world is just noticing
> you are amongst a group of people that sacrificed to make a political
> statement.

*See* Ex. F, PulseChain Website; *see also* Compl. ¶ 51 (incorporating PulseChain website by reference). A similar statement was made as to PulseX. *See* Ex. G, PulseX Website ("You can give your crypto away, sacrifice it as a political statement. Once you have done that you do not own it anymore. Never expect profit from the work of others. Whoever owns your crypto after you sacrificed it does not work for you."); *see also* Compl. ¶ 67 (incorporating PulseX website by reference). These statements alone are sufficient to have made users aware that they were not owed any future profits or other obligations. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) (court need not accept "pleadings . . . contradicted either by statements in the complaint itself or by documents upon which its pleadings rely").

In the absence of evidence, the SEC retreats to conclusory assertions about individuals' supposedly reasonable expectations based on statements by Mr. Heart that merely describe how the software programs were designed to and in fact function. Why these expectations were "reasonable" in the face of explicit statements to the contrary remains unexplained. Unlike other digital asset cases in which courts have found the existence of an investment contract, the SEC's Complaint lacks allegations about what Mr. Heart ***did*** or even, as in *Coinbase*, about what he ***said he would do***. Even the standard articulated in *Coinbase* would not allow the finding of an investment contract on those alleged facts.

## V. THE COMPLAINT UNCONSTITUTIONALLY INFRINGES ON THE FIRST AMENDMENT RIGHTS OF MR. HEART AND THOUSANDS OF HEX, PULSECHAIN, AND PULSEX PARTICIPANTS

Unable to cite or allege dissemination of the sorts of offering materials or communications typically associated with securities contracts, the SEC seeks, in effect, to punish Mr. Heart for his public speech, in violation of his rights of free expression under the First Amendment. It also threatens to trample over the rights of thousands of individuals who express themselves through the software programs at issue.

### A. The Complaint's Reliance on Mr. Heart's Speech as a Basis for Penalizing Him Unconstitutionally Infringes on His First Amendment Rights

The Complaint's allegations and the underlying theory of the SEC's case hinge on Mr. Heart's statements describing the Hex, PulseChain, and PulseX software; explaining how the programs worked and how participants could execute the software programs; and offering his opinions about whether the software programs would be successful and the tokens valuable. Of the 58 paragraphs in the Factual Allegations section of the Complaint, 32 mention statements by Mr. Heart. *See* Compl. ¶¶ 20-28, 31-32, 38-40, 43-44, 46-49, 51, 54, 56, 58-59, 65-67, 70-72, 75. According to the SEC, this speech—what Mr. Heart *said*, not what he *did*—transformed the Hex, PulseChain, and PulseX software programs into investment contracts. The SEC all but concedes that its enforcement action is premised on Mr. Heart's speech, including overtly political speech that enjoys robust protection under the First Amendment. *See, e.g., id.* ¶ 66 ("Heart *frequently* claimed that an investment in PulseChain was *linked to free speech* . . . that 'you believe free speech is a protected human right and blockchains are speech, and you're sacrificing to prove you believe that.'") (emphasis added).

Bulldozing right past the free speech implications of Mr. Heart's statements about the nature of the PulseChain and PulseX sacrifices, the SEC plucks a handful of Mr. Heart's statements

from among hours upon hours of Mr. Heart's commentary and presents them out of context, ignoring the broader aims of Mr. Heart's statements and dismissing as "tongue-in-cheek" Mr. Heart's repeated "disclaimers about the status of his offerings under the securities laws." *Id.* ¶ 74.

The SEC ignores, for example, that Mr. Heart made the statements cited in the Complaint on platforms that have been likened to the modern public square, in the course of hours-long discussions during which he situated features of the software programs at issue here in the context of his policy objectives and political views in support of free expression, privacy, self-sovereignty, technology, education, and more. *See, e.g.*, Ex. B, Transcript of Dec. 2, 2019 YouTube Livestream at 58 ("I'm very lucky to be in an industry that could really change the relationship of man and government."); *id.* at 94 ("It's going to be so nice for me to be with people that believe what I believe, because I've been pushing and fighting, and trying to educate"); *id.* at 46 ("I hope that free speech is not penalizable.  I love to educate."); Ex. C, Transcript of July 21, 2021 YouTube Livestream at 11, 15 (PulseChain Sacrifice "for the political statement that you believe free speech is a protected human right and blockchains are speech"); *id.* at 14 ("[Y]ou're just being witnessed for a political statement . . . ."); Ex. D, Transcript of Jan. 16, 2022 YouTube Livestream at 16 ("The PulseX sacrifice is creating a set of people that believe freedom of movement and assembly are protected human rights.  Sacrifice to prove you believe."); *see also, e.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general . . . and social media in particular.") (citations omitted); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (First Amendment protects expressive conduct where there is "an intent to convey a 'particularized message'" as well as "a great likelihood that the message will be

understood by those who viewed it.") (quoting *Texas v. Johnson,* 491 U.S. 397, 404 (1989));
Compl. ¶ 25 (incorporating December 2, 2019 livestream by reference).

