**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

              **v.**

**RICHARD SCHUELER aka RICHARD HEART, HEX, PULSECHAIN, and PULSEX**

                              **Defendants.**

---

**Case No. 1:23-cv-05749-CBA-PK**

**JURY TRIAL DEMANDED**

## PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANT HEART'S MOTION TO DISMISS

MATTHEW J. GULDE
guldem@sec.gov
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas 76102-6882
Ph: 817-978-1410

BEN KURUVILLA
kuruvillabe@sec.gov
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100
New York, New York 10004
Ph: 212-336-5599

July 8, 2024

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iii-xiii

PRELIMINARY STATEMENT ................................................................................... 1

SUMMARY OF THE ALLEGATIONS ....................................................................... 2

    1.    Hex ................................................................................................................. 3
    2.    PulseChain and PulseX ................................................................................. 4
    3.    Fraud and PulseChain Investors .................................................................... 5
    4.    Heart's Efforts Were Directed at Investors Worldwide, Including Specifically Within the United States ........................................................................ 6
        a.    Heart's Virtual Appearances at U.S. Events ......................................... 6
        b.    Heart's Personally Promoted Hex and PulseChain While in the United States ....... 7
        c.    Investors in the United States Purchased the Heart Securities ............... 8
        d.    Heart Engaged a U.S. Software Developer to Work on Hex, PulseChain, and PulseX ....... 8

STANDARD OF REVIEW ........................................................................................... 8

ARGUMENT .............................................................................................................. 10

I.     THE COURT HAS PERSONAL JURISDICTION OVER HEART ............................... 10

    A.    Heart Has Sufficient Minimum Contacts with the United States ..................... 10

    B.    The Assertion of Personal Jurisdiction is Reasonable ................................. 20

II.    THE COMPLAINT ALLEGES DOMESTIC TRANSACTIONS IN THE PURCHASE, SALE, AND OFFER OF SECURITIES ........................................................ 22

    A.    Congress Overrode *Morrison* with Respect to the Antifraud Claims ............... 22

    B.    The SEC Satisfies the Conduct-and-Effects Test with Respect to its Antifraud Claims ....... 25

    C.    The SEC Has Alleged Domestic Offers or Sales of Securities in Support of its Section 5 Claims ............................................................................ 28

        i.    The Complaint Adequately Pleads Domestic Sales Transactions under the *Morrison* Test Regarding Its Section 5(a) Claims ........................... 29
        ii.    The Complaint Adequately Pleads Domestic Offers of Securities ................. 33

 D. The Transactions Involved in This Case are Not Predominately Foreign ............36

III. THE COMPLAINT SUFFICIENTLY ALLEGES SECURITIES FRAUD AGAINST HEART ........................................................................................................................38

 A. Heart Engaged in Deceptive Acts and Made Material Omissions in Furtherance of a Fraud Scheme ...................................................................................................38

  i. Heart's Deceptive Acts....................................................................38
  ii. Heart's Material Omissions ...........................................................40

 B. Heart Acted with Scienter in Misappropriating Investor Funds ...........................42

IV. THE COMPLAINT ALLEGES THAT HEART OFFERED AND SOLD HEX, PULSECHAIN, AND PULSEX AS INVESTMENT CONTRACTS UNDER *HOWEY* ...................................................................................................................43

 A. *The Howey* Test..................................................................................................44

 B. No Contractual Obligation Requirement for *Howey* ............................................45

 C. Application of *Howey* Test.................................................................................48

  i. Hex.......................................................................................................48
  ii. PLS.....................................................................................................52
  iii. PLSX...................................................................................................54
  iv. Heart's Disclaimers ...........................................................................55

V. THE ALLEGATIONS OF THE COMPLAINT DO NOT ABRIDGE THE FIRST AMENDMENT RIGHTS OF HEART OR ANY USER OF HEX, PULSECHAIN, OR PULSEX ...............................................................................................................56

  a. Heart's Speech ...................................................................................57
  b. Code as Speech ..................................................................................59

**CONCLUSION**……… ...........................................................................................................62

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                      **Page(s)**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.,*
  600 U.S. 412 (2023) .................................................................................29, 33, 35

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012) ..................................................................... 29, 30

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) .................................................................................... 58

*Arcaro v. Parks,*
  143 S.Ct. 427, (2022)................................................................................19

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................. 8

*Audet v. Fraser,*
  605 F. Supp. 3d 372 (D. Conn. 2022) ....................................................... 50

*Balestra v. ATBCOIN, LLC,*
  380 F. Supp. 3d 340 (S.D.N.Y., March 31, 2019) ...................................... 50

*Ball v. Metallurgie Hoboken–Overpelt, S.A.,*
  902 F.2d 194 (2d Cir. 1990) ..................................................................... 6

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.,*
  849 F. App'x 289 (2d Cir. 2021) ......................................................... 33, 37

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................. 8

*Best Van Lines, Inc. v. Walker,*
  490 F.3d 239 (2d Cir. 2007) ............................................................... 11, 15

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) .............................................................................. 12, 14

*Calder v. Jones,*
  465 U.S. 783 (1984) ................................................................................. 11

*Cavello Bay Reinsurance Ltd. v. Shubin Stein,*
  986 F.3d 161 (2d Cir. 2021) ............................................................... 36, 37

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC,*
  596 U.S. 61 (2022) ....................................................................................60

*City of Pontiac Policemen's & Fireman Retirement Systems v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014).................................................................................32, 33

*Chloe v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) ....................................................................... *passim*

*Chris-Craft Indus. v. Bangor Punta Corp.*,
   426 F.2d 569 (2d Cir. 1970) ...................................................................... 34, 35

*Cohen v. Koenig*,
   25 F.3d 1168 (2d Cir. 1994) ............................................................................ 43

*Commodity Futures Trading Comm'n v. Vartuli*,
   228 F.3d 94 (2d Cir. 2000) .............................................................................. 61

*Connecticut Nat'l Bank v. Fluor Corp.*,
   808 F.2d 957 (2d Cir.1987) ............................................................................. 42

*Consol. Gold Fields PLC v. Minorco, S.A.*,
   871 F.2d 252 (2d Cir.) .................................................................................... 27

*CutCo Indus., Inc. v. Naughton*,
   806 F.2d 361 (2d Cir.1986) .............................................................................. 9

*Def. Distributed v. Platkin*,
   2023 WL 6389744 (D.N.J. Sept. 29, 2023) .................................................... 61

*Def. Distributed v. U.S. Dep't of State*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ...........................................................61

*Diskin v. Lomasney & Co.*,
   452 F.2d 871 (2d Cir. 1971) ........................................................................... 35

*Doe v. SEC*,
   2012 WL 78586 (N.D. Cal. Jan. 10, 2012) .................................................... 59

*EMI Christian Music Group, Inc., v. MP3Tunes, LLC*,
   844 F. 3d 79 (2d. Cir. 2016) ........................................................................... 17

*Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*,
   265 F. Supp. 3d 179 (D. Conn. 2017)..............................................................57

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
   147 F.3d 118 (2d Cir. 1998)............................................................................34

*Fed. Ins. Co. v. Gander & White Shipping, Inc.*,
   2020 WL 3833408 (S.D.N.Y. July 8, 2020) .................................................... 9

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ................................................................... 46, 47, 50

*Giunta v. Dingman*,
    893 F.3d 73 (2d Cir. 2018) ............................................................................ 31, 37

*Glen-Arden Commodities, Inc. v. Costantino*,
    493 F.2d 1027 (2d Cir. 1974) ................................................................... 35, 49, 50

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) ............................................................................... 9

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ........................................................................................... 10

*Green v. United States DOJ*,
    54 F.4th 738 (D.C. Cir. 2022) ............................................................................ 60

*Green, Austin, and Turner Broad, Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ........................................................................................... 60

*Happy Inv. Group v. Lakeworld Properties, Inc.*,
    396 F.Supp.175 (N.D. Cal., April 9, 1975) ...................................................... 48

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ............................................................................ 9, 56

*Kernan v. Kurz–Hastings, Inc.*,
    175 F.3d 236 (2d Cir.1999) ................................................................................ 17

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108, (2013) ......................................................................................... 24

*Licci v. Lebanese Canadian Bank SAL*,
    673 F. 3d 50 (2d Cir. 2012) ............................................................................... 10

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) ................................................................... 29, 33, 37

*Meng-Lin Liu v. Siemens A.G.*,
    978 F. Supp. 2d 325 (S.D.N.Y. 2013) ............................................................... 24

*Miami Grp. v. Vivendi S.A.*,
    838 F.3d 223 (2d Cir. 2016) .............................................................................. 30

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 257 (2010) ................................................................................... *passim*

*N. Am. Co. v. SEC*,
    327 U.S. 686 (1946) .......................................................................................... 58

*Loreley Fin. No. 3 Ltd. v. Wells Fargo Secs., LLC*,
  797 F.3d 160 (2d Cir. 2015) ........................................................................ 62

*In re Optimal U.S. Litig.*,
  865 F. Supp. 2d 451 (S.D.N.Y. 2012) ......................................................... 24

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ...................................................................................... 61

*Paris Adult Theatre I v. Slaton*,
  413 U.S. 49 (1973) ...................................................................................... 58

*Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) .................................................................. 36, 37

*Pino v. Cardone Cap., LLC*,
  55 F.4ᵗʰ 1253 (9th Cir. 2022) ................................................................ 19, 35

*Radiation Dynamics, Inc. v. Goldmuntz*,
  464 F.2d 876 (2d Cir. 1972) ....................................................................... 30

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994) ........................................................................... 48

*Rigby v. Jennings*,
  630 F. Supp. 3d 602 (D. Del Sept. 23, 2022) ............................................. 61

*RJR Nabisco, Inc. v. European Community*,
  579 U.S. 325 (2016) .............................................................................. 23, 28

*SEC v. Alexander*,
  2003 WL 21196852 (S.D.N.Y. May 20, 2003) .......................................... 59

*SEC v. Alpert*,
  2018 WL 1156012 (S.D.N.Y. Mar. 2, 2018) ........................................... 9, 56

*SEC v. Aqua-Sonic Prod. Corp.*,
  687 F.2d 577 (2d Cir.1982) ............................................................. 47, 49, 51

*SEC v. Arvida Corp.*,
  169 F. Supp. 211 (S.D.N.Y. 1958) ............................................................. 35

*SEC v. AT&T, Inc.*,
  626 F. Supp. 3d 703 (S.D.N.Y. 2022) .................................................. 57, 58

*SEC v. Balina*,
  2024 WL 2332965 (W. D. Tex. May 22, 2024) ................................... *passim*

*SEC v. Binance Holdings Limited, et al*
  23 cv-01599 (ABJ) (D.D.C. Jun 28, 2024) .......................................... 31, 44

*SEC v. Blockvest, LLC, No. 18 Civ. 2287,*
2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ...................................... 34, 35

*SEC v. Boock,*
2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) .......................................... 39

*SEC v. C.M. Joiner Leasing Co.,*
320 U.S. 344 (1943) .............................................................. 35, 46, 50

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
375 U.S. 180 (1963) ...................................................................... 58

*SEC v. Cavanagh,*
155 F.3d 129 (2d Cir. 1998) ............................................................. 35

*SEC v. Chicago Convention Ctr., LLC,*
961 F. Supp. 2d 905 (N.D. Ill. 2013) ................................................... 24

*SEC v. Chinese Consolidated Benevolent Ass'n,*
120 F.2d 738 (2d Cir. 1941) ............................................................. 35

*SEC v. CKB168 Holdings, Ltd.,*
2022 WL 3347253 (E.D.N.Y. Aug. 12, 2022) ........................................... 59

*SEC v. Coinbase, Inc.,*
2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ..................................... 44, 46, 49

*SEC v. Compania Internacional Financiera S.A.,*
2011 WL 3251813 (S.D.N.Y. July 29, 2011) ............................................ 24

*SEC v. Dunn,*
587 F. Supp. 2d 486 (S.D.N.Y. 2008) ................................................... 11

*SEC v. Edwards,*
540 U.S. 389 (2004) ..................................................................... 50

*SEC v. Egan,*
856 F. Supp. 401 (N.D. Ill. 1993) ...................................................... 59

*SEC v. Farnsworth,*
2023 WL 5977240 (S.D.N.Y. Sept. 14, 2023) .......................................... 42

*SEC v. Gruss,*
859 F. Supp. 2d 653 (S.D.N.Y. 2012) ................................................... 24

*SEC v. Kik Interactive, Inc.,*
492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................................... 47

*SEC v. Morrone,*
997 F.3d 52 (1st Cir. 2021) ............................................................. 24

*SEC v. Penn*
225 F. Supp.3d 225 (S.D.N.Y. 2016) ...................................................................39

*SEC v. Plexcorps,*
2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) ............................................... *passim*

*SEC v. Rio Tinto plc,*
41 F.4th 47 (2d Cir. 2022)...................................................................................40

*SEC v. Ripple Labs, Inc.,*
2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ....................................................... 29

*SEC v. Scoville,*
913 F.3d 1204 (10th Cir. 2019) .......................................................................... 24

*SEC v. SG Ltd.,*
265 F.3d 42 (1st Cir. 2001) ................................................................................ 55

*SEC v. Shapiro,*
2018 WL 2561020 (S.D.N.Y. June 4, 2018) ...................................................... 43

*SEC v. Straub,*
921 F. Supp. 2d 244 (S.D.N.Y. 2013) ................................................................ 20

*SEC v. Stubos,*
2022 WL 6776741 (S.D.N.Y. Oct. 11, 2022) .................................................... 39

*SEC v. Sugarman,*
2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ....................................................39

*SEC v. Telegram Grp., Inc.,*
448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................................... *passim*

*SEC v. Terraform Labs Pte Ltd.,*
684 F.Supp.3d 170 (S.D.N.Y. 2023) ............................................................*passim*

*SEC v. Terraform Labs Pte Ltd.,*
2022 WL 2066414 (2d Cir. June 8, 2022) .................................................... 12, 17

*SEC v. Tourre,*
2013 WL 2407172 (S.D.N.Y. June 4, 2013) ...................................................... 24

*SEC v. W.J. Howey Co.*
328 U.S. 293 (1946) ..................................................................................... *passim*

*SEC v. Wall St. Publ'g Inst., Inc.,*
851 F.2d 365 (D.C. Cir. 1988) ........................................................................... 57

*SEC v. Wey,*
246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................... 42

*SEC v. Yorkville Advisors, LLC,*
  305 F. Supp. 3d 486 (S.D.N.Y. 2018) ................................................................. 42

*SEC v. Zandford,*
  535 U.S. 813 (2002) ........................................................................................... 18

*Set Capital LLC v. Credit Suisse Group, AG,*
  996 F.3d 64 (2d Cir. 2019) ............................................................................. 42-43

*Sommer v. Aspen Dental Management, Inc.,*
  2016 WL 6998665 (E.D.N.Y. Nov. 30, 2016) .......................................................9

*Sullivan v. Barclays PLC,*
  2017 WL 685570 (S.D.N.Y. Feb 21, 2017) ......................................................... 33

*In re Time Warner Inc. Sec. Litig.,*
  9 F.3d 259 (2d Cir. 1993) ................................................................................... 41

*Tcherepnin v. Knight,*
  389 U.S. 332 (1967) ............................................................................................50

*Terraform Labs Pte Ltd v. SEC*
  143 S. Ct. 1020 (2023).........................................................................................12

*In re Turquoise Hill Res. Ltd.,*
  625 F. Supp.3d 164 (S.D.N.Y. Sept. 2, 2022) ..................................................... 39

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.,*
  916 F.3d 143 (2d Cir. 2019) ......................................................................... 11, 19

*United Housing Found., Inc. v. Forman*
  421 U.S. 837 (1975) ............................................................................... 45, 50, 51

