UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

      -against-

RICHARD SCHUELER aka RICHARD
HEART, HEX, PULSECHAIN, and PULSEX,

           Defendants.

Civil Action No. 1:23-cv-05749-CBA-PK

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RICHARD
HEART'S MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

ARGUMENT ..............................................................................................................2

I.     THIS COURT LACKS PERSONAL JURISDICTION OVER MR. HEART ...................2

       A.     The Complaint Fails to Establish Personal Jurisdiction Relating to the
              Alleged Hex Offering .............................................................................3

       B.     The Complaint Fails to Establish Personal Jurisdiction Relating to the
              Alleged PulseChain and PulseX Transactions ..........................................9

       C.     Exercising Personal Jurisdiction Would Not Be Fair or Reasonable ...................12

       D.     The SEC Has Abandoned Its Purported "Alter Ego" Claims ...............................13

II.    THE SEC HAS FAILED TO ADEQUATELY PLEAD THE EXISTENCE OF A
       DOMESTIC PURCHASE, SALE, OR OFFER OF SECURITIES ..................................13

       A.     The SEC Fails to Allege a Domestic Purchase or Sale of Securities in
              Connection with Its Fraud Claims ..........................................................13

              1.     The Dodd-Frank Act Did Not Override *Morrison's* Application to
                     the SEC's Fraud Claims ...............................................................13

              2.     The SEC Fails to Satisfy the Conduct-and-Effects Test in Any
                     Event ......................................................................................14

       B.     The SEC Fails to Allege Domestic Offers or Sales of Securities Under
              Section 5 .............................................................................................16

              1.     The SEC Fails to Allege Domestic Sales of Securities as to Its
                     Section 5(a) Claims ....................................................................16

              2.     The SEC Fails to Allege Domestic Offers of Securities as to Its
                     Section 5(c) Claims ....................................................................18

       C.     The Transactions the SEC Alleges Are Predominantly Foreign ...........................19

III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR SECURITIES FRAUD ..........20

       A.     The SEC Fails to Plead Deceptive Conduct .......................................................20

       B.     The SEC Fails to Support Its Scheme Claims with Alleged Omissions ...............23

              1.     The SEC Cannot Assert Scheme Claims Based on Alleged
                     Omissions .................................................................................23

              2.     The SEC Identifies No Misleading Omissions to Support Its
                     Scheme Claims ..........................................................................23

       C.     The SEC Fails to Plead Scienter ......................................................................26

IV.     THE OPPOSITION DOES NOT ADDRESS THE COMPLAINT'S FAILURE
        TO ADEQUATELY ALLEGE THAT ANY PARTIES ENTERED INTO AN
        "INVESTMENT CONTRACT" ........................................................................27

        A.      The Complaint Does Not Allege the Existence of a Contract, Transaction,
                or Scheme that Created Continuing Obligations for Mr. Heart or Anyone
                Else.......................................................................................................27

        B.      The Opposition Misinterprets Mr. Heart's Continuing Obligations
                Argument as a Dispute About the *Howey* Test.......................................30

V.      THE COMPLAINT UNCONSTITUTIONALLY INFRINGES ON THE FIRST
        AMENDMENT RIGHTS OF MR. HEART AND THOUSANDS OF
        INDIVIDUALS WHO USE HEX, PULSECHAIN, AND PULSEX..............................31

VI.     THE SEC SHOULD NOT BE GRANTED LEAVE TO AMEND THE
        COMPLAINT ...............................................................................................35

# TABLE OF AUTHORITIES

## Cases

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ...........................................................5

*79th Grp., Inc. v. Moore*,
  2024 WL 36992 (S.D.N.Y. Jan. 3, 2024) ..................................................................3

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021) ....................................................................12

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ...............................................................................................35

*Arcaro v. Parks*,
  143 S. Ct. 427 (2022) ...............................................................................................6

*Ashland Inc. v. Morgan Stanley & Co.*,
  652 F.3d 333 (2d Cir. 2011) ...................................................................................22

*Basic v. BProtocol Found.*,
  2024 U.S. Dist. LEXIS 135377 (W.D. Tex. July 31, 2024) ..................................11

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007) .................................................................................4, 9

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) .................................................................................................4

*Callahan v. Wisdom*,
  2020 WL 2061882 (D. Conn. Apr. 29, 2020) ......................................................8, 12

*Chen v. Missfresh Ltd.*,
  2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023) ..........................................................24

*Chirag v. MT Marida Marguerite Schiffahrts*,
  604 F. App'x 16 (2d Cir. 2015) .............................................................................10

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) .....................................................................................7

*Consol. Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir. 1989) ...................................................................................16

*Cornwell v. Credit Suisse Grp.*,
  666 F. Supp. 2d 381 (S.D.N.Y. 2009) ....................................................................16

*Counterman v. Colorado*,
    600 U.S. 66 (2023)..................................................................................32

*Coyle v. Coyle*,
    153 F. App'x 10 (2d Cir. 2005) .............................................................15

*Deida v. City of Milwaukee*,
    176 F. Supp. 2d 859 (E.D. Wis. 2001)...................................................33

*EMI Christian Music Group, Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016).......................................................................3

*Equal Employment Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*,
    265 F. Supp. 3d 179 (D. Conn. 2017).....................................................33

*Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
    147 F.3d 118 (2d Cir. 1998)..............................................................18, 19

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994).....................................................................20

*Gordian Grp., LLC v. Syringa Expl., Inc.*,
    168 F. Supp. 3d 575 (S.D.N.Y. 2016)......................................................4

*Holsworth v. BProtocol Found.*,
    2021 WL 706549 (S.D.N.Y. Feb. 22, 2021).............................................4

*Ill. State Bd. of Inv. v. Authentidate Holding Corp.*,
    369 F. App'x 260 (2d Cir. 2010) ...........................................................25

*Interbrew v. EdperBrascan Corp.*,
    23 F. Supp. 2d 425 (S.D.N.Y. 1998)......................................................15

*Kernan v. Kurz-Hastings, Inc.*,
    175 F.3d 236 (2d Cir. 1999).....................................................................7

*Knight v. Standard Chtd. Bank*,
    531 F. Supp. 3d 755 (S.D.N.Y. 2020)..........................................5, 6, 11

*In re Liberty Tax, Inc. Sec. Litig.*,
    828 F. App'x 747 (2d Cir. 2020) .....................................................25, 35

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)...............................................................................24

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)...............................................................................28

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)........................................................................................24

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)......................................................................................33

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)..........................................................26

*In re Meta Materials Inc. Sec. Litig.*,
    2023 WL 6385563 (E.D.N.Y. Sept. 29, 2023) ............................................22

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)..........................................................................24

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010).................................................................................14, 19

*Navaera Scis., LLC v. Acuity Forensic Inc.*,
    667 F. Supp. 2d 369 (S.D.N.Y. 2009)............................................................8

*Outdoor Partners LLC v. Rabbit Hole Interactive Corp.*,
    2013 WL 6503525 (S.D.N.Y. Dec. 9, 2013) .............................................8, 12

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)..........................................................................14

*In re Parmalat Sec. Litig.*,
    383 F.Supp.2d 616 (S.D.N.Y. 2005)..............................................................26

*Pino v. Cardone Capital, LLC*,
    55 F.4th 1253, 1256 (9th Cir. 2022) ...............................................................6

*Reed Int'l, Inc. v. Afg. Int'l Bank*,
    657 F. Supp. 3d 287 (S.D.N.Y. 2023)..............................................................3

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)............................................................24

*S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*,
    791 F. App'x 230 (2d Cir. 2019) ...................................................................25

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)......................................................................................21

*Sarkisian v. OpenLocker Holdings, Inc.*,
    700 F. Supp. 3d 105 (S.D.N.Y. 2023)...................................................5, 6, 11

v

*SEC v. AT&T, Inc.*,
    626 F. Supp. 3d 703 (S.D.N.Y. 2022) ......................................................................34

*SEC v. Balina*,
    2024 WL 2332965 (W.D. Tex. May 22, 2024) .......................................................18

*SEC v. Binance Holdings Ltd.*,
    2024 WL 3225974 (D.D.C. June 28, 2024) ........................................................6, 29

*SEC v. Boock*,
    2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) .......................................................20

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ...............................................................................................29

*SEC v. Chicago Convention Ctr., LLC*,
    961 F. Supp. 2d 905 (N.D. Ill. 2013) .....................................................................14

*SEC v. Coinbase, Inc.*,
    2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) .......................................................29

*SEC v. Goldman Sachs & Co.*,
    790 F. Supp. 2d 147 (S.D.N.Y. 2011) ...................................................................18

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................................................23

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ...................................................................29

*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) .................................................................................28

*SEC v. Penn*,
    225 F. Supp. 3d 225 (S.D.N.Y. 2016) ...................................................................22

*SEC v. PlexCorps*,
    2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) .............................................3, 5, 7, 10

*SEC v. Ripple Labs*, *Inc.*,
    2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) .........................................................18

*SEC v. Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023) ................................................................6, 29

*SEC v. Scoville*,
    913 F.3d 1204 (10th Cir. 2019) .............................................................................14

*SEC v. Sugarman*,
   2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020)................................................21, 23

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)........................................................28

*SEC v. Terraform Labs Pte Ltd.*,
   2022 WL 2066414 (2d Cir. June 8, 2022) ...............................................3, 6, 9, 12

*SEC v. Terraform Labs Pte Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023)........................................................29

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)..........................................................................27, 29

*SEC v. Wall St. Pub. Inst., Inc.*,
   851 F.2d 365 (D.C. Cir. 1988)..................................................................34

*SEC v. Zandford*,
   535 U.S. 813 (2002)..........................................................................20, 21

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)........................................................23

*SPV Osus, Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)....................................................................5

*Tarrant v. City of Mount Vernon*,
   2021 WL 5647820 (S.D.N.Y. Dec. 1, 2021) ................................................13

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967)...........................................................................29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)...........................................................................26

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) .....................................................................24

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994)..........................................................................33, 34

