1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - X
3
                                    :
4    SECURITIES AND EXCHANGE        :23-CV-05749-CBA
     COMMISSION,                    :
5                                   :
               Plaintiff,           :
6                                   :United States Courthouse
                                    :Brooklyn, New York
7        -against-                  :
                                    :
8                                   :Thursday, October 31, 2024
                                    :2:00 p.m.
9    RICHARD J. SCHUELER, a/k/a     :
     RICHARD HEART, HEX,            :
10   PULSECHAIN, and PULSEX,        :
                                    :
11             Defendant.

12

13   - - - - - - - - - - - - - - X

14        TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
             BEFORE THE HONORABLE CAROL B. AMON
15        UNITED STATES SENIOR DISTRICT COURT JUDGE

16
               A P P E A R A N C E S :
17
     For the Plaintiff:    SECURITIES AND EXCHANGE COMMISSION
18                            801 Cherry Street, Suite 1900
                              Fort Worth, Texas 76102
19                         BY: MATTHEW GULDE, ESQ.

20   For the Plaintiff:    SECURITIES AND EXCHANGE COMMISSION
                              100 Pearl Street, Suite 20-100
21                            New York, New York 10004
                           BY: BEN KURUVILLA, ESQ.

22
     Court Reporter:  Nicole J. Sesta, RMR, CRR
23                    Official Court Reporter
                      E-mail:  NSestaRMR@gmail.com

24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.

NJS  OCR  RPR  RMR  CRR

2

1    APPEARANCES -

2    For the Defendant:      QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                  1300 I Street, NW
3                                 Suite 900
                                  Washington, D.C. 20005
4                             BY: MICHAEL LIFTIK, ESQ.

5
     For the Defendant:      QUINN EMANUEL URQUHART & SULLIVAN, LLP
6                                 865 S. Figueroa Street
                                  10th Floor
7                                 Los Angeles, California  90017
                              BY: KRISTIN TAHLER, ESQ.
8

9    For the Defendant:      KIRK & INGRAM, LLP
                                  43 West 43rd Street. Suite 279
10                                New York, New York 10036
                              BY: DAVID E. KIRK, ESQ.
11

12   For the Defendant:      QUINN EMANUEL URQUHART & SULLIVAN LLP
                                  51 Madison Avenue
13                                New York, New York 10010
                              BY: SAMUEL P. NITZE, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                                     3

1          THE COURTROOM DEPUTY:  Good afternoon.  This is an

2   oral argument on defendant's motion to dismiss, the Securities

3   and Exchange Commission versus Schueler, Case No. 23-cv-05749.

4   Will the parties please introduce themselves, for the record,

5   starting with the plaintiff.

6          MR. GULDE:  Good afternoon, Your Honor.  I'm Matt

7   Gulde for the SEC.

8          MR. KURUVILLA:  Good afternoon, Ben Kuruvilla for

9   the SEC.

10          THE COURT:  Good afternoon.

11          MR. KLEINMAN:  Good afternoon, Your Honor.  Derek

12   Kleinman for the SEC.

13          MR. TENREIRO:  Good afternoon, Your Honor.  Jorge

14   Tenreiro for the SEC.

15          THE COURT:  Good afternoon.

16          MR. LIFTIK:  Good afternoon, Your Honor.  Michael

17   Liftik from Emanuel Urquhart & Sullivan for defendant, Richard

18   Heart.  I'll start and introduce the folks we have over here.

19   I have my partner, Kristen Tahler and Sam Nitze.  We also have

20   from Clark Smith & Villazor, we have Patrick Smith and Brian

21   Burns.

22          From Kirk & Ingram we have David Kirk and Michael

23   Ingram, and from the Gray Reed firm we have Chris Davis.

24          THE COURT:  All right.  Good afternoon, everyone.

25          Who is going to be arguing for the defendant?

*Proceedings*                                                                4

1      MR. LIFTIK:  Your Honor, I will be arguing as to
2  most of the arguments and Mr. Kirk will be handling the
3  personal jurisdiction argument.
4      THE COURT:  Okay.  And for the SEC?
5      MR. GULDE:  Your Honor, it will be Ben Kuruvilla and
6  myself, Matt Gulde.
7      THE COURT:  Are you splitting up arguments?
8      MR. KIRK:  Yes, we are, Your Honor.  I'm going to be
9  handling personal jurisdiction and questions relating to the
10  *Morrison* issues, and also the investment contract piece as
11  well.
12      THE COURT:  Okay.  You can stand up when you're
13  ready to talk.  Everyone can be seated.  Counsel, I guess
14  we'll take your arguments from the table.  I'll have you
15  remain seated because of the way the microphones are set up.
16  I think, first of all, why don't we begin with Mr. Kirk and
17  the issue of personal jurisdiction.
18      MR. KIRK:  Thank you, Your Honor.  Can you hear on
19  the microphone okay?
20      THE COURT:  I sure can, yes.
21      MR. KIRK:  Your Honor, as for the SEC's complaint
22  alleging that Mr. Heart, a resident of Finland, published
23  blockchain software programs, put information about them up on
24  web sites and online videos, the complaint alleges that some
25  persons in the U.S. executed that software, or viewed that

*Proceedings*                                                                5

1    online content.  That's not nearly enough to establish

2    personal jurisdiction over Mr. Heart, or causally show that he

3    engaged in any domestic transactions that should be subjected

4    to U.S. securities laws.  If I could, Your Honor --

5              THE COURT:  Is that simply because you're saying it

6    was a global, the terms of the information on his web site, it

7    was globally to everyone and wasn't directed to the United

8    States?

9              MR. KIRK:  That's correct, Your Honor.  I think in

10   contrast to some of the other cases that the parties have

11   cited, including Your Honor's opinion in *PlexCorps*, Mr.

12   Heart's, both the blockchain software programs he developed

13   and the web sites and information he put up about the software

14   in online videos, is available to the world at large.

15             And under the Second Circuit's opinion in *Best Van*

16   *Lines*, as well as a number of more recent authorities in the

17   district courts, as well as more recent internet authorities

18   in other circuits, you know, Courts have started to realize

19   that the worldwide web is inherently worldwide.  And just

20   because persons in one jurisdiction are able to go and access

21   information doesn't mean that the person who put that

22   information online, or in this case the blockchain software

23   programs were online has expressly aimed any activities at the

24   forum.

25             That's the test under *Calder* is that the defendant

*Proceedings*                                                                      6

1   has to have expressly aimed his activities at the United

2   States.  We don't think the SEC makes that showing.

3          THE COURT:  What about the conferences that the SEC

4   makes reference to?  It's your position there that they're

5   after the offer period and, therefore, not relevant?

6          MR. KIRK:  That's right, Your Honor.  And we've

7   actually prepared a demonstrative just to help set out the

8   timeline, because I think two things that I'd like to bring to

9   your attention, the first is that there are three different

10  software programs at issue here and the SEC calls those

11  software programs.  They call them securities offerings.

12  Obviously, we disagree with that.

13         And if we discuss offerings here, we're not agreeing

14  with that contention.  But what I think we can all agree on,

15  is the software programs, they started and ended on different

16  dates.  They involve different alleged facts, different

17  software codes, different statements, different assets,

18  different people.  If the SEC doesn't meet its burden to show

19  jurisdiction and domestic transactions as to any one of them,

20  then that one is out of the case.

21         So that's why, with Your Honor's permission, I hope

22  you can see the demonstrative okay.  We also have copies.

23         THE COURT:  Have you given them to your adversary?

24         MR. KIRK:  We have before the hearing, Your Honor.

25         MR. KURUVILLA:  Your Honor, if we can get a few more

*Proceedings*                                                    7

1   copies.  We just have the one.

2          THE COURT:  Let me clarify one thing, which will

3   shorten the arguments.  Addressing the SEC, you have

4   abandoned, I take it, any alter-ego theory that you had set

5   forth in the original complaint?  That's gone?

6          MR. KURUVILLA:  Your Honor, it's not part of this

7   motion.  It's not relevant to this motion.

8          THE COURT:  Have you abandoned those claims or not?

9   Counsel raised the issue that they weren't viable claims, that

10  the PulseChain, the blockchains themselves, weren't entities.

11  Are you pursuing that or not pursuing that?

12         MR. KURUVILLA:  I think with respect to alter-ego,

13  Your Honor, we allege that because we had facts, we had some

14  facts to suggest that Mr. Heart has control over these

15  entities, that he's controlling the web sites, et cetera.

16         THE COURT:  But you've named the blockchains

17  themselves as defendants.  What's the basis for doing that,

18  and are you continuing to do that or maintain that they're

19  defendants?

20         MR. KURUVILLA:  Right.  Your Honor, again, it's not

21  relevant for this motion but we are -- the reason we did that

22  in the first place was because, again, to the extent there's

23  an argument that Mr. Heart is not responsible for any of the

24  conduct that's alleged in the complaint, that these are all

25  with the responsibility of Hex and PulseChain and PulseX,

1  because they exist on the blockchain, he has no control over

2  them, they're their own thing, we wanted to ensure when we

3  pled this that we are covering the entire scheme, that we're

4  covering all possible defendants.  So that's why --

5          THE COURT:  I'm sorry.  Why isn't it relevant to the

6  motions?  It was part of their motion to dismiss, I think.

7          MR. KURUVILLA:  Right.  And we haven't responded to

8  that argument, Your Honor.

9          THE COURT:  So you're agreeing that they should be

10  dismissed then?

11          MR. KURUVILLA:  It's not part of our -- right.  It's

12  not part of our theory for why the Court would have personal

13  jurisdiction.

14          THE COURT:  All right.

15          MR. KIRK:  Your Honor, if you have questions on

16  that, I'm happy to speak about it.  But I did just want to

17  make clear that it is our position, we moved to have them

18  dismissed, as I think counsel has acknowledged, even if they

19  didn't respond to those arguments.

20          I do just want to point out that we cited case law

21  in which opposing counsel cited, you know, they named

22  non-existent entities as defendants.  Again, our point was you

23  can't do that.  I had cited the case, sued as a defendant is a

24  division of the New York Police Department that didn't exist,

25  it wasn't an entity, and the Court on a motion by the City of

*Proceedings*                                                        9

1   New York said, okay, we're going to dismiss that because you

2   can't bring a suit against a non-existent entity.

3              Same with a lawsuit that named a television series

4   as a defendant.  We think this is the same kind of problem.

5   I'm happy to elaborate on that, Your Honor.

6              THE COURT:  No, I don't think that's necessary.  You

7   have this chart here.  I take it it's your position that for

8   both Hex and PulseChain and PulseX that the contacts that the

9   SEC relies on heavily all occurred after the offering period

10  for those three entities or securities.  Correct?

11             MR. KIRK:  That's correct, Your Honor.

12             THE COURT:  And your chart presumably shows that.

13             MR. KIRK:  That's right.  That's our position.  I

14  think it's important here to unpack each of the three software

15  programs because each one is different, and they occurred --

16  the events that the SEC has brought this lawsuit about

17  occurred at different times.