Because the Complaint seeks to punish Mr. Heart's for his political speech—for his
expression of opinions about, for example, the social and economic ills the defendant software
programs are designed to address, and the social and economic good they are meant to advance—
the enforcement action directly affects Mr. Heart's ability to engage in such speech.

Government actions that restrict or punish speech based on its content are permissible ***only***
if they can survive strict scrutiny, and here they cannot. *United States v. Playboy Entm't Grp.,
Inc.*, 529 U.S. 803, 813 (2000). To satisfy strict scrutiny, the Government must "prove that the
restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona
Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). Under this
standard, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature
must use that alternative." *Playboy Entm't Grp.*, 529 U.S. at 813 (internal citations omitted). The
Complaint fails both prongs of the analysis.

First, the SEC has no compelling interest in seeking the destruction of Hex, PulseChain,
and PulseX. Nor do they have a compelling interest in muzzling Mr. Heart by relying solely on
his prior statements as proof these tokens are securities. Yet this is precisely what the SEC seeks,
including a permanent injunction against the existence of Hex, PulseChain, and PulseX and against
Mr. Heart to bar him from "engaging in activities for purposes of inducing or attempting to induce
the purchase, offer, or sale of any crypto asset security by others . . . ." Compl. at 27. An injunction
based on the SEC's insistence that Mr. Heart's words and opinions somehow serve as the primary
basis to transform the Hex, PulseChain, and PulseX into securities would permanently infringe on

Mr. Heart's constitutional right to express his opinions about the state of cryptocurrency. This overbroad assault is not narrowly tailored and therefore cannot pass constitutional muster.

Second, any legitimate interest the SEC might have could be served by other measures that permit the continued existence of those expressive communities and allow Mr. Heart to continue enjoying his rights under the U.S. Constitution. *See United States v. Salameh*, 992 F.2d 445, 447 (2d Cir. 1993) (holding blanket prohibition on attorney speech regarding pending trial to be unconstitutional because it was not narrowly tailored and there was no showing that alternatives were inadequate). Because the SEC's enforcement action fails strict scrutiny, the Court should dismiss the Complaint as violating the First Amendment.

Even under the more permissive rubric of regulation of commercial speech, the SEC's enforcement action based solely on Mr. Heart's speech fails to meet Constitutional muster. Commercial speech is implicated when a law regulates how entities can speak about their goods or services. "The Supreme Court has articulated two definitions of what constitutes commercial speech." *Volokh v. James*, 2023 WL 1991435, at *7 (S.D.N.Y. Feb. 14, 2023). "First, speech is considered to be commercial when it 'does no more than propose a commercial transaction.'" *Id.* (quoting *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010)). "Second, 'commercial speech [constitutes] expression related solely to the economic interests of the speaker and its audience.'" *Id.* (quoting *Conn. Bar Ass'n*, 620 F.3d at 94).

Restrictions on commercial speech are only permissible if they (1) serve a substantial government interest; (2) directly advance that government interest; and (3) are "no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 44 (2d Cir. 2019) (citing *Central Hudson Gas & Elec. Corp. v. Public Servs. Comm'n*, 447 U.S. 557, 566 (1980)). Here, even assuming *arguendo* that the SEC is able to assert a substantial government

interest, this enforcement action seeks to impose restrictions that are far more extensive than necessary. *See* Compl. at 27 (asking this Court to "[p]ermanently bar[] Defendants from participating directly or indirectly, in the purchase, offer, or sale of any crypto asset security, or engaging in activities for purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset security by others").

**B.     The Inherent Features of Hex, PulseChain, and PulseX Warrant First Amendment Protection**

The Complaint offends the First Amendment not only by directly targeting Mr. Heart's speech, but also by targeting the publication of the Hex, PulseChain and PulseX computer code, which is itself protected expression and which serves as a platform for the protected expression of thousands of people.

Numerous courts, including the Second Circuit, have held that computer code itself—here, Hex, PulseChain, and PulseX—contains expressive elements that are protected by the First Amendment. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 434 (2d Cir. 2001) ("Communication does not lose constitutional protection as speech simply because it is expressed in the language of computer code."); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First Amendment.").

These holdings are consistent with the very foundation of the First Amendment. As the Supreme Court has explained, "[a]ll ideas having even the slightest redeeming social importance— unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion— have the full protection" of the First Amendment. *See Roth v. United States*, 354 U.S. 476, 484 (1957). Hex, PulseChain, and PulseX themselves are expressive computer code and, therefore, protected First Amendment expression. The code itself creates a library, a database of transactions,

through which people may publish ideas for public consumption. The SEC's enforcement action seeks to chill this protected mode of communication. *See Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) ("It is well-established that First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.").