*United States v. Alavi,*
  2008 WL 1989773 (D. Ariz. May 5, 2008) ......................................................... 61

*United States v. Leonard,*
  529 F.3d 83 (2d Cir. 2008) ........................................................................... 45, 46

*United States v. Naftalin,*
  441 U.S. 768 (1979) ........................................................................................... 35

*United States v. O'Brien,*
  391 U.S. 367 (1968) ........................................................................................... 60

*United States v. Vilar,*
  729 F.3d 62 (2d Cir. 2013) ................................................................................. 31

*United States v. Zaslavskiy,*
  2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ................................... 48, 50, 52, 54

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ................................................................ 60, 61

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...........................................................30, 40, 41

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018) ..................................................... 28, 33, 36

*Wildes v. BitConnect Int'l, PLC*
   25 F.4th 1341 (11th Cir.2022) ..................................................19

*Williams v. Binance*,
   96 F.4th 129 (2d Cir. 2024) ....................................................... 30

*Williams v. Preeminent Protective Servs., Inc.*,
   81 F. Supp. 3d 265 (E.D.N.Y. 2015) ...................................... 6, 9, 18

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) .................................................................57

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ........................................................... 10, 11

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*,
   471 U.S. 626 (1985) .............................................................. 58

*Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*,
   952 F. Supp. 1119 (W.D. Pa. 1997) .................................... 15, 16

## Federal Statutes

### Securities Act of 1933

Section 2, [15 U.S.C. § 77b] ................................................... 34, 44

Section 5, [15 U.S.C. § 77e] ...................................................... 1, 28

Section 17, [15 U.S.C. § 77q] ........................................................ 1

### Securities Exchange Act of 1934

Section 3, [15 U.S.C. § 78c] ......................................................... 45

Section 27, [15 U.S.C. § 78aa(b)] ............................................ 23, 24, 25

Section 10(b), [15 U.S.C. § 78j] ................................................... 1

**State Cases**

*DVD Copy Control Ass'n, Inc. v. Bunner*,
    75 P.3d 1 (Cal. 2003) ........................................................................................... 61

**Rules**

17 C.F.R. § 230.901 ............................................................................................... 34

17 C.F.R. § 230.902 ............................................................................................... 34

17 C.F.R. § 230.903 ............................................................................................... 34

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Memorandum of Law in Opposition to Defendant Richard Heart's (aka Richard Schueler ("Heart")) Motion to Dismiss the SEC's Complaint ("Motion").  For the reasons set forth below, the Court should deny the Motion to Dismiss.

## PRELIMINARY STATEMENT

Between December 2019 and April 2022, Defendants engaged in unregistered offers and sales of securities in the form of crypto asset securities.  Defendants collected over $1 billion from investors worldwide, including many in the United States, selling Hex, PulseChain, and PulseX assets.  Additionally, Heart and PulseChain misled investors about the use of investor funds, and Heart misappropriated investor funds worth millions of dollars for personal luxury purchases, including watches, cars, and the so-called largest black diamond in the world.

All Defendants are charged with violations of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)] and Defendants Heart and PulseChain are additionally charged with violations of the antifraud provisions under Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [15 U.S.C. § 240.10b-5].

In his Motion asking the Court to dismiss all the claims against him, Heart disregards the well-pleaded allegations of the Complaint and the applicable law.

*First*, the Complaint and declaration submitted with this motion sufficiently allege facts supporting Heart's contacts with the United States such that the Court asserting personal jurisdiction over him comports with the requirements of due process and fairness.

1

*Second*, the Complaint adequately alleges substantial steps taken in the United States in furtherance of Heart's fraud and a foreseeable substantial effect on United States investors sufficient to satisfy the "conduct and effects" test for the Commission's fraud claims.  In addition, the Complaint adequately alleges domestic purchases, sales, and offers of securities in compliance with *Morrison v. Nat'l Austl. Bank Ltd.,* 562 U.S. 247 (2010) and applicable statutes and precedent.

*Third*, the Complaint's securities fraud allegations satisfy FED. R. CIV. P. 9(b) and 8(a), stating "with particularity the circumstances constituting fraud or mistake" and providing Defendants Heart and PulseChain with the required notice of the SEC's fraud claims.

*Fourth*, the Complaint adequately alleges that Heart offered and sold securities, which involved an investment of money in a common enterprise with an expectation of profits from the efforts of others, satisfying the Supreme Court's test set out in *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946).

Finally, the SEC's Complaint does not unlawfully abridge the First Amendment rights of Heart or any Hex, PulseChain, or PulseX investor.

For these reasons and those set forth below, Heart's Motion should be denied.

## SUMMARY OF THE ALLEGATIONS

Heart raised more than $1 billion in the unregistered offer and sale of crypto asset securities to retail investors in the United States and elsewhere.  *See* Complaint ("Compl."), ¶¶ 1, 3, 55, 67.  Heart personally directed the creation and development of three crypto assets called Hex, Pulse or PLS, and PLSX (together, "Heart Securities"), including directing the efforts of programmers who wrote the code for each.  *See, e.g., id.* at ¶¶ 26, 33, 72.  Heart personally promoted the Heart Securities to investors in the United States and immediately misappropriated

millions of dollars of PulseChain investor funds to buy cars, watches, and a diamond for himself. *See, e.g., id.* at ¶¶ 1, 3, 55, 61-66.

**1.      Hex**

From December 2019 through November 2020, Heart offered and sold Hex as a crypto asset security he designed to operate on the Ethereum network.  *Id.* at ¶ 20.  Heart billed Hex as the first "blockchain certificate of deposit," touting a feature of the crypto network in which investors could "stake" their tokens in a process that would purportedly continually increase their holdings of Hex.  *See id.* at ¶¶ 20-23, 44.  Heart claimed that Hex "was built to be the highest appreciating asset that has ever existed in the history of man."  *Id.* at ¶ 1, 25.  It appears that investors tendered as much as $678 million worth of ETH tokens to buy Hex tokens between December 2019 and November 2020.[1]

By "staking" their Hex tokens in a process that Heart designed, Hex investors could send their tokens to an address with no owner – the Ethereum blockchain's genesis address.  *Id.* at ¶ 22.  Heart explained on many occasions that Hex token holders would receive an average investment return of 38% in exchange for "staking" their Hex tokens in this manner.  *Id.*  Heart repeatedly emphasized that owning Hex would lead to profit for investors, stating, for example, "if you want to get rich [Hex is] built for that."  *Id.* at ¶ 24.

Heart publicized and personally undertook efforts that he claimed would make Hex successful.  He published myriad "how-to" videos designed to stoke interest and investment in Hex (*Id.* at ¶ 25); he undertook efforts to get Hex listed on so-called crypto asset trading platforms (Compl., ¶ 28); and he designed incentives to lure additional investors to Hex. *Id.* at ¶¶

---

[1] It is unclear how much of that amount was "recycled" in non-arms-length transactions by Heart or other insiders to create the false impression of organic demand for Hex tokens.  After Heart received more than 2.3 million ETH from Hex investors, analysis indicates that the ETH was repeatedly sent back to the Hex contract address in exchange for more Hex.  Compl., ¶ 37.

32-33.  After the Hex Offering, Heart continued to promote Hex and the "Hex ecosystem" by publicly touting Hex, encouraging investors to buy and stake Hex, and advancing the notion that the upcoming launch of PulseChain and PulseX would generate profits for investors.  Compl., ¶¶ 39-43.  As of July 2023, Hex's value has dropped about 98.4% below its all-time high.  *Id.* at ¶ 76.

### 2.      PulseChain and PulseX

Between July 2021 and April 2022, Heart raised more than $354 million in a securities offering to develop PulseChain, a purported fork[2] of the Ethereum network.  *Id*. at ¶ 51.  In a process that he called "sacrificing," Heart instructed PulseChain investors to send him various forms of crypto assets in order to receive Pulse ("PLS"), PulseChain's native token at some point in the future.  *Id.* at ¶ 52.  To avoid Pulse being classified as a security under the *Howey* test, Heart referred to investments (deposits of crypto assets by investors in return for the promise to deliver to them PLS tokens) as "sacrifices" that would yield nothing in return.  However, the statements that Heart made emphasizing that investors would profit from PLS tokens and directly tying that profit to development of PulseChain, contradicted those disclaimers. *See, e.g.,* Compl. ¶¶ 6, 51-52, 58-60.

Between December 2021 and April 2022, Heart raised more than $676 million in a securities offering to develop PulseX, which he described as a fork of Uniswap's so-called decentralized trading platform.  *Id*. at ¶ 67.  Heart instructed investors to give him crypto assets in exchange for the promise of PLSX (the PulseX native token) that could at some later time supposedly be used on the platform that he was still developing.  *Id*.

---

[2] A fork is a blockchain software update that can either implement minor changes to the existing protocol or cause it to split into two separate and incompatible protocols.  If the protocol change is significant enough, it can lead to the creation of a new blockchain, plus a new crypto asset.

PulseChain and PulseX did not launch – and investors did not receive Pulse or PLSX tokens – until May 12, 2023, more than a year after the end of the offering period for PulseChain and PulseX.  Compl., ¶ 60.  In the interim, the value of the PulseChain and PulseX investments depended solely on the efforts of Heart and his team of developers, who were undertaking efforts to successfully launch the platform and the token.  *Id.* at ¶¶ 60, 72, 75.

### 3.    Fraud on PulseChain Investors

While he was raising funds from PulseChain investors, Heart used at least $12.1 million of their "sacrificed" funds for personal luxury purchases including watches, cars, and what he calls the largest black diamond in the world.  *Id.* at ¶¶ 61-63.  Heart often spoke about the efforts that he and his developers were making to bring PulseChain online, and he often stated that the purpose of PulseChain investors' sacrifice was to support "free speech." Yet, Heart never disclosed that he was instead actually using millions of dollars' worth of their funds for his own personal luxury purchases.  *Id.* at ¶ 6, 7, 60, 62, 65, 66, 75.  Additionally, before he made these purchases, Heart transferred the PulseChain investors' funds through an extensive series of back-and-forth transactions apparently aimed at obfuscating the path and origin of the funds.  *Id.*, ¶¶ 61-62. Specifically, it appears as if Heart transferred or directed the transfer of approximately $217 million in PulseChain offering proceeds, consisting of various crypto assets from the PulseChain "sacrifice address" to a privately held digital wallet. *Id.* at ¶ 61.  Then, after the closing of the PulseChain offering period, more than $26.5 million of funds were transferred from that private wallet in a series of back-and-forth transactions resulting in approximately $26 million in investor funds being deposited to the private digital wallet.  *Id*.  Next, it appears as if Heart transferred, or directed the transfer of, $26 million in investor funds through a crypto asset "mixer" —a program that facilitates anonymous transactions by obfuscating their origin,

destination, and counterparties— and then through at least 50 intermediary wallets before ending up on three purported crypto asset platforms. *Id*. Following the "mixer" transactions, Heart misappropriated at $12.1 million of PulseChain investor assets to fund purchases of luxury goods. *Id.* at ¶¶ 62-63. As of July 2023, PLS and PLSX are practically worthless due to declines in their value. *Id.* at ¶ 76.

### 4. Heart's Efforts Were Directed at Investors Worldwide, Including Specifically Within the United States

Heart personally marketed and promoted Hex, PulseChain, and PulseX and the Hex, PLS, and PLSX tokens, primarily through the Internet, including YouTube Livestream videos, on social media, and through websites that he owns, including hex.com, hex.win, ethhex.com, pulsechain.com, and pulsex.com. Compl. ¶¶ 22, 24-28, 39-41, 48-49, 56, 58-59, 70-72. Heart directed many of his promotional efforts specifically towards investors in the United States, appearing virtually and in-person at U.S.-based events marketing his crypto products. *See* Declaration of Derek Kleinmann, ¶¶ 5-10 ("Kleinmann Decl." attached hereto).[3] Heart also developed Hex, PulseChain, and PulseX using at least one developer that resided in the United States. *See* Declaration of Kyle Bahr, *e.g.*, ¶¶ 4-11, 44-53, ("Bahr Decl.," attached hereto).

#### a. Heart's Virtual Appearances at U.S. Events

In March 2022, during the offering periods for PulseChain and PulseX, and while Hex was being traded on the secondary market, Heart appeared virtually at a "Hex Conference" before a live audience in Las Vegas, Nevada. Heart's virtual appearance was also livestreamed on YouTube. During this appearance, he promoted each of Hex, PulseChain, PulseX, and the

---

[3] In responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff is not limited to the facts pleaded in the complaint and may meet its jurisdictional burden through facts pleaded in response to the motion, including in affidavits and other supporting evidence. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990); *Williams v. Preeminent Protective Servs., Inc.*, 81 F. Supp. 3d 265, 269 (E.D.N.Y. 2015).

Heart Securities.  *See* Kleinmann Decl., ¶ 5. Heart also appeared virtually on a screen before a live audience at "Pulsecon," another in-person conference in Las Vegas in September 2022, which was attended by approximately 3,000 people.  *Id*., ¶¶ 8-10.   This event occurred before PulseChain and PulseX were launched in May 2023.  Compl., ¶¶ 13, 14, 53, 69.  During his Pulsecon appearance, Heart promoted PulseChain wearing a Pulsechain.com shirt, telling the audience that it will be faster and cheaper than the Ethereum network, and providing updates on PulseX's development.  At the Las Vegas Pulsecon, Heart also discussed additional developments and features that were planned for Hex.  Kleinmann Decl., ¶ 9.  These appearances before live audiences in the United States were interactive with Heart engaging in a dialogue with interviewers and audience members and responding to questions.  *Id*., ¶¶ 5, 10.

**b.   Heart Personally Promoted Hex and PulseChain While in the United States**

In August 2022, before PulseChain launched and while Hex was trading on the secondary market, Heart appeared in person at a studio in Miami, Florida, for an interview for a podcast being conducted by U.S.-based interviewers where Hex and PulseChain were promoted.  During this interview, Heart promoted Hex and PulseChain with the interviewers, other guests/interviewees, and members of the YouTube livestream audience.  Kleinmann Decl., ¶¶ 6-7.  Listeners understood this event as a promotion of the investment potential for these assets.  For example, during Heart's interview, one of the messages from viewers in the livestream chat which was read on-air to the audience indicated: "PulseChain will make more billionaires/millionaires than Ethereum" and "Hex is bigger than Bitcoin."  *Id.*, ¶7.  Heart told the interviewers and the listening audience that Hex increased its value 10,000 times in two years and bragged about the wealth these investments had supposedly brought him, noting he possessed the "world's largest diamond," "$10 million in watches" and "$3 million of cars." *Id.*,

¶6. (Without noting that, in fact, he had obtained these items simply by misappropriating investor funds as discussed, *infra*.).

### c. Investors in the United States Purchased the Heart Securities

As alleged in the Complaint, U.S. investors purchased the Heart Securities.  Compl., ¶¶ 29, 34, 55, 60, 67.  Additionally, since the filing of the Complaint, the Commission has received reports from at least ten U.S. investors who purchased the Heart Securities, and in some cases, invested in more than one of these offerings.  Kleinmann Decl., ¶¶ 11-13.  At least one of these investors, who resides in California and invested in each of the three offerings, specifically referenced that he learned of Heart and the three offerings through YouTube, Twitter, and Telegram.  *Id.*, ¶ 12.  Another investor, who resides in Ohio, invested in Hex and stated that he learned about Heart on YouTube and Twitter.  *Id.*, ¶13.

### d. Heart Engaged a U.S. Software Developer to Work on Hex, PulseChain, and PulseX

Heart also engaged a software developer, Kyle Bahr, who resides in the United States, to help develop Hex, PulseChain, and PulseX.  Bahr Decl., ¶ *e.g.*, ¶¶ 4-11, 44-53.  Heart directed Bahr to hire other software developers to assist with developing PulseChain and PulseX.  *Id.*, ¶44; Compl., ¶¶ 72, 75.  Bahr helped facilitate interview questions and answers between Heart and the potential developers, and, at Heart's direction, would send a contract for signature to the potential hire.  Bahr Decl., ¶ 44.