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................23

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975)...........................................................................28

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)................................................................21, 22

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).....................................................................24

*Walden v. Fiore*,
    571 U.S. 277 (2014)..........................................................................5, 6, 11

*Wildes v. BitConnect International PLC*,
    25 F.4th 1341 (11th Cir. 2022) ...................................................................6

*Williams v. Binance*,
    96 F.4th 129 (2d Cir. 2024) .................................................................16, 17

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993)...................................................................................32

*Yash Raj Films (USA) Inc. v. Dishant.com LLC*,
    2009 WL 4891764 (E.D.N.Y. Dec. 15, 2009) ..........................................7

## Rules and Statutes

15 U.S.C. § 77v...............................................................................................14, 15

Fed. R. Civ. P. 9.....................................................................................................20

Fed. R. Civ. P. 12....................................................................................15, 16, 30

## Other Authorities

August 5, 2021 Archive of PulseChain Sacrifice Webpage,
    INTERNET ARCHIVE WAYBACK MACHINE, https://tinyurl.com/3n8sjsrp...............................11

Ether Transactions for PulseChain Sacrifice Address,
    ETHERSCAN.IO, https://tinyurl.com/c3y9d8k .........................................11

Ether Transactions for PulseX Sacrifice Address,
    ETHERSCAN.IO, https://tinyurl.com/3zm89k8n  .....................................11

## PRELIMINARY STATEMENT

Defendant Richard Heart's Motion to Dismiss lays bare numerous glaring legal deficiencies in Plaintiff Securities and Exchange Commission's slapdash Complaint—a pleading consistent with the SEC's ongoing haphazard campaign to punish people who create or interact with blockchain technologies. At the apex of these improper efforts is the current attempt to muzzle Mr. Heart using a narrative riddled with factual inaccuracies, cherry-picked statements, and misguided legal theories. Tacitly admitting its inability to defeat Mr. Heart's arguments for dismissal, the SEC now lobs in new putative evidence, twists its timelines to suggest that the alleged offerings were promoted long after they had concluded, peppers its Opposition to Mr. Heart's Motion with unpled, unsupported allusions to nonexistent U.S. connections, and conjures up new allegations found nowhere in the Complaint. None of this can salvage the SEC's Complaint, which should be dismissed with prejudice in its entirety.

*First*, the SEC says almost nothing to rectify the Complaint's jurisdictional shortcomings and instead admits the Complaint's insufficiencies by resorting to new purported evidence. But the SEC's eleventh-hour facts still fail because they either post-date the alleged offerings at issue, bear no relevance to the jurisdictional inquiry, or both.

*Second*, the SEC attempts to overcome *Morrison*'s bar on extraterritoriality by relying on authorities involving detailed U.S.-centric allegations not present here. Lacking such allegations, the SEC litters its Opposition with references to the United States not found in the Complaint or otherwise substantiated. The SEC cannot simply wish domestic transactions into existence.

*Third*, the SEC fails to salvage its incoherent fraud claims, instead merely repeating its conclusory refrain that Mr. Heart's conduct was inherently deceptive. Alleged uses of funds that do not comport with the SEC's preferences are not deceptive if no representations *whatsoever* were

1

made about them.  The SEC's incredulity and indignation that individuals would partake in the transactions at issue do not approach a viable fraud claim in the absence of anything fraudulent.

*Fourth*, the SEC misunderstands Mr. Heart's argument that an "investment contract" requires a continuing obligation, whether as part of a formal contract or an informal transaction or scheme.  The Complaint does not allege any such continuing obligation, so there is no "investment contract" here, and the federal securities laws cannot apply.  Critically, the Opposition identifies no case that says otherwise.  Rather than address that point, the SEC spends pages responding to a hypothetical *Howey* test argument that Mr. Heart does not make in his Motion.  Building a straw house and then blowing it down does not address the legal argument Mr. Heart raises before this Court.

*Fifth*, the SEC fails to grapple at all with Mr. Heart's First Amendment arguments.  It ignores the unconstitutionality of cobbling together purported securities *entirely* by cherry-picking words from hundreds of hours of public commentary of protected speech, resulting in content-based discrimination unsupported by a compelling government interest.  The SEC also overlooks the unconstitutionality of its proposed injunction, which would dismantle blockchain-based public speech and impose a prior restraint on Mr. Heart's future speech by prohibiting him from interacting with communities that depend on blockchains for the exchange of ideas.

## ARGUMENT

## I.    THIS COURT LACKS PERSONAL JURISDICTION OVER MR. HEART

Apparently recognizing the Complaint's failure to make a *prima facie* showing of personal jurisdiction, the SEC responds by jumbling together its jurisdictional allegations concerning the three software programs at issue, mischaracterizing the alleged timeline of events, and introducing new purported jurisdictional "facts."  These efforts do not cure the SEC's failure to establish sufficient minimum contacts between Mr. Heart and the United States as to any of the three

software programs and alleged transactions at issue.

A.  **The Complaint Fails to Establish Personal Jurisdiction Relating to the Alleged Hex Offering**

Mr. Heart cannot be dragged into a U.S. court regarding the Hex software without a specific showing that his Hex-related activities were "expressly targeted, or directed to [the United States]." *Reed Int'l, Inc. v. Afg. Int'l Bank*, 657 F. Supp. 3d 287, 305 (S.D.N.Y. 2023).  The SEC does not dispute that anyone can execute the Hex software on the worldwide Ethereum blockchain network, making it a "peculiarly non-territorial" activity.  *79th Grp., Inc. v. Moore*, 2024 WL 36992, at *13 (S.D.N.Y. Jan. 3, 2024) (internal quotation and citation omitted); *see also* Br. of Defendant Heart at 14-17 (hereinafter "Mot.").

Nevertheless, the SEC doubles down on its assertion that the mere execution of the Hex software by U.S. residents can satisfy minimum contacts, pointing to ten U.S. residents who allegedly reported doing so during the so-called Hex offering (compared to 21,156 wallet addresses that allegedly did so worldwide).  Opp. Br. of Plaintiff at 17 (hereinafter "Opp. Br."); Declaration of Derek Kleinmann ¶ 11 (hereinafter "Kleinmann Decl."); Compl. ¶ 34.  Those allegations are a far cry from what sufficed in the SEC's cited authorities.

*SEC v. PlexCorps* entailed thousands of sales made with U.S.-based payment accounts, of which 90% "were made in [U.S.] dollars" and "more than 25% to [U.S.] buyers," of whom the defendants were expressly aware.  2018 WL 4299983, at *5 (E.D.N.Y. Aug. 9, 2018).  In *SEC v. Terraform Labs Pte Ltd.*, the defendants signed "agreements with U.S.-based entities to facilitate the trade of [the] digital assets" and themselves stated, while entering into one such agreement, that "15% of users . . . [were] within the [United States]."  2022 WL 2066414, at *3 (2d Cir. June 8, 2022), *cert. denied sub nom. Terraform Labs Pte Ltd. v. SEC*, 143 S. Ct. 1020 (2023).  And in *EMI Christian Music Group, Inc. v. MP3tunes, LLC*, the defendant "was aware both that [his

3

company] had at least 400 users located in [the forum] and that his company provided services to [forum] customers."  844 F.3d 79, 98 (2d Cir. 2016).

In contrast, Mr. Heart is not alleged to have had any knowledge or control over whether or how many U.S. persons executed the Hex software, which, as the SEC tacitly concedes, is a "unilateral activity."  *See Gordian Grp., LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 586-87 (S.D.N.Y. 2016); Mot. at 14-15.  Thus, the SEC cannot show that Mr. Heart "purposefully directed his activities at [the United States]."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation and citation omitted).

**YouTube and Web Content.**  The SEC claims that Mr. Heart "*targeted* the United States . . . by extensively promoting and marketing the Hex . . . offering[] *specifically and directly* to U.S. investors."  Opp. Br. at 12 (citing Compl. ¶¶ 22, 24-28, 39-41, 48-49, 56, 58-59, 70-72) (emphasis added).  As occurs frequently throughout the Opposition, the SEC simply makes up its assertion regarding U.S. "targeting"—the Complaint does not support it.  Those cited Complaint paragraphs reference online statements directed at no particular audience, other than one alleged post-offering online chat concerning PulseX, not Hex.  *See* Compl. ¶ 70; Mot. at 21 n.15.  Such untargeted, globally available online content cannot establish jurisdiction.  *See* Mot. at 18-19; *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 250-51 (2d Cir. 2007); *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *2 (S.D.N.Y. Feb. 22, 2021).

The SEC tries to establish Hex-related activities targeting the United States with a declaration referencing two alleged live video streams broadcast to audiences in Las Vegas in March 2022 and September 2022, and an alleged interview in Miami in August 2022 that was livestreamed on YouTube, during each of which Mr. Heart allegedly discussed Hex.  Kleinmann Decl. ¶¶ 5-9.  These new allegations do not suffice, as merely speaking about Hex is not enough

to show that Mr. Heart expressly targeted the alleged Hex offering toward the United States.

But these alleged video broadcasts suffer from a greater problem: all three took place long after November 2020, the conclusion of the alleged "Hex Offering," after which Mr. Heart is not alleged to have offered or sold Hex tokens. Compl. ¶¶ 20, 29, 38. To establish specific jurisdiction, "[Mr. Heart's] *suit-related* conduct must create a substantial connection with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis added). Discussing Hex more than a year *after* the alleged offering ended cannot budge the jurisdictional needle. *See, e.g.*, *SPV Osus, Ltd. v. UBS AG*, 882 F.3d 333, 344-45 (2d Cir. 2018) (feeder funds created years after the plaintiff began investing were a forum connection "too tenuous to support the exercise of specific jurisdiction"); *Sarkisian v. OpenLocker Holdings, Inc.*, 700 F. Supp. 3d 105, 110 (S.D.N.Y. 2023) (no personal jurisdiction based on forum contacts post-dating sale of promissory notes, because "none of the aforementioned events giving rise to liability occurred during that time period"); *Knight v. Standard Chtd. Bank*, 531 F. Supp. 3d 755, 769 (S.D.N.Y. 2020) ("post-termination conduct . . . cannot provide the necessary connection to [the forum] for specific personal jurisdiction" for an employment claim); *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015) (no personal jurisdiction where the "[p]laintiff ha[d] not pled facts suggesting that the conduct [in forum] . . . took place within the relevant time period" for the claim at issue), *aff'd*, 771 F. App'x 498 (2d Cir. 2019).