18             If we take Hex as an example, Hex is a software

19  program that Mr. Heart launched on December 3, 2019, and there

20  was a period of about 11 months called the adoption amplifier

21  period.  And this is what they're suing over.  This is the

22  period of time when users could execute the Hex software and

23  use it to generate Hex tokens.

24             The first of these conferences that they allege

25  shows a tie to the United States wasn't until March of 2022.

*Proceedings*                                                        10

1    That's well over a year later.  And so we don't think it can

2    have any conceivable connection to what they're calling the

3    Hex offering.  Again, we don't think it's an offering but we

4    don't think it has any conceivable connection to this adoption

5    amplifier period that ended more than a year before this first

6    conference.

7           I think that's an easy sort of open and shut case

8    when it comes to Hex.  I'd like to also briefly touch upon

9    each of the PulseChain Sacrifice and the PulseX Sacrifice.

10   Again, two different transactions occurring at two different

11   time periods.  PulseChain, as you can see from the slide,

12   July 15, 2021 through August 3, 2021, again, many months

13   before the first of these conferences, and PulseX was

14   December 29, 2021 through February 26, 2022, again, it ended

15   before the first conference in March of 2022.

16          Now, the only thing, as far as we can tell, that

17   sort of -- that they're using as a basis to, I guess, claim

18   that this conference has some relevance is they have one

19   allegation that says both the PulseChain offering period and

20   the PulseX offering period were unofficially extended, are the

21   words used, until April 6th of 2022.

22          We're not sure what unofficially extended means and

23   it looks like they got that from the declaration of Kyle Bahr.

24   He's an individual who that's what he said, and I think that's

25   all that we have to go on for that.  And just a couple of

1    things that --

2            THE COURT:  Well, isn't there evidence, though, that

3    there were transactions after April 6, 2022?  In other words,

4    people were able to go in and put money in and get whatever

5    they got.

6            MR. KIRK:  Your Honor, one of the strange

7    idiosyncrasies about blockchain transactions is both the

8    PulseX sacrifice wallet, to use the SEC's words, and the

9    PulseChain sacrifice wallet, both of those wallets are

10   essentially blockchain addresses that anyone can send assets

11   to who uses the Ethereum network.  I could do it today and

12   that can never be stopped or turned off.

13           It's sort of like a PO box or even more it's kind of

14   like the night drop box at the court.  Anyone can walk up and

15   put a digital asset into it.  They can do it today.  So I

16   think it's correct that as a technical matter people can still

17   send assets to this address.  I don't know what that would

18   accomplish.  I think nothing.  But that's just sort of the

19   technological nature of how blockchain works.

20           However, in terms of what was actually happening

21   after the close of these sacrifice periods, this unofficially

22   extended period that lasts until April 6th of 2022, well,

23   there if you look at the PulseChain web site, and we have this

24   using the internet way back machine in a footnote in our reply

25   brief, the PulseChain web site actually said as of early

*Proceedings*                                                                    12

1    August 2021, the PulseChain sacrifice phase is over.  Don't

2    send any more money.  And so we're not really sure where they

3    get this offering, to use their words, this sacrifice.

4              THE COURT:  But you're making this argument to say,

5    I take it, that I shouldn't consider anything said at the Hex

6    conference about PulseChain?

7              MR. KIRK:  That's --

8              THE COURT:  Is that the reason that you're making

9    this argument?

10             MR. KIRK:  That's correct, Your Honor.  I think

11   that's why to us the unofficial extension makes it, you know,

12   we don't think that's an allegation that is specific enough to

13   be credited.  With that said, Your Honor, suppose we say for

14   argument's sake if we do credit the -- say let's see what

15   happens if the time period for the sacrifices lasted up until

16   April 6, 2022, let's think about what the consequence of that

17   would be.

18             And so the only thing that gets into that extended

19   timeline is this March 2022 Hex conference.  And just to drill

20   down a little bit on what that is, that's a community run Hex

21   conference in Las Vegas.  Mr. Heart was invited by video to

22   attend and receive a lifetime achievement award from the

23   community and give some remarks by video.

24             So he speaks for about two-and-a-half hours.  That's

25   all in the declaration.  He talks about a lot of different

1    topics.  During that talk, he mentions that the PulseChain and

2    PulseX software seemed to have product markets because

3    thousands of people joined chat rooms about them.  And that's

4    it.

5           THE COURT:  So you're saying that it's not related

6    to the claim in essence?

7           MR. KIRK:  That's correct.  For Hex, again, we could

8    put that one to the side because the Hex offering ended more

9    than a year before, again, using offering just to use the

10   SEC's terminology.  But that adoption amplifier period that

11   allowed users to generate Hex tokens on the software, that was

12   long over.

13          What I'm saying is that for PulseChain and PulseX,

14   they're saying the offering period was extended and this video

15   appearance gets Mr. Heart with a United States connection.

16   And it's based on two-and-a-half hours of remarks, during

17   which he mentions offhand that there are lots of people in the

18   chat rooms about the PulseChain and PulseX software.  We don't

19   think that remotely supports the assertion that these were

20   promoting the sacrifices.  He never even mentions the

21   sacrifices.

22          To put a finer point on it, Your Honor, if he was

23   promoting the sacrifices to this audience, wouldn't he have

24   encouraged people to participate or mention the sacrifice, or

25   that people should or even could still participate, despite

*Proceedings*                                                              14

1   the fact that the web site said it was over for several

2   months?

3            And so we think that basically one line about these

4   other software programs at a conference about Hex, about the

5   different software program, one line about the software we

6   don't think remotely gets to, you know, enough to support the

7   allegation that he was promoting the sacrifices, if they were

8   even still going on.

9            I think if that was his intention, he would have

10  said something like, there's one month left, I encourage you

11  to participate.  He never even mentioned the word.  He just

12  briefly mentioned the software.

13           THE COURT:  What about the fraud claim?  The fraud

14  claim, that was presumably to September 22nd, around that

15  period of time, 2022, with the misappropriation.  So the fraud

16  claim goes out.  What is your response to the personal

17  jurisdiction issue as it pertains to the fraud claim?

18           MR. KIRK:  Your Honor, Mr. Liftik will speak in more

19  detail about the fraud chronology.  I think the timeline there

20  is also a little bit mixed up.  But there, the issue we have

21  for personal jurisdiction as it pertains to the fraud claim

22  specifically is, you know, sort of like with these -- sort of

23  like with these events we mentioned, there's no tie to any

24  conduct in the United States.

25           The statements that they're relying on that they say

*Proceedings*                                                              15

1    were misleading investors, they said they mislead United

2    States investors because he was giving them updates about

3    software development.  Those statements weren't targeted

4    towards anyone in the United States.  Again, he was just --

5              THE COURT:  Are you talking now about You Tube

6    statements?  What about statements made in the Miami

7    interview, the Pulse Con, those two?

8              MR. KIRK:  Your Honor, I don't think the SEC has

9    contended that there are specific statements that they think

10   were misleading.

11             THE COURT:  In those conferences?

12             MR. KIRK:  That's my understanding of their

13   allegations.

14             THE COURT:  So you're just saying that the

15   statements that were made were made not directed to the United

16   States, but part of this sort of global statements going to

17   everyone?

18             MR. KIRK:  That's correct, Your Honor.  Our

19   understanding of the fraud theory, and, again, Mr. Liftik will

20   dive into some of the issues with the allegations themselves.

21   But to the extent they've stated a claim for fraud, and we

22   don't think they have, putting that to the side, they haven't

23   stated a claim for domestic securities fraud because none of

24   this conduct was targeted to the United States.

25             I believe we cited the *Aegean Marine* case, showing

1  that you actually have to have some nexus to United States

2  conduct to state a fraud claim under securities laws, to state

3  a domestic claim, that is.

4         THE COURT:  Did you have anything else you wanted to

5  add with regard to the personal jurisdiction argument?

6  Because I'll try to take them argument by argument and hear

7  from the SEC on that issue.

8         MR. KIRK:  If I could just very briefly touch on an

9  issue that I think is important.  It's important as the

10  jurisprudence develops.  But it comes back to the first thing

11  that you mentioned of there's a difference between information

12  that's made generally available and things that are targeting

13  the United States.

14         I actually think Your Honor's decision in *PlexCorps*

15  really honed in on the different factors and the difference

16  between what type of conduct falls on the side of expressly

17  targeting United States persons, or the United States as a

18  forum, and what type of conduct is just generally available to

19  the world at large.  And I just want to flag that, because you

20  were probably interested to see that both we and the SEC

21  relied on *PlexCorps*.

22         But that case involved Facebook accounts that

23  marketed and advertised directly to United States persons, web

24  site user registrations, including credit cards and billing

25  addresses, including some United States customers, U.S.

*Proceedings*                                                                 17

 1   payment accounts, and payment processors and even a business

 2   trip.  Your Honor at least found there was an issue of fact as

 3   to whether it was a business trip to do business relating to

 4   the offering at the beginning of the offering period in that

 5   case.

 6           Again, there's nothing here that resembles that, in

 7   our opinion, Your Honor.  And we think the facts here are much

 8   closer to what the Southern District considered in *Holsworth*

 9   *versus BProtocol,* as well as a number of other cases that we

10   cite that just show the way the internet works is you can put

11   content online for the world to see and for the world to

12   access, and that's not enough to show purposeful availment and

13   expressly aiming activities.

14           THE COURT:  Thank you.  Who is going to take up this

15   issue?

16           MR. KURUVILLA:  I am, Your Honor.

17           THE COURT:  How have you shown personal

18   jurisdiction?

19           MR. KURUVILLA:  Your Honor, we believe that we've

20   shown it through a mix of different contacts, over the

21   internet activity, as already discussed, which I'll elaborate

22   on more, as well as the specific contacts with the United

23   States.  I just want --

24           THE COURT:  Let me just ask for a concession, first

25   of all.  Do you agree that you have to establish personal

*Proceedings*                                                              18

1    jurisdiction with respect to each of the claims?

2            MR. KURUVILLA:  So we do have to establish it with

3    respect to each claim, Your Honor.  That's a general point I

4    wanted to make.  I know the defense wants you to sort of slice

5    it up between each of these offerings, and certainly we did

6    plead them in the complaint separately, because we do take the

7    position that each one of them was offered and sold as a

8    security and each one of them has to meet the *Howey* element.

9    So each one of them is a security.

10           THE COURT:  Each one of them you have to establish

11   personal jurisdiction for.

12           MR. KURUVILLA:  As far as personal jurisdiction is

13   concerned, Your Honor, the point here is that each one of

14   these offerings, although they were separate, they are

15   interrelated.  And the way we pled them is that they're

16   intrarelated, as well.  For example, we pled in the complaint

17   that he's telling his audience via his internet marketing and

18   his promotional campaign that Hex is -- the development of

19   Pulse and PulseX is going to drive value to Hex.

20           The purpose, one of the purposes of developing

21   PulseChain is so that Hex users can now trade on PulseChain

22   and it would be cheaper than what it was before on Ethereum.