In addition, Hex, PulseChain, and PulseX constitute twenty-first century "public squares" in which individuals enjoy a First Amendment right to share their ideas and make their voices heard. *See Packingham*, 582 U.S. at 107 (noting that the Internet "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard"). Participants execute code to disseminate their ideas, including anonymously if they so desire. By attempting to close such public squares and choke off this discourse, the Complaint runs afoul of the First Amendment. *Packingham*, 582 U.S. at 107; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ("[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.").

Lastly, participants' use of Hex, PulseChain, and PulseX further constitutes expressive and associative conduct protected under the First Amendment. *See generally Johnson,* 491 U.S. 397 (flag burning protected by First Amendment); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (protecting right to associate with others for "political, social, economic, educational, religious, and cultural ends"). "It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" *Church of Am. Knights of the Ku Klux Klan*, 356 F.3d at 205 (quoting *Virginia v. Black*, 538 U.S. 343, 358 (2003)). To determine whether conduct is sufficiently expressive and entitled to constitutional protection there must be

"an intent to convey a particularized message" as well as a great likelihood "that the message will be understood by those viewing it." *Id.* (quoting *Johnson*, 491 U.S. at 404).

Here, users' participation in Hex, PulseChain, and PulseX intends "to convey a particularized message" that would be "understood by those viewing" that participation. *Id.* Specifically, the Complaint admits that users participated in the PulseChain sacrifice to signal their belief that "free speech is a protected human right and blockchains are speech." Compl. ¶ 66. Participation in the PulseX sacrifice reflected users' support for "freedom of movement and freedom of association and freedom of assembly." Ex. D, Transcript of Jan. 16, 2022 YouTube Livestream at 1. Subsequently making available tokens that the SEC concedes are necessary for individuals to execute software on the blockchain and thereby engage in this expression is an extension of that protected speech. *See* Compl. ¶ 54 (PLS tokens as "gas" necessary to execute transactions on blockchain). This kind of associative conduct must receive First Amendment protection.

Each of these infringements of protected First Amendment ideals is permitted only if the restriction can pass strict scrutiny. As described in Section V.A, above, the SEC's Complaint falls well short of this exacting standard and should be dismissed.

*     *     *

For all of the foregoing reasons, the SEC's Complaint is an impermissible effort to penalize and restrain Mr. Heart's speech, along with the speech of thousands of users. Because the government may not selectively regulate the content of speech, and the SEC's Complaint at its core seeks to silence Mr. Heart, allegations principally relying on Mr. Heart's words should not be credited. Stripped of the allegations about what Mr. Heart said—speech that the SEC has no Constitutional authority to condemn—there is nothing left of the Complaint; there is no foundation

on which to claim that Hex, PulseChain, and PulseX were investment contacts; and the Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.  Because the manifest legal deficiencies in the Complaint cannot be cured by amendment, the dismissal should be with prejudice.

Dated: April 8, 2024


*/s/ Michael E. Liftik*
Michael E. Liftik

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
Michael Liftik (*pro hac vice*)
Nicholas Inns (*pro hac vice*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
michaelliftik@quinnemanuel.com
nicholasinns@quinnemanuel.com

Kristin Tahler
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kristintahler@quinnemanuel.com

Samuel P. Nitze
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samuelnitze@quinnemanuel.com


**GRAY REED**
Chris Davis (*pro hac vice*)
Joshua Smeltzer (*pro hac vice*)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (469) 320-6215
Facsimile: (469) 320-6926
cdavis@grayreed.com
jsmeltzer@grayreed.com

**KIRK & INGRAM, LLP**
David E. Kirk
43 West 43rd Street, Suite 279
New York, NY 10036
Telephone: (212) 859-3504
dkirk@kirkingram.com

Michael W. Ingram (*pro hac vice*)
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: (310) 487-0270
mingram@kirkingram.com


**CLARK SMITH VILLAZOR LLP**
Patrick J. Smith
Jeffrey D. Rotenberg
Brian T. Burns
250 West 55th Street, 30th Floor
New York, New York 10019
Telephone: (212) 582-4400
patrick.smith@csvllp.com
jeffrey.rotenberg@csvllp.com
brian.burns@csvllp.com


*Attorneys for Defendant Richard Heart*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of April, 2024, I served a true and correct copy of the foregoing Memorandum of Law in Support of Defendant Richard Heart's Motion to Dismiss, Defendant Richard Heart's Notice of Motion to Dismiss Complaint, and the Declaration of Michael E. Liftik with attached Exhibits A-G on counsel for Plaintiff the Securities and Exchange Commission via electronic mail.

By: /s/ *Nicholas Inns*
Nicholas Inns
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
nicholasinns@quinnemanuel.com

*Counsel for Richard Heart*