### STANDARD OF REVIEW

"To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Court's function on a motion dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Sommer v. Aspen Dental Management, Inc.,* No. 1:16-cv-3027 (KAM), 2016 WL 6998665 at *1 (E.D.N.Y. Nov. 30, 2016) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).  In deciding the Motion, the Court must assume "the truth of the facts asserted in the Complaint" and draw "all reasonable inferences from those facts in favor of the plaintiff."  *SEC v. Alpert*, No. 1:17-cv-1879 (LTS), 2018 WL 1156012, at *2 (S.D.N.Y. Mar. 2, 2018) (citing *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009)); *accord Federal Ins. Co. v. Gander & White Shipping, Inc.,* No. 1:19-cv-7209 (ALC), 2020 WL 3833408, at *1 (S.D.N.Y. July 8, 2020) (same).

However, in responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff is not limited to the facts pleaded in the complaint and may meet its jurisdictional burden through facts pleaded in response to the motion.  *See Ball,* 902 F.2d at 197. To successfully oppose a motion under Rule 12(b)(2), a plaintiff only needs to make a *prima facie* showing of personal jurisdiction over the defendant and the Court construes the pleadings and affidavits in the light most favorable to plaintiff, resolving all doubts in plaintiff's favor. *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 (2d Cir. 2010)*.*  A plaintiff may demonstrate a *prima facie* showing of jurisdiction by way of the complaint's allegations, affidavits, and other supporting evidence, which are evaluated in the light most favorable to plaintiff.  *Preeminent Protective Servs.,* 81 F. Supp. 3d at 269 (citing *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 364–65 (2d Cir. 1986)).

**ARGUMENT**

## I.     THE COURT HAS PERSONAL JURISDICTION OVER HEART

Heart argues that he can evade the Court's exercise of personal jurisdiction because he lives abroad and claims he did not direct any activity at the United States.  The record, however, reflects Heart's purposeful availment of the United States by creating a market for the offer, sale, and purchase of the Heart Securities here.  Heart thus has the necessary minimum contacts with the United States to support this Court's exercise of personal jurisdiction over him.  These contacts with the United States demonstrate that Heart should reasonably have anticipated the possibility of being haled into court in the United States.  *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).  Accordingly, the SEC has made the necessary *prima facie* showing that this Court has personal jurisdiction over Heart.  *Chloe,* 616 F.3d at 163.

### A.  Heart Had Sufficient Minimum Contacts with the United States

To assess whether the exercise of personal jurisdiction comports with the Due Process Clause, the constitutional analysis "consists of two separate components: [1] the 'minimum contacts' inquiry and [2] the 'reasonableness' inquiry."  *Licci ex rel. Licci v. Lebanese Canadian Bank*, 673 F.3d 50, 59 (2d. Cir. 2012) (quoting *Chloe,* 616 at 164).  The minimum contacts inquiry requires the Court to consider whether the defendant has sufficient contacts with the forum to justify the Court's exercise of personal jurisdiction.  *Chloe,* 616 F.3d at 164.  In evaluating these contacts, the Court may consider whether there is a basis for either "general or all-purpose jurisdiction" – involving "continuous and systematic contacts" with the forum – or "'specific, case-linked jurisdiction' – where conduct—or the effects of that conduct –'take place in the forum.'"  *SEC v. Plexcorps*, 1:17-cv-7007 (CBA), 2018 WL 4299983 at *8 (E.D.N.Y. Aug. 9, 2018) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

The Second Circuit recognizes three requirements to exercise specific jurisdiction over a non-resident.  First, the non-resident must have "purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State," second, the "plaintiff's claim must arise out of or relate to the [non-resident's] forum conduct," and, third, "the exercise of jurisdiction must be reasonable under the circumstances."  *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotations and citations omitted).  The Court "must evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test," *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007), to determine whether the contacts are such that defendant should "reasonably anticipate being haled into Court."  *World-Wide Volkswagen*, 444 U.S. at 297.

Minimum contacts may be demonstrated by either a defendant's "overall activity within the forum state" or by the "in-state effects of out-of-state activity."  *Plexcorps*, 2018 WL 429983 at *9 (quoting *Best Van Lines*, 490 F.3d at 243).  For the "effects test" for minimum contacts, a defendant's out-of-state conduct will support the assertion of personal jurisdiction in the forum when defendant's conduct was "expressly aimed" at the forum and caused "effects" in the forum.  *Calder v. Jones*, 465 U.S. 783, 789-90 (1984).  Courts in the Second Circuit have used the "effects test" to uphold personal jurisdiction when the defendant's conduct giving rise to the plaintiff's claims occurred entirely outside of the forum but (1) the defendant's acts caused effects in the United States, (2) the effects were the direct and foreseeable result of the actions abroad, and (3) the defendant knew or had good reason to know that the actions would have effects in the United States.  *Plexcorps*, 2018 WL 429983 at *9 (quotation marks omitted) (quoting *SEC v. Dunn*, 587 F. Supp. 2d 486, 509 (S.D.N.Y. 2008)).

Here, contrary to Heart's assertions, Heart cannot avoid the Court's jurisdiction by simply relying on the fact that he lives abroad.  See *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State") (emphasis in original).  Here, the Court can assert specific jurisdiction over Heart because of his contacts with the United States that relate directly to the SEC's allegations regarding Hex, PulseChain, and PulseX.  As noted, the first prong of the personal jurisdiction test for a non-resident considers a defendant's purposeful actions within or directed toward the United States.  *SEC v. Terraform Labs Pte Ltd*., No. 22-368, 2022 WL 2066414, at *3 (2d Cir. June 8, 2022), *cert. denied sub nom*. *Terraform Labs Pte Ltd. v. SEC*, 143 S. Ct. 1020 (2023) ("*Terraform I*").  As the Second Circuit recently held, personal jurisdiction over foreign defendants is proper where they "purposefully availed themselves of the U.S. by promoting the digital assets at issue in the SEC's investigation to U.S.-based consumers and investors." *Terraform I*, 2022 WL 2066414, at *3.

Heart's conduct easily satisfies this test and is indistinguishable from *Terraform I*.  He engaged in conduct that was directed at the United States and targeted the United States as a market for the Heart Securities by extensively promoting and marketing the Hex, PulseChain and PulseX offerings specifically and directly to U.S. investors including by traveling here to do so. Compl., ¶¶ 22, 24-28, 39-41, 48-49, 56, 58-59, 70-72.

Heart's promotion occurred through internet activity, including YouTube Livestream videos, on social media and through his websites.  *Id.*  Heart engaged in these promotional efforts before and after the initial offering period for Hex, PulseChain, and PulseX.  *Id*., ¶¶ 26-28, 38-43, 56, 58-59, 70-72.  And Heart's promotional efforts included his virtual appearance at a "Hex Conference" before a live audience in Las Vegas, Nevada in March 2022, which was during the

12

offering periods for PulseChain and PulseX and while Hex was being traded on the secondary market. During this March 2022 appearance, Heart promoted each of Hex, PulseChain, and PulseX. *See* Kleinmann Decl., ¶ 5. Prior to the launch of PulseChain and PulseX, Heart also appeared virtually at another in-person conference in Las Vegas in September 2022 called "Pulsecon," which was attended by approximately 3,000 people, where he promoted the PulseChain offering and discussed additional developments and features that were planned for Hex, which was trading on the secondary market at this time. *Id.*, ¶¶ 8-10. These appearances before live audiences in the United States were interactive, with Heart engaging in a dialogue with interviewers and audience members and responding to questions. *Id.*, ¶¶ 5, 8. Heart clearly understood he was speaking directly to a live United States audience gathered in Las Vegas (and livestreamed on YouTube) when he appeared before them to promote these assets, reflecting purposeful direction into the United States to encourage U.S. investment in Hex, PulseChain and PulseX. *Plexcorps*, 2018 WL 429983 at *14-16 (finding purposeful availment of the forum based on Facebook communications directed towards U.S. investors as a part of an overall marketing strategy).

Moreover, although Heart contends in his Motion that the SEC has not alleged that Heart ever "set foot" in the United States, Heart did in fact *physically enter the United States* when he appeared *in person* at a studio in Miami, Florida, prior to the launch of Pulsechain, and while Hex was trading on the secondary market, for an interview in August 2022 during which Heart, the interviewers, other interviewees, and members of the YouTube livestream audience promoted Hex and PulseChain. Kleinmann Decl., ¶ 6-7. Investors understood these as promotions of Heart's investment offerings. For example, during Heart's August 2022 interview, one of the messages from viewers in the livestream chat which was read on-air to the audience indicated:

"PulseChain will make more billionaires/millionaires than Ethereum" and "Hex is bigger than Bitcoin." *Id.*, ¶ 7.  Heart also told the interviewers and the listening audience that Hex increased its value 10,000 times in two years….".  *Id.*, ¶ 6.  By appearing in this Miami studio where Hex and PulseChain were promoted and hyped for their ability to make profits for investors, Heart again marketed directly in the United States, this time while physically present *in person* in the United States.  *See Plexcorps*, 2018 WL 429983 at *10, 19 (finding that trip to the United States which included business activity was a significant contact); *Burger King,* 471 U.S. at 476 (although not required for jurisdiction, "territorial presence will frequently enhance a potential defendant's affiliation" with the forum).

   In addition to the above virtual appearances directly before United States audiences and the in-person appearance in the United States, Heart regularly appeared on YouTube livestreams and social media, and had a dedicated website, to promote the Heart Securities offerings.  Heart contends that the Court cannot exercise personal jurisdiction over him based on such internet activity because these virtual appearances and website content were accessible to a global audience and not specifically directed at the United States.  Heart's Motion ("Mot."), pp. 18-19.  However, website contacts like the ones Heart employed here support a finding, together with the other contacts at issue, that Heart had the requisite minimum contacts with the United States to support the exercise of personal jurisdiction.  Heart's mix of online plus in-person promotions as part of a global marketing campaign that was also specifically directed towards the United States is similar to the campaign at issue in *Plexcorps*, where personal jurisdiction existed.  *See* 2018 WL 4299983 at *14-18 (online marketing and advertising efforts through Facebook accounts to solicit potential investors for a crypto asset offering constituted "notable" and "significant" United States contacts even though the Facebook marketing campaign was global,

and the solicitations in these Facebook accounts were globally accessible, and not limited to only the United States).

In analyzing website contacts for personal jurisdiction purposes, courts in the Second Circuit have also recognized the test set forth in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) as a useful framework for analyzing commercial and marketing activity conducted through websites. *See Best Van Lines*, 490 F.3d at 251-252 (noting that other circuits have recognized *Zippo* as the seminal authority on assessing internet web activity and have adopted its test); *Plexcorps*, 2018 WL 4299983 at *13-14 (applying the *Zippo* "sliding scale" test). The *Zippo* court held that the extent to which personal jurisdiction can be constitutionally exercised is "directly proportionate to the nature and quality of commercial activity conducted over the internet, which can be assessed along a sliding scale" where on one end of the spectrum, a defendant clearly conducts business over the internet, and, on the other end of the spectrum, a defendant simply posted information on a passive website that a person in another forum accessed. 952 F. Supp. at 1124. The *Zippo* court also recognized a middle ground which consists of "interactive" websites, where the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the website. *Id.*

Heart's YouTube, social media, and website marketing campaigns all were ways for Heart to conduct business over the internet, or at a minimum were "interactive," under the *Zippo* standard. As alleged, Heart used his YouTube livestreams, social media, and websites to provide potential investors with specific how-to information, including instructions on how to purchase Hex, PLS, and PLSX, and the websites included tabs that invited users to click to learn how to purchase these assets during and after the offerings had ended, all of which helped to facilitate

sales.  *See* Compl., ¶¶26, 41, 42, 51, 67.  At a minimum, Heart's YouTube and website contacts

fall into the "interactive website" category under the *Zippo* test because they were used to

market, promote and solicit investments in the Heart Securities and provided information about

how specifically to make purchases, making these contacts "integral to finding investors and

directing statements at them to encourage them to participate" in the purchase of the Heart

Securities.  *Plexcorps*, 2018 WL 4299983 at *15 (Facebook accounts were "interactive" because

they were used to convey information about the crypto asset project and its initial offering and

directed individuals to the defendants' websites, and as such were "integral to finding investors

and directing statements at them to encourage them to participate" in the offering).  And because

they were purposefully directed at the U.S., they caused a foreseeable effect here.  *Id.*, 2018 WL

4299983 at *13-14 (also finding that the "global reach" of the marketing information distributed

on the website, "served as evidence of the attempt to reach the United States market" and caused

a foreseeable effect in the United States which was to help facilitate purchases in the United

States).[4]

 Heart even designed ethhex.com, a website interface he owns that allowed investors to

directly engage in secondary market transactions of Hex tokens through the Uniswap platform.

*Id.*, ¶¶ 40-42, which is akin to website features in *Plexcorps* that demonstrated interaction

because they helped to directly facilitate sales.  2018 WL 4299983 at *16; *see also Chloe*, 616 F.

3d at 171 (exercise of personal jurisdiction over non-resident comported with Due Process clause

where non-resident offered its product for sale to consumers in the forum through its website,

and, as a result, "developed and served a market for its products" in the forum and even though

---

[4] Heart's two virtual appearances before live audiences in Las Vegas, which were also livestreamed on
YouTube, also support a showing of "interactivity" of the website under the *Zippo* test for the additional
reason that Heart was communicating with members of the audience and fielding questions relating to the
crypto asset security offerings at issue here, all for the purpose of promoting the crypto asset securities.

the non-resident sought to "serve a nationwide market does not diminish any purposeful contacts" with the forum) (citations and quotations omitted); *Kernan v. Kurz–Hastings, Inc.,* 175 F.3d 236, 243 (2d Cir. 1999)) (upholding personal jurisdiction in New York where defendant's agreement to sell its products in North America and throughout the world, served as evidence of the attempt to serve the New York market, even if indirectly).

Moreover, since the filing of the Complaint in this action, the SEC has received reports from at least ten United States investors who purchased Hex, Pulse, and PLSX, and in some cases, more than one of these offerings. Kleinmann Decl., ¶¶ 11-13. At least two of these investors specifically learned of the offerings through Heart's promotional contacts. *Id.*, ¶¶ 12-13. Further, the Complaint pleads that an individual in Brooklyn invested in PulseChain with the expectation that he would earn profit through his investment based on Heart's statements and his efforts to develop PulseChain. Compl., ¶64. These investors confirm that Heart's YouTube and social media marketing campaigns "met their targets" and resulted in investments from the United States, further supporting a finding of minimum contacts and the exercise of personal jurisdiction. *Plexcorps*, 2018 WL 4299983 at *13-14; *Terraform I*, 2022 WL 2066414, at *3 (proper exercise of specific personal jurisdiction over a foreign person and entity because they had "purposefully availed" themselves of the United States by promoting the digital assets to U.S.-based investors and because investors in the subject digital assets were located within the United States); *EMI Christian Music Group, Inc., v. MP3Tunes, LLC,* 844 F. 3d 79, 98 (2d. Cir. 2016) (court exercising specific personal jurisdiction because non-resident was aware that his company provided services to users in the forum).