The timing of these alleged video streams is critical and sets Mr. Heart's case apart from the SEC's purported authorities. *See* Opp. Br. at 12-14, 19-20. In *PlexCorps*, the defendants "[did] business while traveling in the United States" on a trip that took place "at the start of the ICO pre-sale" and allegedly interacted with U.S. persons over Facebook during the alleged offering. 2018 WL 4299983, at *10, *14. *Terraform* involved contemporaneous conduct such as "promoting the

5

digital assets at issue . . . to U.S.-based consumers and investors," "retain[ing] U.S.-based employees . . . that [had] promoted [the] digital assets in the [United States]," and contracting with "U.S.-based entities to facilitate the trade of [the] digital assets."  2022 WL 2066414, at *3.  And *Wildes v. BitConnect International PLC* and *Pino v. Cardone Capital, LLC* involved solicitations using social media—not social media appearances *after* the offerings ended (and neither concerned personal jurisdiction at all).  *See Wildes*, 25 F.4th 1341, 1343-44 (11th Cir. 2022), *cert. denied sub nom. Arcaro v. Parks*, 143 S. Ct. 427 (2022); *Pino*, 55 F.4th 1253, 1256 (9th Cir. 2022).

It makes no difference that these alleged video streams took place "while Hex was being traded on the secondary market."  Opp. Br. at 13; *see also* Mot. at 18.  As the SEC alleges, Hex can be traded on Uniswap, a third-party "decentralized crypto asset trading platform[ ]."  Compl. ¶ 41.  The SEC does not allege that Mr. Heart had anything to do with Uniswap, nor that he sold Hex tokens in any such so-called "secondary market" transactions, nor even that such "secondary market" transactions are "investment contracts" at all.  *See SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *22 (D.D.C. June 28, 2024) (distinguishing and dismissing secondary market claims); *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 331 (S.D.N.Y. 2023) (same).  Thus, this so-called "secondary market" does not pertain to Mr. Heart's "suit-related conduct" or give the SEC license to extend the jurisdictional timeline beyond the end of the alleged offering in November 2020.  *See Walden*, 571 U.S. at 284; *Sarkisian*, 700 F. Supp. 3d at 110; *Knight*, 531 F. Supp. 3d at 769.

The SEC also relies on ethhex.com, a website that allegedly served as one avenue by which individuals could execute the third-party Uniswap software to trade Hex on the so-called "secondary market."  Compl. ¶ 42; Opp. Br. at 16-17.  As explained above, Mr. Heart is not alleged to have anything to do with the Uniswap software, and so-called "secondary market" transactions

on Uniswap are not even at issue in this case.  As such, ethhex.com bears no resemblance to the website in *PlexCorps*, which was a sales platform "through which users could provide their credit-card information and purchase [the digital asset]," thereby effecting the very sales at issue in the case.  2018 WL 4299983, at \*16 (internal quotation and citation omitted).  Multiple U.S. residents used that website and "created accounts to purchase [the digital asset]."  *Id*. at \*17.  In contrast, the SEC does not allege that *any* U.S. residents used ethhex.com, making it irrelevant to the jurisdictional analysis.  *See* Mot. at 18 n.12; *Yash Raj Films (USA) Inc. v. Dishant.com LLC*, 2009 WL 4891764, at \*5 (E.D.N.Y. Dec. 15, 2009) (no need to address jurisdictional questions regarding a website without evidence that forum residents used it).  The SEC's other cases are also inapposite.  *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 166 (2d Cir. 2010) (the defendants knowingly sold handbags to forum residents and purposefully shipped them into forum state); *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir. 1999) (the defendants purposefully sold products to forum state customers, albeit indirectly through an "exclusive sales right agreement").  Nothing similar is alleged here.

**Kyle Bahr.**  The SEC lobs in a declaration signed months before the Complaint was filed from a person named Kyle Bahr.  *See* Declaration of Kyle Bahr (hereinafter "Bahr Decl.").  The declaration states that Mr. Bahr "currently" resides in the United States (as of May 2023) but says nothing about his whereabouts during the relevant time period.  Bahr Decl. ¶ 2.  Nor does it give any indication that Mr. Heart, who allegedly interacted with Mr. Bahr over the internet, had any idea of Mr. Bahr's whereabouts.  *See* Bahr Decl. ¶¶ 4, 9.  Those deficiencies render Mr. Bahr's declaration irrelevant to the jurisdictional inquiry.

Even ignoring those threshold defects, Mr. Bahr's declaration does not help the SEC.  The SEC vaguely asserts that Mr. Bahr was "engaged" to "help develop Hex."  Opp. Br. at 18.  But the

declaration makes clear that Mr. Bahr was a volunteer who heard about Hex on a podcast, wanted to "devote [his] hobby time to learning and developing applications on the blockchain," and thought Hex "seemed like a good starter project" for him.  Bahr Decl. ¶ 3.  So he joined a public chatroom, studied the Hex software code, and "helped" by answering questions about the code in the chatroom, clarifying or checking Mr. Heart's answers about how the code worked, and proofreading website content.  Bahr Decl. ¶¶ 4, 6.  Although Mr. Bahr allegedly wrote "experimental and prototype code," there is no indication that Mr. Heart asked him to do so, and none of his code was used.  *See* Bahr Decl. ¶ 8.  Rather, the only Hex developer whom Mr. Heart allegedly *hired*—who is not alleged to have any ties to the United States—"rewrote [Mr. Bahr's experimental and prototype code] before it was deployed."  Bahr Decl. ¶¶ 7, 8, 10.

Even if Mr. Bahr were alleged to have lived in the United States at the time, his relevant activities did not otherwise pertain to the United States and are not an adequate basis for personal jurisdiction, which must arise out of the "*defendant['s]* activities."  *Outdoor Partners LLC v. Rabbit Hole Interactive Corp.*, 2013 WL 6503525, at *5 (S.D.N.Y. Dec. 9, 2013) (no personal jurisdiction based on a contractor who "regularly conducted testing and de-bugging of the [software] in [the forum]") (internal quotation and citation omitted); *see also Callahan v. Wisdom*, 2020 WL 2061882, at *12 (D. Conn. Apr. 29, 2020) (the defendant could not "reasonably anticipate being haled into court in [the forum] merely by engaging a consultant, who, purely incidental to his work for the [defendant], was located in [the forum]"); *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 374-75 (S.D.N.Y. 2009) (no personal jurisdiction based on a contractor's "development and maintenance" work in the forum).

Moreover, none of Mr. Bahr's alleged activities relate to the alleged securities offering at issue, in contrast to the U.S.-based employees in *Terraform* who "promoted the[] digital assets in

the [United States]," 2022 WL 2066414, at *3, or the agent in *SEC v. Stubos* who carried out the fraudulent acts at issue in the forum state on the defendant's behalf.  634 F. Supp. 3d 174, 188 (S.D.N.Y. 2022).  *Williams v. Preeminent Protective Services, Inc.* also misses the mark, as that case involved a claim by an employee hired in the forum state *concerning* his employment, which therefore arose out of the defendant's forum contacts.  81 F. Supp. 3d 265, 271-72 (E.D.N.Y. 2015).  To find personal jurisdiction based on Mr. Bahr's activities would force foreign software developers to ban U.S. chatroom participants from answering questions, writing practice code, or otherwise getting involved—an infeasible and draconian outcome without support in the law.

**B.    The Complaint Fails to Establish Personal Jurisdiction Relating to the Alleged PulseChain and PulseX Transactions**

The SEC does not dispute that individuals sent assets to the PulseChain and PulseX "sacrifice wallets" unilaterally and that Mr. Heart had no way of knowing or controlling whether any of those anonymous transfers emanated from the United States.  *See* Mot. at 19-20.  As with Hex, that lack of knowledge or control over whether U.S. persons did so nullifies the allegation that ten U.S. persons reported sending assets to the PulseChain and PulseX sacrifices (compared to 179,000 alleged sacrifice transactions).  *See* Kleinmann Decl. ¶ 11; Compl. ¶¶ 55, 67.

The SEC claims that the PulseChain and PulseX websites contained "tabs that invited users to click to learn how to purchase these assets," somehow making them "interactive."  Opp. Br. at 15-16.  That argument distorts the *Zippo* test beyond recognition—clickable tabs are basic web design, not interactive content.  Tabs or no tabs, websites that "[do] little more than make information available to those who are interested in it, [are] not grounds for the exercise of personal jurisdiction."  *Best Van Lines*, 490 F.3d at 251 (internal quotation and citation omitted); *see also* Mot. at 19 n.14.  The alleged websites are a far cry from the Facebook accounts in *PlexCorps*, which "purposefully disseminated fraudulent messages to Facebook users in the United States,"

"directed Facebook advertisements and messages containing fraudulent misrepresentations to potential purchasers who were [U.S.] residents," and "responded to questions."   2018 WL 4299983, at *14-15.

The SEC claims that Mr. Heart promoted the PulseChain and PulseX offerings through his video broadcast to the "Hex Conference" in March 2022.  Opp. Br. at 12-13; Kleinmann Decl. ¶ 5.  But the evidence they cite tells a different story:  this live video was allegedly broadcast to the (post-offering) "Hex Conference"—not a PulseChain or PulseX conference—so that Mr. Heart could receive a "Lifetime Achievement Award."  *See* Kleinmann Decl. ¶ 5, Ex. A at 2.  During a "nearly 2.5-hour" discussion, Mr. Heart's alleged "promotional" statement was his observation that the PulseChain and PulseX software programs had "product market fit" because they had a lot of members in their chatrooms.  *Id.* ¶ 5, Ex. A at 53.  Mentioning the number of people in chatrooms during a lengthy discussion, at a conference for a *different* software program, does not remotely suggest any "promotion" of the alleged offerings at issue.