23           And that once PulseChain is developed and Hex users

24   begin using PulseChain, that the value of Hex would go up.  So

25   I think it's important.

*Proceedings*                                                          19

1          THE COURT:  I think you need to differentiate,

2    though, if you would, between statements that were made just

3    broadly, across the globe, which counsel has pointed out are

4    not that relevant or relevant for the question of personal

5    jurisdiction because they're not directed and statements that

6    you have then pointed out to the Court, well, there were

7    instances where, you know, they came to the United States, he

8    was Zoomed in to 3,000 people in Las Vegas, the Hex

9    conference, the Miami interview, the Pulse con, virtual

10   appearance in Las Vegas.  The question I have with all of

11   those is they all occurred after the offering period.

12          So how are those relevant to the inquiry?

13          MR. KURUVILLA:  So Your Honor, with respect to that

14   point, just because the offering period ends doesn't mean that

15   the conduct has ended.

16          THE COURT:  That may be true but the conduct has to

17   be -- the conduct we're talking about, it has to be directed,

18   it has to be during the period of the offering.

19          MR. KURUVILLA:  Well, Your Honor, during before and

20   during the offering period, the way these offerings were

21   marketed to the public was that Mr. Heart was going to engage

22   in efforts that included efforts Pulse launched.  With respect

23   to Hex, for example, he was going to stay involved, he was

24   going to get Hex listed on platforms, that he was going to

25   engage in efforts Pulse launched to make sure that Hex remains

*Proceedings* 20

1    a successful --

2              THE COURT:  That may be relevant to your fraud

3    claim.  How is it relevant to the other claims?  Because the

4    offering sale of securities, that's what your claims are with

5    regard to Hex, PulseChain, PulseX.  Once that offering period

6    has ended, the terms of personal jurisdiction, why are you

7    considering things that happened after that period?

8              The offering is closed.  And what authority do you

9    have that supports the fact that I can consider on the issue

10   of personal jurisdiction post offering contacts?

11             MR. KURUVILLA:  Your Honor, it's relevant to *Howey*

12   post sale efforts.

13             THE COURT:  I'm not talking about *Howey*.  I'm

14   talking about personal jurisdiction.

15             MR. KURUVILLA:  Personal jurisdiction is considered

16   what our claims are.  Personal jurisdiction goes to what our

17   specific claims are.  We have a claim for under Section 5,

18   Section 5 of the Securities Act, under Section 17 of the

19   Securities Act for fraud, and under Section 10(b) for fraud,

20   as well.  So the *Howey* analysis is relevant to our claim.  So

21   post sale efforts go to whether or not --

22             THE COURT:  Whether or not there's a security.

23             MR. KURUVILLA:  Whether or not there's a security.

24   Exactly.

25             THE COURT:  But that's not what we're talking about

*Proceedings*                                                           21

1   now.  We're not talking about the *Howey* issue or whether or

2   not there's a security.  We're talking about personal

3   jurisdiction.

4            For instance, in the *Sarkisian* case, Southern

5   District, the Court determined that contacts that occurred

6   after the events giving rise to the liability, which is here

7   the offer and sale, were not relevant to the question of

8   personal jurisdiction.

9            MR. KURUVILLA:  Right.  Your Honor, so let me

10  address one point.  The April 6, 2022, the point that counsel

11  was making about the unofficial extension of PulseChain and

12  PulseX, our position is that we have pled that as the date the

13  offerings ended for both of those, for PulseChain and PulseX,

14  April 6, 2022, the relevant date.  We pled it in the

15  complaint.  It's in the affidavit that we submitted by Mr.

16  Bahr and we've indicated that the reason it was extended was

17  that Mr. Heart can continue to receive investments through

18  April 6th.

19           So that's -- that is a well pled allegation.  And at

20  this stage, Your Honor, the Court has to draw inferences in

21  favor of the plaintiff and accept the April 6, 2022 date as

22  the date the offering period ended for both of those

23  offerings.

24           THE COURT:  For Hex?

25           MR. KURUVILLA:  No.  For PulseChain -- both

*Proceedings*                                                                22

1    PulseChain and PulseX, we pled in the complaint that the

2    offering periods for both of those were open through April 6,

3    2022.

4            THE COURT:  Okay.

5            MR. KURUVILLA:  To the extent the defense is

6    proffering facts to contradict that, those are not facts that

7    the Court should accept on a motion to dismiss.  So for that

8    reason, the March 2022 conference occurred during the offering

9    period for PulseChain and PulseX.

10           THE COURT:  What happened at the March 22nd

11   conference that is relevant to PulseChain or PulseX?

12           MR. KURUVILLA:  The entire conference, Your Honor,

13   is a promotion.  It's called a Hex conference.  It's a

14   promotion for investment.  It's an investment promotion.

15           THE COURT:  It doesn't say anything about PulseChain

16   or PulseX, other than there are a lot of people in a chat

17   room.  Right?

18           MR. KURUVILLA:  He talks about that in reference to

19   investment, Your Honor.  He says that the fact that this is a

20   product, that it has product market fit.  The product -- the

21   public is demanding this product.  This is how you drive

22   investments.  He's talking about holding on, he's talking

23   about advice with respect to Hex holders and PulseChain and

24   PulseX holders, that they should hold onto their investment

25   and watch it grow.

*Proceedings*                                                    23

1      He's providing investment strategy during this Hex

2   conference, with respect to Hex, with respect to PulseChain.

3      THE COURT:  With respect, at least, to Hex you have

4   to see that the offering period is over for Hex.  On the issue

5   of personal jurisdiction it has no relevance.

6      MR. KURUVILLA:  I think -- well, I understand your

7   point, Your Honor.  I think our position, again, with respect

8   to -- and I think this conference elaborates this point.  He's

9   talking about Hex, PulseChain, together here.  In the later

10  context that we have in our motion, the August 2022 appearance

11  in the United States, the Pulse Con appearance in September,

12  he's talking about Hex, PulseChain, PulseX, he's talking about

13  all these things together.  I think when the Court considers

14  personal jurisdiction, it should consider that point.

15     THE COURT:  Consider it for what purpose?  Consider

16  it as it relates to Pulse, as it relates to Hex?

17     MR. KURUVILLA:  As it relates to Hex.  Hex, for

18  example, the offering period --

19     THE COURT:  The offering period is over by the time

20  he's having those conferences.  I don't understand how you say

21  that I can consider that.

22     MR. KURUVILLA:  I think this goes back to the

23  argument, Your Honor, that we have to establish -- for our

24  claims, we make our claims, we make our Section 5 claim and

25  our fraud claims based on whether or not the offerings are

*Proceedings*                                                                 24

1  securities and are evidence for why there are securities

2  include post launch efforts, as well.  That is relevant to

3  establishing our claims under the Securities Act, under the

4  Exchange Act.

5          And for that reason, when the Court is considering

6  jurisdiction, it should consider these facts that are relevant

7  to our making our claims.  So let me make another point, Your

8  Honor.

9          On Section 5, specifically, we plead a count for

10  Section 5.  The factual allegations that support the Section 5

11  claim are with respect to all three offerings.  So at this

12  stage, for our Section 5 claim to survive, it's our view that

13  if the Court finds personal jurisdiction with respect to any

14  one of those offerings that support our Section 5 claim, that

15  the Section 5 claim should survive.

16          But it's our view that, again, because the claims --

17  our claims are dependent on whether or not we can establish

18  that each of these offerings are, in fact, securities.  And in

19  order to do that, the Court can consider post launch efforts

20  and that's established in the *Telegram* case, for example, in

21  the Southern District.  That is a principle that comes out of

22  that case, that post launch efforts of the seller should be

23  considered in the securities analysis and for that --

24          THE COURT:  But it's not a personal jurisdiction

25  case.

*Proceedings*                                                          25

1      MR. KURUVILLA:  That's not a personal jurisdiction

2  case, Your Honor.

3      THE COURT:  What are you relying on for the fraud

4  case in terms of establishing personal jurisdiction?

5      MR. KURUVILLA:  For the fraud case, the fraud case

6  is the offering that is PulseChain.  So it would be all the

7  facts that we've alleged with respect to PulseChain.  So that

8  would include his appearance in -- one, his appearance at the

9  conference virtually before the conference in Las Vegas, his

10  appearance in August of 2022 before -- in a live studio for

11  the podcast, and then his September 2022 appearance at Pulse

12  Con.  In addition to that, of course, we are using the

13  internet --

14      THE COURT:  Do you use what happened at those

15  conferences as part of your fraud claim, or are you relying on

16  the statements that were made during the You Tube videos as

17  part of your fraud claim?

18      MR. KURUVILLA:  No.  I don't think that we're using

19  any of the conferences for support.

20      THE COURT:  They're not part of your fraud claim,

21  the conferences?

22      MR. KURUVILLA:  That's right.

23      THE COURT:  So then, what are your contacts, then,

24  or what are the activities that are directed towards the

25  forum?

*Proceedings*                                                    26

1          MR. KURUVILLA:  Let me also say this --

2          THE COURT:  For the fraud claim.

3          MR. KURUVILLA:  With respect to the internet

4    contacts, we haven't discussed those yet.  As we pled in the

5    complaint, Mr. Heart made comments when he was promoting these

6    offerings, specifically talking about the *Howey* test, or at

7    least tracking the language of the *Howey* test.

8          And so he, for example -- and I think the defense

9    highlighted some of this in their opposition where they quote

10   a line from him where he specifically says you are not to

11   expect profit from the efforts of others.  This is

12   specifically tracking the *Howey* language.

13         The reason he does this is because he understands

14   that there is a market in the United States, and he's

15   directing these statements at those investors, specifically.

16   He understands that there's a market for these securities in

17   the United States.  And with respect to PulseChain and PulseX,

18   Hex has already been on the market at this point.  Hex has

19   already been on the market.

20         THE COURT:  Does this relate to your fraud?  What

21   does this relate to?

22         MR. KURUVILLA:  This relates to why statements that

23   Mr. Heart has made in his promotional campaign through the

24   internet, why these support personal jurisdiction.  That

25   includes statements that he's --

*Proceedings* 27

1      THE COURT:  But you make this argument in your brief

2  that because he talked about the *Howey* test he must be

3  directing these to people in the United States.  Is that an

4  argument you made in your brief?

5      MR. KURUVILLA:  That was not made in the brief, Your

6  Honor, but those are facts that are pled in our -- those are

7  facts that are pled in our complaint, and they do, again,

8  underscore the fact that Mr. Heart understood that there was a

9  securities market in the United States for his offerings.  He

10  certainly didn't restrict access.

11      THE COURT:  He doesn't have to restrict access.

12  Where do you get that principle from, that somehow personal

13  jurisdiction is established unless he restricts access?