Heart also engaged a software developer, Kyle Bahr,[5] who resides in the United States, to help develop Hex, PulseChain, and PulseX.  Bahr Decl., e.g., ¶¶ 4-11, 44-53.  For the PulseChain and PulseX projects, Heart directed Bahr to hire other software developers to assist with developing PulseChain and PulseX.  *Id*., ¶¶ 44-53; Compl., ¶¶ 72, 75.  Bahr helped communicate interview questions and answers between Heart and the potential developers, and, at Heart's direction, sent a contract for signature to the potential hire.  Bahr Decl., ¶44.  Heart's engagement with a U.S.-based software developer to help develop Hex, PulseChain, and PulseX, and to facilitate the hiring of Heart's developers, reflects further purposeful conduct directed at the United States which relates specifically to the offerings at issue in this case.  *Williams v. Preeminent Protective Servs., Inc.,* 81 F. Supp. 3d 265, 272 (E.D.N.Y. 2015) (finding specific personal jurisdiction under the New York long-arm statute where non-resident defendant hired employee who lived in New York to conduct marketing and communications for the defendant even though defendant may not have sought a unique benefit in the forum); *SEC v. Stubos*, 634 F. Supp. 3d 174, 188 (S.D.N.Y. Oct. 11, 2022) ("It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'")

While all of Heart's contacts described above – including an in-person appearance in Miami, virtual appearances directly to live audiences in Las Vegas, extensive marketing and promotional efforts to potential investors in the United States through "interactive websites," confirmed investors in the United States, and engagement with a U.S.-based software engineer to develop the crypto assets at issue in this litigation and to assist with hiring Heart's developers – individually support the exercise of jurisdiction, the totality of these contacts with the United

---

[5] Bahr stated that he was not compensated for his services although Heart sent him a gift in the form of digital assets to purchase a Rolex wristwatch.  Bahr intended to return the funds that were used to purchase the wristwatch, but he was robbed while attempting to sell it.  Bahr Decl., ¶ 56.

States compel the conclusion that exercise of jurisdiction is appropriate.  *See Plexcorps,* 2018 WL 4299983, at *19 ("In determining the strength of the contacts under ... the Due Process Clause, the Court looks to the totality of Defendants' contacts with the forum....") (cleaned up) (quoting *Chloé*, 616 F.3d at 164).  Here, the totality of Heart's contacts with the United States reflects his direct and purposeful direction into the United States relating to the offerings at issue in this litigation.  These contacts and conduct created the foreseeable effect of producing a market in the United States for the Heart Securities, and generating U.S. investment in the three offerings, which Heart should have been aware of given his direct and purposeful marketing into the United States, all of which reflect that Heart has the necessary minimum contacts with the United States to sustain the exercise of personal jurisdiction under the Due Process Clause.

Furthermore, the SEC's claims arise directly from Heart's above-described contacts and conduct directed at the United States.  As such, these facts support the second element for specific jurisdiction – that "plaintiff's claim must arise out of or relate to the [non-resident's] forum conduct." *U.S. Bank Nat'l Ass'n,* 916 F.3d at 150.  The SEC's claims relate to Heart's unregistered offers and sales of securities into the United States and fraud in connection with those offers and sales.  A person offers a security "every" time he makes an "offer to dispose of"—or a "solicitation of an offer to buy"—a security for value. *Id.;  Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345-1346 (11th Cir. 2022), cert. denied sub nom. *Arcaro v. Parks*, 143 S. Ct. 427, 214 L. Ed. 2d 235 (2022) (declining to limit the interpretation of solicitation of an offer under the federal securities laws to only personal or individualized ones but instead includes "communications made through diffuse publicly available means"; recognizing that sellers can now "reach a global audience through podcasts, social media posts, or, as here, online videos and web links."); *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1260 (9th Cir. 2022) ("[A] person can

solicit a purchase, within the meaning of the Securities Act, by promoting the sale of a security in

a mass communication" including "Instagram posts and YouTube videos"). Here, Heart's

contacts with the United States, which reflect minimum contacts and purposeful availment of the

United States – his promotional campaign of his securities offerings through YouTube and social

media, including appearances before United States investors and interviewers – are the very

things that give rise to the claims against Heart in this action.

### B.  The Assertion of Personal Jurisdiction is Reasonable

Because Heart has sufficient minimum contacts with the United States, the Court must

decide "whether the assertion of personal jurisdiction comports with traditional notions of fair

play and substantial justice—that is, whether it is reasonable to exercise personal jurisdiction

under the circumstances of the particular case." *Chloé*, 616 F.3d at 164 (internal quotation marks

omitted). The defendant in a federal securities case must make a particularly compelling case

that jurisdiction is unreasonable because "[t]he reasonableness inquiry is largely academic in

non-diversity cases brought under a federal law which provides for [worldwide] service of

process because of the strong federal interests involved," *PlexCorps*, 2018 WL 4299983, at *19;

(quoting *SEC v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013)). "[W]hile most courts

continue to apply the test as a constitutional floor to protect litigants from truly undue burdens,

few ... have ever declined jurisdiction, on fairness grounds, in [securities] cases." *Id.*

To determine whether the exercise of personal jurisdiction is reasonable, the Court

considers the following: "(1) the burden that the exercise of jurisdiction will impose on the

defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest

in obtaining convenient and effective relief; (4) the interstate judicial system's interest in

obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloé*, 616 F.3d at 164–65.

Here, Heart makes no attempt to show any burden on him of having to litigate in the United States.  Nor could he.  Heart has hired competent counsel to represent him before this Court and has made claims that he is immensely wealthy, suggesting he has nearly unlimited resources.  *See* Kleinmann Decl., ¶ 6, Compl., ¶¶ 27, 62-63.  Heart is also a United States citizen who is originally from Fort Lauderdale, Florida, and he was in the United States as recently as two years ago during which time he promoted the crypto assets at issue in this litigation.  Kleinmann Decl., ¶6; Compl., ¶¶ 1, 19   He also has immediate family living in the United States.  Kleinmann Decl., ¶ 6.  Accordingly, the first factor favors jurisdiction in the United States.  The second and third factors also favor jurisdiction in the United States as the SEC has pled facts showing that Heart's conduct reached into the United States and harmed investors living in the United States, and the SEC has a compelling interest in enforcing the federal securities laws and protecting investors.   Heart offers no response to any of this, only advancing generalized concerns that the exercise of personal jurisdiction here "would amount to an endorsement of worldwide jurisdiction over blockchain networks" because they "are available everywhere."  Mot., p. 21.  But the SEC is not asserting that U.S. federal courts may exercise personal jurisdiction over blockchain developers based on the global nature of these networks.  Instead, the exercise of personal jurisdiction is specific to the facts of this case and is based solely on Heart's specific, repeated, continual, and successful targeted efforts to reach United States investors.

The last two factors are neutral.  As such, Heart has not made any showing, let alone a compelling one, that the exercise of jurisdiction is unreasonable.  *See Plexcorps*, 2018 WL 4299983, at \*19 (finding that exercise of personal jurisdiction was reasonable).

## II.   THE COMPLAINT ALLEGES DOMESTIC TRANSACTIONS IN THE PURCHASE, SALE, AND OFFER OF SECURITIES

### A. Congress Overrode *Morrison* with Respect to the Antifraud Claims

The transactions and conduct at issue in this action are domestic and not impermissibly extraterritorial under *Morrison v. Nat'l Austl. Bank Ltd*., 562 U.S. 247 (2010).  In its complaint, the SEC raises fraud claims under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act in connection with Heart's misappropriation of PulseChain investor funds. Compl., ¶¶ 61-66, 77-82.  *Morrison* considered the extraterritorial reach of Section 10(b) of the Exchange Act.  Before *Morrison*, courts had used two tests to determine whether particular conduct was actionable under the U.S. securities laws.  The "effects test" examined "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens," and the "conduct test" examined "whether the wrongful conduct occurred in the United States." *Morrison*, 561 U.S. at 257 (cleaned up).  Before *Morrison*, courts considered these so-called "conducts and effects" tests to be jurisdictional.  *Id*. at 253-54.

*Morrison* first explained that the extraterritorial application of the Exchange Act was not a matter of jurisdiction, but simply an issue about the scope of the Act.  *Id.*  It then rejected the "conducts and effects" test and held that Section 10(b) applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id*. at 267.  While *Morrison* was before the Supreme Court, Congress was considering legislation to amend the securities laws.  That legislation became The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which was signed into law in July 2010, one month after

*Morrison* was decided.  Section 929P(b) of Dodd-Frank addressed the extraterritorial application of both the Securities Act and the Exchange Act.  124 Stat. 1376, 1864-1865; *see also* 15 U.S.C. § 78aa(b).  The provision codified for SEC enforcement actions the longstanding court of appeals precedent that district courts have subject-matter jurisdiction over securities frauds that satisfy the conduct-and-effects test.  *Id*.[6]

These amendments were not merely addressing subject matter jurisdiction—they clearly intended to expand the reach of these Acts in SEC fraud actions beyond that which had been prescribed by *Morrison*.[7]  Heart's argument – that Section 929P of Dodd-Frank failed to codify the conduct-and-effects test for SEC enforcement actions because it was supposedly mislabeled as a "jurisdictional" provision – makes no sense.  In *Morrison* itself, the Court had clarified that a federal statute is presumed to apply only domestically unless there is an "affirmative indication" that the statute "applies extraterritorially."  561 U.S. at 265.  The "affirmative indication" required to rebut the presumption, however, need not come in the form of a "'clear statement.'"  *Id*.  That is, there is no "requirement that a statute say 'this law applies abroad.'"  *Id*. (citation omitted); *see RJR Nabisco, Inc. v. Eur. Cmty.,* 579 U.S. 325, 340 (2016) ("[A]n express statement of extraterritoriality is not essential.").  Instead, the "affirmative indication" can come through inferences from "context" or other "sources of statutory meaning."  *Morrison*, 561 U.S. at 265.

---

[6] S*ee also* H.R. Rep. No. 111-687(I) (2010) at 80.

[7] The text and structure of the section at issue reinforce that understanding.  Its title, "Strengthening Enforcement By The Commission," indicates that Congress intended to define the substantive scope of *the SEC's* enforcement powers, not merely the jurisdiction of the courts. 124 Stat. 1862.

In *SEC v. Scoville*, the Tenth Circuit thus held that in enacting Section 78aa(b), "Congress has 'affirmatively and unmistakably' indicated that the antifraud provisions of the federal securities acts apply extraterritorially when the statutory conduct-and-effects test is met." 913 F.3d 1204, 1218 (10th Cir. 2019). *Scoville* rejected the same argument that Heart makes here based on "the specific context in which Congress enacted the 2010 jurisdictional amendments as part of the Dodd-Frank Act." *Id.* at 1215-16. As the Supreme Court has held, "it is true that Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117, (2013).[8]

Heart's argument makes no sense for additional reasons. In *Morrison*, the Court held that district courts *already had* subject matter jurisdiction to adjudicate whether Section 10(b) applies to "particular extraterritorial conduct." 561 U.S. at 254. Under Heart's theory, Section 78aa(b) added nothing to the jurisdiction that federal courts already possessed — Congress instead enacted a statutory provision that had no practical effect at all.

---

[8] *See also SEC v. Morrone,* 997 F.3d 52, 60 n.7 (1st Cir. 2021) (recognizing *Scoville*'s holding); *Meng-Lin Liu v. Siemens A.G.*, 978 F. Supp. 2d 325, 328 (S.D.N.Y. 2013), *aff'd sub nom Liu Meng-Lin v. Siemens AG,* 763 F.3d 175 (2d Cir. 2014) (recognizing that Section 78aa(b) "permits the SEC to bring enforcement actions for certain conduct or transactions outside the United States"); *SEC v. Gruss*, 859 F. Supp. 2d 653, 664 (S.D.N.Y. 2012) (Section 78aa(b) permits the SEC to bring civil "actions extraterritorially in certain cases."); *SEC v. Tourre*, 2013 WL 2407172, *1 n.4 (S.D.N.Y. June 4, 2013) (929P(b) "effectively reversed *Morrison* in the context of SEC enforcement actions"); *In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 456 n.28 (S.D.N.Y. 2012) ("Congress has . . . restor[ed] the conducts and effects test for SEC enforcement actions."); *SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, *6 n.2 (S.D.N.Y. July 29, 2011) ("It may be that [929P(b)] was specifically designed to reinstate the Second Circuit's 'conduct and effects' test."). Defendants cite to one district court case for the proposition that Dodd-Frank did not overrule *Morrison*. Mot., p. 27. Yet, this case never reached such a conclusion. *See SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 916-17 (N.D. Ill. 2013) (ruling that the Court did not need to resolve the question because the SEC's complaint survived under either *Morrison* or the conduct-and-effects test).

**B. The SEC Satisfies the Conduct-and-Effects Test with Respect to its Antifraud Claims**

Heart next claims that, even if the Court were to apply the conduct-and-effects test of Section 78aa(b) to the SEC's antifraud claims, the SEC has not plausibly alleged conduct or effects in the United States to meet the test because Heart did not "target U.S. persons" and could not have foreseen who might participate in the Pulse offering, which forms the basis for the SEC's fraud allegations.   Heart's position is refuted by the allegations in the Complaint, which establish both conduct as well as effects in the United States.

The SEC has sufficiently alleged that Heart engaged in "conduct within the United States that constitutes significant steps in furtherance of the violation" and conduct that had "a foreseeable substantial effect within the United States."  15 U.S.C. § 78aa(b).  As described in the Complaint, Heart often discussed development work on PulseChain during his promotional efforts through YouTube livestreams and the Pulsechain.com website to give U.S. investors the reasonable expectation of profit and belief that their invested funds would go toward the development of PulseChain.  Compl., ¶¶ 64-65, 76.  During YouTube livestreams, he gave investors updates on the development work that he and his team of developers were conducting to successfully launch PulseChain, including updates on developmental milestone tasks and work that still needed to be completed, all of which objectively led investors to reasonably believe that their invested funds were being put toward these efforts.  *Id.*  As described further below in Argument, Section III, however, Heart did not tell investors that he would misappropriate investor funds to buy himself luxury items.  As such, Heart engaged in material, deceptive omissions to PulseChain investors—which included U.S.-based investors—regarding the use of their invested funds.

Heart engaged in this deceptive conduct in connection with a promotional and marketing campaign for PulseChain that specifically targeted United States investors through YouTube livestream videos and the Pulsechain.com website that Heart controls.  Compl., ¶ 56.  This marketing campaign consisted of extensive and repeated uses of social media and YouTube videos that hyped and promoted PulseChain giving investors the reasonable belief that they would profit from Heart's efforts to develop PulseChain.  *Id*., ¶¶ 56, 58, 59, 65, 70, 72, 75.  This targeting of United States audiences occurred either before or when Pulse was in its offering period or otherwise during the period when the Complaint alleges that Heart was misappropriating PulseChain investor funds, and before the launch of PulseChain.  *Id*.  ¶¶ 51, 53, 56, 58, 61, 63, 65, 66.

Heart's marketing conduct clearly and successfully targeted a United States market.  U.S. investors invested their funds as part of the more than $354 million worth of assets invested in PulseChain.  Compl., ¶ 55.  These U.S. investors include an investor in Brooklyn, New York, who invested in PulseChain with the expectation that Heart was going to use the investor's funds to develop PulseChain and earn profit for the investor through increases in the value of the PLS token, and not instead to use investor funds to buy luxury goods for Heart's own personal consumption.  Compl., ¶¶ 60, 64.  Having invested their funds in PulseChain, these U.S. investors now hold PLS tokens that are practically worthless as the value of the token has decreased.  Compl., ¶76.  None of this is surprising given that Heart did not limit or restrict the ability of United States investors to access his YouTube livestream videos or the Pulsechain.com website that promoted the PulseChain offering.  Nor did he restrict the ability of United States investors to purchase PLS tokens and invest in PulseChain, and, indeed, successfully targeted those investors through his promotional campaign. ¶¶ 51, 55, 56, 58, 59, 60, 64-66, 70, 72

Thus, Heart's conduct in extensively marketing PulseChain and its development to U.S. investors through a promotional campaign that reached directly into the United States, thereby encouraging and accepting investment from investors, while omitting information about Heart's misappropriation of funds, constituted substantial steps in the United States in furtherance of the violation.  Moreover, Heart's conduct had the foreseeable substantial effect of reaching investors in the United States who invested funds to purchase PLS tokens that they believed would increase in value based on Heart's statements that he would successfully develop PulseChain, Compl., ¶ 55, 60, 64, and has also effected substantial losses to those U.S. investors who now hold practically worthless PLS tokens due to their investment in PulseChain.  Compl., ¶76.    On these facts, the Complaint has adequately pled that there were foreseeable and substantial effects resulting from Heart's promotional campaign targeting U.S. investors.  The Second Circuit has recognized under the "effects test" that even a relatively small number of U.S. investors who purchased securities in connection with a fraud can constitute substantial effects, especially if misleading statements are transmitted to the U.S. as was the case here with Heart's statements during his marketing campaign touting the development of PulseChain.  *See* Compl.*, ¶¶ 55, 64-65, 76; Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 262 (2d Cir. 1989) (cleaned up), *amended*, 890 F.2d 569 (2d Cir. 1989).