The SEC's reliance on this live video broadcast also fails when timing is considered.  The Complaint alleges that the so-called PulseChain and PulseX offerings ended on August 3, 2021, and February 26, 2022, respectively, but vaguely asserts that the offerings were "unofficially extended" until April 6, 2022, apparently based Mr. Bahr's unexplained statement to that effect. *See* Compl. ¶ 51 n.6, ¶ 67; Bahr Decl. ¶ 53.  Mr. Bahr's musing aside, the SEC never alleges that anyone in the United States sent assets during this "unofficially extended" period or that Mr. Heart even hinted during the March 2022 broadcast that additional assets should be sacrificed.

The SEC's unexplained, unspecific reference to "unofficially extended" sacrifice periods falls short of its obligation to provide "non-conclusory fact-specific allegations or evidence" supporting personal jurisdiction, *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16,

19 (2d Cir. 2015), and cannot justify extending by months the jurisdictional timeline of the alleged offerings.  While nothing more is needed to discard that allegation, public website and blockchain records underscore its lack of substance.  As early as August 5, 2021, the PulseChain website warned:  "The sacrifice phase is over.  Do NOT sacrifice any more money!"[1]  And blockchain records indicate that well over **99%** of transfers to the "sacrifice wallets" had taken place before the alleged March 2022 broadcast, making clear that the alleged offerings were over.[2]

The alleged August 2022 interview and September 2022 video broadcast are quickly dispensed with, as those took place long after even the "unofficially extended" offering periods for PulseChain and PulseX had ended.  *See* Compl. ¶ 51 n.6, ¶ 67.  Moreover, the alleged broadcasts all took place before the PulseChain and PulseX programs were released in May 2023, *id*. ¶¶ 60, 69, such that there was no offering, sacrifice, token, or market of any sort at the time, flatly contradicting the SEC's contention that Mr. Heart "promoted the PulseChain offering" and "encourage[d] U.S. investment" in it during these alleged broadcasts.  Opp. Br. at 13.

Accordingly, these allegations do not concern Mr. Heart's "suit-related" conduct relating to the alleged PulseChain and PulseX offerings and cannot form a basis for personal jurisdiction. *See Walden*, 571 U.S. at 284; *Sarkisian*, 700 F. Supp. 3d at 110; *Knight*, 531 F. Supp. 3d at 769; *see also Basic v. BProtocol Found.*, 2024 U.S. Dist. LEXIS 135377, at *21-22 (W.D. Tex. July 31, 2024) (recommending dismissal for lack of personal jurisdiction, notwithstanding the

---

[1] *See* August 5, 2021 Archive of PulseChain Sacrifice Webpage, INTERNET ARCHIVE WAYBACK MACHINE, https://tinyurl.com/3n8sjsrp.

[2] For example, charts of Ethereum transaction volume on the blockchain website Etherscan.io show activity dropping to nearly zero when the alleged "official" offerings ended on August 3, 2021 and February 26, 2022.  *See* Ether Transactions for PulseChain Sacrifice Address, ETHERSCAN.IO, https://tinyurl.com/c3y9d8k (showing a peak of 4,007 daily transactions on July 19, 2021, and 7 transactions on March 9, 2022); Ether Transactions for PulseX Sacrifice Address, ETHERSCAN.IO, https://tinyurl.com/3zm89k8n (showing a peak of 15,500 daily transactions on January 9, 2022, and 11 transactions on March 9, 2022).

defendants' appearance at four U.S.-located conferences "after [the plaintiff] already had investments in [relevant cryptocurrency]," and where "there [was] no indication that [the defendants' online materials] were specifically targeted at the United States as opposed to the rest of the world"). Nor do these video broadcasts cure the SEC's failure to allege a jurisdictional nexus for the allegedly fraudulent PulseChain transactions, as they do not pertain to Mr. Heart's alleged deceptive conduct at all. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 137 (S.D.N.Y. 2021) (no personal jurisdiction over fraudulent scheme claim where alleged fraudulent conduct was not directed towards the United States).

That leaves Mr. Bahr's declaration, which does not suggest that Mr. Bahr promoted or facilitated the sacrifice transactions or alleged "offerings," or that he undertook any other conduct jurisdictionally relevant to the claims at issue. His declaration does not even suggest that he was involved in coding the PulseChain or PulseX software, contrary to the SEC's characterization that he was a "developer" who "helped develop" the programs. Opp. Br. at 6, 18. Rather, Mr. Bahr allegedly helped with administrative tasks to facilitate hiring developers for the PulseChain and PulseX software, such as emailing potential developers and sending out contracts for signature. Bahr Decl. ¶¶ 44, 56. Mr. Bahr's declaration does not state that he was doing those tasks in the United States, and even if he had, those activities would have been purely incidental to his living there, not relevant to the alleged securities offerings at issue, and not an adequate basis for asserting personal jurisdiction over Mr. Heart. *See Callahan*, 2020 WL 2061882, at *12; *Outdoor Partners*, 2013 WL 6503525, at *5; *cf. Terraform*, 2022 WL 2066414, at *3 (finding personal jurisdiction based in part on U.S. employees "promot[ing] the[] digital assets in the [United States]").

## C.    Exercising Personal Jurisdiction Would Not Be Fair or Reasonable

The SEC does not dispute Mr. Heart's argument that asserting personal jurisdiction based on U.S. residents' use of globally available decentralized blockchain software would not comport

with traditional notions of fair play and substantial justice.  *See* Mot. at 20-22.  Hoping to avoid that serious policy concern, the SEC instead contends that personal jurisdiction can be "based *solely* on Mr. Heart's specific, repeated, continual, and successful targeted efforts to *reach [U.S.] investors*."  Opp. Br. at 21 (emphases added).  The Court should hold the SEC to that representation and refrain from considering U.S. residents' unilateral use of the blockchain in connection with the alleged "offerings," the alleged ministerial assistance of a U.S. volunteer, or Mr. Heart's untargeted, globally available statements.  The SEC cannot meet its burden with the scant U.S.-related allegations that remain.

### D.    The SEC Has Abandoned Its Purported "Alter Ego" Claims

The SEC's claims concerning purported entities serving as Mr. Heart's "alter egos" must be dismissed because the Complaint fails to adequately allege that any such entities exist, let alone as Mr. Heart's alter egos.  Mot. at 22-24; *see also* Amicus Curiae Br. of PulseChain Foundation DAO, ECF No. 37-1, at 3-4 (hereinafter "PulseChain Foundation Br.").  Apparently recognizing that it cannot sue software, the SEC does not respond or even mention the term "alter ego" in the Opposition.  The SEC "chose consciously, by [its] silence, to waive and abandon any argument [it] could have made with respect to the [alleged alter ego entities]."  *Tarrant v. City of Mount Vernon*, 2021 WL 5647820, at *5 (S.D.N.Y. Dec. 1, 2021).  All claims premised on the SEC's "alter ego" entity theory therefore must be dismissed.

## II.    THE SEC HAS FAILED TO ADEQUATELY PLEAD THE EXISTENCE OF A DOMESTIC PURCHASE, SALE, OR OFFER OF SECURITIES

### A.    The SEC Fails to Allege a Domestic Purchase or Sale of Securities in Connection with Its Fraud Claims

#### 1.    The Dodd-Frank Act Did Not Override *Morrison's* Application to the SEC's Fraud Claims

The SEC argues that the jurisdictional provisions of the Dodd-Frank Act override *Morrison*

with respect to the federal securities laws' anti-fraud provisions by providing *Morrison*'s requisite "affirmative indication" of "extraterritorial[]" statutory application, and that the conduct-and-effects test therefore applies.  Opp. Br. at 23 (internal quotation and citation omitted).  The SEC is incorrect.  *See* Mot. at 27.  As the Second Circuit has stated, the "import of [the Dodd-Frank] amendment[s] is unclear" since *Morrison* recognized that the court in that case had jurisdiction and extraterritoriality raised a merits issue.  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 211 n.11 (2d Cir. 2014) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253-54 (2010)).  Indeed, the "plain language" of the Dodd-Frank amendments "does not clearly express th[e] potential intent" to "rebut the presumption against extraterritoriality."  *SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 911 (N.D. Ill. 2013).[3]  Despite the SEC's heavy reliance on *SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), *see* Opp. Br. at 24, that out-of-circuit decision does not control this Court's analysis, nor overcome the Second Circuit's explicit questioning of the impact of the Dodd-Frank Act in *Parkcentral*.  Accordingly, this Court should apply *Morrison* to the SEC's fraud claims and dismiss them.