14      MR. KURUVILLA:  Well, Your Honor can consider the

15  totality of the circumstances here, the totality of the

16  context.  I would say that if Mr. Heart understands that there

17  is a market in the United States for his offerings, and then

18  he is directing statements into the United States now globally

19  through You Tube and other social media, he would understand

20  that indirectly this is reaching the U.S. market.

21      THE COURT:  Well, it reaches any market in the

22  world.

23      MR. KURUVILLA:  Right.  So, for example, in the

24  *PlexCorps* case, Your Honor, there were efforts that were made,

25  purported efforts that were made, to exclude the United States

*Proceedings*                                                    28

1    investors, to exclude the United States investment.

2         I'm sorry.  To prevent United States users from

3    accessing Facebook or whatever other social media account was

4    being distributed globally.  I understand that those efforts

5    were ultimately unsuccessful.  The Court found that they were

6    unsuccessful, but it underscores the point that -- and I think

7    the Court makes this in *PlexCorps,* that simply because

8    something is available globally, simply because a marketing

9    campaign is targeting globally, does not mean that it does not

10   indirectly reach and have relevance if it indirectly reaches

11   the United States, especially where we have a seller who

12   understands that there is a market for these securities in the

13   United States.

14        THE COURT:  This case is vastly different from

15   *PlexCorps* in terms of the amount of contacts though.  There

16   was a trip to the United States during the offer period.  U.S.

17   based payment service providers received funds, I mean, as

18   counsel pointed out all of the differences in *PlexCorps.*

19        So are you making the argument here that this case

20   is similar to *PlexCorps*?

21        MR. KURUVILLA:  No, Your Honor.  We don't have all

22   those contacts that existed in *PlexCorps.*  With regard to the

23   internet contacts, I would say that the Court articulated this

24   principle in *PlexCorps.*

25        THE COURT:  Are you relying on the affidavit you put

*Proceedings*                                                                 29

1    in from Mr. Bahr?

2            MR. KURUVILLA:  We are.  We understand that that's

3    not one of our principle contacts we're relying on, but he

4    certainly was a developer in the United States who worked on

5    Hex and who worked on PulseChain and PulseX.  We understand

6    that we don't have anything in that affidavit that suggests

7    that Mr. Heart knew that he was dealing with somebody in the

8    United States when he was engaging him for work on Hex and

9    PulseChain.

10           THE COURT:  In essence, you're not relying on that

11   affidavit?

12           MR. KURUVILLA:  Right.  The other point I want to

13   make, Your Honor, is the conferences he had, the Hex

14   conference, the conference in Las Vegas in September of 2022,

15   the fact that he's having these conferences also reflect the

16   fact that he understands that there is a U.S. market for his

17   securities.

18           Why else would he be appearing before these markets?

19   Why would he be appearing before these audiences and talking

20   about Hex, PulseChain, and PulseX if he did not understand

21   that there was a market for his securities there.  I think

22   that just the fact that he's having these conferences, and in

23   the case of PulseChain and PulseX right around the time of the

24   end of the offering period.

25           Why else would he be having it if he didn't

*Proceedings*                                                    30

1   understand fully that there was a market to which these

2   securities are going to be --

3           THE COURT:  Well, the test isn't whether he

4   understood there was a market.  Obviously if he's going to

5   everyone in the globe he understands that there's likely a

6   market.

7           I think the question is whether he was directing his

8   activities to that specific market, as opposed to any market

9   in the entire world.  I think that's the inquiry.  Isn't it?

10          MR. KURUVILLA:  He's reaching out to these when he's

11  appearing virtually.

12          THE COURT:  But these are, again, we're going over

13  old ground here.  The Hex Miami and Pulse Con conferences with

14  respect to Hex were clearly after the offerings closed and

15  after the offerings -- actually after the offerings for Pulse

16  and PulseX closed.  In any event, why don't we take up a

17  different issue.  Thank you.

18          I'll leave it to counsel for Mr. Heart to address

19  the next issue that they think is the most important to raise,

20  in terms of their motion to dismiss.

21          MR. LIFTIK:  Thank you, Your Honor.  I think we'll

22  turn briefly to the fraud argument next.  But before I do, I

23  would like to raise two broader contextual points that I think

24  have become live issues as part of the discussion, and they're

25  being highlighted and run as a theme throughout the remainder

*Proceedings*                                                      31

1    of the discussion.

2           And that is that there's a paradox in how the SEC

3    treats Mr. Heart's statement.  The SEC is asking the Court to

4    focus on Mr. Heart's statements as evidence of jurisdiction,

5    domestic securities transactions, or fraud.  Then the SEC also

6    wants this Court to ignore as, quote, tongue and cheek

7    statements by Mr. Heart that undermine their allegations.  The

8    SEC can't have it both ways.

9           Either the relevant statements matter and the Court

10   can take judicial notice of a significant amount of them, or

11   none of them do.  And if they matter, then even taking all the

12   SEC's allegations as true, the complaint fails to allege, as

13   we argue, and if you're limiting -- if none of them matter and

14   we limit ourselves to Mr. Heart's conduct, what did he do,

15   what is he alleged to have done in the complaint, then the

16   complaint still fails.

17          The second sort of broad contextual point that will

18   run as a theme throughout the remainder of the argument is

19   that there's a significant issue throughout the complaint, and

20   that is that the chronology is out of sequence leaving the

21   impression that events happened before or long after or

22   simultaneously when they didn't, and that Mr. Heart knew of

23   the events before they happened or withheld information he

24   could not have known at the time.

25          We would like to -- we believe that the Court --

*Proceedings*                                                    32

1   that the SEC has jumbled this timeline for good reason.  Once

2   you actually deconstruct the timeline, the actual chronology

3   would make apparent that the technology at issue is very

4   different from the crypto projects that they mentioned in a

5   lot of their briefing.  This project is much more like Bitcoin

6   fully built when launched, and that impacts legally how the

7   complaint continues to fail.

8            I'd like to turn with that context to the fraud

9   claim.  As counsel for the SEC has admitted, the fraud claim

10  is quite narrow.  The fraud claim only relates to the

11  PulseChain project.  It also takes up an incredibly small

12  amount of the SEC's complaint.  It is only six paragraphs,

13  two-and-a-half pages, of their entire complaint.  It is very

14  thinly alleged and it is very narrow.

15           To be very clear, and I think Mr. Kuruvilla conceded

16  this point, the content in the affidavits that were submitted

17  as part of jurisdiction discovery are not in the complaint.

18  They have not alleged the Miami conference or any of the later

19  events as giving rise to the fraud claim.  It's quite narrow.

20           The second important point is that the SEC concedes

21  that this is a claim that is based only on scheme liability.

22  They have not alleged a false statement or omissions case.

23  Under 10b-5(b) they have conceded that this is a 10b-5(a) or

24  (c) case, or under the Securities Act it's a 17(a)(1) or (3)

25  case not 17(a)(2) case.

*Proceedings*                                                    33

1          So to establish scheme liability in broad strokes,

2    the SEC needs to establish the omission, that they allege, and

3    deceptive conduct.  Obviously, they have done neither.  It's a

4    Second Circuit law that misstatements and omissions alone

5    cannot establish scheme liability.  That's the recent *Rio*

6    *Tinto* case that the SEC brought.

7          And here, this is where the point about the

8    statements comes into play.  Mr. Heart's stark disclosures

9    make any fraud claim impossible.  Mr. Heart clearly disclosed

10   in plain and unambiguous language that people who sent assets

11   to the sacrifice address lost those assets.

12          THE COURT:  Why would they send them?  What is the

13   earthly purpose of sending money to lose money?

14          MR. LIFTIK:  Your Honor, the complaint doesn't give

15   us anything on that.  Frankly, I would be speculating if I

16   were to guess why people were doing it.  But what Mr. Heart

17   said, again, we can return to his words, is that he was asked

18   what is the sacrifice.  This is in my declaration, Exhibit C,

19   at page 11.

20          When you say sacrifice, what does it mean?  What is

21   a sacrifice?  Mr. Heart says, you lose your coins.  You don't

22   have them anymore.  For the political statement that you

23   believe free speech is a protected human right and blockchains

24   are speech.

25          THE COURT:  What does that mean?

*Proceedings*                                                    34

1          MR. LIFTIK:  Well, we can't really go beyond his

2     words in the context of a motion to dismiss, but I think what

3     he's getting at is to express one's political belief, here is

4     something you can do, and as a community people are going to

5     be aware of that statement and acknowledge that statement.

6          One imperfect analogy is flag burning.  You can

7     destroy something to make a political statement.  Here, people

8     are choosing to sacrifice assets.

9          THE COURT:  To build a blockchain, right?

10         MR. LIFTIK:  No, Your Honor.  That's expressly not

11    what was said.  This is sort of a key.  We really have to look

12    at what Mr. Heart said.  He said the sacrifice is the coins

13    are gone.  In another place he says, you should have no

14    expectation of profit from the work of others.  You have lost

15    your money.  You have sacrificed it.  It is gone.

16         The SEC themselves, I don't think, can draft a more

17    explicit stark disclosure.

18         THE COURT:  Why is he later in October 8th, for

19    instance, of 2022 talking about things like you're not getting

20    any updates on PulseChain, PulseX, they're done when they're

21    done.  The developers are working on it.  Why is he saying

22    that if someone has just given their money over for nothing?

23    Why is he making those comments?  Why is he talking about that

24    at that point in time?

25         MR. LIFTIK:  Again, the complaint offers us no clue

*Proceedings*                                                    35

1   about that and it's not part of their fraud claim.  I think we

2   have to remember that there are essentially two events that

3   happened.  There's the sacrifice event, and Mr. Heart

4   undertook to build PulseChain blockchain.  And so he's

5   speaking about the updates on the PulseChain blockchain, and

6   the progress that they're making there.

7            THE COURT:  What happens to all the money?  I mean

8   in terms of how you view what the complaint is saying, people

9   are investing all of this money and what is this money

10  supposed to be used for?

11           MR. LIFTIK:  Well --

12           THE COURT:  According to what Mr. Heart is saying.

13           MR. LIFTIK:  Right.  Again --

14           THE COURT:  It doesn't make any sense.

15           MR. LIFTIK:  Certainly it may not be a choice that

16  Your Honor and I may make, but it is a choice that people are

17  free to make and he was very clear with them.  What Mr. Heart

18  did not do is he did not give them a use of proceeds.

19           Mr. Heart did not say if you sacrifice to this

20  address the money will be spent to build the PulseChain

21  blockchain and we're going to spend X amount on coders and X

22  amount on --

23           THE COURT:  Well, even if he had said that, aren't

24  the facts, as at least established in the complaint, even if

25  he had said give me the money I'll build a straight

*Proceedings*                                                    36

1    blockchain, you'll get all these tokens, everybody will be

2    happy, that all happened.  Correct?

3              MR. LIFTIK:  Correct.

4              THE COURT:  And there was never any statement that

5    he wasn't going to take a fee or a cut from this or anything?