Based on the foregoing, the SEC has pled sufficient facts to show that Heart satisfied the "conducts and effects" test with respect to its anti-fraud claims.[9]

---

[9] In his Motion, Heart claims that the SEC has supposedly not made any allegations of domestic securities transactions despite the "agency's sweeping investigative power" and "broad authority to investigate". Motion, pp. 2 and 25.  First, as demonstrated in this opposition brief, the SEC has alleged domestic securities transactions and conduct.  Second, the SEC notes that Heart's conduct during the SEC's investigation of this matter suggests that he does not recognize the agency's authority.  On August 22, 2022, the SEC personally served Heart with subpoenas at the Miami International Airport, requiring him to produce documents (on behalf of Heart and Hex) and to appear for testimony in connection with Hex. Heart has never responded to the SEC's lawful subpoenas.

### C.  The SEC Has Alleged Domestic Offers and Sales of Securities in Support of its Section 5 Claims

Heart also argues that the SEC fails under *Morrison's* transactional test to allege a domestic offer or sale of a security in connection with its Section 5 claims. *Morrison* establishes a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016).  First, a court should ask if the relevant statute applies extraterritorially.  *Id.*  Second, the court should determine "whether the case involves a domestic application of the statute…by looking at the statute's *focus*." *Id.* (emphasis added).  "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (quoting *RJR Nabisco*, 136 S. Ct. at 2101).  Here, because Congress has not expressly indicated that Section 5 applies extraterritorially, the inquiry proceeds to the second step: to determine whether, looking to the "focus" of Securities Act Section 5, this case involves a permissible domestic application of the statute.

The *Morrison* court did not address Section 5 of the Securities Act and instead dealt with Section 10(b) of the Exchange Act, holding that there is a domestic application of Section 10(b) when there are (1) "transactions in securities listed on domestic exchanges" or (2) "domestic transactions in other securities." *Morrison*, 591 U.S. at 267.  *Morrison* relied on the fact that Section 10(b) focuses on *purchases* and *sales* of securities.  *Id.*  Section 5, however, applies to both *offers* and sales of securities.  15 U.S.C. § 77e(a), (c).  So, while *Morrison's* domestic transactions test "may be properly applied to determine where *sales* occurred for the purpose of Section 5, the same is not true when the Court is determining where *other conduct* relevant to the

focus of Section 5" occurred, like offers.  *SEC v. Balina*, No. 1:22-cv-00950-DAE, 2024 WL

2332965, at *6 (W.D. Tex. May 22, 2024).  As the Supreme Court stated regarding the courts'

inquiry into a statute's focus, the "analysis applies at the level of the particular provision."

*Abitron Austria GmbH v. Hetronic Int'l, Inc.,* 600 U.S. 412, 419, n.3 (2023).  Section 5 also

regulates offers, not just completed transactions and sales.  Therefore, *Morrison* does not require

that the Court limit its inquiry regarding the domestic application of Section 5 to only

circumstances where there is a security listed on a domestic exchange or a purchase or sale made

in the United States, as this is only the test for location where relevant *sales* occur.  *See Balina,*

2024 WL 2332965, at *6*; SEC v. Ripple Labs, Inc*., No. 1:20-cv-10832(AT), 2022 WL 762966,

at *11 (S.D.N.Y. Mar. 11, 2022) (finding that *Morrison* governs the domesticity of sales, but not

offers, and applying different tests for both).  In any event, the SEC has pled domestic sales

under *Morrison's* transactional test as well.

> ### i.   The Complaint Adequately Pleads Domestic Sales Transactions under the *Morrison* Test Regarding Its Section 5(a) Claims

Applying *Morrison*'s transactional test to the Securities Act Section 5(a) claim, the

Complaint pleads domestic sales of the Heart Securities by Heart.  As noted, transactions can

meet *Morrison*'s transactional test in one of two ways:  either because the transaction occurred

on a "national securities exchange" in the U.S., or because it constituted a "domestic transaction

in other securities."  561 U.S. at 266-67.  The first method is a "bright-line test"—the transaction

either occurred on a domestic exchange or it did not.  *Absolute Activist Value Master Fund Ltd. v.

Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) (citation omitted). The Heart Securities did not trade on

any U.S. or non-U.S. national securities exchange, so only the second method is at issue here.

The second method can itself be met in one of two ways—by showing that "irrevocable liability

was incurred" or "title [to the shares] was transferred" in the U.S.  *Id.*; *see also Loginovskaya v.*

*Batratchenko*, 764 F.3d 266, 273-74 (2d Cir. 2014) ("there are two ways to allege a 'domestic transaction'" under Section 10(b) (citing *Absolute Activist*)).

Under the second method for establishing domesticity, irrevocable liability attaches with respect to a sale of a security when parties "becom[e] bound to effectuate the transaction or enter[ ] into a binding contract to purchase or sell securities." *Miami Grp. v. Vivendi S.A.* (*In re Vivendi, S.A. Sec. Litig.*), 838 F.3d 223, 265 (2d Cir. 2016) (internal quotation marks omitted). In other words, irrevocable liability attaches "when the parties to the transaction are committed to one another," or when "in the classic contractual sense, there was a meeting of the minds of the parties." *Absolute Activist*, 677 F.3d at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)). Irrevocable liability may be determined based on many factors, including the location of the "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 69-70. The parties may be bound, and therefore irrevocable liability may attach, in "more than one location and at more than one time because there is always more than one side to any given transaction." *Williams v. Binance*, 96 F.4th 129, 137 (2d Cir 2024) (internal citations and quotations omitted).

The Second Circuit's recent decision in *Williams,* 96 F.4th 129, exemplifies the application of these principles to transactions in crypto assets. In *Williams,* the Court of Appeals held that purchasers of crypto assets incurred irrevocable liability in the United States when they "sent buy orders" and "sent payments" for those orders from within the United States because they "committed to the investment[s] while in their states of residence." 96 F.4th at 136 (internal quotations omitted). Because *Williams* involved a crypto asset trading platform claiming no physical location with transactions recorded on a digital blockchain, the Second Circuit noted that in order to assess where irrevocable liability incurred, it needed to evaluate factors other than

physical location where trades occurred.  *Id.* at 139-140 ("[B]ecause the Binance exchange disclaims having any physical location, we have particular reason to consider other factors that our cases have found relevant to the irrevocable liability analysis").

  *Williams*' reasoning was, in turn, based on other Second Circuit decisions that had similarly found irrevocable liability premised on the location from which money or funds were transferred.  *Id.*, at 140; *Giunta v. Dingman*, 893 F.3d 73, 76-77, 79-80 (2d Cir. 2018) (irrevocable liability occurred in New York because funds were transferred from there); *United States v. Vilar*, 729 F.3d 62, 76–78 (2d Cir. 2013) (looking to location where party executed documents necessary to make investment and location from where money was sent).  The *Williams* court stressed that it has "placed more emphasis" on factors such as the location from where buy orders were placed and payments made to determine irrevocable liability "when dealing with transactions that did not occur on an official exchange."  *Id.* at 140.  In conducting its analysis, the *Williams* court was also guided by the principle that transactions occurring over an online platform with no physical location simply cannot occur "nowhere."  *Id.* at 137-38.

  A recent decision, *SEC v. Binance Holdings Limited., et al*., 23-cv-01599 (ABJ), ECF No. 248 (D.D.C. Jun 28, 2024), followed *Williams* and held that irrevocable liability was incurred when customers in the United States placed orders and sent payments from the United States. ("Given that Binance disavows being located anywhere, this Court agrees with the Second Circuit's analysis in *Williams* and concludes that the factual allegations here plausibly allege that irrevocable liability was incurred in the United States when customers in the United States placed trade orders and sent payments on the Binance.com platform.")

  The SEC has adequately alleged a domestic sale of a security under the *Morrison* transaction test as construed by the Second Circuit because it has pled facts reflecting that

irrevocable liability was incurred within the United States.  Here, the SEC's claims do not relate to transactions occurring on a crypto asset trading platform, but rather to transactions occurring between digital wallets on a digital blockchain without any physical location.  The SEC has pled that United States-based investors deposited crypto assets to wallet addresses established by Heart on a digital blockchain for receipt of investor funds for each of the Heart Securities. Compl., ¶¶ 29-30, 34, 51, 55, 67.  In return for the deposit of these funds from investors in the United States, the investors received Hex, PLS, and PLSX token.  *Id*., ¶¶ 29-30, 51, 53, 67. Heart even referred to the deposits for PLS and PLSX as "sacrifices," further evincing the irrevocable nature of these transactions once the funds were committed from within the United States to the "sacrifice" digital wallet address.  *Id*., ¶¶ 51-52, 67.   In accordance with the Second Circuit's decision in *Williams* and other cases, at this pleading stage of the case, the SEC has adequately pled that these deposits of crypto asset funds which came from United States-based investors in return for Hex, PLS, and PLSX tokens reflect that irrevocable liability was incurred in the United States.

Heart's attempt to distinguish *Williams* in a footnote is unavailing.  *See* Mot., p. 26 fn.16. While it is true that the *Williams* court found that irrevocable liability was established when transactions were matched on Binance's servers located in the United States, it also found that the sending of buy orders and payments from the United States constituted a second, separate basis for irrevocable liability.   96 F.4th at 139-140.  Heart's citation to other cases is also inapposite.  For example, Heart cites to *City of Pontiac Policemen's & Firemen's Retirement Systems v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) to argue that "mere placement of a buy order in the United States" is insufficient for irrevocable liability.  However, the *Williams* Court distinguished *City of Pontiac*, noting that it involved transactions that occurred over a foreign

Swiss exchange that was regulated by Switzerland, unlike *Williams* which involved a crypto asset platform with no physical location.  96 F.4th at 140.  Because the transactions at issue in this case did not occur over any platform at all, and instead involve deposits of funds to a digital wallet address on a digital blockchain that is not regulated by any particular jurisdiction, "the sovereignty and comity concerns that at least partially motivate the careful policing of the line between foreign and domestic transactions in cases like *City of Pontiac* and *Morrison* are less present in a case like this."  *Id.*

The other cases Heart cites are all distinguishable from the facts of the present case, do not involve crypto cases where the subject transactions occurred over the digital blockchain, or otherwise involve predominantly foreign transactions.  *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 294 (2d Cir. 2021) (Brazilian bank purchasing debt securities of a Brazilian mining company)*; Loginovskaya v. Batratchecnko*, 764 F.3d 266, 275 (2d Cir. 2014) (investor was a Russian citizen residing in Russia and solicited to enter into investment contract in Russia using Russian-language investment memoranda and brochures); *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb 21, 2017) (no allegations regarding the structure of the transactions themselves to show they were domestic, such as details about the specific exchange of money or how orders were placed).

### ii.  The Complaint Adequately Pleads Domestic Offers of Securities

With respect to the SEC's Section 5(c) claim relating to Heart's offers of securities, again, the relevant inquiry in determining whether there is a domestic application of the statute is to examine the statute's focus.  "The focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to "regulate,"' as well as the parties and interests it 'seeks to "protect"' or vindicate."  *Abitron,* 600 U.S. at 418 (quoting *WesternGeco LLC v. ION*

*Geophysical Corp.*, 585 U. S. 407, 413-414 (2018)).  The aim of Section 5's regulation of the offer of securities is "to protect United States investors and United States financial markets from the offer of unregistered securities." *Balina*, 2024 WL 2332965, at *6.  It intends "to assure full and fair disclosure in connection with the public distribution of securities" in the United States "to prevent the offer of securities in the United States securities market without accompanying standardized disclosures to aid investors." *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998), *abrogated on other grounds*, *Morrison*, 561 U.S. at 247.

The Second Circuit has explained that "in keeping with Congress's purpose, the registration provisions should apply to those offers of unregistered securities that tend to have the effect of creating a market for unregistered securities *in the United States*." *Banque Paribas London,* 147 F.3d at 126.  Thus, the statute's focus (as to offers) is the offer of securities in the U.S. securities market, and that conduct is "domestic" if directed to the U.S.— *i.e.*, to U.S. investors. *Balina*, 2024 WL 2332965, at *6.[10]

In Securities Act Section 2, "offer" is defined broadly: "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." *Id.* § 77b(a)(3).  A statutory "offer" can occur under a variety of circumstances including: (a) the contents of "website[s]" and "social media posts" concerning the asset, *SEC v. Blockvest, LLC*, No. 18 Civ. 2287, 2019 WL 625163, at *9 (S.D. Cal. Feb. 14, 2019); (b) statements to the public

---

[10] To avoid applying this statutory language extraterritorially, the SEC has explained that "offer" and "sale" as used in Section 5 excludes offerings that are exclusively foreign. *See* Regulation S, Rule 901, 17 C.F.R. § 230.901.3. This includes situations where no offers are made to "a person in the United States." *Id.* § 230.902(h)(1) (defining "offshore transaction"); *id.* § 230.903(a) (requiring "offshore transactions," and that "no directed selling efforts are made in the United States by the issuer" or anyone associated with it).  Thus, Regulation S reflects the judicial presumption against extraterritoriality, while preserving the interests of U.S. investors consistent with Section 5's broad statutory language.

and to the press, *e.g.*, *Chris-Craft Indus. v. Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970); *SEC v. Arvida Corp.*, 169 F. Supp. 211, 215 (S.D.N.Y. 1958); (c) written advertisements, *e.g.*, *SEC v. Chinese Consolidated Benevolent Association*, 120 F.2d 738, 740 (2d. Cir. 1941); and (d) transmittal of "an order to a broker to sell securities." *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *see also Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974) ("[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'") (quoting *SEC v. C.M. Joiner Leasing Co.*, 320 U.S. 344, 352-353 (1943)).

As a result, the definition of "offer" in Securities Act Section 2(a)(3) "extends beyond the common law contract concept of an offer." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d. Cir. 1998); *see also Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971). An offer occurs "[w]hen it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished." *Chris-Craft*, 426 F.2d at 574. "What is dispositive…is whether defendants' conduct conditioned the public mind." *Blockvest*, 2019 WL 625163, at *8 (enjoining future conduct in connection with public distribution of digital asset securities) (citation omitted); *BitConnect*, 25 F.4th at 1345-1346 (recognizing that offers and solicitation can occur through podcasts, social media posts, online videos and web links."); *Pino*, 55 F.4th at 1260 ("Instagram posts and YouTube videos" can be used to solicit a purchase).

As noted, "the object at the focus of a statute" includes "those parties and interests that the statute intends to protect." *Abitron*, 600 U.S. at 418. Section 5(c) seeks to protect United States investors and United States financial markets from the offer of unregistered securities.