## 2.  The SEC Fails to Satisfy the Conduct-and-Effects Test in Any Event

Even if the Dodd-Frank amendments resurrected the conduct-and-effects test for securities fraud claims, the SEC does not satisfy that test.  The SEC does not allege that Mr. Heart engaged in any conduct "within the United States," 15 U.S.C. § 77v(c), but still argues that the conduct test is nonetheless satisfied because Mr. Heart "discussed development work . . . *to give U.S. investors* the reasonable expectation of profit," "*targeted [U.S.]* investors through YouTube livestream videos and the Pulsechain.com website," and "extensively market[ed] PulseChain and its

---

[3] The SEC claims that *Chicago Convention Center* is not significant because the court did not decide the issue.  Opp. Br. at 24 n.8.  But the court's conclusion in *Chicago Convention Center* that the plain language of the Dodd-Frank amendments does not clearly rebut the presumption against extraterritoriality is a persuasive indicator that the Dodd-Frank Act did not override *Morrison*.

development to *U.S. investors*," Opp. Br. at 25, 26, 27 (citing Compl. ¶¶ 56, 64-65, 76) (emphases added).  But supposedly "targeting" U.S. investors from outside the United States is not conduct "within the United States."  15 U.S.C. § 77v(c).  Moreover, this argument relies on the SEC's misrepresentation of its own allegations—*none* of those cited Complaint paragraphs mention the United States or its residents at all.  *See* Compl. ¶¶ 56, 64-65, 76.  The SEC cannot circumvent the deficiency of, or supplement, the Complaint by inserting "in/at/to the United States" in the Opposition wherever convenient, without any factual or even alleged basis.  *See Coyle v. Coyle*, 153 F. App'x 10, 11-12 (2d Cir. 2005).[4]

The SEC also argues that Mr. Heart did not "restrict the ability of [U.S.] investors" to access his YouTube videos, view the Pulsechain.com website, or invest in PulseChain.  Opp. Br. at 26.  But the Complaint contains no mention of alleged failures to "restrict" U.S. investors.  Nor has the SEC set forth any authority for the proposition that a *lack* of conduct is equivalent to *affirmatively* targeting U.S. persons.  That is obviously not the law.  *See Interbrew v. EdperBrascan Corp.*, 23 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1998) (effects test not satisfied despite "U.S. investors [] participat[ing] in [the] transaction," where the U.S. investors were "neither the intended nor the actual 'victims'").

The SEC also fails the effects test, which requires conduct to have "a foreseeable substantial effect within the United States."  15 U.S.C. § 77v(c).  The only alleged PulseChain-related "effects" consist of "one investor in Brooklyn" and an unspecified amount of "crypto assets invested by investors in the United States."  Compl. ¶¶ 55, 60, 64.  Given these paltry allegations, this Court "cannot find that the fraud would have had a substantial effect in the United States or

---

[4] The SEC appears to recognize that it may not bolster its *Morrison* argument—which applies under Rule 12(b)(6)—with the purported new facts introduced in the Opposition to oppose Mr. Heart's Rule 12(b)(2) arguments.  That evidence would not help the SEC in any case, for the same reasons discussed above.  *See supra* Section I.

upon United States citizens.'" *Cornwell v. Credit Suisse Grp.*, 666 F. Supp. 2d 381, 395 (S.D.N.Y. 2009) (internal quotation and citation omitted).[5]

**B.    The SEC Fails to Allege Domestic Offers or Sales of Securities Under Section 5**

**1.    The SEC Fails to Allege Domestic Sales of Securities as to Its Section 5(a) Claims**

In attempting to salvage its Section 5(a) claims, the SEC unduly relies on the recent decision in *Williams v. Binance*.  96 F.4th 129 (2d Cir. 2024).  There, the court held that the plaintiffs had "plausibly alleged facts showing that two transactional steps giving rise to an inference of irrevocable liability occurred in the United States."  *Id.* at 137.  The court (1) found that "the transactions at issue were matched, and therefore became irrevocable, on [the defendant's] servers located in the United States," and (2) accepted the "interrelated" allegations that when the "[p]laintiffs transacted on [the defendant's platform] from the United States, and pursuant to [the defendant's] Terms of Use, their buy orders became irrevocable when they were sent." *Id*. at 137, 139.  The court also observed that "[the defendant] now has a substantial presence, with servers, employees, and customers throughout the country," *id*. at 133, but focused on where buy and sell orders were "matched."  *Id*. at 137-39.

Here, the Complaint includes no comparable allegations.  The SEC does not allege that any alleged transactions were "matched"—there were no "buy" or "sell" orders, and no exchange platform upon which the alleged offerings took place.  Rather, the alleged offerings involved unilaterally executing the Hex software or sending assets to "sacrifice wallets."  Compl. ¶¶ 30, 51, 67.  There was no alleged infrastructure nor any "orders" to match *anywhere*—let alone in the

---

[5] The SEC's reliance on *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989), *amended* 890 F.2d 569 (2d Cir. 1989), is misplaced.  *See* Opp. Br. at 27.  In that case, there were "at least 22 United States residents," representing 2.5% of total shareholders.  871 F.2d at 262.  Nothing comparable is alleged here.  Even if the SEC's Rule 12(b)(2) evidence could be considered, ten reported U.S. persons amounts to only 0.02% of the 59,000 alleged PulseChain sacrifice transactions.  Kleinmann Decl. ¶ 11; Compl. ¶ 55.

United States.

The few allegations in the Complaint that even mention the United States lack the specificity present in *Williams*. *See* Mot. at 25. The SEC alleges that one PulseChain investor "resides in Brooklyn" and the three software programs had an unspecified number of "investors in the United States" or "wallet addresses that belong to investors in the United States." Compl. ¶¶ 34, 55, 60. These allegations do not even state whether these individuals took any actions in the United States, let alone plausibly establish that they incurred irrevocable liability there.

The SEC also argues that the second prong of the *Williams* analysis (about transacting from the United States pursuant to the defendant's terms of use) "constituted a second, separate basis for irrevocable liability." Opp. Br. at 32. Not so. In fact, the Second Circuit expressly observed that the alleged entry into terms of use, placement of purchase orders, and transmission of payments from the United States were a "second, *interrelated*, reason" that irrevocable liability attached in the United States. *Williams*, 96 F.4th at 139 (emphasis added). Moreover, even if *Williams* had suggested that this second theory could be independently sufficient in that case, the Second Circuit specifically found "reason … to consider where [the plaintiffs'] trades originated, given that [the defendant] expressly disclaims having any physical location, foreign or otherwise." *Id.* at 140. The SEC alleges no such express disclaimers here. Indeed, the SEC alleges that Mr. Heart resides in Finland, Compl. ¶ 1, a country with its own securities laws that, in contrast to *Williams*, is not alleged to have "disclaim[ed] responsibility for regulating" Mr. Heart. *Id.* at 139.

The other cases cited by the SEC are inapposite. *See* Opp. Br. at 31. In *Giunta v. Dingman*, the court determined that irrevocable liability attached in the United States because of substantial U.S. connections, including material misrepresentations made at in-person meetings in New York and an underlying agreement being formed in the United States. 893 F.3d 73, 77, 80 (2d Cir.

2018).  In *United States v. Vilar*, the defendant held in-person meetings within a U.S. territory and had significant correspondence with U.S.-based purchasers, leading to the purchasers incurring irrevocable liability within the United States.  729 F.3d 62, 77-78 (2d Cir. 2013).  By comparison, the Complaint contains a single allegation that Mr. Heart had an online chat about the PulseX software with someone in New York, *after* the alleged offerings had concluded.  Compl. ¶ 70.  That allegation bears no resemblance to those found sufficient in the SEC's cited authorities.

### 2.  The SEC Fails to Allege Domestic Offers of Securities as to Its Section 5(c) Claims

"[T]he focus of 'offer,' under the Securities Act, is on the person or entity attempting or offering to dispose of or soliciting an offer to buy securities."  *SEC v. Goldman Sachs & Co*., 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (cleaned up and internal citation omitted).  "[I]t is the location of the offerors—here [Mr. Heart]—that is relevant."  *SEC v. Ripple Labs*, *Inc*., 2022 WL 762966, at *13 (S.D.N.Y. Mar. 11, 2022).  The SEC does not contend that Mr. Heart made any offers from within the United States.

Retreating to an out-of-circuit case, *SEC v. Balina*, 2024 WL 2332965 (W.D. Tex. May 22, 2024), the SEC argues that the Complaint sufficiently alleges that "[Mr.] Heart engaged in a targeted marketing campaign that was directed at U.S. investors," and therefore "offered" securities in the United States.  Opp. Br. at 36.  As discussed above, *supra* Section II.A.2, the SEC cannot simply sprinkle the words "United States" throughout the Opposition to try to fit this case within *Balina*.  Casting aside those mischaracterizations, the Complaint merely references "investors in the United States," which plainly does not suffice.  Compl. ¶¶ 29, 34, 55.[6]

---

[6] The SEC gets nowhere relying on *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998), *abrogated by Morrison*, 561 U.S. 247 (2010).  *See* Opp. Br. at 34.  For one thing, *Morrison* abrogated *Banque Paribas*.  And even if it remained the case that "registration provisions should apply to those offers of unregistered securities that tend to have the effect of creating a market for unregistered securities in the United

### C.      The Transactions the SEC Alleges Are Predominantly Foreign

The SEC does not dispute that binding Second Circuit precedent holds that a "domestic" transaction under *Morrison* is a necessary—but not necessarily sufficient—condition to pleading a claim under the federal securities laws.  Both *Morrison* and the Second Circuit's decisions in *Parkcentral* and *Cavello Bay Reinsurance Ltd. v. Shubin Stein* prescribe a "focus on the transaction rather than surrounding circumstances," and instruct courts to "flexibly consider[] whether a claim—in view of the security and the transaction as structured—is still predominantly foreign." *Cavello Bay*, 986 F.3d 161, 166 (2d Cir. 2021) ("*Morrison*'s 'domestic transaction' rule operates as a threshold requirement, and as such may be underinclusive.").  Predominantly foreign claims must be dismissed.  Here, the digital assets at issue "are listed on no U.S. exchange and are not otherwise traded in the United States." *Id.* at 167.  The claims arise out of a non-resident publishing globally available software and speaking about it on the internet from abroad.  Mot. at 29-30.

The SEC's only response is to repeat its unsupported assertion that "U.S. investors purchased each of these assets after a promotional and marketing campaign that *reached into the United States*."  Opp. Br. at 37 (emphasis added).  That is not enough as a matter of law.  Nor is that characterization supported by the allegations, as explained above.  The sparse contacts actually alleged in the Complaint cannot justify extraterritorial application of the federal securities laws. *Cavello Bay*, 986 F.3d at 167 ("'[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.'") (quoting *Morrison*, 561 U.S. at 266) (emphasis in original).