6    Even if you viewed the statements as yes, I'm going to develop

7    this, you give me this money, you fight, it's wonderful for

8    free speech, blockchains are free speech, and you might get

9    airdrop tokens, which is at the end of that speech, I might

10   add, even if you viewed that as what he said, he did all of

11   that.  Correct?

12             MR. LIFTIK:  We agree completely, Your Honor.  There

13   was no statements made that he would not spend money, or a

14   very small portion, and the SEC is grasping to turn statements

15   that they don't like into an omissions case.

16             THE COURT:  Your position is a little bit puzzling

17   because you seem to put all your eggs in one basket, which is

18   there's no fraud because he told them they were giving up

19   their money.  That seems to me a little counterintuitive that

20   people would just send money on that understanding.

21             MR. LIFTIK:  If I may, Your Honor, I think there's

22   two elements to our argument.  The first is, where is the

23   omission.  I think Your Honor aptly walked through where is

24   the omission, and our point is the SEC's argument seems to be

25   that can't possibly be what happened.

*Proceedings*                                                    37

1        In fact, they must have known, it must have been

2    said that the money was being used.  So we're just simply

3    drawing out what was actually said, what were the words, what

4    were the disclosures that were made.

5        The second point relates to their attempt to create

6    allegations of deception, and their allegations of deception

7    have to do with back and forth transactions.

8        THE COURT:  Tell me about those.  The mixer

9    transactions, that seemed a little odd.  Tell me why that's

10   not suspect.

11       MR. LIFTIK:  For a very simple reason, Your Honor.

12   In order for an act to be deceptive, you have to be tricking

13   somebody.

14       THE COURT:  You have to be what?

15       MR. LIFTIK:  Tricking somebody.  You have to be

16   hiding something from somebody.  The SEC alleges that mixers

17   are used to anonymize transactions.  Well, these are all

18   blockchain transactions.

19       So anyone can see assets being transferred into that

20   mixer.  If everyone knows that mixers are used to anonymize

21   transactions, then what you see on the blockchain is assets

22   going into a mixer and it is apparent that it's being used to

23   anonymize for whatever reason.  But there's nothing inherently

24   deceptive about using a mixer.

25       Same with the back and forth transactions.  These

*Proceedings*                                                          38

1    are all visible on the blockchain.  It's almost impossible to

2    deceive people about blockchain transactions when you can see

3    them in the blockchain when you look at the code.  That's very

4    different than the cases that the SEC relies on like *Sugarman,*

5    where they're setting up shell entities to hide who owns an

6    entity.

7         *Sugarman* is very interesting because what they do

8    there is there's an Irish company with a very Irish name based

9    in Ireland that they're going to be selling assets into.  And

10   it's alleged that what they do is set up a Nevada corporation

11   with the exact same name, and they trick the investors to send

12   the money to the Nevada corporation instead of to the Irish

13   corporation.

14        There is nothing akin to that here.  It's very plain

15   on its face what's happening with the assets.  Mr. Heart was

16   very clear that nobody should expect anything.  They're

17   sacrificing as a free speech statement, and then things happen

18   to the assets, that a small portion of the assets were sent to

19   the --

20        THE COURT:  The assets that they allege, the SEC

21   alleges, though, that as a result of all these mixer

22   transactions they ended up in a wallet that was Mr. Heart's

23   private wallet.  Have I got that right?

24        MR. LIFTIK:  They don't actually allege who owns the

25   private wallet, I believe, but they do eventually allege

*Proceedings*                                                    39

1    transactions in various goods, watches, and cars.  Again, here

2    is where the chronology becomes important because the

3    statements --

4              THE COURT:  They do allege that it went into a

5    wallet controlled by Mr. Heart.  Correct?

6              MR. LIFTIK:  They allege in their fraud claim.

7              THE COURT:  That's what I'm talking about.

8              MR. LIFTIK:  Correct, Your Honor.  They allege that

9    the assets -- it was not disclosed that the assets would go to

10   a private wallet address, as if there was a disclosure

11   obligation to disclose that after the period was over some

12   amount of the assets would be sent to a private wallet.

13             Again, there is no affirmative duty to disclose on

14   which SEC can pin their allegations.  There's an

15   understanding, a plain statement, there is no omission, they

16   don't touch the topic of how assets would be spent.  And so

17   one of their claims is it was not disclosed that assets would

18   be immediately transferred from the PulseChain Sacrifice

19   address to the private wallet.  There is no disclosure

20   obligation for that.

21             The other important point is the chronology, which

22   is that the alleged mixer transaction and alleged back and

23   forth, does not happen until January of 2022, well after the

24   alleged purchase of the goods that they are --

25             THE COURT:  I have to say I was confused.  Maybe

*Proceedings*                                                    40

 1   this question goes to the SEC, as opposed to you, but there

 2   was some footnote that suggested that there were funds taken

 3   out, or this mixing happened throughout the course of the -- I

 4   didn't understand the footnote, quite frankly, but I'm not

 5   sure it was your footnote.

 6               MR. LIFTIK:  Your Honor, I think you're right.  The

 7   chronology, which you have before you, is the PulseChain

 8   Sacrifice period, even unofficially extended goes to the end

 9   of April 6, 2022.  The complaint alleges that these various

10   goods were purchased starting in August.

11               THE COURT:  August of when?

12               MR. LIFTIK:  August '21.

13               THE COURT:  When did the period begin?

14               MR. LIFTIK:  The period began in July of 2021.

15               THE COURT:  So I mean it could be that he took out

16   the initial assets that were being deposited.

17               MR. LIFTIK:  It's not in the complaint.  I would

18   also point out the other -- that the SEC has in their

19   opposition raised a new theory.  And obviously you can't

20   demand in your opposition and so --

21               THE COURT:  What new theory do you see them raising?

22               MR. LIFTIK:  The new theory I see is the theory

23   about adding another statement about money going to charity,

24   and we can walk through that but it's not in their complaint.

25               THE COURT:  That was the statement about where the

*Proceedings*                                                    41

1    money wasn't going.  There wasn't a statement about where

2    money was going.  It was a statement about where money wasn't

3    going.  Correct?

4             MR. LIFTIK:  Well, again, what they've done is

5    they've quoted it out of context.  And the question, the

6    specific question, was so the money that is raised by

7    PulseChain, essentially, for the most part goes to charity.

8    And Mr. Heart says no, they're different.

9             If you go to SENS.org and send them an email, some

10   of it went to charity, 26.5 million is done as money in the

11   bank.  And then it goes on to say but it's not the .5 billion

12   that you see on those other sacrifice addresses.

13            Those addresses, to the best of my knowledge, do not

14   go to charity.  Right there on the web site it says, you have

15   no expectation of profit from the work of others.  So to the

16   extent that 26.5 million did go to charity, that's a true

17   statement.

18            THE COURT:  That was 26.5 million of funds of

19   PulseChain that went to charity?  I haven't heard that before.

20   So I'm just --

21            MR. LIFTIK:  This is the problem with amending

22   through the opposition, Your Honor, it's not laid out.  But

23   they do raise this statement and there is money that was sent

24   to a different address that was designated for charity.

25   But --

*Proceedings*                                                    42

1          THE COURT:  Well, I guess this is outside the

2     complaint, I take it.

3          MR. LIFTIK:  Yes.

4          THE COURT:  Did you have anything you wanted to add

5     or I can hear from the SEC on the question of fraud.

6          MR. LIFTIK:  Reserving to reply, yes, Your Honor.

7          THE COURT:  Counsel, you're going to take this

8     issue?

9          MR. GULDE:  Yes, Your Honor.  Thank you.

10          Your Honor, it's not that the SEC's conceded that

11     we're only seeking a fraud scheme.  We're seeking a fraud

12     scheme as set forth in the complaint.  We only sued Mr. Heart

13     under Section 17(a)(1) and (2) and Rule 10b(a) and (c).

14          So there's no concession.  It's what we set out to

15     do.  To support the fraud scheme, we do have an omission.  We

16     have kind of deceptive movements.

17          THE COURT:  What is the omission?  The omission is

18     what, that I didn't say I was going to spend some of the money

19     on myself?

20          MR. GULDE:  The matrix initiatives, which they cite,

21     says disclosure is required under these provisions of the U.S.

22     securities laws when necessary to make statements made in

23     light of the circumstances under which they were made, not

24     misleading.

25          THE COURT:  What statement did he make that made the

*Proceedings*                                                    43

1    failure to disclose that he was going to use assets

2    misleading?  What affirmative statement did he make that using

3    the assets made misleading?

4              MR. GULDE:  Number one, when he was talking about

5    while he was raising money for the PulseChain offering,

6    lamenting publicly in response to PulseChain investors who

7    were frustrated, apparently, about the timeline of the roll

8    out, stuff is hard.  He's saying the software development in

9    connection with PulseChain was hard, that he had a team of

10   developers working on PulseChain, and that investors would

11   have to wait.  That's one example.

12             THE COURT:  You glean from that that he's telling

13   them that I'm using your assets to develop PulseChain?

14             MR. GULDE:  I'm saying that that is an example of a

15   statement made, which under the circumstances to omit the fact

16   that in January 2022 he had already used millions of their

17   dollars directly.

18             And by the way, Heart sets himself out as a mega

19   millionaire.  He's not using his prior Bitcoin money.  He's

20   using money that's directly traceable to what's just coming in

21   from PulseChain investors to buy luxury goods for himself like

22   cars, watches, and ultimately the biggest black diamond in the

23   world, not to hire more developers, not to pay developers for

24   overtime, not to hasten or at least split among these.  And it

25   is misleading, in this context, to talk about the development

*Proceedings* 44

1    and not also mention that he's doing that.

2         He's spending PulseChain investor funds as soon as

3    it hits his hand.  That would have altered the total mix of

4    information available to investors, and we point to a specific

5    Brooklyn investor that told us he expected Heart to use the

6    PulseChain funds to actually develop PulseChain.

7         THE COURT:  PulseChain was developed.  Correct?  And

8    people got, some investors got tokens.  So why didn't he do

9    what he said he was going to do?  How is it fraud if you do

10   what you say you're going to do?

11        MR. GULDE:  PulseChain was eventually released.  As

12   evidenced by these conversations that he's having with

13   PulseChain investors, clearly not released as fast as they

14   wanted it.  The comment I just made, I mean he's giving an

15   exasperated response to the PulseChain investors saying we're

16   going as fast as we can.  I hired developers.  We're working

17   on this.  And so while PulseChain --

18        THE COURT:  Have you alleged those statements are

19   false?

20        MR. GULDE:  We have alleged in our complaint those

21   statements, and I believe that that statement is rendered

22   misleading by the omission of the statement that -- the

23   omission of disclosure that at the exact same time he is, in

24   fact, using millions of those dollars, their dollars, directly

25   for personal luxury purchases, Rolexes, McLaren, Ferrari, and

*Proceedings*                                                45

1    a black diamond.