Given this purpose of Section 5, in *Balina* the Court found that defendant's targeting of the U.S market and investors through social media sufficiently showed domestic conduct in connection with the offer of securities. *Balina*, 2024 WL 2332965, at *6. As in *Balina*, and as described above in Argument, Section I, Heart engaged in a targeted marketing campaign that was directed at U.S. investors. Heart also failed to take any steps to ensure that the offerings he promoted would not be sold to U.S. investors, *e.g.*, Compl., ¶ 34. To the contrary, Heart made extensive "offers" of the Heart Securities to U.S. investors—including through promotional and marketing statements in YouTube livestream videos, the websites hex.com, hex.win, pulsechain.com, and pulseX.com, and on social media accounts, all promoting the investment potential of these assets—and in fact created a U.S. public market for these assets into which these assets ultimately came to rest. *See e.g.*, Compl. ¶¶ 29, 34, 55. This conduct targeting United States investors, and conditioning the U.S. markets through these promotional efforts to encourage investment in Hex, PulseChain and PulseX, and the existence of United States investors, support a showing of domestic conduct in connection with Heart's offer of securities. As such, this case involves a permissible domestic application of the statute even if some of Heart's relevant conduct is deemed to have occurred while he was physically present outside the U.S. *WesternGeco*, 138 S. Ct. at 2137.

### D.  The Transactions Involved in This Case are Not Predominately Foreign

Finally, Heart's argument that the transactions in this case are "predominately foreign" based on language in *Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198 (2d Cir. 2014), and *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161 (2d Cir. 2021) is unavailing. Those cases are easily distinguishable. *Parkcentral* involved securities-swap agreements where the swaps were pegged to the price of shares traded *only* on European exchanges, the allegedly fraudulent conduct involved statements made primarily in Germany

with respect to stock in a German company, and that misconduct was already the basis of several foreign investigations and enforcement actions. 763 F.3d at 216; *see Giunta*, 893 F.3d at 82 (distinguishing *Parkcentral*). Similarly, *Cavello Bay* involved a private agreement for a private offering between a Bermuda investor and a Bermuda issuer. *Cavello Bay*, 986 F.3d at 167.

This case is unlike those two cases and unlike other cases cited in Heart's Motion, which also involve foreign investors dealing in foreign securities. *See Banco Safra S.A*, 849 F. App'x at 294; *Loginovskaya,* 764 F.3d at 275. Here, by contrast, the Complaint alleges that U.S. investors purchased each of these assets after a promotional and marketing campaign that reached into the United States. The U.S. investors who purchased Hex, Pulse, and PLSX did so by depositing their funds in a wallet address on the digital blockchain. There is nothing "predominately foreign" about these transactions. In his Motion, Heart does not identify any foreign jurisdiction that would have connections to the transactions in this case.

Moreover, none of the considerations about intruding on the regulations of securities transactions by a foreign jurisdiction that animated the "predominantly foreign" cases like *Cavello Bay* are present here. Here, as in *Balina* and as in *Williams*, public policy supports finding that domestic transactions occurred here, otherwise defendants like Heart could evade securities laws by temporarily leaving the United States while still "promoting crypto investments to United States investors on United States social media platforms." *Balina*, 2024 WL 2332965, at *8 (finding that defendants can "evade United States securities regulations while targeting United States investors and United States financial markets" if the Court were to hold that no domestic transactions occurred despite marketing of crypto assets to United States investors through social media); *Williams*, 96 F.4th at 138 (court finding that it cannot be the case that the transactions simply occurred "nowhere").

### III.  THE COMPLAINT SUFFICIENTLY ALLEGES SECURITIES FRAUD AGAINST HEART

The Complaint alleges that Heart defrauded investors in PulseChain by misappropriating millions of dollars of investor funds for his own personal luxury purposes.  Heart argues that the Complaint alleges neither a deceptive scheme, a fraudulent omission, nor Heart's scienter.[11]  As discussed below, these arguments fail and the fraud claims against Heart under Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) should stand.

#### A.  Heart Engaged in Deceptive Acts and Made Material Omissions in Furtherance of a Fraud Scheme

Contrary to Heart's claims, the Complaint adequately alleges that Heart engaged in deceptive acts by (a) using millions of dollars of investor funds for the direct purchase of luxury items for himself; (b) concealing millions of dollars of transfers of investor funds through the use of devices intended to hide his transactions; and (c) failing to disclose these transactions even though he explicitly discussed the use of investor funds.

#### i.  Heart's Deceptive Acts

Heart violated the antifraud provisions of the federal securities laws by misappropriating at least $12.1 million of PulseChain investment proceeds for Heart's personal whims, including the purchase of luxury watches, high-end automobiles, and "The Enigma" diamond.  Compl., ¶¶ 62-63.  Heart's misuse of investor funds, standing alone, is a basis for scheme liability.  *See SEC*

---

[11] Heart also argues that the misappropriation claims of the Complaint are impossible because, as he reads the allegations, certain transactions are out of chronological order.  (Motion, pp. 38-39).  This argument is misplaced.  The Complaint distills hundreds of Heart's deceptive transactions and provides, as specific examples, the back-and forth movement of $26.5 million in crypto assets beginning in January 2022. (Compl. ¶ 61).  As Heart knows, this $26.5 million is not the only money that he moved through so-called Mixer transactions, the proceeds of which the SEC has alleged Heart misappropriated to his own personal use at least as early as August 3, 2021.  (*Id.*, ¶ 62).

*v. Zandford*, 535 U.S. 813, 819-20 (2002) (misappropriation of the proceeds of a securities transaction to pay one's personal expenses constitutes a fraudulent scheme under the antifraud provisions of the Exchange Act); *SEC v. Boock*, 2011 WL 3792819, at *22-23 (S.D.N.Y. Aug. 25, 2011) (scheme liability extends to misappropriated assets).

Further, Heart did not just misappropriate investor funds: he also used devices specifically designed to conceal his movements of investor funds in furtherance of the scheme. The Complaint alleges that Heart engaged in deceptive acts, including at least 22 "back-and-forth transactions" disguising the movement of approximately $26 million in ETH that had just been invested by PulseChain investors.  Compl., ¶ 61.  Heart also used a "crypto asset mixer" to obfuscate his transactions before funneling funds through at least 50 intermediary wallets.  *Id*.  A "wide range" of deceptive conduct suffices to satisfy scheme liability, *SEC v. Stubos*, No. 22-Civ-04674 (LJL), 2022 WL 6776741, at *15 (S.D.N.Y. Oct. 11, 2022), including deceptive conduct such as "sham agreements, sham transactions, sham companies, or undisclosed payments ...."  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-CV-08585 (LJL), 2022 WL 4085677, at *58 (S.D.N.Y. Sept. 2, 2022).  Myriad back-and-forth transactions through scores of intermediary crypto wallets to conceal his misappropriation of investor funds qualifies as deceptive conduct.  *SEC v. Sugarman*, No. 19-cv-5998, 2020 WL 5819848, at *9 (S.D.N.Y. Sept. 30, 2020) (a series of sham transactions intended to hide the source of funds used for purchases were deceptive acts supporting a fraud scheme claim) citing *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (finding that by "disguising the ultimate recipient of ... funds through sham transactions, [defendant] engaged in an inherently deceptive act") and *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d at 161 (creation and use of intermediary entity to conceal identity of transaction's beneficiary is deceptive)).

### ii.   Heart's Material Omissions

In *SEC v. Rio Tinto,* the Second Circuit held that misstatements and omissions are not sufficient, *on their own*, to constitute scheme liability under Securities Act Section 17(a)(1) and (3) and Exchange Act Rules 10b-5(a) and (c), but also expressly held that "omissions can form *part* of a scheme liability claim."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original).  *SEC v. DeFrancesco*, No. 23-CV-131 (JSR), 2023 WL 6965051, at *7 (S.D.N.Y. Oct. 23, 2023) (finding a fraud scheme existed on the basis of misrepresentations, pump-and-dump activity, and related transactions) (citing *Rio Tinto*, 41 F.4th at 49); *see also Lorenzo v. SEC,* 587 U.S. 71, 78 (2019) ("dissemination of false or misleading statements with intent to defraud" sufficient to trigger scheme liability).  Here, in addition to the deceptive conduct described above, Heart's fraudulent scheme also involved material, deceptive omissions to PulseChain investors.  Heart repeatedly told investors (1) about the development tasks that needed to be completed before PulseChain could be released (Compl., ¶¶ 64-65, 75) and (2) that investment in PulseChain supported free speech ideals. *Id.*, ¶¶ 66.  Meanwhile, Heart omitted that he was actually using a portion of the PulseChain investor funds, not for the development and marketing of the PulseChain network, but for his own luxury purchases.  A reasonable investor hearing about Heart's plans for the tasks that needed to be developed would have also wanted to know about this direct misappropriation of invested funds.

Heart incorrectly claims that he did not omit anything about his use of investor funds because he promised nothing in connection with PulseChain "sacrifices."  However, "promising nothing" is not the standard.  The standard for a fraudulent omission is whether a speaker has told the whole truth when choosing to speak on a particular topic.  *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("once a company speaks on an issue or topic, there is a duty to

tell the whole truth"). As Heart admits, he *did* speak about the use of PulseChain investor proceeds. Mot., p. 31. For example, Heart stated in November 2021 that the half billion dollars raised from investors that was not related to a charity promotion "to the best of my knowledge do not go to charity." *Id.* at Ex. C, p. 11. Heart made that statement knowing full well that millions of dollars of those invested funds had been (and would continue to be) funding his personal purchases. Heart's statement is thus misleading in that it omits key information a reasonable investor would have wanted to know—that Heart was spending millions of their "sacrificed" funds on luxury items for his personal use. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("[a] duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements"); *Vivendi*, 838 F.3d 223, 258 (2d Cir. 2016). Heart's misleading omission further supports the Commission's allegation of a fraud scheme. *DeFrancesco*, 2023 WL 6965051, at *7; *Lorenzo v. SEC*, 587 U.S. at 78.

Notably, Heart's too-cute "to the best of my knowledge" modifier makes his statement additionally misleading because Heart is *feigning ignorance* about where the investors' funds had actually gone. The SEC's Complaint alleges that Heart controlled the funds raised from investors, and his implication that he lacked complete knowledge of its disposal is simply false.

Moreover, Heart was discussing the use of investor funds while he was still developing PulseChain. Lamenting investor demand for updates on the development of PulseChain and PulseX and their launch, Heart commented, "So, you ain't getting any updates. It's done when it's done. Software is hard. The [developers] are working hard on it. That's all there is to it. You got to wait, just like I'm waiting, except I don't cry and moan while I wait." Compl., ¶75. As alleged in the Complaint, a reasonable investor would have heard Heart complaining about

the laborious – and presumably expensive – process of developing PulseChain and expected that the funds Heart raised would be applied to that development. *Id.* at ¶ 65. At the very least, a reasonable investor would have wanted to know that Heart had spent PulseChain "sacrifices" worth millions of dollars on cars, watches, and a giant diamond rather than the necessary software that his developers were "working hard" to bring online.

While Heart's other deceptive acts – misappropriating investor money and disguising the money's paths – are sufficient to support the Commission's fraud-scheme claims against him, his misleading omission provides further support for these claims, including to the extent they demonstrate deceptive conduct and an intent to deceive investors as set forth below.[12]

### B. Heart Acted with Scienter in Misappropriating Investor Funds

Because a plaintiff "cannot be expected to plead a defendant's actual state of mind," *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987), a complaint adequately pleads scienter where it alleges that a defendant engaged in conscious misbehavior or recklessness. *See SEC v. Wey*, 246 F. Supp. 3d 894, 912 (S.D.N.Y. 2017). While claims brought under Sections 10(b) and 17(a)(1) require proof of scienter, claims under Sections 17(a)(2) and 17(a)(3) only require proof of negligence. *See, e.g., SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018). Courts in the Second Circuit "evaluate the sufficiency of a complaint's allegations of scienter holistically, considering all of the facts alleged, taken

---

[12] Heart also appears to argue that these omissions are not "material." This argument misses the mark both because the SEC is not charging an independently actionable material omission under Rule 10b-5(b), as opposed to deceptive conduct that *includes* an "omission," but also because the omission *is* plainly material. The test for a *material* omission is whether the truth would have significantly altered the total mix of information available to a reasonable investor. *SEC v. Farnsworth*, No. 22 CIV. 8226 (KPF), 2023 WL 5977240, at *8 (S.D.N.Y. Sept. 14, 2023). Heart cannot seriously contend that knowledge of misappropriation of funds would not have significantly altered the total mix of information available to investors in his securities.

collectively, rather than any individual allegation, scrutinized in isolation." *Set Capital LLC v. Credit Suisse Group AG,* 996 F. 3d 64, 78 (2d. Cir. 2019) (cleaned up).  As the Second Circuit has instructed, "great specificity is not required with respect to allegations of scienter," and plaintiffs need only provide a "minimal factual basis for their conclusory allegations of scienter." *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (cleaned up).  "A complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on 'fairly tenuous inferences' of intent, because intent is a fact that a jury should find."  *SEC v. Shapiro*, No. 15-cv-7045 (RMB), 2018 WL 2561020, at *4 (S.D.N.Y. June 4, 2018) (internal citation omitted).

The Complaint here more than adequately alleges Heart's scienter in defrauding PulseChain investors.  Heart knowingly engaged in a series of labyrinthine transactions designed to obscure his movements of newly invested PulseChain funds.  Compl., ¶¶ 61-62.  Heart knowingly spent millions of dollars of investor funds on personal luxury items.  Compl., ¶ 62.  Heart knew that he had not purchased his watches, cars, and large black diamond with actual profits from his enterprises, but with funds from investors.  Knowing that he was using money coming in from PulseChain investors, he failed to disclose this fact, despite speaking publicly about (1) the use of PulseChain invested dollars and (2) the difficulty of the task of bringing PulseChain online.  Heart was conscious of his misuse of invested funds.  Compl., ¶¶ 64-66, 75.

## IV.  THE COMPLAINT ALLEGES THAT HEART OFFERED AND SOLD HEX, PULSE, AND PULSEX AS INVESTMENT CONTRACTS UNDER *HOWEY*

The SEC has adequately pled that the Heart Securities were offered and sold as "investment contracts" and therefore as securities subject to the federal securities laws.  Heart wrongly contends that a traditional contractual undertaking or a "continuing obligation" is required to establish the existence of an "investment contract" under the federal securities laws.  Heart's argument is foreclosed by *Howey* itself, which recognized that investment contracts

43

include contracts, *transactions, or schemes* meeting the *Howey* test, *see SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  And he blatantly ignores recent cases that have applied to digital assets *Howey*'s long-standing test and expressly and repeatedly rejected the "continuing obligation" requirement, including recent decisions in this Circuit and elsewhere.  *E.g.*, *SEC v. Coinbase, Inc.,* No. 1:23-cv-4738 (KPF), 2024 WL 1304037, at *18 (S.D.N.Y. Mar. 27, 2024), *SEC v. Terraform Labs Pte Ltd.*, 684 F.Supp.3d 170 (S.D.N.Y., July 31, 2023) ("*Terraform II*"), and *SEC v. Binance Holdings Limited., et al*., 23-cv-1599 (ABJ), ECF No. 248 (D.D.C. Jun 28, 2024).

Moreover, Heart attempts to isolate Hex, PLS, and PLSX from the circumstances under which each was offered and sold, including Heart's many representations to potential investors about the nature of the offerings, and asks the Court to focus only on the software that makes up the underlying crypto asset.  Again, this approach ignores precedent which counsels that courts applying *Howey* should analyze the "totality of the circumstances" under which the assets were offered and sold, including all understandings and expectations that accompanied the offerings, rather than viewing the assets in isolation.  Finally, Heart asks the Court to draw disputed inferences from the facts in his favor.  Specifically, he asks the Court to accept as true statements that Heart made—which were intended to evade the securities laws—even though the SEC has pled facts that contradict those statements and has further specifically pled that Heart made those statements to deliberately disguise the economic realities underpinning the Hex, PulseChain, and PulseX offerings and evade the securities laws.  But at this stage of the litigation all facts and reasonable inferences from those facts must be construed in favor of the SEC.