---

States," the SEC has not adequately alleged that Mr. Heart "creat[ed] a market" in the United States. *Banque Paribas*, 147 F.3d at 126.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR SECURITIES FRAUD

### A.   The SEC Fails to Plead Deceptive Conduct

The SEC concedes that it has not brought claims for fraudulent misstatement or omission. Opp. Br. at 42 n.12.  Thus, the SEC is only asserting claims for a fraudulent scheme, which require particularized allegations of deceptive conduct.  *See* Mot. at 30-31.  The SEC contends that alleged expenditures of certain PulseChain sacrifice assets were a "misuse of investor funds," and that this alleged misuse was an inherently deceptive act.  Opp. Br. at 38-39.  Both contentions are wrong.

First off, nothing supports the SEC's conclusory contention that the PulseChain sacrifice assets were "investor funds" at all.  The SEC has no response to Mr. Heart's clear disclosures that the sacrificed assets were just that:  "sacrificed," "lost," and "gone," with no expectations from those who sacrificed them.  Mot. at 32-33.  The SEC's assertion that those assets could nonetheless be misappropriated is an "unwarranted deduction[] of fact" that cannot be credited under Rule 9(b).  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (internal quotation and citation omitted).

Moreover, the SEC's cited authorities do not support the proposition that the alleged expenditures were somehow inherently deceptive.  Those cases found fraudulent schemes based on alleged deceit.  *See SEC v. Zandford*, 535 U.S. 813, 822 (2002) (a stockbroker defrauded his clients by selling their securities and spending the proceeds on himself because the clients "were *duped* into believing [the defendant] would 'conservatively invest' their assets in the stock market") (emphasis added); *SEC v. Boock*, 2011 WL 3792819, at *22 (S.D.N.Y. Aug. 25, 2011) (the defendants took over dormant corporations by filing "*deceptive* documents" with secretaries of state and "*false* documents" with NASDAQ, and then used those corporations to "*deceive* shareholders about the true identity of the issuing company") (emphasis added).  Here, no "duping" or deception is alleged, so no securities fraud claims exist.  Mr. Heart did not tell anyone that

sacrificed assets would be held in custody, protected, invested, or used for any particular purpose. To the contrary, he told everyone up front that any assets they sacrificed would be "lost" and "gone."  Mot. at 32.

The SEC tries to blow past the plain meaning of what Mr. Heart said—that assets would be sacrificed—to argue, without support, that Mr. Heart still had some unexplained obligation to ensure that the sacrificed assets were used in certain ways and not others.  Even humoring that unsupported theory, the SEC still comes up short, because misappropriation *without* deception cannot constitute securities fraud.  In *Zandford*, the Supreme Court made clear that "if the broker *told* his client he was stealing the client's assets, that breach of fiduciary duty . . . would not involve a deceptive device or fraud."  535 U.S. at 825 n.4 (emphasis added).  Other courts have firmly rejected the SEC's theory that "misappropriation is inherently deceptive and is enough to state a claim for a violation of the securities laws," noting that "[t]he SEC is incorrect as a matter of law." *SEC v. Sugarman*, 2020 WL 5819848, at *10 (S.D.N.Y. Sept. 30, 2020) (internal quotation and citation omitted) ("[C]ourts must parse fraud allegations to distinguish between misappropriation that is a mine-run conversion, and misappropriation through deceptive conduct"); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (holding that a breach of fiduciary duty without deception does not constitute securities fraud); *United States v. Finnerty*, 533 F.3d 143, 149-50 (2d Cir. 2008) (holding that the "garden variety conversion" of assets does not give rise to scheme liability securities fraud claims in the absence of deceptive conduct).

The SEC also asserts that the ways that the sacrificed assets were moved on the blockchain constituted "deceptive acts."  *See* Opp. Br. at 39.  That theory similarly fails because the SEC does not establish that any assets were misappropriated in the first place.  Deception cannot exist here, where no one was plausibly entitled to an expectation as to the location, use, or movement of such

21

assets.  Mot. at 33-34.  The SEC has no response to this.

Nor does the SEC allege anything deceptive about the publicly recorded blockchain transactions it references.  The SEC recharacterizes 22 alleged "back-and-forth transactions" as an effort to "disguis[e] the movement of approximately $26 million in ETH."  Opp. Br. at 39.  But the Complaint alleges that those were swaps exchanging a stablecoin called Tether for the Ethereum blockchain's native token, ETH.  *See* Compl. ¶ 61 ("$26.5 million of Tether was transferred from the Private Wallet in 22 back-and-forth transactions resulting in approximately $26 million of ETH being deposited to the Private Wallet.").  Exchanging one common cryptocurrency for another through public blockchain transactions does not suggest that anything was disguised or anyone deceived, because such transactions are both plainly visible and plainly ordinary.  *See Finnerty*, 533 F.3d at 150 (rejecting the conclusory assertion that the scheme was "self-evidently deceptive").

The SEC's allegations concerning the use of a "crypto asset mixer" fare no better.  *See* Opp. Br. at 39.  Anyone who "sacrificed" assets, knowing that they would be "lost" and "gone," could not have had any expectation as to wherever those assets then went, including via public blockchain transactions to a "mixer" program that allegedly facilitates anonymous transactions.  Mot. at 33; *see also* Compl. ¶ 61.  To the contrary, such assets were sacrificed and gone.  Thus, Mr. Heart's express disclaimers "'disclosed the very . . . risks about which [the SEC] claim[s] to have been misled."  *In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563, at *15 (E.D.N.Y. Sept. 29, 2023) (quoting *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011)).

Unlike here, where individuals were put on accurate, specific notice, the SEC's inapposite authorities involve sham companies or transactions used to "give[] the victim a false impression."  *Finnerty*, 533 F.3d at 148; *see also SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (fake

due diligence payments to a sham entity gave the misleading impression that funds were being used for due diligence); *Sugarman*, 2020 WL 5819848, at *9 (use of a sham entity to "hid[e] the source of [a] purchase through a series of fraudulent transactions"); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (use of a subcontractor entity "to obscure the fact that [the defendants] . . . would reap the benefits" of a discounted rate). Nothing comparable is alleged here.

## B.   The SEC Fails to Support Its Scheme Claims with Alleged Omissions

### 1.   The SEC Cannot Assert Scheme Claims Based on Alleged Omissions

The SEC cannot establish scheme liability without alleging "'an inherently deceptive act that is distinct from an alleged misstatement.'" *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *15 (S.D.N.Y. Mar. 18, 2019) (quoting *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)), *aff'd*, 41 F.4th 47 (2d Cir. 2022); *see also* Mot. at 35. Accordingly, this Court "must scrutinize [the SEC's] pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." *In re Smith Barney*, 884 F. Supp. 2d at 161; *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022) (dismissing scheme claim); *Kelly*, 817 F. Supp. 2d at 344 (same).

The SEC argues that alleged omissions regarding PulseChain assets can still form a part of the SEC's scheme claims, as long as those omissions are paired with other deceptive conduct— namely, the aforementioned alleged expenditures and movements of assets. Opp. Br. at 40. But, as explained above, none of that conduct was deceptive. Left with no "inherently deceptive act that is distinct" from the alleged omissions, the SEC's scheme claims fail, whether or not the SEC could have alleged materially misleading omissions.

### 2.   The SEC Identifies No Misleading Omissions to Support Its Scheme Claims

Putting aside that threshold defect, the Complaint identifies no misleading omissions—let

alone material ones—to support its purported scheme claims.  The SEC asserts that, by saying that nobody could have any expectations about the sacrificed assets—which were lost, gone, and not going to charity—Mr. Heart somehow then became obligated to "'tell the whole truth'" about how such sacrificed assets would be used.  Opp. Br. at 40-41 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016)).  That assertion makes no sense, as it would paradoxically require full disclosure of a subject every time someone disclosed that they would *not* be speaking about it.

The assertion also ignores the bedrock principle that the federal securities laws "'do not create an affirmative duty to disclose any and all material information.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  Courts have made clear that "the mere reference to a topic does not require 'disclosure of the entire corpus of [the person's] knowledge' relating to it." *Chen v. Missfresh Ltd.*, 2023 WL 7289750, at *10 (S.D.N.Y. Nov. 6, 2023) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (cleaned up); *see also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012).  Thus, silence is not actionable unless "the omission renders affirmative statements made misleading." *Macquarie*, 601 U.S. at 265; *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (similar).  Indeed, even the liability in *Vivendi* was "predicated on [the defendant's] *statements*, not its silence." *In re Vivendi*, 838 F.3d at 238 (emphasis added).

The SEC's theory boils down to a contention that people would have "wanted to know" about the use of the sacrificed assets.  Opp. Br. at 40, 41.  But "a [person] is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner*, 9 F.3d at 267.  Fatally absent from the SEC's theory is how Mr. Heart's expressly

forewarned silence as to subsequent uses of the sacrificed assets rendered any of his prior statements materially misleading.  The assets were "gone," just as he stated, and he was not obligated to provide any further information.  *See, e.g.*, *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 752 (2d Cir. 2020) (not misleading to omit the "true reason" for an executive's termination from a press release); *S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 236 (2d Cir. 2019) (not misleading to omit information about a "hypothetical divesture"); *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 265 (2d Cir. 2010) (no duty to disclose financial difficulties where omission did not render prior statements materially misleading).

The SEC claims that Mr. Heart "feign[ed] ignorance about where the investors' funds *had actually gone*," because he stated that they would not go to charity "'to the best of [his] knowledge,'" while "knowing full well that millions of dollars of those invested funds *had been* (and would continue to be) funding his personal purchases."  Opp. Br. at 41 (emphasis added).  The SEC again twists up its timeline, pretending that Mr. Heart made the quoted statement in November 2021 rather than July 2021.  *See* Opp. Br. at 41 (quoting Declaration of Michael E. Liftik, Ex. C at 11 (hereinafter "Liftik Decl.")).  Given that the sacrifice was allegedly still ongoing as of July 2021, *see* Compl. ¶ 51, the alleged expenditures had not yet begun, *see* Compl. ¶ 19, and the alleged expenditures amounted to only 2.5% of assets, *see* Mot. at 31-32, 32 n.20, qualifying Mr. Heart's limited perspective about how the sacrificed assets may or may not be used is not plausibly misleading.  Nor was it misleading for Mr. Heart to speak about "free speech ideals" or "development and marketing" without also disclosing the uses of the sacrificed assets, Opp. Br. at 40, as the SEC does not allege that Mr. Heart ever stated that the sacrificed assets would be spent on those subjects.  Thus, the SEC has identified no misleading omission that could make up even

a part of a deceptive scheme claim.