2              There's one thing that Mr. Liftik said that I really

3    have to address, and Your Honor was hinting towards it.  Heart

4    spent a lot of time arguing that these are not investor funds

5    and there can't be any expectation about the use of these

6    funds, you know, harking again to *Howey,* and an example of how

7    Heart is speaking into the United States, by the way, because

8    otherwise it would not have been relevant.  And we're talking

9    about this interview.

10             THE COURT:  Which interview are you talking about?

11             MR. GULDE:  The one they included as Exhibit C, and

12   they cite at page 11 -- I'd like to focus on pages 11 and 13,

13   also.  But it's got that language in there.

14             THE COURT:  Is this the Miami interview?

15             MR. GULDE:  This was a You Tube interview.

16             THE COURT:  Okay.

17             MR. GULDE:  I don't believe he's in the United

18   States when he gave this.  He says those words.  He says,

19   there's sacrifice, lost and gone, with no expectation from

20   this sacrifice.  This is worth unpacking, number one, because

21   it's obviously not true.  He directly contradicts himself

22   afterwards and because, also, Heart relies on this idea of

23   loss and gone repeatedly throughout the briefing.

24             THE COURT:  Do you allege anywhere in your complaint

25   that these were false statements that he made?

*Proceedings*                                                             46

1          MR. GULDE:  Throughout the complaint the idea that

2     he's alleging that PulseChain Sacrificers sacrifices were not

3     going to his personal use, that concept.

4          THE COURT:  He doesn't say that anywhere, that I'm

5     not going to take, I don't know what you want to call it, a

6     fee or anything else.  He doesn't tell any of the investors

7     that he's getting nothing out of this.  This is not like a

8     fraud where you say to the investors, all this money is going

9     to this charity, I'm not taking a bit of it and then it turns

10    out that money is taken, and the next thing you know you're

11    spending four months in jail.  It's not that case.

12         MR. GULDE:  It is not that case, Your Honor.  You're

13    right.  This is a case where the things he's saying are

14    rendered misleading by him not also saying, by the way, you

15    probably want to know that I'm spending your money as soon as

16    it hits my hands on these cars.  So the briefing --

17         THE COURT:  Does it make any difference what he

18    spent the money on?  The question is, could he take money out?

19    Was he permitted to take money out?

20         MR. GULDE:  It makes a difference if he spent it on

21    the enterprise or not.

22         THE COURT:  I understand that.  But if he took out

23    personal money, you keep emphasizing that.  If he is entitled

24    to money, and I know you dispute that, and he takes money out,

25    it doesn't really make any difference the nature of the

Case 1:23-cv-05749-CBA-PK   Document 56   Filed 11/13/24   Page 47 of 70 PageID #: 826

*Proceedings*                                                              47

 1   purchases that he made, as long as he was permitted to take

 2   some money out if he took it out as a fee.

 3          MR. GULDE:  In one sense, no, and I don't disagree

 4   with that.  In another sense, Your Honor could consider it in

 5   terms of we're not talking about subsistence goods.  He's not

 6   Jean Valjean over there stealing a piece of bread.

 7          I want to speak simply about Exhibit C where they

 8   quote Mr. Heart as -- and he's explicitly very thoroughly

 9   implicitly referring to *Howey* and saying, you should have no

10   expectation of profit from the work of others, you've lost

11   your money, you sacrificed it.  But then in the very next

12   breath he says, lucky you, if you get an airdrop of 10,000

13   Pulse per each dollar value of sacrifice that you performed

14   weighted against that rate I was telling you about.

15          And then he goes on to talk more about multipliers

16   and how lucrative PulseChain might be for these folks.  Heart

17   cannot claim that these sacrificed funds are lost and gone in

18   one breath, and then turn right around in the next breath and

19   tell investors what they're getting for their exchange.  It

20   gives up the whole joke here.

21          THE COURT:  Did you mention this added paragraph in

22   your brief?  I don't remember.

23          MR. GULDE:  We pointed to the exhibit in the

24   exchange, I believe, but I don't think we talked about the

25   "lucky you" paragraph.

*Nicole Sesta, RPR, RMR, CRR*
*Official Court Reporter*

*Proceedings*                                                              48

1          That idea, when we talk about tongue and cheek, and

2    we're a little bit mock to the idea that you can't rely on him

3    and then also call his statements tongue and cheek, I'm

4    certainly responding to that argument by saying we can hold

5    Mr. Heart to his words and we can point out obvious

6    contradictions when they exist.

7          PulseChain was still being developed at this time

8    and so Heart is speaking about an investment in the

9    enterprise.  PulseChain hadn't been released yet.  By his own

10   words, he was still developing PulseChain.

11         So Heart is simply not being serious when he says

12   PulseChain funds are lost or gone.  It's another example of

13   him not being honest with investors.  So not only did Heart

14   use millions of this PulseChain investor money for himself,

15   not only did he misleadingly omit this information from

16   investors, but he also took this money through a series of

17   back and forth transactions.

18         THE COURT:  Those were all public transactions,

19   though.  If someone wanted to take the time, I take it, it

20   would have been publicly available.  They could have seen what

21   was happening.

22         MR. GULDE:  I don't think that's true as to where

23   they end up.  So I don't think it's as transparent as Heart

24   would have you believe, the result of these 2022 back and

25   forth transactions, and also the use of a crypto asset

1    mixture.

2              One reason is because we don't have full information

3    about who owns the addresses.  So even if there's public --

4    even if they're open to the public, you don't know who is

5    transacting.  Again, we return to when Mr. Heart is talking

6    about, in the briefing, why these can't be deceptive acts,

7    these back and forth transactions.  He goes back to the idea

8    of lost and gone.  You can't have deceptive transactions about

9    money that you had no expectations about to begin with.

10             We've already discussed that.  Lost and gone are

11   effectively a sham, part of Mr. Heart misleading us here.

12   Heart immediately retracts it with a little bit of a wink and

13   a nod saying lucky you, if you get all these Pulse out of the

14   deal.

15             We have alleged a reasonable investor would expect

16   Heart to use the funds to develop the enterprise, and we've

17   alleged a Brooklyn investor believed that.  Now they poke

18   holes on the Brooklyn investor and they point to the *National*

19   *Elevator* case that talks about needing to establish a

20   confidential witness' reliability, saying we haven't done

21   that.  That case is definitely not this case.

22             The four confidential witnesses in that case, they

23   needed more specialized knowledge to testify about the things

24   that are being quoted on.  It was pointed out that they had no

25   routine interaction with the particular corporate project at

*Proceedings*                                                        50

1    issue.  They had no firsthand knowledge of facts contradicting

2    the executive of the company's public statements.

3           Here, the only bona fide that matters is that the

4    Brooklyn investor was an investor in PulseChain, and we have

5    alleged that.  So, Your Honor, we have deceptive conduct.

6           THE COURT:  The greatest number that you have

7    alleged is not in the complaint, but I recognize you could

8    amend the complaint to add it.  But you have not alleged

9    anything more than ten U.S. investors.

10          Am I correct about that?

11          MR. GULDE:  As written in the complaint, yes, Your

12   Honor.

13          THE COURT:  I don't think that's even in the

14   complaint.  That's all you have.  Right?

15          MR. GULDE:  Maybe we should get a show of hands from

16   the folks in the gallery.

17          THE COURT:  I would just as soon not.

18          MR. GULDE:  Yes, Your Honor, you're right.  We have

19   only alleged that.  As I sit here today, of course, I believe

20   many more than ten.

21          THE COURT:  How does that relate when we talk about

22   going -- there's an argument that's been made, and perhaps

23   counsel needs to articulate the argument quite apart from the

24   fraud argument and quite apart from the *Howey* argument, about

25   whether these are investment contracts that meet the *Howey*

*Proceedings*                                                        51

1   test.

2          There's more of a preliminary argument about whether

3   these are domestic securities transactions.  And let me ask if

4   counsel wants to address that issue, because that seems to be

5   a fairly significant issue.

6          MR. LIFTIK:  Your Honor, we can talk about the

7   *Morrison* issue, but before we go there, I do feel like I need

8   to address a couple of points that Mr. Gulde made.  It's a

9   little hard because it almost sounds like the complaint is

10  being amended in real-time.

11         We know that they didn't like that the assets are

12  gone, the language, because it doesn't anywhere appear and, in

13  our opinion, it's false.  Here's the key, the chronology.  Mr.

14  Gulde spent a bit of time talking about the October 8th

15  statement.  If Your Honor draws your attention to the chart

16  that we made, it's literally off the chart.  That is in

17  October of 2022.  And even under the most expansive version of

18  the SEC's view of the sacrifice period, that ends in April 6,

19  2022.  So again, similar to the argument --

20         THE COURT:  As it pertains to the fraud.

21         MR. LIFTIK:  As it pertains to the fraud.

22         THE COURT:  It's not past the fraud, the theory of

23  the fraud case.  Correct?

24         MR. LIFTIK:  I believe it is, Your Honor.  If the

25  sacrifice period ended April 6, 2022, how is a statement made

*Proceedings*                                                                52

1    six months later relevant to decisions that purchasers or

2    sacrificers were making six months before?

3                Again, this is why we started with the theme of the

4    chronology.  The way they conflate events with when things

5    happen is really important here.  We want to turn to *Morrison*.

6    We can also do that.  The other point that is very clear, as

7    Your Honor notes, that ultimately the PulseChain was built and

8    there's certainly no allegation about there were insufficient

9    funds to purchase it.  There was a significant amount of money

10   that went to the sacrifice address, and only a fraction of

11   that is alleged to have been spent on the items that are in

12   the complaint.  So we can turn to *Morrison*.  And Mr. Kirk, do

13   you want to address that?

14               MR. KIRK:  Yes.  Thank you, Your Honor.  I'll speak

15   for just a couple of minutes on *Morrison* and their obligation,

16   the SEC's obligation, to plead domestic security transactions.

17               THE COURT:  Because that's the end of the game.  If

18   there's no domestic security transactions, that's it.

19   Correct?

20               MR. KIRK:  That's correct, Your Honor.  And we think

21   there's neither personal jurisdiction, nor domestic securities

22   transactions.  Those are two equally valid ways out.  We think

23   that, again, it's not disputed that *Morrison* applies here and

24   that it's the SEC's burden to plead adequate --

25               THE COURT:  Well, *Morrison*, it's disputed whether

*Proceedings*                                                    53

1    *Morrison* applies to the fraud claim.  Correct?

2                MR. KIRK:  That's correct.

3                THE COURT:  That is disputed.

4                MR. KIRK:  That is disputed.  You're absolutely

5    right, Your Honor.  So focusing -- and I apologize.  I'll

6    focus on Section 5 for a moment.  On the Section 5 sales

7    claims, we don't think the allegations in the complaint even

8    do the bare minimum.

9                The only thing they say, the only allegation at all,

10   is that some unspecified number of U.S. persons participated

11   in these alleged transactions.  That's not enough as a matter

12   of law because in *Absolute Activist* the Second Circuit said,

13   and I'm quoting, the parties' residency or citizenship is

14   irrelevant to the location of the given transaction.