### A.    The *Howey* Test

Both the Securities Act and the Exchange Act include "investment contract" in their definition of "securities," along with traditional instruments like "stock" or "bond."  *See* 15

U.S.C. § 77b(a)(1) (stating that "the term 'security' means any ... investment contract"); 15

U.S.C. 78c(a)(10).   In the seminal case, *SEC v. W.J. Howey*, the Supreme Court defined the term

investment contract as "a contract, transaction or scheme whereby a person invests his money in

a common enterprise and is led to expect profits solely from the efforts of the promoter or a third

party."  328 U.S. at 298-99.[13]  In applying the *Howey* test to analyze whether a contract,

transaction, or scheme is an investment contract, "form should be disregarded for substance and

the emphasis should be on economic reality."  *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352,

365 (S.D.N.Y. 2020) (citation omitted); *see also United Housing Found v. Forman,* 421 U.S.

837, 849 (1975) ("Congress intended the application of [the securities laws] to turn on the

economic realities underlying a transaction, and not on the name appended thereto").  Thus, the

definition of an investment contract "embodies a flexible rather than a static principle, one that is

capable of adaptation to meet the countless and variable schemes devised by those who seek the

use of the money of others on the promise of profit."  *Howey*, 328 U.S. at 299, 66 S.Ct. 1100.

The *Howey* standard was intended to effectuate "[t]he statutory policy of affording broad

protection to investors."  328 U.S. at 301, 66 S.Ct. 1100.

### B.  No Contractual Obligation Requirement for *Howey*

Heart attempts to restrict the application of the *Howey* test by inviting the Court to write

into the test a contractual or continuing obligation requirement. Mot., pp. 39-42. Courts have

repeatedly turned back this attempt and others like it.  *Howey* sets forth a legal test—an

investment contract is "*a contract, transaction or scheme* whereby a person invests his money in

a common enterprise and is led to expect profits solely from the efforts of the promoter or a third

---

[13] The Second Circuit has held that the term "solely" in the "expectation of profits" element of the *Howey* test is not to be construed as a literal limitation.  *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008).

party." 328 U.S. at 298-99 (emphasis added).  Thus, *Howey* and other Supreme Court and Courts of Appeals precedent directly foreclose the notion that an investment contract must include ongoing contractual obligations.  *E.g.*, *Joiner,* 320 U.S. at 352-353  (noting that it was immaterial whether a state law contract that obligated the developer to do certain things had actually been formed); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 233, 240 (2d Cir. 1985) (finding an investment contract based on *implicit* promises to develop and maintain a secondary market); *see also, e.g.*, *Leonard*, 529 F.3d at 85 ("[I]n applying the *Howey* factors, courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions.").

Based on the foregoing, every single court that has considered this argument has rejected it.  Most recently in this Circuit, the *Coinbase* decision, which applied the *Howey* test to digital assets traded on a crypto asset trading platform, clearly rejected the notion that a formal contract or contractual obligations are required.  *See Coinbase*, 2024 WL 1304037, at *19 ("there need not be a formal contract between transacting parties for an investment contract to exist under *Howey*.  Indeed, courts in this Circuit have consistently declined invitations by defendants in the cryptocurrency industry to insert a 'contractually-grounded' requirement into the *Howey* analysis").  Similarly, the Court in *Terraform,* another recent crypto asset case, also agreed that no contractual undertaking was required.  684 F. Supp. 3d at 193 ("By stating that 'transaction[s]' and 'scheme[s]'—and not just 'contract[s]'—qualify as investment contracts," "the Supreme Court made clear in *Howey* that Congress did not intend the term to apply only where transacting parties had drawn up a technically valid written or oral contract under state law"); *see also Binance*, 23-cv-1599 (ABJ), ECF No. 248 (D.D.C. Jun 28, 2024) (declining to read into the *Howey* test the requirement of a contractual relationship or arrangement between

the seller and purchaser, finding instead that it was the "expectations created by the seller" that "brought the transaction within the scope of the federal securities law); SEC v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y., Sept. 20, 2020) (rejecting defendant's "ongoing contractual obligation" requirement, observing that "contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract" (citations omitted)); *Ripple Labs,* 682 F. Supp. 3d 308, 322 (S.D.N.Y. July 13, 2023) (rejecting defendants' "essential ingredients" test requiring a finding of a contract and post-sale obligation between promoter and investor).

Heart cannot point to a single decision at any level of the judiciary endorsing this invented "contractual obligations" requirement. Instead, he disregards *Howey* itself and ignores the holdings in these recent decisions that squarely reject any contractual requirement. He also cites cases, many of which are outside the Second Circuit, purportedly for the proposition that *Howey* requires that there be a contractual-type obligation to establish the existence of an investment contract. *See* Mot., p. 41. But these cases include no such holding and instead reflect only that courts will examine all parts of the subject transactions, including any expectations created by the seller and the parties' understanding of the transaction when applying the *Howey* elements. *See, e.g., Gary Plastic*, 756 F.2d at 233, 240 (no ongoing, post-sale contractual obligation requirement discussed; Court found certificate of deposits were investment contracts due to investors' reliance on skill and effort of defendant and implicit promise to use its skill and efforts); *SEC v. Aqua-Sonic Prod. Corp.,* 687 F.2d 577, 582-585 (2d Cir. 1982*)* (no ongoing, post-sale contractual obligation requirement discussed; Court relying on totality of circumstances surrounding the offering and found that where licensees could not reasonably be expected to perform the work of a sales agent, it is more likely that they relied on the efforts of others);

*Happy Inv. Group v. Lakeworld Properties, Inc.*, 396 F.Supp. 175, 181 (N.D. Cal., April 9, 1975) (no investment contract because there no reasonable expectation of profit based on efforts of others; no contractual requirement discussed); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-89 (2d Cir. 1994) (no horizontal commonality supporting an investment contract because there was no pooling of assets among the investors; at most there was a common agent used by the investor but no common enterprise; no discussion of a contractual requirement for investment contracts). Accordingly, the Court should reject Heart's argument that the SEC must plead a continuing contractual obligation to establish an investment contract.

### C.  Application of *Howey* Test

#### i.      Hex

The Complaint pleads facts supporting the *Howey* elements for Hex.  With respect to the first element – investment of money – the SEC has pled that investors deposited crypto assets into a Hex wallet address that Heart owned and controlled for the purpose of purchasing and investing in Hex tokens.  Compl., ¶ 29. *See United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *5 (E.D.N.Y. Sept. 11, 2018) (investment of crypto assets constitutes valid consideration to meet the first *Howey* prong).   Moreover, the Complaint also pleads facts reflecting that Hex satisfies the second *Howey* prong, the existence of a common enterprise, which may be demonstrated through horizontal commonality. *Howey*, 328 U.S. at 298-99; *Revak*.  Horizontal commonality is established when "investors' assets are pooled and the fortunes of each investor [are] tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. 3d at 369 (citing *Revak*, 18 F.3d at 87 (2d Cir. 1994)); *see also SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001) (describing "horizontal commonality" as "a type of commonality that involves the pooling of assets from multiple

investors so that all share in the profits and risks of the enterprise").  Heart pooled investor funds together into private wallet addresses and stated he would use these funds to develop the Hex ecosystem, and all Hex tokens are fungible such that investors' financial fortunes rise and fall together in equal proportions.  Compl., ¶¶ 34-37, 44-49.  The ability of each investor to profit is therefore tied to the overall success of the Hex ecosystem, including the Hex staking feature and the supply and demand principles that support the value of the Hex token.  *See Terraform II*, 684 F.Supp.3d at 195-96 (SEC demonstrated the existence of a common enterprise through allegations of "horizontal commonality," where defendants used proceeds from coin sales to further develop the tokens' broader "ecosystem," representing that these improvements would increase the value of the tokens themselves).

With respect to the third *Howey* element – the reasonable expectation of profit from the efforts of others – Heart argues that Hex is a "simple digital asset with no intended-or promised functionality beyond its software code" and that its functions were "built into the software," and thus the only efforts required are those of Hex users themselves to execute the software.  Mot., p 43.  However, in conducting the *Howey* analysis, courts "are not to consider the crypto-asset in isolation" and instead, as noted above, should consider the "totality of the circumstances" and "evaluate whether the crypto-assets and the 'full set of contracts, expectations, and understandings' surrounding its sale and distribution – amount to an investment contract." *Coinbase*, 2024 WL 1304037, at *20 (citation omitted).  Rather than viewing assets in isolation, in assessing economic realities, courts look at the "totality of the circumstances" surrounding the offer of an investment contract, *Glen-Arden Commodities, Inc.* v. *Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974), including the "intentions and expectations of the parties at that time," *SEC* v. *Aqua-Sonic Prod. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 577 (2d Cir.

1982).

Importantly, the Supreme Court has made it clear that, in analyzing whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on [the] economic reality" of the parties' arrangement. *Tcherepnin* v. *Knight*, 389 U.S. 332, 336 (1967); *see also Forman*, 421 U.S. at 849 (stating "Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto"); *Terraform II*, 684 F.Supp.3d at 194 (declining to erect an "artificial barrier between the tokens and the investment protocols with which they are closely related" for the purposes of the analysis); *cf. Howey*, 328 U.S. at 297-98 (declining to "treat[ ] the contracts and deeds as separate transactions"). This analysis necessarily involves examination of how the promoter marketed the investment. *See, e.g.*, *Terraform II*, 684 F.Supp.3d at 196 (analyzing "social media posts," "investor materials," and "readouts of investor meetings" to identify investors' expectations); *Balestra v. ATBCOIN, LLC*, 17-Civ-10001 (VSB), 380 F. Supp. 3d 340, 355 (S.D.N.Y., Mar. 31, 2019) (finding that investors' expectation of profits came from "a marketing campaign," a "press release," "advertisements," and the promoter's website); *Zaslavskiy*, 2018 WL 4346339, at *2, 4-7 (finding that the indictment sufficiently alleged the existence of investment contracts based on marketing in online advertising and websites); *Audet* v. *Fraser*, 605 F. Supp. 3d 372, 395-96 (D. Conn. 2022) (finding expectation of profits premised on issuer's "promotional materials," "press release[s]," and "graphic[s] on its website"); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) (looking to "sales campaign" and "sales literature"); *Edwards*, 540 U.S. at 391 (beginning opinion with quote from marketing brochure); *Gary Plastic.*, 756 F.2d at, 233, 240 (relying on "implicit" promises); *SEC v. Glen-Arden Commod., Inc.*, 493 F.2d 1027, 1031, 1034 (2d Cir.

1974) (relying on "sales literature" and "canned sales pitch").

Here, the Complaint pleads that Heart marketed and sold Hex as an investment into his efforts, not as mere software to be deployed.  Thus, investors reasonably expected to profit from Heart's efforts, because Heart extensively marketed and promoted Hex through social media, YouTube livestream videos, and websites before, during and after the initial offering of the Hex token, specifically as an investment into his efforts.  And he specifically touted the profit-making potential of Hex, including, for example, that holders of Hex tokens can use the staking feature mechanism to lock up their token and receive dividends in the form of additional tokens. Compl., ¶¶ 21-25.  Heart extensively promoted the staking feature on the Hex.com website as a form of conventional interest payments and investment returns.  He further made repeated statements that Hex would skyrocket in value, hyped its potential for investment gain, and claimed Hex would make Hex token holders rich.  *See* Compl. ¶¶ 20, 21.

Nor did Heart restrict the sales of Hex tokens to persons who wanted to use Hex tokens—to the extent any use for them even existed—or in amounts that people could reasonably be expected to use or "consume."  Instead, he sold the tokens in unlimited amounts, more consistent with an investment purpose than any "functionality."  *See* Compl., ¶¶34, 55, 67;  *Telegram*, 448 F. Supp. 3d at 372 ("The size and concentration" of the asset purchases reflects that the purchasers "purchased with investment, not consumptive intent"); *see also Forman,* 421 U.S. at 849 (sale of shares in cooperative housing were not investment contracts because purchasers intent was not to receive profit from the efforts of others but instead was personal consumptive use of the living quarters"); *Cf. Aqua-Sonic Prod. Corp.,* 687 F.2d at 582-585 (2d Cir. 1983) (noting that where investors could not reasonably be expected to undertake the efforts themselves, it was more likely that there was a reasonable expectation of profit from the efforts of others).

While Heart now seeks to ignore the economic reality of the transactions at issue as he created it, the Complaint specifically pleads efforts that Heart said he would, and did, undertake to help make Hex successful and boost its investment value.  These include engaging developers to work on the Hex code to benefit the Hex ecosystem, conducting "airdrops" of Hex tokens to generate investor interest in the crypto market, personally contacting crypto asset trading platforms to ensure that Hex would be traded on these platforms to increase demand and value after the offering period, continuing to extensively promote and market Hex through his followings on Twitter, YouTube, Instagram, and the websites he controlled before, during, and after the offering period when Hex began trading on the secondary market, developing a website interface to allow investors to engage in secondary market purchases of Hex tokens, and continuing to extensively market the "staking" feature after the offering period as a means to earn investment returns. Compl., ¶¶ 26-28, 38-43.  All of these efforts, and marketing and promotional statements, objectively gave investors the reasonable expectation that they would derive profits from their purchase of Hex due to Heart's efforts to increase value and invited the reasonable investor to view her purchase of Hex as an investment into these efforts—not a mere purchase of software.

    ii.    **PLS**

The economic reality of Heart's PLS offering is factually indistinguishable from his Hex offering, as alleged in the Complaint.  First, Heart sold PLS tokens in exchange for cash or other crypto assets, establishing the first *Howey* element.  Compl., ¶¶ 51-52, 55; *See Zaslavskiy*, 2018 WL 4346339, at *5.  Second, Pulse investor funds were pooled together in a PulseChain wallet address, and all investors profited together because the prices of all PLS tokens rose and fell together.  Compl., ¶¶ 51-52, 60.  *See Telegram*, 448 F. Supp. 3d at 369 (Horizontal commonality is established when "investors,' assets are pooled and the fortunes of each investor [are] tied to

52

the fortunes of other investors as well as to the success of the overall enterprise.")