### C.   The SEC Fails to Plead Scienter

The SEC claims that Mr. Heart acted with fraudulent intent because he knew that the alleged expenditures were being made "with funds from investors."  Opp. Br. at 43.  But the SEC does not adequately plead that the sacrificed assets somehow constituted investor funds, and it offers no answer to Mr. Heart's clear and truthful disclosures regarding the consequences of the sacrifice.  Nor does the SEC dispute that Mr. Heart's *only* alleged promise was to launch PulseChain and release PLS tokens, and that he is alleged to have done precisely that.  Compl. ¶¶ 5, 52, 53; Mot. at 37.

The SEC cannot concoct a strong inference of fraudulent intent based on movements of sacrificed assets either.  *See* Opp. Br. at 43.  Those movements are consistent with Mr. Heart's disclosure that the assets would be "gone" and that no one should have any other expectations.  The more "cogent and compelling" inference is that Mr. Heart took his own statements and disclaimers seriously.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).[7]

The SEC's disdain for the PulseChain software program and associated sacrifice does not make up for the incurable absence of a coherent factual or legal basis for a fraud claim, the assertion of which inflicts injury not only upon Mr. Heart, but upon the communities who execute the software programs at issue.  The claims should be dismissed with prejudice.[8]

---

[7] The SEC argues that claims brought under Section 17(a)(3) require only proof of negligence, Opp. Br. at 42, but neither the Complaint nor the Opposition assert that Mr. Heart acted negligently.

[8] *See* PulseChain Foundation Br., Att. A, ECF No. 37-1, at 19 (community petition stating "we are not now, nor have we ever been, victims of fraud by Richard Heart" and "did not harbor any expectations as to how the monies raised through our contribution to the public sacrifices were to be spent").  Mr. Heart's Motion showed that the SEC's alleged timeline is impossible.  Mot. at 38-39.  In a footnote, the SEC admits that some transactions are "out of chronological order" but claims that those erroneous allegations were merely "examples."  Opp. Br. at 38 n.11.  That response underscores the SEC's failure to "state with particularity 'what deceptive or manipulative acts were performed . . . [and] when the acts were performed.'"  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (quoting *In re Parmalat Sec. Litig.*, 383 F.Supp.2d 616, 622 (S.D.N.Y. 2005)).

IV.   **THE OPPOSITION DOES NOT ADDRESS THE COMPLAINT'S FAILURE TO ADEQUATELY ALLEGE THAT ANY PARTIES ENTERED INTO AN "INVESTMENT CONTRACT"**

A.   **The Complaint Does Not Allege the Existence of a Contract, Transaction, or Scheme that Created Continuing Obligations for Mr. Heart or Anyone Else**

Hoping to recast the software programs at issue as "investment contracts," the SEC mischaracterizes Mr. Heart's arguments and Supreme Court and Second Circuit precedent.  But that effort cannot alter the fact that the SEC has failed to allege the existence of a "contract, transaction or scheme" that creates continuing (*i.e.*, post-purchase) obligations for Mr. Heart (or someone else) to generate profits for individuals who execute the Hex, PulseChain, or PulseX software programs.  *See* Mot. at 39-46; *SEC v. W.J. Howey Co.*, 328 U.S. 293, 294 (1946).  Without any such continuing obligations, the Hex, PulseChain, and PulseX software programs are not "investment contracts," and therefore are not "securities."

As an initial matter, the SEC does not allege that there were any written or oral "contracts" concerning the Hex, PulseChain, or PulseX software programs.  Instead, the SEC exclusively relies on the assertion that the Hex, PulseChain, and PulseX software programs are "transaction[s]" or "scheme[s] whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  *Id.* at 298-99.

The Opposition ignores the fact that, to qualify as "investment contracts," such transactions or schemes—even if not formal contracts—must still impose continuing obligations on an offeror or another person to generate profits.  Without that limitation, the sale of *any* asset that a buyer hopes will increase in value could constitute an "investment contract," thereby vastly extending the SEC's enforcement authority beyond its current purview.  This prerequisite, which prevents overreach by the SEC, is implicit in the definition of an "investment contract" set out in *Howey* and has been affirmed by subsequent Supreme Court decisions.  *See* Mot. at 40-41; *Howey*, 328

U.S. at 299 (emphasizing an offeror's obligations to "manage, control and operate the enterprise"); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975) (holding that shares of stock in a housing cooperative that entitled purchasers to a lease were not "securities" because such purchasers had no expectation of profits "from the efforts of others"); *Marine Bank v. Weaver*, 455 U.S. 551, 560 (1982) ("Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities . . . .").

The existence of an "investment contract" therefore requires such a continuing obligation. *See SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358-59 (S.D.N.Y. 2020) (relying on the offeror's "implicit (though formally disclaimed) intention" to remain involved post-transaction in holding that the relevant cryptocurrency was an "investment contract"); *cf. SEC v. Life Partners, Inc.*, 87 F.3d 536, 546, 548 (D.C. Cir. 1996) (highlighting the offeror's lack of post-transaction involvement in holding that insurance contracts at issue were not "investment contracts").

The SEC inaccurately argues that Mr. Heart "cannot point to a single decision at any level of the judiciary endorsing" the continuing obligations requirement necessary to find a "contract, transaction or scheme" under the securities laws. Opp. Br. at 47. Mr. Heart's Motion itself easily debunks that argument, as it addresses not only the implicit presence of this requirement in *Howey* and its progeny, but also Second Circuit precedent that emphasized offerors' continuing obligations to purchasers when finding "investment contracts," and the lack of continuing obligations when finding no "investment contracts." *See* Mot. at 41-42. Mr. Heart is not asking the Court to impose a new requirement for "investment contracts," as the Opposition suggests, but rather to enforce a prerequisite well founded in precedent.

The Opposition misreads Mr. Heart's Motion as "inviting" the Court to read a "contractual obligation" requirement into the *Howey* test. Opp. Br. at 45.   But the Motion does not once refer

to a "contractual obligation," and Mr. Heart has never argued that a formal contract is required. Rather, the critical point missed by the SEC is that continuing obligations—whether formally documented (a "contract") or readily apparent from the totality of the circumstances (a "transaction" or "scheme")—are integral to finding an "investment contract." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' . . . form should be disregarded for substance and the emphasis should be on economic reality.") (citing *Howey*, 328 U.S. at 298); *see also SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 349 (1943) (holding that it is "unnecessary to determine" whether the continuing obligation at issue was enforceable as a "legal right," in determining that it could underpin an investment contract).

Even the recent cryptocurrency cases the SEC cites support this precept, with each court emphasizing an offeror's commitment to involvement in the development and growth of the relevant cryptocurrency or "ecosystem," whether or not a written contract expressly required it to do so. For instance, the court in *SEC v. Terraform Labs Pte. Ltd.* concluded that a "technically valid written or oral *contract*" was not required because the parties could also informally "agree—that is, '*scheme*'—that the contractee will make an investment of money in the contractor's profit-seeking endeavor." 684 F. Supp. 3d 170, 193 (S.D.N.Y. 2023) (emphasis added); *see also SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *19, *25 (S.D.N.Y. Mar. 27, 2024) (relying on *Terraform* analysis); *Binance*, 2024 WL 3225974, at *9-10; *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020); *Ripple Labs, Inc.*, 682 F. Supp. 3d at 326-27 (S.D.N.Y. 2023).

In sharp contrast, the Opposition simply fails to address the Complaint's plain lack of allegations that Mr. Heart (or anyone else) had any similar continuing obligations to individuals who choose to unilaterally execute the Hex, PulseChain, or PulseX software programs. *See* Mot. at 43-45. That pleading failure distinguishes this case from the ones above and precludes the

finding of either a formal "contract" or, as in *Terraform*, an informal "transaction" or "scheme." Without such a finding, no "investment contract" exists, and the federal securities laws cannot apply.

### B. The Opposition Misinterprets Mr. Heart's Continuing Obligations Argument as a Dispute About the *Howey* Test

Misunderstanding Mr. Heart's arguments, the SEC dedicates a significant portion of the Opposition to countering an argument that he does not make. Section IV.B of Mr. Heart's Motion does not argue that the Complaint fails to allege facts sufficient to satisfy the *Howey* test. Rather, that section thoroughly establishes that the Complaint fails to allege any contracts, transactions, or schemes that imposed continuing obligations on Mr. Heart or anyone else to generate profits for those who execute the Hex, PulseChain, or PulseX software. *See* Mot. at 43-46. As discussed above, the existence of such a contract, transaction, or scheme is a fundamental prerequisite for an "investment contract."

Despite its insistence that this Court consider the "totality of the circumstances," the Opposition exemplifies the SEC's tendency to cherry-pick allegations convenient to its *Howey* "analysis" while ignoring scores of statements contradicting its predetermined outcome. Opp. Br. at 44. Constrained by the Rule 12(b)(6) standard, and notwithstanding the contradictory facts and statements *included in the Complaint*, Mr. Heart does not at this stage challenge the distorted record the SEC has created to plead the *Howey* factors. To the extent that any aspect of the Complaint survives Mr. Heart's Motion, Mr. Heart is confident that a fully developed factual record will show that Hex, PulseChain, and PulseX are not "investment contracts" based on the *Howey* test. He looks forward to making that argument at the appropriate stage of this litigation.