15               It also says:  The mere assertion the transactions

16   took place in the United States is insufficient to adequately

17   plead the existence of domestic transactions.  That's at page

18   70 of *Absolute Activist*.  The *City of Pontiac*, which involved

19   U.S. purchasers, made clear that even alleging the U.S.

20   persons placed transactions from the U.S. is not enough.  The

21   SEC here didn't even do that.  It just says there are some

22   unspecified number of U.S. persons.

23               I think if those allegations were enough, then we

24   would be back to a citizenship or residency test, which isn't

25   what *Morrison* calls for.  I think there's just not enough meat

*Proceedings*                                                           54

1   on the bone, Your Honor.  I'm not even sure there is a bone.

2           The only thing they do to try to save that problem

3   is they invoke the recent decision in *Williams versus Binance*.

4   The problem is none of the facts that animated the Court in

5   *Williams* are present here.  In that case you have transactions

6   with U.S. users that were allegedly matched on the defendant's

7   servers located in the U.S., and in addition, the transactions

8   became irrevocable when they were sent in the U.S. pursuant to

9   express terms of service.  Again, nothing like that is present

10  here.  The Court also relied on what it called an interrelated

11  reason.

12          THE COURT:  Do you think that's an independent

13  basis?  That's not clear from the decision to me.  When it

14  calls it interrelated, can it stand by itself?

15          MR. KIRK:  Your Honor, my reading of *Williams,* and

16  obviously everyone will have a slightly different gloss, my

17  reading is that both of these things are what got the Court

18  there.  The reason is, the Court clearly said there might be

19  some cases where allegations about servers that were based in

20  the U.S. might not be enough.  The Court went on and it went

21  on to describe, I think, the allegations in that case that the

22  Second Circuit found troubling, for lack of a better word, and

23  that is that the defendant entities, according to the Second

24  Circuit, had expressly disclaimed having any location and

25  notoriously disclaimed being subject to any country's

*Proceedings*                                                                55

1    regulation.

2            A couple of quotes.  They said:  *Binance* expressly

3    disclaims having any physical location, foreign or otherwise.

4    The Court also noted that the government of the defendants'

5    headquarters in Malta had actually disclaimed having any

6    regulatory authority over the defendant.

7            THE COURT:  What would be the equivalent in this

8    case of Malta and *Binance*.

9            MR. KIRK:  Your Honor, it's a little bit difficult

10   because we have so few allegations in this complaint.  The one

11   thing we have is that Mr. Heart is alleged to be a resident of

12   Finland.  Finland has financial services authority.  I dare

13   not say the Finnish version of it.  I would butcher the

14   pronunciation.  But it's alive and well and it's a regulatory

15   authority.  They have other regulatory agencies, as well.

16           Of course it doesn't mean they're going to chose to

17   regulate blockchain technology the same way that the United

18   States must, or that the SEC is at the moment.

19           But, you know, that said, they've alleged that Mr.

20   Heart lives in a foreign country.  They've alleged that that's

21   where he developed and launched this software, that's where he

22   spoke about it on the internet, that's where he made what the

23   SEC is characterizing as promises to users.  We disagree with

24   that, of course.  But all of that is happening from Finland.

25   So, Your Honor, there aren't enough allegations here and I

*Proceedings*                                                    56

1   think we can stop the work there.  But as best as I could

2   piece it all together, the only reasonable nexus would be that

3   these are activities happening in Finland, or at least

4   certainly not in the United States.

5           Again, the SEC tries to compare this to *Williams.*

6   But Mr. Heart is a human being.  He certainly doesn't lack a

7   physical location.  He certainly hasn't disclaimed having one

8   and, again, no allegation that the Finnish government has

9   disclaimed any responsibility for him.  The only comparison

10  that the SEC really can draw between this case and *Williams* is

11  that they both involve blockchain technology.

12          In the SEC's brief, as I read it, they seem to be

13  suggesting that if transactions occur on a decentralized

14  blockchain ledger, then they have no location under *Williams*

15  and they should default to the U.S.  I don't actually think

16  that's what *Williams* said at all.  I think the Court in

17  *Williams* wasn't concerned so much with the decentralized

18  blockchain ledger as with a decentralized defendant.

19          Again, it was saying the defendant itself disclaims

20  having any location.  I think the fact the transactions are

21  recorded on a decentralized ledger isn't really part of the

22  analysis, and if it were, it would mean anytime you used

23  blockchain ledger technology, as opposed to servers, or pen

24  and paper, or whatever, to record transactions, then you would

25  automatically get to default to the United States.  I don't

*Proceedings*                                                          57

1    think that's the outcome that *Williams* intended.

2            THE COURT:  What about the 5(c) offer, the analysis

3    there?

4            MR. KIRK:  So thinking about that, the clear result

5    under the case law is that it's the location of the offerer

6    that's relevant.  Here, according to the SEC, that's Mr.

7    Heart.  I'm not agreeing that he made offers, but it would be

8    the location of Mr. Heart that matters.

9            And that was established and made clear by the Court

10   in *Ripple*, and it was also established many years before by

11   the Court in the Goldman Sachs case.  We quote both of those.

12   And I'll note those are both cases brought by the SEC.  And in

13   both of those cases the SEC was very happy with the result

14   that it's the location of the offer that we look at.

15           That was the test and they were pleased with that

16   result because the offerer in both cases was based in the

17   United States.

18           What troubles me a little bit is now the shoe is on

19   the other foot.  There's a person outside the United States

20   making statements and so they say, oh, well, maybe it should

21   be a different test.  Maybe now we should base it on where

22   offers are heard.

23           Again, that's not supported by any case law in this

24   circuit and, in fact, *Absolute Activist* actually noted that

25   even allegations about heavy marketing in the U.S. or U.S.

*Proceedings*                                                          58

1   persons being effected, again, we don't have marketing in the

2   U.S., *Absolute Activist* says that sort of thing might satisfy

3   conduct in effect, but not what *Morrison* calls for, a

4   transactional test.

5           We also think there is no factual basis for this

6   theory because, again, they don't actually provide any

7   particulars of who heard what and where they heard it.  The

8   only law that they cite is a recent case from the Western

9   District of Texas called *SEC versus Balina*.  It's an out of

10  circuit case recently accepted for interlocutory appeal.

11          And in addition to not being anything binding on

12  this circuit, it's also a very unusual set of facts that are

13  not present here.  The defendant in *Balina* was a U.S.

14  resident.  He knowingly built up an investment information

15  group with other U.S. participants, along with people from

16  elsewhere in the world.  So there's no personal jurisdiction

17  issue.  He's a U.S. resident and he leaves the U.S. on a two

18  month road trip to learn about and promote cryptocurrencies,

19  and in the meantime, he is, according to the opinion,

20  expressly beaming back his information and promotions to his

21  U.S. audience.

22          So he goes away for two months and then he comes

23  back to the country when he's done.  And the Court said it

24  didn't want to encourage people to do what the defendant did

25  by quote, temporarily leaving the United States to evade

*Proceedings*                                                        59

1    United States securities regulations while targeting United

2    States investors and United States financial markets.  There's

3    nothing similar here at all.

4            THE COURT:  All right.  Thank you.  Let me just take

5    up one separate issue, and then I'll hear from the SEC with

6    response to both of those arguments.  And this deals with the

7    *Howey* argument.  And I admit to being a bit confused by what

8    position Mr. Heart is advocating on the Court with respect to

9    the *Howey* analysis.

10           You said you're not making an argument that the

11   PulseChain, Hex, PulseX don't satisfy the *Howey* test.  You're

12   saying that there's some sort of preliminary finding that has

13   to be established prior to.  You get to the *Howey* test about

14   some continuing obligation, and I don't know where that is in

15   the law.

16           MR. LIFTIK:  Your Honor has accurately described our

17   argument.  The argument is before we march our way through the

18   *Howey* elements, you have to have a preliminary inquiry.

19   Frankly, at some point in time on a full record after full

20   discovery we would be happy to argue the *Howey* elements.  But

21   on a motion to dismiss standard, we'd be arguing facts and

22   that's obviously not appropriate.

23           But the federal securities laws define certain

24   things as securities.  Stock, bonds, ventures, notes, et

25   cetera.  One of those terms is an investment contract.  That

*Proceedings*                                                    60

1    language has to have meaning.  The investment contract.  Now,

2    *Howey* defines how do you know once you have an investment

3    contract, that's the box we're in, how do I know if I have a

4    security.

5              Our argument is, essentially, it's not clear to us

6    and we think under these facts as alleged, we're not even in

7    the investment contract box.  Now, why is that?  You could

8    even use a little bit of *Howey* to get there.  *Howey* says --

9              THE COURT:  Well, most of the cases that you cite

10   use a lot of *Howey* to get there, don't they?  They're mainly

11   *Howey* cases examining the third element.

12             MR. LIFTIK:  Well, they are, Your Honor.  Here's the

13   challenge.  Before these crypto cases came about, the stream

14   of crypto cases, nearly every single *Howey* test, *Howey* case,

15   actually involved a contract.  It's maybe not formally

16   written, maybe it's an oral representation, but nobody is

17   disputing that there is actually a contract, a binding

18   agreement, or some type of agreement between two parties.

19             What is challenging and unique about crypto and

20   about these transactions at issue here, the argument is there

21   is no contract, there is no agreement, there is no connective

22   tissue between someone sitting in their house choosing to

23   execute the Hex code, execute against the Hex smart contracts,

24   get back Hex tokens and anyone else.

25             *Howey* refers to transactions scheme or contract, and

*Proceedings*                                                                 61

1   our essential argument is there are none of those.  If there

2   is no transaction scheme or contract, we don't do the *Howey*

3   analysis.  We're not in the investment contract box.

4            THE COURT:  There had been a series of cases that

5   analyze cryptocurrency under the *Howey* test and, in fact, find

6   that it's met the term investment contract.

7            MR. LIFTIK:  I don't disagree.  Obviously there is

8   limited appellate authority here, and we believe that the

9   argument still has merit, even if other courts disagree.  But

10  I think one of the other key aspects, if you look at some of

11  the examples, for example, the *Telegram* case which counsel

12  mentioned, you look at what happened in *Telegram* and there

13  actually was a contract initially.

14           The investors made an investment.  Telegram said

15  they were going to develop the TON blockchain and that at some

16  future period of time, they would release the TON blockchain

17  and the TON tokens.  So it was pretty apparent, putting aside,

18  again, the elements of the *Howey* test, that there was some

19  kind of agreement and some kind of continuing obligation that

20  Telegram had took on.

21           Our argument here is if you look at the facts as

22  alleged, Mr. Heart made no promises, no undertakings to do

23  anything in the future.  Once Hex was launched, fully built,

24  anyone was free to either engage with that smart contract on

25  their computers or not engage with that smart contract.