Third, investors in Pulse reasonably expected to profit from their investments based upon Heart's efforts, because that is precisely how Heart marketed the investment proposition. Specifically, Heart marketed and promoted Pulse by leading investors to reasonably believe that they would profit through Heart's efforts to develop it.  He publicly stated that PulseChain would be a fork of the Ethereum blockchain but would be four times faster and cheaper to use than Ethereum.  Compl., ¶¶ 51, 67. He also touted that an investment in the PulseChain offering would result in at least a fourteen thousand times return on investment "because that's what Ethereum did and this is a very similar thing but better," and that such investment would bring investors "infinite ROI" (return on investment) because PulseChain would launch initially at a zero percent valuation.  *Id.*, ¶¶ 58-59.  Moreover, Heart discussed and promoted development efforts and updates regarding the progress of PulseChain giving investors the reasonable belief that their funds were being used to develop PulseChain and that the value of the PLS token was tied to the successful launch of PulseChain by Heart and his team of developers who were working to bring PulseChain and its PLS native token out of the "test phase" and into the "main net" launch phase. *Id.*, ¶¶ 64-66.  Heart also tied the success of the three projects, Hex, PulseChain, and PulseX together, because, for example, Hex would trade on the PulseChain network and, according to Heart, Hex would be more valuable there than on Ethereum, and the success of the projects was dependent on Heart and his developers' efforts. *Id.*, ¶¶ 72, 75 ("The [developers] are working hard on it.  It's done when it's done.  That's all there is to it.  You've got to wait, just like I'm waiting . . .").  Investors thus reasonably understood that Heart's efforts to develop and launch PulseChain were instrumental to their profit potential and would check with him about progress on his development efforts in connection with the PulseChain and PulseX launch.  *Id.*, ¶ 75.  And

although the *Howey* test is an objective test, *see, e.g.*, *Telegram*, an investor in Brooklyn confirmed

that he invested in PulseChain with the expectation of profiting through the PLS token. *Id.*, ¶¶ 60,

64

### iii.    PLSX

The PulseX offering occurred in much the same way as the previous two, and meets the

*Howey* test in much the same way.  Heart raised investor funds by selling PLSX tokens in exchange

for cash or other crypto assets, demonstrating the first *Howey* element.  Compl., ¶ 67.  *See Corley*,

2018 WL 4346339, at *5.  Funds from investors in PulseX were also pooled into a "PulseX

Sacrifice Address."  *Id.*  The funds were used to develop PulseX, which Heart described as a fork

of the Uniswap so-called decentralized trading platform that would allow for transactions in digital

assets offered and sold on PulseChain.  *Id.*  Moreover, all PLSX tokens rise and fall in value

together, meaning that investors' financial fortunes were tied together.  *Id.*, ¶¶ 67, 70-72, 75.  All

of these facts demonstrate horizontal commonality enough to satisfy the common enterprise

*Howey* element.  *Telegram*, 448 F. Supp. 3d at 369.

Finally, Heart led investors to believe that their investment in PulseX would earn profit

based on his efforts, satisfying the final *Howey* element.  He emphasized this through statements

about PulseX, such as "PLSX is designed to increase in value," and "we have the coolest highest

liquidity automated market maker exchange," and he told investors that he believed that PLSX

tokens would appreciate "10,000x in two years."  Compl., ¶70.  Investors were led to expect, based

on Heart's statements and the economic reality of the transactions, that the PLSX tokens would

derive value from the success of the PLSX platform as underscored by the fact that PLSX tokens

were not delivered until May 3, 2023, when PulseX was deployed.  Compl., ¶¶67, 69.  As noted

above, Heart also tied the success of all three projects together and to an increase in profits for

Hex, PulseChain, and PulseX investors.   ¶72.   But the platform itself would come about based upon Heart's supposed entrepreneurial efforts—deploying investor capital—to do so.   Investors thus reasonably understood that their ability to earn profits from PLSX tokens was tied to the success of PulseX, which they understood was only possible through Heart's efforts to develop the project.   Compl., ¶¶ 72, 75.

### iv.   Heart's Disclaimers

Heart contends that investors in the Heart Securities could not have reasonably expected any profit, because he made statements telling potential investors, for example, that they should not expect to earn a profit from investment in Hex, PulseChain, or PulseX, that investors were "sacrificing" their crypto assets when they deposited them to the wallet addresses Heart set up, and that these "sacrifices" were for the purpose of supporting "free speech.".   Mot., pp. 45-46.   This contention is meritless.   First, as the SEC pled in its Complaint, Heart made numerous other statements emphasizing that investments in these offerings were designed to generate tremendous profits for investors.   *See, e.g.*, Compl., ¶ 25 ("Hex is designed to surpass ETH, which did 10,000x price in 2.5 years.   It's working!"), ¶ 59 ("PulseChain's gonna launch at zero . . . it's pretty hard to beat the ROI [return on investment] of something that goes from zero to anything because, you know, in theory it's like infinite ROI"), ¶ 70 ("10,000x in two years is well within the realm of possibility" with respect to the appreciation of the PLSX token).   Under *Howey* and its progeny, *all* facts and circumstances must be analyzed, not just Heart's convenient disclaimers in isolation.   When Heart's disclaimers are considered together with his investment promotional statements as well as the economic reality of the offering—that the Heart Securities had little to no other use beyond being investment vehicles—the plain economic reality of the schemes he offered and sold is that of investment contracts.   *SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st

Cir. 2001) (defendant's disclaimer language did not overcome showing that defendant's other representations satisfy *Howey's* expectation of profit requirement); *Telegram*, 448 F. Supp. 3d at 373-74 (holding that defendant's disclaimers and public statements to not expect profit and highlighting consumptive use of digital assets were not sufficient to negate the evidence that a reasonable investor expected to profit, including promotional materials emphasizing opportunities for potential profit).

Moreover, the SEC has specifically pled in its Complaint that Heart is familiar with the federal securities laws and the *Howey* test and that he made false statements to his investors in order to disguise the economic reality of his crypto asset offerings. Compl., ¶¶ 6, 74-75. To the extent Heart now requests that the Court credit his version of events over the allegations in the Complaint, Heart is asking the Court to bypass and ignore black letter law regarding the standard of review for a motion to dismiss brought under Rule 12(b)(6), which requires that the Court assume "the truth of the facts asserted in the Complaint" and draw "all reasonable inferences from those facts in favor of the plaintiff." *Alpert*, 2018 WL 1156012, at *2 (citing *Harris v. Mills*, 572 F.3d at 71).

## V.   The Allegations of the Complaint Do Not Abridge the First Amendment Rights of Heart or any User of Hex, PulseChain, or PulseX

Heart contends that the Court should dismiss the SEC's entire Complaint because it is "an impermissible effort to penalize and restrain Heart's speech, along with the speech of thousands of users." Mot., p. 53. Heart presents this argument in two pieces: first objecting to the Complaint's use of his own words, and then attempting to wrap free-speech protections around the code that he developed for Hex, PulseChain, and PulseX. (*Id.*, pp. 47-53). For the reasons described below, these arguments fail.

### a.  Heart's Speech

Heart broadly argues that the SEC is not allowed to refer to his public statements in support of its claims.  Mot., p. 47-48.  Pointing to examples in the Complaint quoting and using his words against him, Heart claims that the use of his own words is somehow impermissible under the First Amendment.  This is a novel and untenable position, akin to a bank robbery defendant claiming that his constitutional rights are violated if prosecutors quote him as saying "stick 'em up."

The First Amendment does not prohibit the evidentiary use of speech to establish the elements of a claim or to prove motive or intent.  *Wisconsin v. Mitchell*, 508 U.S. 476, 489, 113 S. Ct. 2194, 2201, 124 L. Ed. 2d 436 (1993); *see, also, Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 194 (D. Conn. 2017) (the First Amendment does not protect a defendant from his own speech giving rise to liability under the ADA or other employment discrimination statutes).  The Court should reject Heart's attempt to use the First Amendment to insulate himself from the consequences of his actions.

In reality, it is difficult to imagine a securities enforcement case that does not make extensive use of a defendant's written and oral statements.  "Speech relating to the purchase and sale of securities . . . forms a distinct category of communications."  *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022), citing *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988).  *SEC v. AT&T* addressed the First-Amendment constitutionality of Regulation FD, which prohibits a public company from disclosing material nonpublic information *to some* people unless it also discloses that information *to the public*.  *Id.* at 710.  Opting to apply intermediate – not strict – scrutiny in that case, the court found that the prohibited- and

compelled-speech requirements of Regulation FD did not violate the First Amendment. "If speech employed directly or indirectly to sell securities were totally protected [by the First Amendment], any regulation of the securities market would be infeasible—and that result has long since been rejected." *SEC v. AT&T, Inc.*, 626 F. Supp. 3d at 743 (citing *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973) and cases cited therein); *see SEC v. Capital. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186–95, 84 S. Ct. 275, 11 L.Ed.2d 237 (1963); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 99–103, 67 S. Ct. 133, 91 L. Ed. 103 (1946); *N. Am. Co. v. SEC*, 327 U.S. 686, 705–07, 66 S. Ct. 785, 90 L. Ed. 945 (1946).

In *SEC v. Wall Street Publishing*, the D.C. Circuit went even further in showing constitutional deference to regulation efforts, finding that "the government's power to regulate [securities-related speech] is at least as broad as with respect to the general rubric of commercial speech." 851 F.2d 365, 373 (D.C. Cir. 1988). In that case, the court soundly rejected a First Amendment challenge to the SEC's anti-touting injunction under Section 17(b) of the Securities Act:

> [W]e do not think it necessary for us to inquire, as we would if only commercial speech were involved, whether the government's specific regulatory objective—disclosure of consideration—is constitutionally permissible. In areas of extensive federal regulation—like securities dealing—we do not believe the Constitution requires the judiciary to weigh the relative merits of particular regulatory objectives that impinge upon communications occurring within the umbrella of an overall regulatory scheme. We note, however, that even if we were so required, disclosure requirements have been upheld in regulation of commercial speech even when the government has not shown that "absent the required disclosure, [the speech would be false or deceptive] or that the disclosure requirement serves some substantial government interest other than preventing deception."

*Id.* at 373-374, quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650, 105 S. Ct. 2265, 2281, 85 L.Ed.2d 652 (1985). Heart does not grapple with, or even mention, the *AT&T* or

*Wall Street Publishing* lines of cases in summarily claiming First Amendment protection for all statements made surrounding Hex, PulseX, and PulseChain.

In this case, regardless of the standard applied, the SEC's interest in enforcing the securities laws is substantial and compelling. *SEC v. Egan*, 856 F. Supp. 401, 402 (N.D. Ill. 1993) (the SEC and the public have a substantial interest in the deterrence of securities violations); *Doe v. SEC*, No. MC 11-80209 CRB, 2012 WL 78586, at *3 (N.D. Cal. Jan. 10, 2012) (SEC has a compelling governmental interest in investigating potential violations of the federal securities laws); *SEC v. Alexander*, No. 00 CIV.7290 LTS HBP, 2003 WL 21196852, at *4 (S.D.N.Y. May 20, 2003) (the judicial system has a substantial interest in providing efficient relief for securities violations). Although Heart points to the injunctive relief sought by the SEC as "far more extensive than necessary" (Mot., p. 51), this is not the case. If the Court chooses to permanently bar the Defendants from further sales of crypto asset securities, it will only come after the Court has identified compelling reasons to do so through application of several relevant court-tested factors.[14]

### b. Code as Speech

Heart argues that his crypto products and platforms are inherently protected by the First Amendment and urges the Court to apply strict-scrutiny review to the SEC's attempt to enforce the federal securities laws in connection with them. Strict scrutiny should not apply here. The

---

[14] Before ordering injunctions in securities regulation actions, courts consider "(1) whether a defendant has been found liable for illegal conduct; (2) what level of scienter defendant acted with; (3) whether defendant's past fraudulent acts were an isolated occurrence; (4) if the defendant has acknowledged his wrongdoing; and (5) whether future violations are likely. *SEC v. CKB168 Holdings, Ltd.*, No. 13-CV-5584 (HG), 2022 WL 3347253, at *2 (E.D.N.Y. Aug. 12, 2022) (citing *SEC v. Nadel*, No. 11-cv-215, 2016 WL 639063, at *5 (E.D.N.Y. Feb. 11, 2016), *report and recommendation adopted*, 206 F. Supp. 3d 782 (E.D.N.Y. 2016)).

SEC's effort to regulate these digital products and platforms is content neutral – based not on any *expressive* use, but on the *function* of Hex, PLS, and PLSX as securities. *Green v. United States*, 54 F.4th 738, 746 (D.C. Cir. 2022) (the DMCA is content-neutral because "it cares about the expressive message in the code 'only to the extent that it informs' the code's function") (citing *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 142 S. Ct. 1464, 142 L. Ed. 2d 418).

The enforcement of the federal securities laws is inherently content-neutral because the SEC is concerned that securities follow the same rules, regardless of what form the securities take (*e.g.,* crypto assets, equities, bonds, or lemon-tree contracts). Accordingly, under cases like *Green*, *Austin*, and *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 662, 114 S. Ct. 2445, 2469, 129 L. Ed. 2d 497 (1994), the Court should analyze the application of the federal securities laws to Heart's products with, at most, intermediate scrutiny.

As above, this analysis requires asking whether the regulation "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.*, citing *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

Heart points to cases like *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 434 (2d Cir. 2001) for the proposition that computer code can contain expressive elements that are protected by the First Amendment. But *Corley* explicitly found that the First Amendment did not protect the code-speech at issue there. In *Corley*, the Second Circuit found a statute forbidding websites from posting (or even linking to) copyright-circumvention software constitutional in part because "a content-neutral regulation need not employ the least restrictive means of

accomplishing the governmental objective.  It need only avoid burdening 'substantially more speech than is necessary to further the government's legitimate interests.'"  *Corley*, 273 F.3d at 455 (internal citation and quotation omitted).

Many code-related cases have been decided in recent years that have considered the free-speech aspects of code without hindering the government's efforts to regulate it.  *See DVD Copy Control Ass'n, Inc. v. Bunner*, 75 P.3d 1, 10 (Cal. 2003) (upholding a preliminary injunction banning the distribution of copyright circumvention software as a violation of state trade-secret law); *United States v. Alavi*, No. CR 07-429, 2008 WL 1989773, at *1 (D. Ariz. May 5, 2008) (upheld criminal indictment of engineer who unlawfully exported software to Iran over First-Amendment objections); *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (finding no First-Amendment concerns because software at issue was sold as a "system" and "trading program" rather than a learning program, editorial, or informational newsletter); *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 691-96 (W.D. Tex. 2015) (no abridgement of speech rights when the government refused preclearance for Internet publication of plans for 3-D printed handguns); *Rigby v. Jennings*, No. CV 21-1523, 2022 WL 4448220, at *10 (D. Del. Sept. 23, 2022) (publication of 3D gun plans lawfully restricted); *See also Def. Distributed v. Platkin*, No. CV219867MASTJB, 2023 WL 6389744, at *6-8 (D.N.J. Sept. 29, 2023) (publication of 3D gun plans lawfully restricted).

Heart cites *Packingham* for the notion that the SEC cannot "close the public squares" of Hex, PulseX, and PulseChain.  Mot., p. 52.  In *Packingham*, convicted sex offenders successfully challenged a North Carolina law that would have effectively banned them from all social networking sites.  *Packingham v. North Carolina*, 582 U.S. 98, 198 L. Ed. 2d 273 (2017).  Even so, the *Packingham* court acknowledged that the First Amendment *would allow* a state to

prohibit a sex offender from using a website to contact or gather information about a minor. *Id.* at 107. The SEC's enforcement action against Defendants here is just such a targeted measure. As stated above, the Commission has a valid and compelling interest in enforcing the federal securities laws. Further, any restriction on speech would be merely incidental to the orderly imposition of those laws. The SEC does not seek to remove Heart or any crypto enthusiast from the Internet; it seeks, as always, to prevent the unregistered offers and sales of securities and to fight securities fraud. Importantly, no case cited by Heart stands for the proposition that a financial software constitutes a "public square" or "public forum" that deserves First Amendment protection. This Court should refuse to adopt the novel position urged by Heart.

## CONCLUSION

For the foregoing reasons, Heart's Motion to Dismiss should be denied. If the Court grants any part of the Motion, the Commission respectfully requests leave to amend to address those deficiencies identified by the Court in ruling on the Motion.[15]

DATED: July 8, 2024                    Respectfully submitted,

s/ Matthew J. Gulde
MATTHEW J. GULDE*
Illinois Bar No. 6272325
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Ph: 817-978-1410
Fax: 817-978-4927
guldem@sec.gov

---

[15] The Commission does not believe its Complaint is deficient in any respect and cannot therefore cite with any specificity those amendments it could make at this time. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015) (reversing District Court's dismissal without leave to amend where plaintiff could not anticipate the defects prior to full briefing and a decision and could not therefore propose specific amendments).

BEN KURUVILLA
United States Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
Ph: 212-336-5599
kuruvillabe@sec.gov

ATTORNEYS FOR PLAINTIFF UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

*admitted *pro hac vice*