Nevertheless, it bears noting that even here at the pleading stage, when all allegations are presumed true, the SEC routinely resorts to misrepresentations about its own alleged facts. For

example, the SEC falsely asserts that Mr. Heart "stated he would use th[e] funds to develop the Hex ecosystem." Opp. Br. at 49. Nothing in the Complaint supports that assertion—the SEC simply stated it to suit its litigation position. The SEC also mischaracterizes the Complaint as alleging that "funds were used to develop PulseX," Opp. Br. at 54, and that Mr. Heart was "deploying investor capital," Opp. Br. at 55, when no such allegations exist in the Complaint. As another example, the SEC inaccurately claims that Mr. Heart "touted that an investment in the PulseChain offering *would result in* at least a fourteen thousand times return on investment," Opp. Br. at 53 (emphasis added), while the actual underlying allegation is that Mr. Heart said such a return "is a reasonable estimate for *what could be possible*." Compl. ¶ 58 (emphasis added). The SEC also continues to claim that PLS and PLSX are "practically worthless," Opp. Br. at 6, while ignoring judicially noticeable data showing that assertion to be unmistakably erroneous. Mot. at at 10-11, 10 n.10. In weighing Mr. Heart's Motion, the Court should bear in mind the SEC's inability to stand by, and constrain itself to, its own Complaint.

## V. THE COMPLAINT UNCONSTITUTIONALLY INFRINGES ON THE FIRST AMENDMENT RIGHTS OF MR. HEART AND THOUSANDS OF INDIVIDUALS WHO USE HEX, PULSECHAIN, AND PULSEX

The Opposition mischaracterizes each of Mr. Heart's First Amendment arguments and, in doing so, sets up strawmen that the SEC proceeds to knock down. But the Opposition fails to even grapple with, let alone refute, the arguments Mr. Heart actually makes.

First, the SEC wrongly asserts that "[Mr.] Heart broadly argues that the SEC is not allowed to refer to his public statements in support of its claims." Opp. Br. at 57. The SEC does not merely "refer" to Mr. Heart's "public statements." Instead, the Complaint rests *almost exclusively* on Mr. Heart's public political speech, which is why the SEC's position infringes on his First Amendment right to free speech. *See* Mot. at 47-51. Far from countering this argument, the SEC instead doubles down on the offense: its arguments that Hex, PulseChain, and PulseX are "investment

contracts" rely not on the "economic realities" of the software programs, but on cherry-picked excerpts from Mr. Heart's protected speech. *See e.g.*, Opp. Br. at 51 (regarding Hex), 53 (regarding PLS), 54-55 (regarding PLSX).

As just one example, the SEC repeatedly cites statements Mr. Heart allegedly made on December 29, 2021, *see* Opp. Br. at 53-54, but never acknowledges that the statements were made over the course of a 7-hour discussion of countless topics that enjoy First Amendment protections, including the global economy, the ecological effects of blockchain technologies, and the media industry. Liftik Decl., Ex. B at 7, 14, 48. Holding Mr. Heart liable based on out-of-context quotations plucked from that protected political speech would severely chill his—and others'— ability to exercise their constitutional right to free speech. *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023). As the Supreme Court explained, "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. . . . The result is self-censorship of speech that could not be proscribed—a cautious and restrictive exercise of First Amendment freedoms." *Id.* (internal quotations and citations omitted).

The SEC's nearly exclusive focus on Mr. Heart's political speech as the basis for the Complaint distinguishes this case from those the SEC cites for the proposition that "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see* Opp. Br. at 57. In such cases, **conduct** was at issue; speech was used as a ***means*** of proving some fact about that conduct (for example, in *Mitchell*, the selection of a rape victim based on race). By contrast, here, the SEC seeks to unconstitutionally penalize Mr. Heart's political speech selectively where

such speech alone is at issue. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (a government burden on "core political speech" must meet "exacting scrutiny," meaning that it must be "narrowly tailored to serve an *overriding* state interest") (emphasis added). *Equal Employment Opportunity Commission v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179 (D. Conn. 2017), is likewise inapposite. There, the court found that an employer could be liable for retaliating against an employee only after determining that the retaliation "falls outside the scope of the First Amendment's protections."[9] *Id.* at 195. Here, Mr. Heart's speech is not categorically excluded from First Amendment protection and is not used merely as evidence of some other fact. His political speech *is* the SEC's case.

Second, the SEC's contention that its enforcement of securities laws is inherently content-neutral misconstrues Mr. Heart's arguments. Opp. 60. As noted above, the Complaint relies almost exclusively on the ***content*** of Mr. Heart's speech and thereby seeks to "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994); *see also Deida v. City of Milwaukee*, 176 F. Supp. 2d 859, 865 (E.D. Wis. 2001) ("If it is necessary to look at the content of the speech in question to determine whether the speaker violated the regulation, then the regulation is content-based."). The SEC's case consists of selectively excerpting portions of Mr. Heart's political speech and claiming that those *words* allegedly transformed software into securities ***because*** of their content. *See, e.g.*, Opp. 51 (HEX is security *because* Mr. Heart "hyped its potential for investment gain"); *id.* at 53 (PLS is security *because* Mr. Heart "publicly stated that PulseChain would be a fork of the Ethereum blockchain but would be four times faster and cheaper to use than Ethereum.").

---

[9] Despite the SEC's repeated invocations of its interest in "fight[ing] securities fraud," *see, e.g.*, Opp. Br. at 62, Mr. Heart does not argue that the First Amendment protects any allegedly fraudulent statements, were the SEC to allege any with the requisite particularity, *see supra* Section III.A.

The Complaint must therefore pass strict scrutiny to survive, and the SEC's rote and generic invocations of its "compelling interest in enforcing the federal securities laws," Opp. Br. at 62, with no discussion of any narrow tailoring, cannot clear this hurdle. *See* Mot. at 49-50. Even if intermediate scrutiny were to apply, the Complaint does not pass constitutional muster, as the SEC makes no attempt to show how muzzling and imposing staggering monetary penalties on Mr. Heart for his speech, and destroying three expressive communities, is "no greater [a restriction of First Amendment freedoms] than is essential to the furtherance" of the SEC's interest in enforcing securities laws, especially as it relates to registration violations. *See* Opp. Br. at 59 (quoting *Green, Austin, and Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994)); *see also* Mot. at 50-51.

Third, the SEC's reliance on case law permitting regulation of speech "employed directly or indirectly to sell securities" misses the mark. Opp. Br. at 58. In each of the SEC's cases, there was no dispute that the speech at issue related to securities. *See SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 714 (S.D.N.Y. 2022) (speech related to a stock); *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 367 (D.C. Cir. 1988) (same). Here, by sharp contrast, whether HEX, PLS, and PLSX are "securities" is precisely the question at issue. The SEC cannot rely on case law permitting specific regulations of speech *about securities* to defend its use of speech, and speech alone, to establish that the software programs at issue here *are securities* in the first place. That circular argument would permit the SEC to sidestep the First Amendment at will simply by asserting that speech it did not like was related to securities, without first establishing that any securities are even involved.

Fourth, the SEC offers only a superficial defense of the devastating effect that it seeks to impose on the Hex, PulseChain and PulseX public squares, each of which is populated by tens of thousands of individuals, including Mr. Heart, who exercise their rights to free speech and free

association through those software programs. *See* Opp. Br. at 61-62 ("The SEC does not seek to remove Heart or any crypto enthusiast from the Internet."). Indeed, the SEC does not respond at all to Mr. Heart's argument that the SEC's desired relief would entail the destruction of the Hex, PulseChain, and PulseX software as public fora for speech, as the Complaint effectively seeks to enjoin their very existence. *See* Mot. at 49, 52-53. The lack of response is fatal, as even if the SEC could establish that Mr. Heart's speech was unlawful (which it cannot), "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). That is precisely what the SEC seeks to do here: suppress the lawful speech of thousands of individuals who execute the Hex, PulseChain, and PulseX software to suppress and penalize Mr. Heart's speech.

## VI.   THE SEC SHOULD NOT BE GRANTED LEAVE TO AMEND THE COMPLAINT

The SEC requests leave to amend its Complaint if part or all of it is dismissed. Opp. Br. at 62. That request should be denied. The SEC has brought a case based principally on public statements and public blockchain transactions that have been available for years, has reviewed Mr. Heart's pre-motion letter and Motion, has supplemented its jurisdictional allegations with evidence outside the Complaint, has allowed the deadline for amending its pleadings to pass, and has stated that it is unable to specifically identify any amendments that it could make. Opp. Br. at 62 n.15. If the SEC were able to cure the defects in its Complaint, it would have done so by now. But the defects are incurable because the SEC's theories do not support either the claims that it seeks to bring or the jurisdiction that it seeks to bring them in. Accordingly, amendment would be futile, as "nothing in the record suggests that another complaint could remedy the legal deficiencies set forth above." *In re Liberty Tax*, 828 F. App'x at 754 (internal citation omitted).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety.

35

Dated:  August 22, 2024

*/s/ Michael Liftik*
Michael Liftik

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
Michael Liftik (*pro hac vice*)
Nicholas Inns (*pro hac vice*)
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
michaelliftik@quinnemanuel.com
nicholasinns@quinnemanuel.com

Kristin Tahler
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
kristintahler@quinnemanuel.com

Samuel P. Nitze
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samuelnitze@quinnemanuel.com

**GRAY REED**
Chris Davis (*pro hac vice*)
Joshua Smeltzer (*pro hac vice*)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (469) 320-6215
Facsimile: (469) 320-6926
cdavis@grayreed.com
jsmeltzer@grayreed.com

**KIRK & INGRAM, LLP**
David E. Kirk
43 West 43rd Street, Suite 279
New York, NY 10036
Telephone: (212) 859-3504
dkirk@kirkingram.com

Michael W. Ingram (*pro hac vice*)
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: (310) 487-0270
mingram@kirkingram.com

**CLARK SMITH VILLAZOR LLP**
Patrick J. Smith
Jeffrey D. Rotenberg
Brian T. Burns
666 Third Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 582-4400
patrick.smith@csvllp.com
jeffrey.rotenberg@csvllp.com
brian.burns@csvllp.com

*Attorneys for Defendant Richard Heart*

36