*Proceedings*                                                      62

1    If Mr. Heart the day after Hex launched had decided

2    to never go on You Tube again, never do anything related to

3    Hex, and go into a completely different line of business, that

4    would not have violated -- there would be no standing for a

5    fraud claim.  It was launched fully built.

6    He never said he was going to maintain the code.  He

7    never said I was going to make apps available on the smart

8    contract.  On Hex that doesn't work, but on PulseChain, never

9    said I'm going to go build apps on PulseChain.  Without any

10   kind of continuing, individuals who are simply choosing to

11   interact --

12   THE COURT:  Hex was being transacted on a secondary

13   market and, obviously, if it went up on the secondary market,

14   that would be important to investors.

15   Wasn't he at the Hex conference and touting?  This

16   is after the period ends, but he's touting how great Hex is.

17   Isn't that continuing on to promote Hex, if you will?

18   MR. LIFTIK:  Well, I think simply speaking and

19   saying I think this is a cool program, and let me explain to

20   you how it works, is very different from saying, I have a

21   continuing obligation here to make sure the code works, to

22   continue to refine it, to make it better.  It's very different

23   than the vast majority of the crypto cases that the Commission

24   has brought.

25   THE COURT:  Okay.  Thank you.  Does counsel for the

*Proceedings*                                                              63

 1  SEC wish to respond to the two arguments that were raised?

 2  And if there's any short rebuttal, I'll hear it.

 3          MR. KURUVILLA:  First, Your Honor, just to address

 4  the points regarding *Morrison*, it's our position that we have

 5  alleged, the SEC has alleged domestic transaction that meets

 6  the *Morrison* test and the test articulated in *Absolute*

 7  *Activist*.

 8          The key inquiry is where was irrevocable liability

 9  incurred.  And that brings both from *Absolute Activist* and

10  also *Williams versus Binance*, which counsel referenced is

11  instructive on this point.

12          In this case we're dealing with a digital --

13  transactions that occurred on a digital blockchain.  So

14  there's even more reason than there was in *Williams versus*

15  *Binance*.  In *Williams versus Binance* the Court articulated the

16  fact that it focused on where orders or where investors sent

17  money from in that case.  The reason that that was the focus

18  of the inquiry was because it was dealing with a digital

19  exchange that disclaimed having a location anywhere, or

20  disclaimed having any presence in any foreign jurisdiction.

21          Here we're dealing with a fact pattern that actually

22  makes that even more significant here, because these were

23  transactions that did not occur over an intermediated exchange

24  of any type, foreign or domestic.

25          THE COURT:  Where did they occur?  Have you

*Proceedings*                                                        64

1   sufficiently alleged where it took place to suggest that they

2   were irrevocably bound within the United States?

3              MR. KURUVILLA:  Well, what we've alleged is that

4   investors sent funds to a digital wallet address on the

5   blockchain, and we have alleged that.

6              THE COURT:  Where is the blockchain?

7              MR. KURUVILLA:  It's --

8              THE COURT:  Where does it live?

9              MR. KURUVILLA:  The blockchain itself is not located

10  in the United States.  But our position --

11             THE COURT:  Didn't it become -- not become

12  irrevocable until it hit the blockchain?

13             MR. KURUVILLA:  Well, no, it becomes irrevocable --

14  it can become irrevocable in -- a transaction can become

15  irrevocable in multiple places.

16             THE COURT:  What if you allege to tell me where that

17  happened here?

18             MR. KURUVILLA:  Here, where the investor in the

19  United States became irrevocably bound is when they sent their

20  funds to the wallet address.  One thing that underscores

21  that --

22             THE COURT:  How did they do that?

23             MR. KURUVILLA:  They transferred crypto assets.

24             THE COURT:  They transferred ETH from where to

25  where?

*Proceedings*                                                    65

1          MR. KURUVILLA:  ETH from their wallet address to a
2   wallet address.

3          THE COURT:  Where was their wallet address?

4          MR. KURUVILLA:  Again, the wallet address exists on
5   a digital blockchain.

6          THE COURT:  Which takes me back to, where is the
7   digital blockchain?  How do I know this is all happening in
8   the United States?

9          MR. KURUVILLA:  Well, we have alleged that investor
10  that's in -- that's, again, located in the United States
11  sending their funds from --

12         THE COURT:  It's not enough that the investor is in
13  the United States, though, correct?  That fact alone is not
14  sufficient.

15         MR. KURUVILLA:  The investor is physically present
16  in the United States with -- again, this was *Williams versus*
17  *Binance.*  The investors were located in the United States
18  sending funds over a digital --

19         THE COURT:  But they found that there was some
20  matching transaction that occurred within the United States.

21         MR. KURUVILLA:  Right.  We don't have that fact here
22  because, again, we're not dealing with an exchange.  Again,
23  *Williams versus Binance* looked at two different ways where
24  someone could incur irrevocable liability.

25         THE COURT:  Is it your burden to show, at least on

*Proceedings*                                                                 66

1   the allegations of your complaint, to establish that?  Isn't

2   it your burden to show me that and how do you do that?

3              MR. KURUVILLA:  Well, I think we do that using the

4   same analogous facts that are here that are analogous to

5   *Williams versus Binance,* which is an investor located in the

6   United States that's sending funds, their funds, from the

7   United States over, again, a digital platform but they're

8   originating from the United States.  At that point the

9   investor becomes bound to the transaction at the point.

10             And, again, Mr. Heart, as I think we've referenced

11  earlier today, referred to at least with regard to PulseChain,

12  the sending of these funds as sacrifices.  In other words,

13  underscoring the point that once they had been sent, the funds

14  have been committed.

15             THE COURT:  So you say take him at his word that

16  they're sacrifices?

17             MR. KURUVILLA:  No, Your Honor.  I think it

18  underscores the point, just as it would be if someone was

19  making an investment that wasn't called a sacrifice, that once

20  they're paying for something, once they've sent their order,

21  once they've sent the funds, they are committed to the

22  transaction.  And that's the inquiry under *Williams versus*

23  *Binance.*

24             We think we've met it here, and that we've pled a

25  domestic transaction, we've pled a Brooklyn investor, of

*Proceedings*                                                      67

1  course, in the complaint.  We think that satisfies the

2  standard that was set out in *Williams versus Binance* and

3  *Absolute Activist*.

4             THE COURT:  Thank you.  I don't know if anyone

5  wanted to speak to the *Howey* issue or not.

6             MR. KURUVILLA:  Yes, Your Honor.  As far as the

7  notion that there is a continuing obligation, or that *Howey*

8  requires some kind of contractually grounded obligation, that

9  argument has been rejected by multiple Courts that have

10 considered it.

11            There has been -- the test for *Howey* is clear.  It's

12 set forth in the *Howey* case, investment money and the common

13 enterprise with an expectation of profit from the efforts of

14 others.

15            And I don't know where they're finding this

16 contractually grounded argument, but if it's in the third

17 *Howey* prong, which is an expectation of profit from the

18 efforts of others, the test there and the focus there is what

19 expectations were created by the seller.

20            THE COURT:  Not whether they actually came to

21 fruition?

22            MR. KURUVILLA:  Right.  Yes, and not that they were

23 obligated.  There is no part of the test that obligates the

24 seller to do those things or requires a contract.  It's just

25 what expectations did they create objectively through the way

*Proceedings*                                                          68

1    they marketed the asset, in what expectations they create in

2    the investor that they were going to engage in certain efforts

3    that would result in profit.  That's the focus.

4           There is no requirement.  Every Court that's heard

5    this argument, *Terraform*, *Coinbase,* they've all rejected this

6    notion that there is any continuing contractually bound

7    obligation for the promoter to do anything in connection with

8    the *Howey* test.

9           THE COURT:  Thank you.  Anything that you feel the

10   need to respond to that you don't think you've been given the

11   opportunity to address, since the burden is with you?

12          MR. KIRK:  Your Honor, just very briefly on the

13   *Morrison* point.  They said that the test they need to show is

14   where was irrevocable liability incurred.  Again, there are a

15   lot of factors that the cases look at, like where were servers

16   located, where were orders matched, where was there a meeting

17   of the minds from a contract perspective.

18          And we'd love to dust off our contract case books

19   and get into the details, but there's just none in the

20   complaint at all.  It just says United States persons

21   participated.  It doesn't actually even say that they did so

22   from the United States.  Even if we assumed that were the

23   case, the *City of Pontiac*, footnote 33, says that even placing

24   purchase orders from the United States isn't enough that

25   they've never actually said that that alone is enough for

*Proceedings*                                                        69

1    irrevocable liability.

2            In *Williams,* again, while *Williams* did look to where

3    purchasers in the United States were, it was for very specific

4    reasons of both U.S. servers matching U.S. orders, and, again,

5    like we said, the express disclaimer of the defendant having a

6    location.

7            Again, there just aren't enough facts here for us to

8    actually do that analysis, and that is the SEC's burden.

9    That's the reason we haven't said more on the topic.  There

10   aren't enough facts to have that debate.

11           MR. KURUVILLA:  Your Honor, if I could address the

12   *City of Pontiac* point.  The *Williams* court did distinguish

13   that case because it held that in the *City of Pontiac* they

14   were dealing with transactions that occurred over a foreign

15   Swiss exchange that was regulated by Switzerland.

16           So there, there was an exchange that implicated a

17   foreign regulatory regime, which did not exist in *Williams*

18   *versus Binance* and does not exist here.

19           THE COURT:  Thank you.  Was there anything further?

20           MR. KIRK:  On that point, Your Honor, again, they're

21   talking about transactions on a Swiss exchange.  We don't have

22   enough details, enough allegations, to get into the facts.

23   But from what little they've alleged, it, again, looks like

24   there might be conduct in Finland.

25           The question is not is this a sufficiently regulated

*Proceedings*                                                    70

1   market in another country.  It's is there another country that

2   would have jurisdiction here, and without enough allegations

3   to get into it, it, again, looks to us like that may be

4   Finland but it's certainly not the United States.  I also just

5   wanted to say this sort of comes back to a point we did make

6   in the brief about transactions being predominantly foreign.

7           Again, here the only nexus to the United States is

8   that some unspecified, or maybe it's 10 people in the United

9   States, participated and were involved in the different

10  software programs.

11          If everything else is alleged to have been outside

12  the country from the person who spoke about the software and

13  allegedly took responsibility for launching it, everything

14  else is outside the country.  I think that's all we have on

15  *Morrison*, Your Honor.

16          THE COURT:  All right.  Thank you, gentlemen, for

17  your argument.  I'll reserve decision.

18          MR. GULDE:  Thank you, Your Honor.

19          MR. LIFTIK:  Thank you, Your Honor.

20          (Proceedings concluded at 3:39 p.m.)

21          - - - - - - - - - - - - - - - -

22          I certify that the foregoing is a correct transcript

23  from the record of proceedings in the above-entitled matter.

24  */S/ Nicole Sesta, RMR, CRR*
    *Court Reporter/Transcriber*

25
    *November 3, 2024*

*Nicole Sesta, RPR, RMR, CRR*
*Official Court Reporter*